# EXHIBIT A
# Part 1

**(Complaint and Exs. 1, 2, 3, 4, thereto)**

E-FILED; Baltimore City Circuit Court
Docket: 10/30/2024 6:35 PM; Submission: 10/30/2024 6:35 PM
Envelope: 18628434

IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

**MAYOR AND CITY COUNCIL OF
BALTIMORE,**

              **Plaintiff,**

v.

**AECOM Technical Services, Inc. in its Own
Capacity and as Successor-in-Interest to
and/or Assignee of URS Corporation, Inc.,**

        **Serve:**

        **The Corporation Trust, Incorporated
2405 York Road, Suite 201
Lutherville Timonium MD 21093-
2264**

        **Defendant.**

**Civil Action No.** C-24-CV-24-003665

## COMPLAINT

NOW COMES Plaintiff, Mayor and City Council of Baltimore ("City" or "Plaintiff"), by and through its counsel, TIBER HUDSON LLC, and for its Complaint against Defendant, AECOM Technical Services, Inc. in its Own Capacity and as Successor-in-Interest and/or Assignee of URS Corporation, Inc. ("AECOM" or "Defendant"), hereby states as follows:

## PARTIES

1.     Plaintiff is a municipal corporation organized pursuant to Article XI-A of the Maryland Constitution, and Article VII, § 27 of the Charter of Baltimore City. Plaintiff is authorized by Article VII, § 26 of the Charter of Baltimore City to institute a lawsuit to recover damages suffered by the City of Baltimore.

2.     Upon information and belief, Defendant is a California corporation with its principal office located at 300 Oceangate Suite 700, Long Beach, CA 90802 and local offices at 3600 O'Donnell St., Suite 300, Baltimore, MD 21224.

3.      Upon information and belief, Defendant is registered as a foreign business in Maryland with an address of 2405 York Road, Suite 201, Lutherville, Timonium, MD 21093-2264.

4.      Upon information and belief, Defendant is URS Corporation's ("URS Corp.") successor-in-interest and/or assignee as a result of Defendant's purchase of one hundred percent (100%) of URS Corp.'s shares in or about October 2014.

5.      Upon information and belief, at all times relevant hereto, Defendant is URS.Corp.'s successor-in-interest and/or assignee of URS Corp.'s obligations and/or was in the business of providing construction-related architecture and engineering services in Maryland.[1]

## JURISDICTION AND VENUE

6.      Jurisdiction is proper under Md. Code Ann., Cts. & Jud. Proc. § 6-102(a) because Defendant was organized as a foreign business entity under Maryland law at all times relevant hereto.

7.      Jurisdiction is proper under Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) because Defendant transacts business and contracts to supply services in Maryland.

8.      Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. § 6-201(b) because all causes of action addressed herein arose from the transaction of business in Baltimore City, Maryland and because Defendant expressly consented to venue in Baltimore City Courts.

## FACTUAL ALLEGATIONS

### The Consent Decree

9.      On or about April 26, 2002, the United States of America, acting at the request and on behalf of the United States Environmental Protection Agency ("EPA"), filed a lawsuit alleging

---

[1] URS. Corp. and AECOM Technical Services, Inc. in its Own Capacity and as Successor-in-Interest and/or Assignee of URS Corporation, Inc. are hereinafter referred to as "Defendant" or "AECOM."

that Plaintiff was in violation of Section 309 of the Clean Water Act, 33 U.S.C. § 1219 seeking injunctive relief and civil penalties ("EPA Claim").

10.     In or about 2002, the State of Maryland filed a Complaint in Intervention in the EPA Claim, on behalf of the Maryland Department of the Environment ("MDE") alleging that Plaintiff was in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311 *et seq.*, and Sections 9-322 and 9-323 of the Environment Article, Annotated Code of Maryland ("MDE Claim") ("EPA Claim" and "MDE Claim" jointly "EPA/MDE Claims").

11.     The EPA Claim is based upon allegations of Plaintiff discharging untreated sewage from its sewage collection system to the Back River, Patapsco River, Chesapeake Bay and several smaller bodies of water and other waters of the United States.

12.     The MDE Claim is based upon allegations of Plaintiff discharging untreated sewage from its sewage collection system to the Back River, Patapsco River, and the Chesapeake Bay and several smaller bodies of water and other waters of the State of Maryland.

13.     The parties to the EPA/MDA Claims agreed that it was in the best interest of the public to avoid the expense and delay of litigation and to work cooperatively in an effort to continue to enhance water quality and to minimize future discharges to the extent possible, through an agreed-upon program of improvements to Baltimore's Collection System reflected in a consent decree executed by the parties in or about April 2002 ("Consent Decree"). *See* Ex. 1, Consent Decree at 2.

14.     In the Consent Decree, Plaintiff made no admissions of law or fact, including admissions of violations of any law or regulation, and denied that it willfully or negligently violated any provision of the Clean Water Act and state water pollution control laws.

15.     Plaintiff contended that it acted in good faith in a sincere effort to comply with the Clean Water Act at all times and that any sewage discharges that occurred through the effective date of the Consent Decree were unintentional.

16.     At the time the Consent Decree was executed, Plaintiff's wastewater collection, treatment and disposal system was treating approximately 250 million gallons of wastewater flow each day, which was generated by Baltimore residents and by an even greater population of residents of surrounding suburban counties.

17.     Prior to the initiation of the EPA/MDE Claims, Plaintiff had made a substantial public investment to improve water quality and reduce sewage collection system discharges and, along with the other parties to the EPA/MDE Claims, acknowledged that further investment of public resources was necessary to continue to maintain and improve Baltimore's sewage collection system and to enhance compliance with the Clean Water Act.

18.     Plaintiff agreed to evaluate the collection system and propose to the EPA and MDE a plan for future rehabilitation and other corrective action for each sewershed ("Sewershed Study and Plan").

19.     The Sewershed Study and Plan was required to include specific rehabilitations and/or other corrective actions to address the deficiencies identified by Plaintiff during its evaluation of its sewersheds. Each sewershed study included a schedule for completion of any proposed rehabilitation.

20.     In the Herring Run Watershed, the area in which the project at the center of this dispute is located, Plaintiff agreed to perform the necessary design and construction work to eliminate collection system overflows within a specified period.

21.    Notably, the Consent Decree included stipulated penalties, which were $1,000/day between the 1st and 30th day that Plaintiff failed to achieve a specified milestone, $1,500/day between the 31st and 60th day that Plaintiff failed to achieve a specified milestone and $2,250/day beyond the 60th day that Plaintiff failed to achieve a specified milestone.

**Black and Veatch Herring Run Sewershed Collection System Plan**

22.    In accordance with the Consent Decree, Plaintiff initiated a plan to improve the Herring Run Sewershed collection system ("Herring Run Improvement") and engaged Black and Veatch to perform a detailed analysis of the collection system and prepare a plan to be used as the basis for the overall development and implementation of the Herring Run Improvement.

23.    In or about June 2009, Black and Veatch completed and issued the "Herring Run Collection System Evaluation and Sewershed Plan - #1001," ("Herring Run Improvement Plan") which identified defects and deficiencies in the Herring Run Sewershed storm and wastewater systems and specified improvements intended to eliminate sanitary sewer overflows by providing additional hydraulic capacity and reducing infiltration and inflow.

24.    The Herring Run Sewershed Plan recommended improvements, including "approximately 27,546 feet of CIPP Lining, 523 feet of CIPP Lining and point repairs, 201 point repairs, 800 [linear feet] of pipe replacement, rehabilitating 153 manholes, re-inspections of 323,559 [linear feet] of sewers and 1482 manholes; and bringing to grade 129 Can Not Locate (CNL) and Can Not Open (CNO) manholes." *See* Ex. 2, Herring Run Sewershed Plan at 1.

**URS Corporation Engineering Services Agreement**

25.    On or about January 26, 2011, Plaintiff entered into an agreement with Defendant to provide engineering services in relation to the Herring Run Improvement Plan, which included further evaluation of the sewershed system and necessary improvements thereto, preparation of a

5

Design Memorandum, development of contract documents, and to provide post-award services for rehabilitation of the collection system *See generally* Ex. 3, Design Agreement.

### URS Corporation Engineering Services Agreement – General Conditions

26.     The Design Agreement required that Defendant "review historical data, including but not limited, to soil data filed among the records of the Department of Public Works prior to and as an integral part of the design process." *See id.* at 2.

27.     Defendant was also required by the Design Agreement to "take reasonable care to review plans, drawings, specifications, plats, design and documents prior to finalization and submission of the final Design Documents to the CITY to provide that the said drawings, specifications, plats, design and documents are consistent." *Id.*

28.     Defendant was further required by the Design Agreement to "verify the accuracy of CITY records and 'as-builts' prior to incorporating information gleaned from these records and 'as-builts' into the design of the project." *Id.*

### URS Corporation Engineering Services Agreement - Professional Responsibility and Standard of Care

29.     Defendant declared in the Design Agreement that it was "an experienced architectural and/or engineering firm having the skill and the legal and professional ability necessary to perform all the Services required of it under this Agreement in connection with the design and/or engineering of a having the scope and complexity of the project(s) and/or tasks contemplated herein." *Id.* at 3.

30.     Defendant further declared in the Design Agreement that it "has the capabilities and resources necessary to perform its obligations hereunder." *Id.*

31.     Defendant also made critical representations, which were relied upon by Plaintiff in engaging Defendant, as to its scope of knowledge, asserting in the Design Agreement that it "is familiar with current and applicable laws, rules and regulations that are applicable to the design and construction of the project(s) and/or tasks, and that drawings, specifications and other documents prepared by the [Defendant] shall be prepared in accordance with and shall accurately reflect and incorporate all such laws, rules and regulations." *Id.*

32.     In the Design Agreement, Defendant agreed that it shall be responsible for negligent errors, inconsistencies and omissions in its deliverables, asserting that it "shall be responsible for any negligent error, inconsistencies or omissions in the drawings, specifications, and other documents. It shall be the responsibility of the [Defendant] throughout the period of performance under the Agreement to use due care with professional competence." *Id.*

33.     Defendant agreed to immediately correct performance defects and deficiencies in its drawings, specifications and other documents at no cost to Plaintiff, asserting in the Design Agreement that it "will immediately correct at no additional cost to the CITY any and all negligent errors and omissions in the drawings, specifications and other documents prepared by the [Defendant]. The [Defendant] further agrees, at no additional cost to render assistance to the CITY in resolving problems relating to the negligent design or specified material." *Id.*

34.     Defendant further agreed to correct defects and deficiencies caused by technical inaccuracies, asserting in the Design Agreement that it "shall be responsible for the technical accuracy of its services and documents resulting there from, and the CITY shall not be responsible for discovering deficiencies therein. The [Defendant] shall correct such deficiencies without additional compensation, except to the extent such action is directly attributable to deficiencies in CITY furnished information." *Id.*

**URS Corporation Engineering Services Agreement -**
**General Conditions**

35.    The Design Agreement included language governing the occurrence of a successor in-interest, which provided that "[t]he benefits and obligations hereunder shall inure and be binding upon the parties hereto and their respective successors and assigns, provided the personnel of the organization that is the successor to [Defendant], whether such successor be an individual, a partnership or a corporation, is acceptable to CITY." *Id.* at 4.

36.    Defendant had broad indemnification obligations under the Design Agreement, whereby it agreed to "indemnify, save and hold harmless the CITY, its officers, agents and employees from any and all liability, claims, suits, demands, actions, damages and expenses (including reasonable attorney fees) of whatsoever kind and by whomsoever brought against the CITY, it officer's, agents and employees, to the extent arising from or in connection with any willful or negligent act, error or omission of [Defendant], its employees or agents in the performance of this Agreement." *Id.* at 5.

**AECOM Technical Services Inc. Purchase of URS Corp.**

37.    On or about October 17, 2014, AECOM closed on its purchase of URS Corp., becoming a successor to URS Corp. with respect to the Design Agreement.

**URS Corporation Engineering Services Agreement -**
**Amendment No. 1**

38.    On or about March 25, 2015, Plaintiff and Defendant executed Amendment No. 1 to the Agreement for 1124U – Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System ("Design Agreement Amendment No. 1"). *See* Ex. 4, Design Agreement Amendment No. 1.

39.    Pursuant to Design Agreement Amendment No. 1, Defendant was to provide environmental, surveying and engineering services necessary to further evaluate, prepare a Design Memorandum, and develop contract documents for stabilization of Chinquapin Run from Walker Avenue at the Baltimore City/County line to its confluence with Herring Run, a distance of about 11,600 liner feet.

40.    In Design Agreement Amendment No. 1, Defendant agreed to review and document the "available information needed to implement" the Design Agreement Amendment No. 1 – Scope of Services and prepare "a Design Memorandum for the services to be performed." *Id.* at 11.

41.    Defendant further declared in Design Agreement Amendment No. 1 that after receiving the watershed assessments and studies, available GIS information and utility drawings that had not been previously provided by Plaintiff, Defendant "shall confirm the recommendations and formulate the necessary rehabilitation work. Based on this review, [Defendant] shall select the rehabilitation techniques that are considered appropriate for the repairs." *Id.*

42.    In Design Agreement Amendment No. 1, Defendant also agreed to "provide the topographic surveys necessary to design the stream stabilization coupled with the sewer replacement, pipeline rehabilitation, manhole rehabilitation, access roads, and permitting needs for Chinquapin Run" and that "[s]urvey controls will be set within the limits of the project and traverse will be run along the length of the project. Traverse points and benchmarks shall be referenced along the site and outside of the construction area." *Id.*

43.    Defendant also agreed in Design Agreement Amendment No. 1 to "determine the locations to perform geotechnical investigations and . . . collect soil borings along proposed pipe replacement projects" and that "[t]he collected samples will be analyzed to determine suitability

of soils for construction, needs for dewatering, and geotechnical requirements for design and construction methods." *Id.* at 16.

44.    On or about December 9, 2016, Defendant signed and sealed the construction plans and specifications it prepared in accordance with the Design Agreement for the sanitary sewer collection system improvements in the Herring Run Sewershed ("Contract Documents"). *See* Ex. 5, Contract Documents.

### URS Corporation Engineering Services Agreement – Amendment No. 2

45.    On or about February 13, 2017, "Design Agreement Amendment No. 2" was issued for the sole purpose of extending the expiration date of the Design Agreement until January 25, 2021. *See* Ex. 6, Design Agreement Amendment No. 2.

### Baltimore Manual of Design Procedure and Criteria

46.    Defendant was also required to satisfy the obligations specified in the Manual of Design Procedure and Criteria in the preparation of its Contract Documents. *See* Ex. 7, Manual of Design Procedure and Criteria.

47.    In selecting a route for a transmission main the "engineer shall utilize topographic, soil, utility, highway and zoning maps, and if a tunneling operation is required, geological surveys. The route selected should provide economic construction and also have as many as possible of the following characteristics: gravity flow; shortest possible distance; few, if any, peaks and depressions; accessibility for construction and repairs; and freedom from landslides and flood waters." *Id.* at 6-12.

48.    The information that must be collected by Defendant in advance of preparing the Contract Documents included "plans of existing and proposed streets, alleys, storm water, water,

sanitary sewer and mechanical electrical conduits, available from various Baltimore City Bureaus" and plans for existing and proposed utilities owned by private utility companies. *Id.* at 6-25.

49.    Defendant also had an obligation to determine and inform Plaintiff as to what "surveys needed" and the "accuracy required" of such surveys in support of its contract obligations. *Id.* at 6-25.

50.    It was critical that Defendant identify the location of existing and proposed utilities which "shall be accurately shown in plan and applicable profiles using the standard symbols as shown in Section 1, General Instructions." *Id.* at 6-28.

51.    Defendant was obligated to "determine the existence of and utilize soils information available from roadway borings, structure borings, and/or borings taken from adjacent projects" and was to determine whether "additional soil boring may be required." *Id.* at 6-30.

### AECOM Technical Services Inc. Post Award Services Agreement

52.    On or about March 21, 2018, Plaintiff and Defendant entered into the Agreement for Sanitary Contract Post Award Services Agreement for 1124U (SC910) – Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System ("PAS Agreement"). *See* Ex. 8, PAS Agreement.

53.    The PAS Agreement was the result of Plaintiff exercising its right under the Design Agreement to engage Defendant for the provision of "Construction Phase Services (also known as Post Award Services) for a negotiated fee and at the City's discretion." *Id.* at 1.

54.    The PAS Agreement provided that the objective of the construction for which Defendant would provide services was to "rehabilitate sanitary sewers in the Herring Run Sewershed as well as repair the Chinquapin Run Streamway." *Id.*

### AECOM Technical Services Inc. Post Award Services Agreement – Services to be Provided

11

55.    Pursuant to the PAS Agreement, Defendant agreed to "review historical data, including but not limited to soil data filed among the records of the Department of Public Works prior to and as an integral part of the design process." *Id.*

56.    In the PAS Agreement, Defendant also agreed to exercise reasonable care in the performance of its contract obligations, asserting that it "shall take reasonable care to review plans, drawings, specifications, plats, design and documents prior to finalization and submission of the final Design Documents to the CITY to provide that the said drawings, specifications, plats, design and documents are consistent." *Id.*

57.    Defendant agreed that it would verify records provided by Plaintiff, asserting in the PAS Agreement that it "shall verify the accuracy of CITY records and "as-builts" prior to incorporating information gleaned from these records and "as-builts" into the design of the project." *Id.*

### AECOM Technical Services Inc. Post Award Services Agreement – Professional Responsibility and Standard of Care

58.    Defendant declared in the PAS Agreement that it was "an experienced architectural and/or engineering firm having the skill and the legal and professional ability necessary to perform all the Services required of it under this Agreement in connection with the design and/or engineering of a project having the scope and complexity of the project(s) and/or tasks contemplated herein." *Id.* at 3.

59.    Defendant further declared in the PAS Agreement that it "has the capabilities and resources necessary to perform its obligations hereunder." *Id.*

60.    Defendant also made critical representations which were relied upon by Plaintiff in engaging Defendant as to its scope of knowledge, asserting in the PAS Agreement that it "is

familiar with current and applicable laws, rules and regulations that are applicable to the design and construction of the project(s) and/or tasks, and that drawings, specifications and other documents prepared by [Defendant] shall be prepared in accordance with and shall accurately reflect and incorporate all such laws, rules and regulations." *Id.*

61.     Defendant represented and agreed in the PAS Agreement "that the drawings, specifications and other documents prepared by it pursuant to this Agreement shall be sufficiently detailed and functional for the purposes intended. The Project(s) and/or tasks, if constructed in accordance with the intent established by such drawings, specifications and other documents shall be structurally sound and sufficiently detailed for a properly functioning facility suitable for the purposes for which it is intended." *Id.*

62.     In the PAS Agreement, Defendant agreed that it shall be responsible for negligent error, inconsistencies or omissions in the required deliverables, asserting that it "shall be responsible for any negligent error, inconsistencies or omissions in the drawings, specifications, and other documents. It shall be the responsibility of [Defendant] throughout the period of performance under the Agreement to use due care with professional competence." *Id.*

63.     Defendant agreed to immediately correct performance defects and deficiencies in its drawings, specifications and other documents at no cost to the Plaintiff, asserting in the PAS Agreement that it "will immediately correct at no additional cost to the CITY any and all negligent errors and omissions in the drawings, specifications and other documents prepared by [Defendant]." *Id.* Defendant further agreed "at no additional cost to render assistance to the CITY in resolving problems relating to the negligent design or specified material." *Id.*

<u>**AECOM Technical Services Inc. Post Award Services Agreement –
General Conditions**</u>

64.    Defendant consented in the PAS Agreement to "follow all applicable Federal and State grant and technical requirements, Baltimore City Codes, and the Maryland Occupational Safety and Health Act (MOSHA) as they may apply to the services to be performed, and all other Federal and State laws and regulations." *Id.* at 5.

65.    Defendant has broad indemnification obligations under the PAS Agreement, agreeing to "indemnify, save and hold harmless the CITY, its officers, agents and employees from any and all liability, claims, suits, demands, actions, damages and expenses (including reasonable attorney fees) of whatsoever kind and by whomsoever brought against the CITY, it officers, agents and employees, arising from or in connection with any willful or negligent act, error or omission of [Defendant], its employees or agents in the performance of this Agreement." *Id.*

### Modified Consent Decree

66.    Following, and in accordance with, the Consent Decree, Plaintiff implemented a series of remedial measures, including, among others, the elimination of certain sanitary sewer overflow structures, the inspection of the collection system, infiltration and inflow evaluation, rainfall and flow monitoring, rehabilitation of certain pumping stations, and development of a collection system model.

67.    Plaintiff needed more time within which to address sanitary sewer overflows; eliminate the existing Back River Wastewater Treatment Plant hydraulic restriction; to investigate and provide follow-up reporting for sanitary discharges of unknown origin and building backups; to provide enhanced emergency response procedures and revisions of the operations and maintenance plan; and engage in improved public outreach.

68.    On or about October 10, 2017, EPA, MDE and Plaintiff caused a "Modified Consent Decree" to be filed with the express purpose being to "take all measures necessary to

14

enable Baltimore to comply with the Clean Water Act, the regulations promulgated thereunder, the Maryland water pollution control laws, the regulations promulgated under such laws, and Baltimore's National Pollutant Discharge Elimination System ("NPDES") Permits Nos. MD 21555 and MD 21601." Ex. 9, Modified Consent Decree at 6.

69.    The Modified Consent Decree required that the portion of the Herring Run Improvement lying at the center of this dispute and designated by Plaintiff as "Contract No. SC 910 - Improvements to the Sanitary Sewer Collection System in the Herring Run Sewershed, Part 2 Chinquapin Run", ("Chinquapin Project"), be completed by January 1, 2021 ("Chinquapin Milestone"). *Id.* at 15.

70.    The Modified Consent Decree also provided that Plaintiff would be subject to a penalty of \$1,000/day between the 1st and 30th day beyond the Chinquapin Milestone that the Chinquapin Project was delayed, \$1,500/day between the 31st and 60th day beyond the Chinquapin Milestone that the Chinquapin Project was delayed and \$2,250/day for each day beyond the 60th day that the Chinquapin Project was delayed. *Id.* at 59.

### Spiniello Companies Agreement

71.    On or about December 20, 2017, Plaintiff awarded Spiniello Companies ("Spiniello") "Sanitary Contract No. 910 - Improvements to Sanitary Sewer Collection System in the Herring Run Sewershed Part 2: Chinquapin Run," which required the performance of the following principal items of work: stream stabilization of the Chinquapin Run, cured in place ("CIPP") lining of sanitary sewers, excavation and installation of sanitary sewers, new manhole installation work, sewer cleaning and closed-circuit television ("CCTV") inspection for a sum of \$23,533,300. *See* Ex. 10, Spiniello Agreement.

72.     The details of the work to be performed in accordance with the Spiniello Agreement were set forth in the Contract Documents, and Spiniello was required to complete its work within 730 consecutive calendar days.

73.     On or about February 12, 2018, Plaintiff issued a "Notice to Proceed" to Spiniello, which shortly thereafter initiated mobilization, cleaning and grubbing efforts and anticipated completion of the Spiniello Project by February 11, 2020.

74.     During the course of performance, the Spiniello Agreement end date was revised on four occasions ultimately resulting in an agreed upon end date of February 28, 2021.

**Agreement 1294**

75.     On or about December 11, 2019, Plaintiff and Defendant entered into Agreement 1294 Wet Weather Consent Decree Compliance and Program Management Services ("Agreement 1294"). *See* Ex. 11, Agreement 1294.

76.     Under Agreement 1294, Defendant's Scope of Work required it to provide general management services on DPW projects and ensure that such projects complied with relevant laws and the Modified Consent Decree.

77.     The Modified Consent Decree provided that Plaintiff could avoid the assessment of fines and penalties if it provided advanced notice that a *force majeure* event would preclude its ability to meet a specified milestone.

78.     Under Agreement 1294, Defendant had a contractual obligation to timely and fully provide notice of such *force majeure* events to the Environmental Protection Agency and Maryland Department of Environment.

79.     AECOM also agreed *inter alia* to "indemnify, save and hold harmless [Plaintiff], its officers, agents and employees from any and all liability, claims, suits, demands, actions,

damages and expenses (including reasonable attorney fees) of whatsoever kind and by whomsoever brought against [Plaintiff], it officers, agents and employees, arising from or in connection with any willful or negligent act, error or omission of [Defendant], its employees or agents in the performance of this Agreement. This requirement shall be included in all subconsultant agreements." *Id.*

### AECOM Performance Errors and Omissions

80.    The Design Agreement required that Defendant provide estimated bid quantities for detailed line items describing the work activities, services, labor, material, and equipment required for the Chinquapin Project ("Estimated Bid Quantities").

81.    Spiniello used the Estimated Bid Quantities in preparation of the proposal which it submitted to provide the construction services required by the Chinquapin Project. *See* Ex. 12, Spiniello Bid.

82.    Plaintiff prudently and thoroughly reviewed and analyzed the Spiniello Bid in accordance with the applicable specifications, rules, regulations, laws, and statutes and reasonably relied upon such effort in deciding to award the Chinquapin Project to Spiniello.

83.    During the course of performance, due to no fault of Plaintiff or Spiniello, at least seventeen (17) bid quantities were overrun by Spiniello, resulting in increased costs and delays to the Chinquapin Project due to defects and deficiencies in the Estimated Bid Quantities for which Defendant is solely responsible and liable.

### AECOM Performance Errors and Omissions – Utility Access Road Non-paved Areas Type 1, 2 & 3

84.    In the Estimated Bid Quantities Defendant underestimated the quantities needed to build and maintain the Temporary Utility Access Roads for Non-Paved Areas – Type 2 and 3,

17

resulting in significant cost overruns by Spiniello with respect to these bid items for which Defendant solely responsible and liable.

85.     Defendant specified in the Contract Documents that, in order to construct and maintain Bid Item 311 Temporary Utility Access Road for Non-paved Areas – Type 2, 2,877 square yards of the materials specified would be necessary.

86.     Spiniello exceeded the amount set forth in Bid Item 311 by a factor of 65%, resulting in an unanticipated increase in costs of $46,729.75 for which Defendant is solely responsible and liable.

87.     AECOM specified in the Contract Documents that, in order to construct and maintain Bid Item 312 Temporary Utility Access Road for Non-paved Areas – Type 3, 1,150 square yards of the materials specified would be necessary.

88.     Spiniello exceeded the amount set forth in Bid Item 312 by a factor of 98%, resulting in an unanticipated increase in costs of $69,603.68 for which Defendant is solely responsible and liable.

**AECOM Performance Errors and Omissions –
Soil Borings Lacking at Launch and Receiving Pits**

89.     The Spiniello Agreement required construction of a tunnel for installation of casing pipe beneath the Northern Parkway and the installation of receiving and jacking pits for the tunneling machine to be used to bore the required tunnel.

90.     The nearest boring provided in the Contract Documents was 2000 feet away and indicated that bedrock would not be encountered at the depth of the excavation needed for the shoring and tunneling beneath Northern Parkway.

91.    Given the boring information provided in the Contract Documents, on or about July 16, 2019, Spiniello submitted a shoring design for the Northern Parkway insertion pit, which was approved by Defendant on or about August 7, 2019.

92.    On or about July 25, 2019, Spiniello procured the materials and equipment, through purchases and rentals, needed to install the approved shoring and began installation efforts on or about July 29, 2019.

93.    During installation efforts, the sheeting hit refusal at an average of 7 feet above the design depth for the insertion pit bottom indicating the presence of bedrock, which was confirmed by Spiniello on further inspection to lie within 3 inches below the invert of the casing pipe to be installed.

94.    On or about September 6, 2019, Spiniello informed Plaintiff in Request for Information ("RFI") 80 of the presence of bedrock within inches of the casing pipe adding unacceptable risk to the ability to complete the jack and bore operation.

95.    In RFI 80, Spiniello also included an updated shoring design and pricing due to the presence of the unanticipated bedrock and in response Plaintiff refused to make payment for the additional costs Spiniello sought.

96.    On or about September 26, 2019, Spiniello submitted a revised shoring design to address the unanticipated conditions which resulted in a series of telephone calls and a meeting, which took place on or about September 30, 2019, to discuss the most acceptable strategy for moving forward.

97.    On or about October 2, 2019, AECOM approved the revised shoring and design submitted by Spiniello.

98.     On or about November 5, 2019, Plaintiff informed Spiniello that it found the geology at the launching pit to be consistent with the information included in the Contract Documents through that point in time and therefore concluded that Spiniello was not entitled to additional compensation and further noted that Spiniello could file a claim in accordance with the Spiniello Agreement should it believe such was warranted.

99.     On or about February 25, 2020, Plaintiff sent a letter to Defendant inquiring as to why soil borings were not performed at the launching and receiving pits for the installation of the tunnel below Northern Parkway.

100.     In a response dated June 11, 2020, Defendant alleged that when the original design configuration was being considered, which was prior to the May 15, 2015, 60% design submission, Defendant was limited by the Design Agreement to a maximum of 300 vertical linear feet of borings.

101.     Defendant further alleged that, at that stage of design efforts, the pipe under the Northern Parkway was to be CIPP, rendering borings unnecessary, and that although the sewer segment was later upsized and relocated and tunneling was the recommended approach to installation, no additional borings were taken.

102.     On or about July 28, 2020, Plaintiff informed Spiniello that it should go forward with tunneling at Plaintiff's direction and that Plaintiff was aware of the potential for misalignment due to presence of bedrock.

103.     Plaintiff further agreed that it would compensate Spiniello for rock removal within the boring operation if the equipment was stopped due to bedrock under the force account.

104.     On or about September 24, 2020, the boring subcontractor remobilized and completed tunneling operations on or about October 20, 2020.

105.    The CIPP was installed 1.5 feet higher than the planned elevation due to the presence of bedrock and adjustments made in adjacent sewer segment to compensate for this elevation change.

106.    On or about December 28, 2020, the jacking and receiving pits were backfilled and the returned shoring materials and equipment returned, completing a work activity that was significantly delayed due to presence of the unanticipated subsurface conditions.

107.    On or about January 27, 2021, Spiniello submitted a claim to Plaintiff seeking $466,152.93, which Spiniello allegedly incurred as a result of additional work and rental costs due to the presence of unanticipated subsurface conditions Defendant should have discovered given the design and construction of the sewer tunnel installed beneath the Northern Parkway.

108.    In a letter dated November 5, 2021, Plaintiff informed Defendant that Defendant should have performed additional borings when the scope changed from CIPP lining and the diameter of the sewer and its tunnel increased, and that Defendant's failure to do so constituted a breach of the applicable standard of care and negligence.

109.    Plaintiff further informed Defendant that it would be held responsible for any additional costs and delays incurred by Plaintiff due to Defendant's breach of the applicable standard of care and negligence associated with Defendant's failure to perform borings that were necessary to place the sewer beneath Northern Parkway.

110.    Following extensive settlement discussions, Plaintiff agreed to and has paid Spiniello a sum of $436,000.00 for the additional shoring costs incurred at Northern Parkway, a sum for which Defendant is solely liable and responsible.

### AECOM Performance Errors and Omissions – 
### Borings Failed to Indicate Abrasivity Encountered

111.    The Spiniello Agreement required construction of a sewer pipe beneath Perring Parkway having a diameter of 36 inches, which Spiniello planned to install in a 42-inch steel casing pipe located in a tunnel bored by a 42-inch micro-tunneling machine.

112.    The Contract Documents included borings in the area which Spiniello reasonably relied upon in determining that the use of a 42-inch micro-tunneling machine was prudent for the required tunneling diameter.

113.    However, in preparation for boring the tunnel for the 42-inch steel casing pipe, Spiniello discovered that the subsurface consisted of rock with strengths that were 2 to 22 times that reflected in the Contract Documents.

114.    As a result of the abrasivity of the encountered subsurface conditions, the tunneling subcontractor was required to use a 60-inch micro-tunneling machine.

115.    Defendant agreed that the subgrade encountered consisted of rock formations that were significantly stronger than that represented in the Contract Documents and that the 60-inch micro-tunneling machine had to be used to create the tunnel given the actual conditions encountered.

116.    Plaintiff ultimately agreed to, and did, compensate Spiniello an additional $605,000.00 for the costs associated with the modifications to its means and methods required by the unanticipated subsurface conditions.

<u>AECOM Performance Errors and Omissions –<br>Unanticipated Rock Hardness, Quality and Quantity</u>

117.    In order to install the Chinquapin Project main sewer line, Spiniello was required to, *inter alia*, utilize the open cut trench excavation method to prepare the site for the installation process.

22

118.    The Contract Documents indicated that approximately 2,500 cubic yards of rock or boulders would have to be removed and that the boring samples obtained failed between 720 psi and 24,960 psi with an average of 13,000 psi.

119.    Spiniello alleged that it utilized this information in deciding to bid a unit price of $350/cubic yard, a total of $875,000.00, for this work activity.

120.    Spiniello alleged that the subsurface conditions encountered included rock formations that failed under pressure testing between 16,160 psi and 48,590 psi with an average of 26,220 psi.

121.    Spiniello also alleged it was required to remove 5,465 cubic yards of rocks and boulders far exceeding the estimated quantity of 2,500 cubic yards provided in the Contract Documents.

122.    On or about February 26, 2021, Spiniello filed a claim with Plaintiff seeking an equitable adjustment for the additional time and costs incurred performing the open cut trench excavation work required by main sewer line installation in the sum of $6,883,080.31.

123.    Spiniello alleged it incurred an additional $6,088,801.37 removing subgrade of quantities, hardness and quality not anticipated by the Contract Documents and, due to the associated time impacts, also incurred an additional $794,277.94 in extended general conditions.

124.    Following extensive settlement discussions, Spiniello agreed to accept and was paid a total sum of $5,892,970.92 for the additional costs incurred excavating rock that differed from that specified in the Contract Documents.

### AECOM Performance Errors and Omissions – Post Construction Failures Reaches C & D Class III Riprap

125.    In the Contract Documents, the designs for Reaches C and D did not specify the use of Class III Heavy Rip to aid in stabilizing of their respective banks.

23

126.    Following completion of construction activities in Reach C, installed structures were dislodged during storm events. In Reach D, the stream overflowed imbricated walls destabilizing the stream bank.

127.    In order to address the performance failures in Reaches C and D, Defendant, *inter alia*, modified the bank design to include Class III Heavy Riprap, a component not specified in the Contract Documents.

128.    The addition of Class III Heavy Riprap to the design of Reaches C and D resulted in an increase in Spiniello's performance cost of $688,501.20, for which Plaintiff has made payment to Spiniello.

129.    Defendant is solely responsible and liable for the increased costs incurred by Plaintiff, a sum of $688,501.20, as a result of Defendant's defective design of Reaches C and D.

### AECOM Performance Errors and Omissions –
### Missing Tributaries in Contract Documents

130.    The Prime Agreement required that Defendant identify where all of the tributaries requiring erosion and sediment control measures intersected with Chinquapin Creek.

131.    Defendant failed to include five tributaries located between Hillen Road and Woodbourne Avenue, which intersected with Chinquapin Creek and required erosion and sediment control measures per the Contract Documents.

132.    The MDE and Plaintiff's Department of Public Works's Office of Compliance and Laboratories issued citations to Plaintiff for the lack of erosion and sediment control measures where these five tributaries intersected with Chinquapin Creek.

133.    Defendant's failure to show these five tributaries resulted in cost overruns to Plaintiff, in a sum to be determined, for which Defendant is solely responsible and liable.

### AECOM Performance Errors and Omissions –

24

## Inapplicable Seed Mixture

134.    The Contract Documents required that a specified seed mixture be placed along the banks and access roads serving Reaches D and E.

135.    The seed mixture grew on Reach D and E banks but failed to grow on their respective access roads.

136.    Because of the failure of the specified seed mixture to grow, Defendant modified the specification to require the use of turf grass.

137.    Defendant's failure to specify the appropriate seed mixture for the Reach D and E access roads caused Plaintiff to incur $48,519.91 in unanticipated costs for which Defendant is solely responsible and liable.

## AECOM Performance Errors and Omissions –
## Riffle Grade Control Missing

138.    During construction of Reach C, Defendant discovered that the overbank areas were experiencing slope erosion that could be prevented by the application of Riffle Grade Control.

139.    Defendant also discovered that, following the remediation of the areas of slope erosion, Riffle Grade Control prevented further erosion.

140.    Given the discovery of the need for Riffle Grade Control in the overbank areas to prevent erosion and the benefit of its use to protect areas of erosion that had been remediated, Defendant modified the Contract Documents to require the use of Riffle Grade Control for these applications.

141.    The addition of Riffle Grade Control to the Contract Documents resulted in increased costs to Plaintiff for which defendant is solely responsible and liable.

## AECOM Performance Errors and Omissions –
## Woodbourne Ave. Culvert As-Builts not Provided

142.    The Design Agreement required that Defendant provide as-builts of existing structures, including the culvert located on Woodbourne Avenue to Spiniello for its use prosecuting the work required by the Spiniello Agreement.

143.    Defendant failed to timely provide the Woodbourne Avenue culvert as-built, resulting increased costs to Plaintiff for which Defendant is solely responsible and liable.

<div align="center">

**AECOM Performance Errors and Omissions –
Erosion Control Matting Detail Missing**

</div>

144.    The Contract Documents design detail for Erosion Control Mating ("ECM") ("detail 32") did not indicate that ECM was to be keyed in at the top of the bank, leaving an area unprotected and subject to erosion.

145.    During construction, Defendant changed the specifications for the ECM so that ECM was to be keyed in over the top of the bank to prevent erosion of the area previously left uncovered.

146.    Defendant's failure to properly specify the keying in of the ECM along the top of the bank and subsequent modification of the specification, which required the use of more ECM than Spiniello included in its bid, resulted in Plaintiff expending an additional $107,922.00 for which Defendant is responsible.

<div align="center">

**AECOM Performance Errors and Omissions –
Excessive Bypass Pumping**

</div>

147.    Spiniello was required by the Spiniello Agreement to install a Bellmouth Structure connection at the confluence of the Herring Run and Chinquapin Run tributaries necessitating the need for a bypass connection in the sewers running adjacent to both.

148.    The Contract Documents anticipated that only 90 days would be needed for the bypass pumping operations required by installation of the Bellmouth Structure.

149.     However, due to Project delays caused by the presence of rock of unanticipated characteristics and other causes for which Plaintiff is not responsible, Spiniello experienced significant delays requiring that the bypass pumping system be ran for a longer period than anticipated in the Contract Documents.

150.     The extended use of the bypass pumping system resulted in cost overruns of at least $324,800.00, for which Defendant is solely responsible and liable.

<u>**AECOM Performance Errors and Omissions –**</u>
<u>**Physical Conflicts with Geological Formations and Structures**</u>

151.     Defendant included a topographic survey in the Contract Documents that failed to illustrate the presence of geological formations that conflicted with in-stream structures included in the Contract Documents.

152.     During the course of construction, Spiniello was forced to make changes to its work in order to compensate for the presence of these unanticipated conflicts.

153.     Defendant's failure to identify these geological structures resulted in additional costs to Plaintiff for which Defendant is solely responsible and liable.

<u>**AECOM Performance Errors and Omissions –**</u>
<u>**Failure to Specify Watertight Lockable Manhole Frames and Covers**</u>

154.     In the Contract Documents, Defendant specified two (2) watertight lockable manhole frame and cover assemblies and 14 water permeable manhole frame and cover assemblies for the manholes located within the flood plain.

155.     During the course of construction, it was discovered that significantly more watertight lockable manhole frame and cover assemblies would be required than the two specified in the Contract Documents.

156.     Due to Defendant's failure to accurately specify the number of watertight lockable manhole frame and cover assemblies required by the Chinquapin Project, Plaintiff incurred additional costs of at $16,500.00 for which Defendant is solely responsible and liable.

### AECOM Performance Errors and Omissions – Reach H Sewer Constructability

157.     The Contract Documents included a design configuration for the Reach H sewer that was not capable of being constructed as designed.

158.     Defendant modified the design to eliminate the constructability issue discovered by Spiniello.

159.     Defendant's modified design resulted in an additional cost to Plaintiff of at least $437,474.80 for which Defendant is solely responsible and liable.

### AECOM Performance Errors and Omissions – Inaccurate Count of Trees Less Than 20" in Diameter

160.     Bid Item 119 was applicable to the felling operation for trees that were 8 to 20 inches in diameter.

161.     Bid Item 119 indicated that 945 trees would be encountered falling within its specified dimensions, leading Spiniello to bid a total of $756,000.00 for this work activity.

162.     Spiniello was actually required to fell an additional 371 trees that fell within the dimensions applicable to Bid Item 119, resulting in an additional cost to Plaintiff of at least $296,800.00 for which Defendant is solely responsible and liable.

### AECOM Performance Errors and Omissions – Inaccurate Count of Trees Greater Than 20" in Diameter

163.     Bid Item 120 was applicable to the felling operation for trees that were greater than 20 inches in diameter.

164.   Bid Item 120 indicated that 347 trees would be encountered falling within its specified dimensions, leading Spiniello to bid a total of $902,000.00 for this work activity.

165.   Spiniello was actually required to fell an additional 90 trees that fell within the dimensions applicable to Bid Item 120, resulting in an additional cost to Defendant of at least $234,000.00 for which Defendant is solely responsible and liable.

<div align="center">

**AECOM Performance Errors and Omissions –**
**Failure to Specify and Design for Appropriate Periodic Storm Capacity**

</div>

166.   In the Contract Documents, Defendant specified that the Project was to be capable of conveying 2025 2-year storm flow.

167.   Prior to the completion of construction, the Project experienced a storm flow exceeding the 2025 2-year-storm flow resulting in significant damages in Reach E.

168.   Spiniello was required to implement a design change to Reach E developed by AECOM to prevent such damage during subsequent storms and remedial measures to address the damage.

169.   Plaintiff paid Spiniello a total of $417,716.00 to perform the work required by the storm damage and revised design, for which Defendant is solely responsible and liable.

<div align="center">

**AECOM Performance Errors and Omissions –**
**Failure to Provide Timely Notice of Force Majeure**

</div>

170.   The Modified Consent Decree provided that Plaintiff could avoid the assessment of fines and penalties if it provided advanced notice that a *force majeure* event would preclude its ability to meet a specified milestone.

171.   Under Agreement 1294, Defendant had a contractual obligation to timely and fully provide notice of such *force majeure* events to the Environmental Protection Agency and Maryland Department of Environment. *See* Ex. 11, Agreement 1294.

172.    During the course of construction, *force majeure* events occurred precluding Plaintiff's ability to meet certain milestones specified in the Modified Consent Decree.

173.    Because Defendant failed to satisfy its contractual obligation to timely provide proper notice of *force majeure* events, Plaintiff incurred damages of at least $2,495,250.00, for which Defendant is solely responsible and liable.

## COUNT 1
### (BREACH OF CONTRACT – DESIGN AGREEMENT)

174.    Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

175.    The Design Agreement is and was a valid and enforceable contract and Plaintiff paid Defendant all consideration due thereunder.

176.    In signing and sealing the Contract Documents for use in connection with the Chinquapin Run Project with the errors and omissions specified herein and summarized below, Defendant materially breached its obligations under the Design Agreement by:

    i.    Failing to thoroughly and accurately determine and estimate the quantity and type of materials required for Utility Access Road Non-paved Areas Type 1, 2 & 3;

    ii.    Failing to obtain borings at or near the locations of the launch and receiving pits for the tunnel below the Northern Parkway;

    iii.    Failing to obtain borings at or near the location for the Perring Parkway microtunnel and conduct the analysis of such borings needed to plan the related microtunneling operations;

    iv.    Failing to obtain a sufficient number of borings to accurately determine the hardness, quality and quality of the subgrade to be excavated along the main sewer line;

    v.    Failing to specify the use of Class III Riprap along the banks of Reaches C and D;

    vi.    Failing to identify five existing tributaries feeding the Chinquapin Creek in the Contract Documents;

    vii.    Failing to specify a seed mixture that was appropriate for use in and around the access roads for Reach D and E banks;

viii.    Failing to specify the use of Riffle Grade Control for the Reach C overbank areas;

ix.    Failing to provide as-builts for all existing utilities, including the Woodbourne Avenue culvert;

x.    Failing to include erosion control matting detail for the top of banks in the Contract Documents;

xi.    Failing to determine that a necessary bypass connection point did not exist that could be used for construction of the Bellmouth Structure;

xii.    Failing to include unambiguous specifications for the payment of bypass pumping;

xiii.    Failing to identify and include in surveys the existence and locations of geological formations that conflicted with instream structures;

xiv.    Failing to accurately identify the location and quantity of watertight lockable manhole frame and cover assemblies required for the Chinquapin Creek Project;

xv.    Failing to design a sewer that was constructable in Reach H;

xvi.    Failing to accurately identify the number of trees less than or equal to 20" in diameter that needed to be felled;

xvii.    Failing to accurately identify the number of tress greater than or equal to 20" in diameter that needed to be felled; and

xviii.    Failing to specify and design to the appropriate worst case storm scenario.

177.    As a direct and proximate cause of Defendant's breaches of its express and implied obligations under the Design Agreement, material and otherwise, Plaintiff has incurred damages of at least $13,862,529.06, plus costs and attorney's fees.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count I of this Complaint, in the amount of $13,862,529.06, or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

## COUNT II
### (PROFESSIONAL NEGLIGENCE-DESIGN AGREEMENT)

178.    Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

31

179.    In the Design Agreement, Defendant represented *inter alia* that it was "an experienced architectural and/or engineering firm having the skill and the legal and professional ability necessary to perform all the Services required of it under this Agreement in connection with the design and/or engineering of a having the scope and complexity of the project(s) and/or tasks contemplated herein." *See* Ex. 3, Design Agreement at 3.

180.    Plaintiff reasonably relied upon Defendant to perform its design professional services required under the Design Agreement in accordance with the applicable standard of care, applicable industry standards, laws, regulations, and codes.

181.    Upon information and belief, Defendant failed to perform its design professional services in accordance with the applicable standard of care, applicable industry standards, laws, regulations and codes.

182.    As a result of Defendant's breach of its duties and obligations to Plaintiff, Plaintiff has and continues to suffer substantial damages.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count II in the amount of $13,862,529.06 or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

## COUNT III
### (CONTRACTUAL INDEMNITY-DESIGN AGREEMENT)

183.    Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

184.    Under the Design Agreement, Defendant agreed *inter alia* to "indemnify, save and hold harmless the CITY, its officers, agents and employees from any and all liability, claims, suits,

demands, actions, damages and expenses (including reasonable attorney fees) of whatsoever kind and by whomsoever brought against the CITY, it officer's, agents and employees, to the extent arising from or in connection with any willful or negligent act, error or omission of [Defendant], its employees or agents in the performance of this Agreement." *Id.* at 5.

185.     Even absent the Design Agreement indemnity provisions, Defendant would be legally liable to Plaintiff for reimbursement of the damages sought herein.

186.     Defendant has failed and refused to satisfy its implicit and express indemnity obligations and is in breach of its obligations to do so under the Design Agreement, thereby entitling Plaintiff to all costs related to its enforcement, including but not limited to legal fees and other costs.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count III, in the amount of $13,862,529.06 or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

## <u>COUNT IV</u>
## (BREACH OF CONTRACT – POST AWARD SERVICES AGREEMENT)

187.     Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

188.     The PAS Agreement is and was a valid and enforceable contract and Plaintiff paid Defendant all consideration due thereunder.

189.     Defendant materially breached its obligations under the PAS agreement in at least the following ways:

   i.     Failing to obtain borings at or near the locations of the launch and receiving pits for the tunnel below the Northern Parkway;

    ii.      Failing to obtain borings at or near the location for the Perring Parkway microtunnel and conduct the analysis of such borings needed to plan the related microtunneling operations;

    iii.      Failing to obtain a sufficient number of borings to accurately determine the hardness, quality and quality of the subgrade to be excavated along the main sewer line;

    iv.      Failing to specify the use of Class III Riprap along the banks of Reaches C&D;

    v.      Failing to identify five existing tributaries feeding the Chinquapin Creek in the Contract Documents;

    vi.      Failing to specify a seed mixture that was appropriate for use in and around the access roads for Reach D and E banks;

    vii.      Failing to specify the use of Riffle Grade Control for the Reach C overbank areas;

    viii.      Failing to provide as-builts for all existing utilities including the Woodbourne Ave. culvert;

    ix.      Failure to include erosion control matting detail for the top of banks in the Contract Documents;

    x.      Failing to determine that a necessary bypass connection point did not exist that could be used for construction of the Bellmouth Structure;

    xi.      Failing to identify and include in surveys the existence and locations of geological formations that conflicted with instream structures;

    xii.      Failing to accurately identify the location and quantity of watertight lockable manhole frame and cover assemblies required for the Chinquapin Creek Project;

    xiii.      Failing to design a sewer that was constructable in Reach H;

    xiv.      Failing to accurately identify the number of trees less than or equal to 20 inches in diameter that needed to be felled;

    xv.      Failing to accurately identify the number of tress greater than or equal to 20 inches in diameter that needed to be felled;

    xvi.      Failing to specify and design to the appropriate worst case storm scenario; and

    xvii.      Failing to provide timely and complete notice that certain force majeure events prohibited Plaintiff's ability to meet certain milestones set forth in the applicable consent decree.

    190.    As a direct and proximate cause of Defendant's breaches of its express and implied obligations under the Design Agreement, material and otherwise, Plaintiff has incurred damages of at least $13,862,529.06, plus costs and attorney's fees.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count IV of this Complaint, in the amount of $13,862,529.06, or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

<div align="center">

### COUNT V
### (PROFESSIONAL NEGLIGENCE-DESIGN AGREEMENT)

</div>

191.    Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

192.    Pursuant to the PAS Agreement, Defendant represented *inter alia* that it was "an experienced architectural and/or engineering firm having the skill and the legal and professional ability necessary to perform all the Services required of it under this Agreement in connection with the design and/or engineering of a having the scope and complexity of the project(s) and/or tasks contemplated herein." *See* Ex. 8, PAS Agreement at 3.

193.    Plaintiff reasonably relied upon Defendant to perform its professional services required under the PAS Agreement in accordance with the applicable standard of care, applicable industry standards, laws, regulations and codes.

194.    Upon information and belief, Defendant failed to perform the professional services required under the PAS Agreement in accordance with the applicable standard of care, applicable industry standards, laws, regulations and codes.

195.    As a result of Defendant's breach of its duties and obligations to Plaintiff, Plaintiff has and continues to suffer substantial damages.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count V in the amount of $13,862,529.06 or the exact amount of the damages established at

trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

<div align="center">

**COUNT VI**
**(CONTRACTUAL INDEMNITY-POST AWARD SERVICES AGREEMENT)**

</div>

196.    Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

197.    Under the PAS Agreement, Defendant agreed *inter alia* to "indemnify, save and hold harmless the CITY, its officers, agents and employees from any and all liability, claims, suits, demands, actions, damages and expenses (including reasonable attorney fees) of whatsoever kind and by whomsoever brought against the CITY, it officer's, agents and employees, to the extent arising from or in connection with any willful or negligent act, error or omission of [Defendant], its employees or agents in the performance of this Agreement." *Id.* at 5.

198.    Even absent the PAS Agreement indemnity provisions, Defendant would be legally liable to Plaintiff for reimbursement of the damages sought herein.

199.    Defendant has failed and refused to satisfy its implicit and express indemnity obligations and is in breach of its obligations to do so under the PAS Agreement, thereby entitling Plaintiff to all costs related to its enforcement, including but not limited to legal fees and other costs.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count VI, in the amount of $13,862,529.06 or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

<div align="center">

**COUNT VII**
**(BREACH OF CONTRACT – AGREEMENT 1294)**

</div>

200.   Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

201.   Agreement 1294 is and was a valid and enforceable contract and Plaintiff paid Defendant all consideration due thereunder.

202.   Defendant materially breached its obligations under the Design Agreement by *inter alia* failing to provide timely and complete notice that certain force majeure events prohibited Plaintiff's ability to meet certain milestones set forth in the applicable consent decree

203.   As a direct and proximate cause of Defendant's breaches of its express and implied obligations under Agreement 1294, material and otherwise, Plaintiff has incurred damages of at least $13,862,529.06, plus costs and attorney's fees.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count VII of this Complaint, in the amount of $2,495,250.00, or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

## <u>COUNT VIII</u>
### (PROFESSIONAL NEGLIGENCE-1294 AGREEMENT)

204.   Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

205.   In Agreement 1294, Defendant represented *inter alia* that it was "an experienced architectural and/or engineering firm having the skill and the legal and professional ability necessary to perform all the Services required of it under this Agreement in connection with the design and/or engineering of a project having the scope and complexity of the project(s) and/or tasks contemplated herein."

206.    Plaintiff reasonably relied upon Defendant to perform its design professional services required under Agreement 1294 in accordance with the applicable standard of care, applicable industry standards, laws, regulations, and codes.

207.    Upon information and belief, Defendant failed to perform its design professional services in accordance with the applicable standard of care, applicable industry standards, laws, regulations and codes.

208.    As a result of Defendant's breach of its duties and obligations to Plaintiff, Plaintiff has and continues to suffer substantial damages.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count VII in the amount of $2,495,250.00 or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

<u>COUNT IX</u>
**(CONTRACTUAL INDEMNITY-AGREEMENT 1294)**

209.    Plaintiff hereby incorporates by reference Paragraphs 1 through 173 as if fully set forth herein.

210.    Under Agreement 1294, Defendant agreed *inter alia* to "indemnify, save and hold harmless [Plaintiff], its officers, agents and employees from any and all liability, claims, suits, demands, actions, damages and expenses (including reasonable attorney fees) of whatsoever kind and by whomsoever brought against [Plaintiff], it officers, agents and employees, arising from or in connection with any willful or negligent act, error or omission of [Defendant], its employees or agents in the performance of this Agreement. This requirement shall be included in all subconsultant agreements."

211.    Even absent the Agreement 1294 indemnity provisions, Defendant would be legally liable to Plaintiff for reimbursement of the damages sought herein.

212.    Defendant has failed and refused to satisfy its implicit and express indemnity obligations and is in breach of its obligations to do so under Agreement 1294, thereby entitling Plaintiff to all costs related to its enforcement, including but not limited to legal fees and other costs.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment against Defendant on Count IX, in the amount of $2,495,250.00 or the exact amount of the damages established at trial, plus pre-judgment interest, post-judgment interest, costs, reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

Dated this 30 day of October 2024.

Respectfully submitted,

Lewis I. Askew, Jr.
Tiber Hudson LLC
1800 M St., NW, 350S
Washington, DC 20036
Tel: (202) 973-0115
Fax: (866) 471-2997
Email: laskew@tiberhudson.com
*COUNSEL FOR Mayor and City Council of Baltimore*

## JURY DEMAND

Plaintiff Mayor and City Council of Baltimore demands trial by jury.

Lewis I. Askew Jr.

## RULE 1-313 CERTIFICATE

Pursuant to Rule 1-313 of the Maryland Rules, I hereby certify that I am duly admitted to practice law in the courts of the State of Maryland.

Lewis I. Askew Jr.

E-FILED; Baltimore City Circuit Court
Docket: 10/30/2024 6:35 PM; Submission: 10/30/2024 6:35 PM
Envelope: 18628434

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF MARYLAND, | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | Civil Action No. JFM-02-1524 |
| v. | ) | |
| | ) | |
| MAYOR AND CITY COUNCIL | ) | |
| OF BALTIMORE, MARYLAND, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

CONSENT DECREE

TABLE OF CONTENTS

I.     JURISDICTION ...................................................................................... 2

II.    VENUE ..................................................................................................... 3

III.   BINDING EFFECT ................................................................................. 3

IV.    PURPOSE ................................................................................................ 4

V.     DEFINITIONS ........................................................................................ 4

VI.    REMEDIAL MEASURES ....................................................................... 8

       8.    Elimination of Sanitary Sewer Overflow and Combined Sewer Overflow Discharges . 8

       9.    Collection System Evaluation and Sewershed Plans ................... 11

       10.   Illegal Sewer Connections .......................................................... 24

       11.   Pumping Station Inspection, Rehabilitation, and Repair ............ 26

       12.   Collection and Transmission System Model ............................... 31

       13.   Collection System Operation and Maintenance .......................... 35

       14.   Information Management System Program................................... 37

       15.   Valve Inspection and Repair Program ........................................ 40

       16.   Emergency Response Plan - Unpermitted Discharges ................. 41

       17.   Reporting of Discharge Events and Recordkeeping .................... 45

VII.   REPORTING ......................................................................................... 47

VIII.  CIVIL PENALTY .................................................................................. 47

IX.    STIPULATED PENALTIES ................................................................. 49

X.     SUPPLEMENTAL ENVIRONMENTAL PROJECT............................ 56

XI.    EFFECT OF SETTLEMENT ................................................................ 57

XII.   FORCE MAJEURE ............................................................................... 58

i

XIII.   RETENTION OF JURISDICTION ................................................................. 59

XIV.   DISPUTE RESOLUTION ........................................................................ 59

XV.   RIGHT OF ENTRY ................................................................................. 61

XVI.   NOT A PERMIT/COMPLIANCE WITH OTHER STATUTES/REGULATIONS ........... 62

XVII.   FAILURE OF COMPLIANCE ................................................................. 62

XVIII.   NON-WAIVER PROVISIONS .............................................................. 64

XIX.    COSTS OF SUIT ............................................................................... 66

XX.   RECORD KEEPING ............................................................................. 66

XXI.   FORM OF NOTICE ............................................................................. 66

XXII.   MODIFICATION ............................................................................... 68

XXIII.   PUBLIC COMMENT AND ENTRY OF CONSENT DECREE ........................ 68

XXIV.   TERMINATION ................................................................................. 68

XXV.   SIGNATORIES ................................................................................. 69

ii

WHEREAS, Plaintiff, the United States of America ("United States"), by the authority of the Attorney General of the United States and through its undersigned counsel, acting at the request and on behalf of the Administrator of the United States Environmental Protection Agency ("EPA"), has filed a Complaint in this action seeking injunctive relief and civil penalties pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319, naming as defendant the Mayor and City Council of Baltimore, Maryland (hereinafter referred to as "Baltimore") pursuant to Section 309(e) of the Clean Water Act, 33 U.S.C. § 1319(e);

WHEREAS, Plaintiff, the State of Maryland, on behalf of the Maryland Department of the Environment ("MDE"), has filed a motion to intervene, and a Complaint in Intervention against Baltimore for its alleged violations of the Clean Water Act, and Title 9, Subtitle 3 of the Environment Article, Annotated Code of Maryland;

WHEREAS, Baltimore operates publicly owned treatment works ("POTW") that serve the citizens of Baltimore and several surrounding counties:

WHEREAS, the United States alleges that Baltimore has violated and continues to violate Section 301 of the Clean Water Act, 33 U.S.C. § 1311, by discharging untreated sewage from its sewage collection system to the Back River, Patapsco River, and the Chesapeake Bay and several smaller water bodies and other waters of the United States, and the State of Maryland alleges that Baltimore has violated and continues to violate Section 301 of the Clean Water Act, 33 U.S.C. § 1311, and Sections 9-322 and 9-323 of the Environment Article, Annotated Code of Maryland, by discharging untreated sewage from its sewage collection system to the Back River, Patapsco River, and the Chesapeake Bay and several smaller water bodies and other waters of the State of Maryland;

WHEREAS, without making any admission of law or fact, and without admitting any violation of any law or regulation, Baltimore denies that it has willfully or negligently violated any provision of the Clean Water Act and state water pollution control laws. Baltimore further alleges that at all times it has acted in good faith in a sincere effort to comply with the Clean Water Act,

1

And that any sewage discharges that have occurred to date have been unintentional; and

WHEREAS, in the best interests of the public, and to avoid the expense and delay of litigation, Baltimore wishes to work in a cooperative partnership with MDE and EPA in an effort to continue to enhance water quality and to minimize future discharges to the extent possible, through an agreed-upon program of improvements to Baltimore's Collection System (as defined herein); and

WHEREAS, Baltimore's wastewater collection, treatment and disposal system must treat some 250 millions of gallons each day of wastewater flow generated by Baltimore residents and by an even greater population of residents of surrounding suburban counties, and although Baltimore has heretofore made a substantial public investment to improve water quality and reduce sewage collection system discharges, the Parties acknowledge that further investment of public resources is necessary to continue to maintain and improve Baltimore's sewage collection system and to enhance compliance with the Clean Water Act; and

WHEREAS, the Parties acknowledge that a high degree of cooperation shall be necessary to carry out the terms of this Consent Decree; and it is the Parties' intent to engage in such cooperation and to act in good faith to fulfill the terms of this Consent Decree; and

WHEREAS, the Parties agree, and the Court finds, that settlement of the claims alleged in the Complaint and the Complaint in Intervention without further litigation or trial of any issues, is fair, reasonable and in the public interest and that the entry of this Consent Decree is the most appropriate way of resolving the claims alleged in the Complaint and the Complaint in Intervention.

NOW THEREFORE, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I.  JURISDICTION

1.  This Court has jurisdiction over the subject matter of this action and over the Parties to this action pursuant to Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1331 and 1367.  The Complaint states claims upon which relief may be granted against

Baltimore under Section 309 of the Clean Water Act, 33 U.S.C. § 1319, and Sections 9-339 and 9-342 of the Environment Article, Annotated Code of Maryland, for injunctive relief and civil penalties. Baltimore waives any and all objections that it might have to the Court's jurisdiction to enter and enforce this Consent Decree. Authority to bring this action is vested in the United States Department of Justice pursuant to Section 506 of the Clean Water Act, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519. Authority to bring this action is vested in the Office of the Attorney General of Maryland pursuant to Section 9-344 of the Environment Article, Annotated Code of Maryland.

## II. VENUE

2. Venue is proper in this Court pursuant to Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a).

## III. BINDING EFFECT

3. The provisions of this Consent Decree shall apply to and be binding on Baltimore, its officers, directors, employees, agents, servants, successors and assigns, and upon the United States and State of Maryland.

4. Effective from the Date of Entry of this Consent Decree until its termination, Baltimore shall give written notice, and provide a copy, of this Consent Decree to any person or entity to whom Baltimore may transfer ownership or operation of its POTWs, including any portion of the Collection System. Baltimore shall notify EPA, MDE and the United States Department of Justice in writing of any successor in interest at least twenty-one (21) days prior to any such transfer.

5. Beginning no later than thirty (30) days after the Date of Entry of this Consent Decree, Baltimore shall provide a copy of all relevant and applicable portions of this Consent Decree to each engineering, consulting and contracting firm retained to perform the work or any portion thereof, required by this Consent Decree once the contract relating to such work has been approved by the Baltimore City Board of Estimates. Any action taken by any contractor or consultant retained to implement Baltimore's duties under this Consent Decree shall be considered an action

3

of Baltimore for purposes of determining compliance with this Consent Decree. In an action to enforce this Consent Decree, Baltimore shall not assert as a defense against the United States or the State of Maryland that any of its officers, directors, employees, agents, servants, contractors, successors or assigns are separately and individually responsible for Baltimore's failure to perform under this Consent Decree; however, this Consent Decree shall not limit Baltimore's right to take all appropriate action against any person or entity that causes or contributes to Baltimore's failure to perform.

## IV. **PURPOSE**

6. The express purpose of the Parties entering into this Consent Decree is to take all measures necessary to enable Baltimore to comply with the Clean Water Act, the regulations promulgated thereunder, the Maryland water pollution control laws, the regulations promulgated under such laws, and Baltimore's National Pollutant Discharge Elimination System Permits Nos. MD 21555 and MD 21601.

## V. **DEFINITIONS**

7. Unless otherwise defined herein, the terms used in this Consent Decree will have the meaning given to those terms in the Clean Water Act, 33 U.S.C. §§ 1251 et seq., and the regulations promulgated thereunder or, if not defined in the Clean Water Act or its regulations, then as defined in Title 9, Subtitle 3 of the Environment Article, Annotated Code of Maryland, and the regulations promulgated thereunder.

The following terms used in this Consent Decree, its appendices, and EPA and MDE approved studies and plans will be defined as follows:

A. "Back River Permit" shall mean NPDES Permit Number MD 21601 and State Discharge Permit Number 93-DP-0580A issued to Baltimore pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, and Section 9-323 of the Environment Article, Annotated Code of Maryland, for the Back River Wastewater Treatment Plant located at 8201 Eastern Boulevard, Baltimore, MD 21224, and any future, extension, modification or re-issuance of this permit.

4

B.  "Collection System" shall mean the collection and transmission system (including all pipes, force mains, sanitary sewer lines, combined sewer lines, overflow structures, regulators, lift stations, pumping stations, manholes, and appurtenances thereto) owned by Baltimore and designed to convey sewage to the treatment plant(s) or in wet weather to an overflow, including portions of the system added after the Date of Lodging of the Consent Decree.

C.  "Combined Sewer Overflow" shall mean any spill, release, or discharge from Baltimore's Combined Sewer System.

D.  "Combined Sewer Overflow Structure" shall mean a structure designed to discharge material from a Combined Sewer System at a point prior to the sewage treatment plant(s).  All currently known Combined Sewer Overflow Structures are identified in Appendix A.

E.  "Combined Sewer System" shall mean the portions of the Collection System designed to convey sanitary sewage and storm water through a single-pipe system to a POTW or to an overflow point in the Collection System.  A map of Baltimore's Combined Sewer System is identified in Appendix B.

F.  "Construction Completion" of a construction project under Paragraph 8 or a rehabilitation or other corrective action project proposed under Paragraph 9 shall mean the point in time the new, modified, or rehabilitated facilities are fully functioning and are on line and in service.

G.  "Day" or "days" as used herein shall mean a calendar day or calendar days.  When the day a report or other deliverable is due under this Consent Decree falls on a Saturday, Sunday or any Federal, State of Maryland or Baltimore legal holidays, Baltimore shall have until the next calendar day that is not one of the aforementioned days for submittal of such report or other deliverable, with the exception of overflow reports required by Paragraph 17 of this Consent Decree.

H.  "Dry Weather Overflow" shall mean any discharge from the Collection System that is unrelated to precipitation related flows (including storm water and snow melt runoff).  For

purposes of this Consent Decree only, it shall be presumed that flow in the Collection System more than 72 hours after a rain event or snow melt event is unrelated to rain or snow melt.

I. "Force main" shall mean any pipe that receives and conveys wastewater from the discharge side of a pump. A force main is intended to convey wastewater under pressure.

J. "Gravity sewer line" shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but is intended to flow unassisted under the influence of gravity. Gravity sewers are not intended to flow full under normal operating conditions.

K. "Hydrograph" shall mean the graphical representation of flow volume over time of wastewater, infiltration, and inflow at a particular point in the Collection System. Hydrographs characterize diurnal variations in wastewater flow rates, as well as flow response to a wet weather event, at a particular point in the Collection System.

L. "Major Gravity Line" shall mean any of the following:

i.      all gravity sewer lines that are ten inches in diameter or larger;

ii.     all eight-inch lines that convey or are necessary to accurately represent flow attributable to a service area in each of the Collection Systems sewershed's service areas;

iii.    all gravity sewer lines that convey wastewater from one pumping station service area to another pumping station service area; and

iv.     All gravity sewer lines that have caused or contributed, or that Baltimore knows are likely to cause or contribute, to capacity-related Overflows.

M. "Overflow" shall mean any spill, release, or discharge of wastewater from any portion of Baltimore's Collection System, except from NPDES permitted outfalls.

N. "Parties" shall mean the United States of America, the State of Maryland, and the Mayor and City Council of Baltimore City.

O. "Patapsco Permit" shall mean NPDES Permit Number MD 21555 and State Discharge Permit Number 89-DP-0581, issued to Baltimore pursuant to Section 402 of the Clean Water Act,

6

33 U.S.C. § 1342, and Section 9-323 of the Environment Article, Annotated Code of Maryland, for the Patapsco Wastewater Sewage Treatment Plant located at 3501 Asiatic Avenue, Baltimore, MD 21226, and any future, extension, modification or re-issuance of this permit.

P.   "Private Service Connection Lateral" shall mean that portion of the Collection System, not owned by Baltimore, used to convey wastewater from a building or buildings to that portion of the Collection System owned by Baltimore.

Q.   "Pumping Station" shall mean facilities comprised of pumps which lift wastewater to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that pumping station.  For the purposes of this document, the term "Pumping Station" shall be limited to the following pumping stations:

     i.     Eastern Avenue;

     ii.    Brooklyn;

     iii.   Dundalk;

     iv.   Jones Falls;

     v.    Locust Point;

     vi.   Quad Avenue;

     vii.  McComas Street; and

     viii.  Westport.

R.   "Separate Sanitary Sewer System" shall mean a conduit designed to carry only sewage, and not stormwater, from residences, commercial buildings, industrial plants and institutions for treatment at either the Patapsco or Back River wastewater treatment plants.

S.   "Sanitary Sewer Overflow" shall mean any spill, release, or discharge  from any portion of the Collection System other than Baltimore's Combined Sewer System.

T.   "Sanitary Sewer Overflow Structure" shall mean any structure constructed to allow discharge from the Separate Sanitary Sewer System at a point prior to the headworks of either the Patapsco or Back River wastewater treatment plants. All currently known Sanitary Sewer

7

Overflow structures are identified in Appendix C.

U. "Small Pumping Station" shall mean the Pumping Stations identified in this Paragraph and their respective electrical, mechanical, and structural systems that are necessary to operation of that Pumping Station. The Small Pumping Stations are:

i.    Fort McHenry;

ii.   Clinton Street Pumping Stations; and

iii.  Any other small, package-type macerating pump serving a limited number of users.

## VI. REMEDIAL MEASURES

### 8. Elimination of Sanitary Sewer Overflow and Combined Sewer Overflow Discharges

A. **General Requirements:** Baltimore shall comply at all times with the Clean Water Act and the regulations promulgated thereunder, Title 9, Subtitle 3 of the Environment Article, Annotated Code of Maryland and the regulations promulgated thereunder, and all terms and conditions of the Back River Permit and the Patapsco Permit. Baltimore shall eliminate Sanitary Sewer Overflows and Dry Weather Overflows from the Collection System through development and implementation of the measures set forth in Paragraphs 8 through 15. In addition, Baltimore shall eliminate all Combined Sewer Overflow discharges from its Collection System through development and implementation of the measures set forth in Paragraphs 8 through 15.

B. **Construction Projects:** Baltimore shall complete the construction projects identified in Appendix D for the Jones Falls, Herring Run, and Gwynns Falls sewersheds, the Gwynns Run portion of the High Level sewershed, and the Combined Sewer Areas according to the milestone dates set forth in Appendix D. In addition, Baltimore shall eliminate the Combined Sewer Overflow and Sanitary Sewer Overflow structures identified in Appendices A and C no later than the milestone dates specified in Appendix D for the elimination of such structures. Further, in accordance with the milestone dates set forth in Appendix D, Baltimore shall modify the Sanitary Sewer Overflow structure at the Jones Falls Pumping Station to eliminate the potential to discharge

8

wastewater from such structure, except in the event of operator intervention. Any discharge from the Jones Falls Pumping Station (including those caused by operator intervention) shall be considered an unpermitted discharge for purposes of compliance with the Clean Water Act and Maryland statutes and/or an unauthorized Overflow for purposes of this Consent Decree. In the event that Baltimore fails to eliminate the Sanitary Sewer Overflow Structures as required by this Paragraph or provide certification that it has done so, Baltimore shall submit to EPA and MDE for their approval, no later than thirty (30) days after the date the certification was due, a plan and schedule for the elimination of any Sanitary Sewer Overflow Structures. The milestone dates set forth in Appendix D are incorporated into, and enforceable under, the Consent Decree as if fully set forth herein.

    **C.**   **Separate Sanitary Sewer Characterization Report**:

No later than ninety (90) days after the Date of Entry of this Consent Decree, Baltimore shall submit to EPA and MDE a Separate Sanitary Sewer Characterization Report that includes:

    i.      A map that depicts the Collection System. The map shall depict the locations of the Sanitary Sewer Overflow structures, the sanitary sewers associated with those Sanitary Sewer Overflow structures as well as outfalls, regulators, manholes, and Pumping Stations;

    ii.     For the five (5) years preceding the Date of Entry of the Consent Decree, a list that identifies (where available) the frequency, date, duration and volume (measured durations and volumes where available, or best estimates) of Sanitary Sewer Overflows (on a per event basis), and the magnitude of rainfall events which have typically resulted in overflows for each discharge location; and

    iii.    The cause(s) or condition(s) that contributed to each Sanitary Sewer Overflow (if known).

    **D.**   **Elimination of Combined Sewer Overflows**: No later than June 30, 2002, Baltimore shall separate the Combined Sewer System and eliminate all Combined Sewer Overflow Structures

from the Collection System in the Walbrook neighborhood of Baltimore.  Baltimore shall certify to EPA and MDE by no later than June 30, 2003, in accordance with the requirements of Paragraph 18 ("Reporting"), that it has separated the Combined Sewer System and eliminated all Combined Sewer Overflow Structures from the Walbrook neighborhood.  No later than June 30, 2005, Baltimore shall separate the Combined Sewer System and eliminate all Combined Sewer Overflow Structures from the Collection System in the Forest Park neighborhood of Baltimore.  Baltimore shall certify in accordance with Paragraph 18 (Reporting) to EPA and MDE by no later than June 30, 2006, that it has separated the Combined Sewer System and has eliminated all Combined Sewer Overflow Structures from the Forest Park neighborhood.  In the event that Baltimore fails to separate any portion of the Combined Sewer System and eliminate any Combined Sewer Overflow Structures as required by this Paragraph, or provide the certification that it has done so, Baltimore shall submit to EPA and MDE for their approval, no later than thirty (30) days after the date the certification was due, a plan and schedule for the separation of any remaining portions of the Combined Sewer System and the elimination of any remaining Combined Sewer Overflow Structures.  No later than thirty (30) days after receipt of EPA's and MDE's approval of Baltimore's plan and schedule, Baltimore shall implement the plan in accordance with the approved schedule.

 **E.  Flow and Rainfall Monitoring for Paragraph 8 Construction Projects:**

 i.  For construction projects scheduled to begin prior to December 31, 2003, Baltimore shall provide to EPA and MDE a summary of all flow monitoring data collected prior to beginning construction of such project.

 ii.  For construction projects scheduled to begin after December 31, 2003, Baltimore shall monitor flow and rainfall for eighteen months at all locations necessary to allow the characterization of flow in the portions of the Collection System and overflows impacted from such construction project(s).  Such flow and rainfall monitoring shall be performed in accordance with the requirements of Paragraph 9.E.iii. a, b, c and d.

iii.  Following completion of any construction project, Baltimore shall monitor flow and rainfall for a period of eighteen months to ascertain the effectiveness of the construction project.  Such flow monitoring shall be performed in accordance with the requirements of Paragraph 9.E.iii. a, b, c and d.

iv.  By mutual agreement of the Parties, the eighteen (18) month flow and rainfall monitoring period(s) required by Paragraph 8.E.ii and iii may be shortened.

v.  The results of any flow and rainfall monitoring conducted by Baltimore pursuant to this Paragraph and completed prior to the date a Sewershed Study and Plan for a sewershed in which a construction project is located is due shall be submitted to EPA and MDE as part of such Sewershed Study and Plan.  The results of any flow and rainfall monitoring conducted by Baltimore pursuant to this Paragraph and completed after the date a Sewershed Study and Plan for a sewershed in which a construction project is located is due shall be submitted to EPA and MDE at the time Baltimore certifies that the construction project has been completed.

F.  **Progress Reports**:  Beginning thirty (30) days after the end of the first full calendar quarter following the Date of Entry of the Consent Decree, and thirty (30) days after the end of each calendar quarter thereafter, Baltimore shall report its progress towards completing the work described for each sewershed required by this Paragraph 8.

9.  **Collection System Evaluation and Sewershed Plans**

A.  In accordance with the schedules and procedures specified in this Paragraph 9 of the Consent Decree, Baltimore shall evaluate the Collection System and propose to EPA and MDE a plan for future rehabilitation and other corrective action for each sewershed ("Sewershed Study and Plan").  As specified in this Paragraph 9, Baltimore shall inspect its Collection System in accordance with the criteria specified in Paragraph 9.D, evaluate infiltration and inflow ("I/I") into the Collection System using all appropriate rainfall and flow monitoring data as specified in Paragraph 9.E, and evaluate the Collection System's capacity to collect and convey peak flows experienced by or predicted for the Collection System as specified in Paragraph 9.F.  Each

11

Sewershed Study and Plan proposed by Baltimore shall include the plan elements identified in Paragraph 9.C and shall present the results of the Collection System inspections, the I/I evaluation, and the Long-Term Capacity/Peak Flow Management evaluations.  In addition, each Sewershed Study and Plan shall include specific rehabilitation projects and/or other corrective actions to address the deficiencies identified by Baltimore during its evaluation of its sewersheds.  Each Sewershed Study shall include a schedule for completion of any proposed rehabilitation projects and/or other corrective actions.  Any schedule proposed by Baltimore in its Sewershed Study and Plans shall not extend beyond January 1, 2016.

   **B.  Sewershed Study and Plan**:  Baltimore shall complete an evaluation for each sewershed and submit to EPA and MDE for approval a Sewershed Study and Plan for such sewershed by the dates specified  below:

      i.      Jones Falls – January 1,  2009;

      ii.     Herring Run – July 1,  2009;

      iii.    Gwynns Falls – July 1,  2010;

      iv.    High Level – January 1,  2010;

      v.     Low Level – January 1,  2010;

      vi.    Pataspco – July 1,  2010;

      vii.   Dundalk – July 1,  2010; and

      viii.   Outfall – July 1,  2010.

   **C.  The Sewershed Study and Plan Elements**: In each Sewershed Study and Plan,  Baltimore shall:

      i.      Evaluate the effectiveness of the projects (completed or proposed) pursuant to Paragraph 8.B ("Construction Projects").  Baltimore shall use rainfall and flow monitoring data collected in accordance with requirements of Paragraph 9.E.iii. of the Consent Decree, and shall use the model developed in accordance with Paragraph 12 of the Consent Decree, to demonstrate the effectiveness of the

Construction Projects;

ii.    Identify all deficiencies discovered during the Collection System inspections conducted pursuant to Paragraph 9.D;

iii.    Identify all rehabilitation and other corrective actions taken by Baltimore (including but not limited to grouting, point repairs, line replacement) to address the deficiencies identified during evaluation of a sewershed;

iv.    Identify all rehabilitation and other corrective actions proposed to be taken by Baltimore (including but not limited to grouting, point repairs, line replacement) to address the deficiencies identified during evaluation of a sewershed;

v.    Describe the decision-making criteria used to select future corrective action;

vi.    Propose a plan and schedule for future evaluation of the Collection System within the sewershed that applies the decision-making criteria identified in Paragraphs 9.D.iv and 13.A.i (requiring annual routine inspections of the Collection System);

vii.    Propose a plan and schedule for implementing rehabilitation and other corrective action determined necessary either to correct deficiencies identified during the evaluations of Baltimore's sewersheds or to ensure operation of the Collection System without causing or contributing to a Sanitary Sewer Overflow. For purposes of this Paragraph only, the term "rehabilitation" shall be interpreted in accordance with the meaning ascribed to that term in Chapters 5 and 6 of the Handbook: Sewer System Infrastructure Analysis and Rehabilitation, EPA/625/6-91/030, Oct. 1991 ("SSES Handbook"), and in accordance with the technical procedures for sewer system rehabilitation set forth in Chapter 6 of the SSES Handbook. The proposed plan shall include:

a.    A description of the proposed rehabilitation and other corrective actions to be implemented for the particular sewershed. Any rehabilitation or other corrective actions proposed shall be designed to address defects identified in

13

the Sewershed Study and Plan including but not limited to activities to repair or replace portions of the Collection System, and address and resolve issues related to capacity, and measures to eliminate unauthorized discharges;

b.     The prioritization scheme developed and applied to the rehabilitation projects or other corrective action scheduled under this Paragraph 9.c.vii; and

c.     An estimate of the cost necessary to complete any proposed rehabilitation and other corrective actions;

viii.    Propose a plan and schedule for eliminating those physical connections (i.e., cross-connections) between the Collection System and the storm water collection system that allow or have the potential to allow sanitary waste to be discharged to the storm water collection system;

ix.    Determine for each sewershed the range of storm events as specified in Paragraph 9.F. for which the Collection System in its existing condition can convey peak flows without the occurrence of Sanitary Sewer Overflows. As part of its analysis, Baltimore shall identify all modeled components of the Collection System that cause or contribute to flow restrictions or that have the potential to cause or contribute to overflows;

x.    Predictively determine for each sewershed the range of storm events for which the Collection System will be able to convey peak flows without the occurrence of Sanitary Sewer Overflows. Such determination shall assume completion of the construction projects required by Paragraph 8 of this Consent Decree, and completion of the proposed rehabilitation or other corrective action projects recommended by the Sewershed Study and Plan required by this Paragraph 9. As part of its analysis, Baltimore shall identify all modeled components of the

Collection System that cause or contribute to flow restrictions or that have the potential to cause or contribute to overflows;

xi.    Present the results of the rainfall and flow monitoring conducted in the sewershed, including a map that depicts all monitored locations, dates of monitoring, a description of quality assurance and quality control analyses performed for samples collected and data analyzed and the results of those analyses (i.e., summarize data quality assurance and data "lost" or "qualified"), a description of the smoke testing and dye testing activities performed in the sewershed, and summary of the results of such testing, a quantification of the rates of I/I for the sewershed and the portions of the sewershed's Collection System impacted by I/I, and any identified sources of I/I to the Collection System located in the sewershed;

xii.    Baltimore shall incorporate into each Sewershed Study and Plan a description of additional data collection activities that will be implemented after the completion of rehabilitation and other corrective action(s) proposed pursuant to Paragraphs 9.C.vi. to assess their efficacy; and

xiii.    Certify that the geographic information system ("GIS") described in Paragraph 14.B is fully functioning and capable of displaying the information described in Paragraph 14.B.i through iv, above, for that sewershed.

**D.  Collection System Inspections**:

**i.  Scope and Nature of Inspections**: As part of the evaluation of each sewershed, and as a precondition to submitting a Sewershed Study and Plan for each sewershed listed in Paragraph 9.B, Baltimore shall complete the inspection of:

a.    All gravity lines having a diameter of eight inches or greater using closed circuit television;

b.    all force mains; and

c.    all appurtenances – i.e., manholes, junction chambers, siphons.

15

ii.  Baltimore shall perform the inspections of the Collection System in accordance with the SSES Handbook, "Specification Guidelines; Wastewater Collection Systems Maintenance and Rehabilitation" by the National Association of Sewer Service Companies ("NASSCO") specifications and standards (hereinafter "NASSCO Guidelines"), and sound engineering practice.  Inspection of force mains will be carried out utilizing one or more methodologies appropriate to the specific characteristics of each force main; these methodologies may include, but are not limited to, visual/CCTV, radiography, ultrasonic/sonar and coupon sampling.  Force main inspections shall be carried out in such a manner as to allow adequate assessment of the condition of all parts of each force main.  In addition, Baltimore shall use all appropriate means to identify sources of I/I, including smoke and/or dye testing.  Baltimore shall use smoke and/or dye testing in accordance with the protocols and procedures described in the SSES Handbook.

iii.  **Cross-connecti**ons:  Baltimore shall identify all physical connections between the Collection System and its stormwater collection system.  Consistent with the requirements of Paragraph 9.C.viii, Baltimore shall propose in its Sewershed Study and Plan for each of its sewersheds an expeditious schedule for the elimination of each such connections.

iv.  Baltimore shall record and prioritize rehabilitation and other corrective action proposed under Paragraph 9.C. for all defects identified through the inspections required under Paragraph 9.D.

v.  **Re-inspection**:  Together with each Sewershed Study and Plan, Baltimore shall submit a schedule for re-inspection of each sewershed's Collection System consistent with the requirements of this Paragraph 9.D and the elements of the operation and maintenance program as approved by EPA and MDE pursuant to Paragraph 13 of the Consent Decree.  Re-inspection of the Collection System consistent with the requirements of Paragraph 9.D shall be completed no later than January 1, 2016. Any proposed re-inspection schedule shall include, but not be limited to, a prioritization scheme for further inspection of Collection System components based on the:

a.       Prior identification of defects, including grease blockages and root intrusion;

b.      Expected life of component;

c.      Estimated rate of existing inflow and/or infiltration;

d.      Scheduled rehabilitation or other corrective action of a component; and

e.      A predetermined re-inspection frequency of Collection System components.

vi.   Any re-inspection of the Collection System required by Paragraph 9.D.v shall meet the specification guidelines and standards referenced in Paragraph 9.D.ii.  For purposes of ascertaining whether a portion of the Collection System has been re-inspected under 9.D.v, those components inspected by Baltimore following replacement or slip-lining pursuant to Paragraphs 8 and 9 of this Consent Decree shall be considered re-inspected.

vii.   Where any of the Collection System components have been replaced, rehabilitated, or slip-lined pursuant to this Paragraph 9 or Paragraph 8 of the Consent Decree, Baltimore may request, and EPA and MDE may approve, waiver of the Paragraph 9.D inspection requirements.

**E.   Infiltration and Inflow ("I/I") Evaluation:**

i.   As part of the evaluation of each sewershed, and as a precondition to submitting a Sewershed Study and Plan for any sewershed identified in Paragraph 9.B, Baltimore shall complete the evaluation of I/I into that sewershed's Collection System.  The evaluations shall include identification of sources of infiltration, sources of inflow, and methods for reducing I/I into the Collection System.  For purposes of this Paragraph 9 only, the term "evaluation" shall be interpreted in accordance with the meaning ascribed to that term in sub-chapters 3.3, 3.4, 3.5, 3.6 and Chapter 4 of the SSES Handbook and in accordance with the technical procedures for identification of I/I set forth in sub-chapters 3.3, 3.4, 3.5, 3.6, and Chapter 4 of the SSES Handbook.

ii.   As part of the I/I evaluations required by Paragraph 9.E.i, Baltimore shall conduct rainfall and flow monitoring to:

a.      Determine baseline I/I rates in each sewershed;

b.      Determine the efficacy of the capital projects completed pursuant to Paragraph 8 to

reduce I/I rates; and

c.    To predict the effectiveness of the capital projects required by Paragraph 8 but not yet completed and any additional rehabilitation, or other corrective action proposed by Baltimore in each Sewershed Study and Plan to reduce peak wet weather flows and/or increase capacity such that Sanitary Sewer Overflows do not occur.

### iii.  **Rainfall and Flow Monitoring**:

**a.  Rainfall Gauges:**  To monitor the contribution from rainfall to a sewershed within Baltimore's jurisdictional boundary, Baltimore shall use a network of rain gauge stations with a minimum coverage of one (1) rain gauge station per ten (10) square miles as well as data compiled by Doppler radar utilizing a minimum resolution of one (1) pixel per four (4) square kilometers. In the event that Doppler radar is not used for rainfall data collection within Baltimore, Baltimore shall use a network of rain gauge stations with a minimum coverage of one rain gauge station per two (2) square miles with no fewer than three (3) rain gauge stations per sewershed. To measure the contribution from rainfall occurring in portions of the Collection System sewershed's outside Baltimore City limits, at a minimum, Baltimore shall use a combination of at least two rain gauges located at the Baltimore City/Baltimore County jurisdictional boundary in that sewershed and Doppler radar, to achieve a resolution as close to those described above as is practical. Baltimore shall also, where practical and appropriate, locate additional rain gauges within sewershed areas outside its jurisdiction, on properties owned or operated by Baltimore (such as water treatment facilities), or where practical and appropriate, by agreement with third-parties.

**b.  Flow Monitoring:**  Flow data shall be collected using a system of permanent and temporary flow monitors placed at locations in the Collection System necessary to allow the characterization of flow from each sewershed service area and the characterization of every known Sanitary Sewer Overflow for a period of eighteen months prior to beginning any of the rehabilitation project(s) to be proposed under Paragraph 9 of the Consent Decree and a period of eighteen months following completion of any such rehabilitation project(s). Baltimore shall

18

inspect, maintain and, if necessary, calibrate all flow monitors at least once per week. By agreement of the Parties, the eighteen (18) month flow monitoring period(s) required by this Paragraph may be shortened. For flow measurements performed using telemetry, the Parties may agree to alternative inspection and calibration criteria.

c. Baltimore's flow and rainfall monitoring network shall be designed, installed, operated and maintained to provide representative, accurate, and precise data of sufficient quality for use in development, calibration, and verification of the Model as required by Paragraph 12, for at least ninety (90) percent of the scheduled operation time for each meter. Monitoring site selection, equipment selection and installation, calibration, and maintenance; and data quality assurance checks shall all be carried out to optimize monitoring accuracy, and shall all conform with the equipment manufacturers' recommendations and current, good engineering practice. Field calibration results for each meter shall be submitted, along with an evaluation of the accuracy for each meter. These shall include (for flow monitoring) monitoring site diagrams, scattergraph plots of field data sets, manual field depth and velocity measurements, and (if the site is free flowing) the appropriate pipe curve.

d. Baltimore shall conduct its flow and rainfall monitoring in accordance with the SSES Handbook, NASSCO Guidelines, and sound engineering practice. Rainfall and flow measurements shall be collected in accordance with good industry practice and such measurements shall be handled and analyzed consistent with appropriate quality assurance and quality control procedures that will assure that the measurements are representative of flow conditions and that the data are both accurate and precise.

**F.  Long-Term Capacity/Peak Flow Management**:

i. Baltimore shall use the data and information collected and analyzed in its evaluation of each sewershed conducted pursuant to Paragraph 9 of the Consent Decree to evaluate whether the construction projects required by Paragraph 8 of the Consent Decree and the projects it proposes and/or completes pursuant to Paragraph 9 will ensure adequate long-term transmission capacity in

the Collection System.  At a minimum, Baltimore shall evaluate the hydraulic capacity of all force mains, major gravity lines, and Pumping Stations and their respective related appurtenances (hereinafter referred to as "Collection System Components").

ii.  As part of this evaluation, Baltimore shall use the information, including I/I rates, it is required to develop pursuant to Paragraph 9 of the Consent Decree, including I/I rates, to assess existing and long-term capacity of the Collection System and to evaluate the ability of the Collection System to transmit peak flows experienced by and predicted for the Collection System.  Baltimore shall use flow data and rainfall data collected pursuant to Paragraph 9 and the model required by Paragraph 12 to estimate the impact of peak flows experienced by the Collection System on the capacity of the Collection System Components to manage peak flows.  Peak flows shall be determined using flow monitoring conducted pursuant to Paragraph 9.E and shall take into account variables including, but not limited to:  the average age of the gravity sewer system; soil-type and porosity (where applicable); maximum, minimum and average yearly groundwater elevations; proximity to surface water bodies; tidal influence; amount of drainage area; service area size; land use; historic I/I data; seasonal population patterns (where applicable); and collection system construction materials.

iii.  Baltimore shall determine predicted peak flows for each of its sewersheds under baseline and future flow conditions for each of the following storm events:

a.    The 3-month storm having a duration equal to the time of concentration for the sewershed;

b.    The 20-year, 24-hour storm event; and

c.    Five intermediate storm events, one of which will be the 10-year, 24-hour storm event.

All of the storm events considered shall have temporal rainfall distributions appropriate to the Baltimore region.  Baseline conditions shall be those in effect at the time flow metering is completed in each sewershed.  Future conditions shall be based on reasonable population and

sewer condition deterioration projections for year 2020. Baltimore shall evaluate the effects of completion of the capital projects required under Paragraph 8 and any projects that it proposes to complete pursuant to each Sewershed Study and Plan. The baseline reference shall be the period during which rainfall and flow monitoring were last carried out. Baltimore may consider the utilization of in-line storage capacity in evaluating the capacity of the Collection System and the adequacy of the Collection System Components to both accurately represent wastewater flow attributable to a service area, and to manage peak flows resulting from storm events. Baltimore shall identify the portions of the Collection System with inadequate capacity for each storm event considered.

      iv.  Baltimore shall develop I/I hydrographs for each sewershed. The hydrographs shall be developed using:

        a.      Historical rainfall and flow data;

        b.      Rainfall and flow data collected as required by Paragraph 9.E;

        c.      Population data;

        d.      Winter water use records; and

        e.      Other appropriate information.

Baltimore shall identify and apply widely-used and accepted engineering methodologies to determine baseflow rates and diurnal baseflow variation, dry weather infiltration, relationships between rainfall and wet weather flow volumes and rates in each portion of each sewershed, and to identify a representative hydrograph shape(s). The I/I hydrographs shall be developed for the storm recurrence frequencies identified in Paragraph 9.F.iii. The I/I hydrographs shall be integrated with baseline wastewater, rainfall, and flow data and used in the Model to understand the flow through the Collection System's force mains, major gravity lines, Pumping Stations, and their respective related appurtenances.

      v.  In identifying the impact of the capital improvement projects required by Paragraph 8 of the Consent Decree, and capital projects that Baltimore proposes in any Sewershed Study and

21

Plan(s), on the adequacy of long-term transmission capacity and the ability of the Collection System to transmit peak flows, for EPA and MDE, Baltimore shall:

a.  Identify Collection System Components that restrict flow of wastewater through the Collection System that cause or contribute, or are likely to cause or contribute, to Overflows from the Collection System;

b.  Quantify the maximum flow that each component identified in a., above, can convey without causing or contributing to an Overflow;

c.  Identify all components that cannot manage peak flows during a full range of storm events listed in 9.F.iii without causing or contributing to an Overflow; and

d.  Identify the improvements to the Collection System necessary to ensure adequate long-term capacity consistent with the SSES Handbook during a full range of storm events specified in Paragraph 9.F.iii.

Baltimore shall account for the Collection System's existing and modeled capacity, the estimated population for the year 2020, and estimated sewer deterioration rates in identifying the impact of the capital improvement projects as outlined in this Paragraph.

vi.  The improvements Baltimore shall consider to assure adequate capacity shall include but not be limited to replacement of malfunctioning Pumping Station equipment, installation of Pumping Station back-up equipment, reduction of inflow and infiltration, and installation of larger replacement sewers or relief sewers.

G.  **Sewershed Study and Plan(s) Approval and Implementation**:  Baltimore shall submit its Sewershed Study and Plan(s) by the milestone dates set forth in Paragraph 9.B of the Consent Decree. Within thirty (30) days of receipt of EPA's and MDE's comments on the proposed Sewershed Study and Plan(s), Baltimore shall modify the Sewershed Study and Plan(s) accordingly, and submit the plan of implementation to EPA and MDE for final approval.  Upon receipt of EPA's and MDE's final approval of the Sewershed Study and Plan(s), Baltimore shall implement the plan, which shall be incorporated into, and become enforceable under this Consent

22

Decree.  No later than sixty (60) days after receipt of EPA and MDE approval of each Sewershed Study and Plan, Baltimore shall implement the plan, including any schedule for implementation of rehabilitation and other corrective action.  The schedules proposed by Baltimore in its Sewershed Study and Plans, and approved by EPA and MDE, are each separately enforceable.

**H.  Progress Reports:**

i.  Beginning thirty (30) days after the end of the first full calendar quarter following the Date of Entry of the Consent Decree, and thirty (30) days after the end of each calendar quarter thereafter, Baltimore shall report its progress towards completing the evaluation of each sewershed required by this Paragraph 9.  The progress report shall provide a summary of the length (in feet) of gravity sewer lines evaluated in each sewershed during the previous calendar quarter.

ii.  Beginning thirty (30) days after the end of the first full calendar quarter following EPA's and MDE's approval of the Sewershed Study and Plan for a particular sewershed, and thirty (30) days after the end of each calendar quarter thereafter, Baltimore shall certify and report to EPA and MDE Baltimore's progress towards implementing and completing each Sewershed Study and Plan.  The progress report shall provide the following information:

a.    A summary tabulation of deficiencies identified during the previous calendar quarter through the inspection conducted pursuant to Paragraph 9.A;

b.    The date of completion of the evaluation of each sewershed;

c.    A summary of the length (in feet) of gravity sewer lines evaluated in each completed service area during the previous calendar quarter;

d.    A summary tabulation of deficiencies corrected during the previous calendar quarter; and

e.    A summary of rainfall and flow monitoring data for the three month period ending thirty (30) days before the end of the calendar quarter (organized by sewershed and sewershed service area where appropriate), which shall at a minimum provide daily rainfall amounts, peak hourly rainfall intensity, daily flow volumes, and peak flow

23

rates for each location at which flow monitoring is carried out.

Baltimore shall submit the information in Paragraph 9.H.ii.e above in either Excel or Lotus 1-2-3.

### 10. Illegal Sewer Connections

### A. Illegal Private Connections:

Baltimore shall continue to identify and eliminate each illegal stormwater or sewage connection to the Collection System. Within one hundred eighty (180) days after the Date of Entry of this Consent Decree, Baltimore shall take one or more of the following actions consistent with its authority under Article 25 of the Code of the City of Baltimore:

  i.    Issue a permit as provided under Article 25, § 2-3(b) of the Code of the City of Baltimore for the discharge to individuals qualified to receive such a permit;

  ii.   Initiate an enforcement action to cause the removal of each illegal connection from the Collection System known to Baltimore on the Date of Entry of this Consent Decree; or

  iii.  Initiate the discontinuation of wastewater service.

For purposes of this Paragraph of this Consent Decree, the term "enforcement action" shall mean the issuance of an order by the City to the owner of the property from which the illegal connection originates pursuant to Article 25, § 22-3 or § 22-4 citing violation of the requirements of Article 25, § 2-3(a) of the Code of the City of Baltimore, Maryland. The foregoing remedies shall be cumulative and independent and shall not be deemed to exclude the independent and cumulative utilization of other judicial and administrative remedies provided by law or ordinance.

B. Within one hundred twenty days (120) of the Date of Entry of this Consent Decree, and for each calendar quarter thereafter, Baltimore shall submit to EPA and MDE a report that includes:

  i.    An updated list of known illegal connections;

  ii.   The specific location of each known illegal sewer connection;

24

iii.    Current status of each known illegal connection (i.e., those newly identified, those still connected, those disconnected, and those newly permitted) in the previous calendar quarter;

iv.    Alternative discharge location or method of discharge;

v.    Identity of person or entity responsible for the known illegal sewer connection; and

vi.    The date each known illegal connection was identified.

For purposes of the initial list of illegal connections provided by Baltimore under this Paragraph, item vi. ("the date each known illegal connection was identified"), above, may be satisfied when Baltimore cannot establish the date it first knew of such illegal connection, by stating "unknown."

C.    Within one hundred twenty days (120) of the Date of Entry of this Consent Decree, Baltimore shall submit to EPA and MDE for approval a plan for implementation and enforcement with regard to illegal connections under Article 25 § 2- 4 and §§ 17-1 et seq. of the Code of the City of Baltimore.  The plan shall include at a minimum a:

i.    Proposed annual budget;

ii.    Discussion of the method(s) of enforcement; and

iii.    Program to identify illegal connections and to ensure effective implementation of the ordinance.

D.    Within thirty (30) days of receipt of EPA's and MDE's comments on the proposed plan of implementation and enforcement, Baltimore shall modify the plan of implementation and enforcement accordingly, and submit the plan of implementation to EPA and MDE for final approval.  Upon receipt of EPA's and MDE's final approval of the plan of implementation and enforcement, Baltimore shall implement the plan, which shall be incorporated into, and become enforceable under this Consent Decree.

E.    Beginning thirty (30) days after the first full calendar quarter following the Date of Entry of this Consent Decree, and thirty (30) days after the end of each calendar quarter thereafter,

Baltimore shall certify and report to EPA and MDE the progress Baltimore has made toward complying with the provisions of Paragraph 10.

F. **Privately-Owned Portion of a Customer Service Connection Lateral**: Where a privately-owned portion of a customer service connection lateral that is neither in the public right-of-way nor in a public sanitary sewer easement is a source of I/I that causes or contributes, or is likely to cause or contribute, to an Overflow from the Collection System, Baltimore, within sixty (60) days of the date of the identification of such a lateral, shall notify the owner(s) of the customer service connection lateral(s) that the lateral(s) is a source of such I/I and shall require the owner(s) to take all appropriate steps to repair, rehabilitate, replace, or terminate that customer service connection lateral. Baltimore shall, within six months of identification of a customer service connection lateral that is a source of such I/I, either complete the repair, rehabilitation, replacement, or termination of the customer service connection lateral or initiate enforcement action to cause the repair, rehabilitation, replacement, or termination of a customer service connection lateral where the owner of a privately-owned portion of the customer service connection lateral has failed, after reasonable notice, to take all appropriate steps to repair, rehabilitate, replace, or terminate a customer service connection lateral that is a source of such I/I. For purposes of this Paragraph of this Consent Decree, the term "enforcement action" shall mean the issuance of an order to the owner by the City pursuant to Article 25, § 22-3 or § 22-4 citing violation of the requirements of Article 25, § 2-3 of the Code of the City of Baltimore, Maryland. The foregoing remedy shall not be exclusive of other judicial and administrative remedies provided by law or ordinance.

11. **Pumping Station Inspection, Rehabilitation, and Repair**

A. **Pumping Station Rehabilitation/Repair**: Baltimore shall rehabilitate the Pumping Stations identified below:

    i.    Baltimore shall complete the rehabilitation work of the Brooklyn Pumping Station, as described in Appendix E, on or before October 31, 2001;

ii.      Baltimore shall complete the rehabilitation work of the Dundalk Pumping Station, as described in Appendix E, on or before October 31, 2001;

iii.     Baltimore shall complete the rehabilitation work of the Jones Falls Pumping Station, as described in Appendix E, on or before November 30, 2001;

iv.      Baltimore shall complete the repair work to the Locust Point Pumping Station, as described in Appendix E on or before October 31, 2004;

v.       Baltimore shall complete the rehabilitation work of the Quad Avenue Pumping Station, as described in Appendix E, on or before December 31, 2003; and

vi.      Baltimore shall replace or upgrade the bar screen at the Westport Pumping Station, as described in Appendix E, on or before October 31, 2004.

**B.  Pumping Station Inspection Procedures:**

i.  Baltimore shall continue to inspect each Pumping Station twice daily until such time as the supervisory control and data acquisition ("SCADA") system required by Paragraph 11.C is on-line and Baltimore is able to remotely monitor each Pumping Station's operation for the parameters specified in Paragraph 11.C at that Pumping Station.  At such time, Baltimore shall inspect each Pumping Station once daily.

ii.  Baltimore shall conduct the inspections required by Paragraph 11.B.i to ensure that the Pumping Stations are in good working order according to the inspection checklists attached hereto as Appendix F.  Baltimore shall verify that each Pumping Station is in good working order by completing for each inspection the checklist attached as Appendix F.  Such checklists shall be maintained by Baltimore in accordance with the requirements of Paragraph 66 (Recordkeeping).

iii.  For each deficiency identified during an inspection conducted in accordance with requirements of Paragraph 11.B, Baltimore shall either correct the deficiency within eight hours, or, alternatively, issue a work order for the correction of the deficiency, in which Baltimore shall assign a priority ranking in accordance with the ranking system attached hereto as Appendix G,    and complete action necessary to correct such deficiency within the time frame corresponding to

27

the priority ranking. All such deficiencies shall be corrected by no later than six (6) months from the date of the inspection in which that deficiency was first observed.

    iv.  Baltimore shall maintain at each Pumping Station the operation and maintenance manual required pursuant to Paragraph 11.F.

    **C.  <u>Pumping Station Remote Monitoring</u>:**

    i.  Baltimore shall upgrade its SCADA system for remote monitoring of Pumping Stations no later than two (2) years from the Date of Entry of this Consent Decree.

    ii.  The new SCADA system shall continuously monitor, report, and transmit the following parameters for each Pumping Station:

        a.      Wet well high level and low level alarms;

        b.      Dry well flood alarms;

        c.      Dry well sump pumping failure, where available;

        d.      Flow (instantaneous and average) determined from a flow meter;

        e.      Failure of any one of the following parameters (as a single alarm):

            1.      loss of three-phase power;

            2.      single phase condition;

            3.      phase reversal;

            4.      over-voltage and under-voltage;

            5.      use of standby power;

            6.      failure of standby power; and

            7.      second power source;

        f.      Pump failure (for each pump);

        g.      Pump running times;

        h.      Pump starts; and

        i.      Remote signal failure alarms.

Set points may be established at each Pumping Station and/or the location at which Pumping

Station parameters are monitored.  System performance relative to such set points shall be observed by operators monitoring Pumping Stations remotely.

iii.  The SCADA system shall transmit an alarm notifying Baltimore of Sanitary Sewer Overflows at the Jones Falls Pumping Station and shall continuously monitor, report, and transmit the date, time, and estimated volume of any Sanitary Sewer Overflow.

iv.  With respect to all Pumping Stations, system monitoring data of wet well levels, force main pressures, and energy requirements (kilowatts) shall be stored in an archival data base for a period of five years.  In addition, the Pumping Station operating hours for each pump shall be recorded monthly and entered into an archival data base.  Baltimore shall retain for each month the 24-hour maximum and the monthly average flow data until termination of this Consent Decree.

v.  The new SCADA system shall enable Baltimore to store a record of each alarm generated by the SCADA system that includes the date, time, location, and parameter of the alarm.

vi.  Prior to the SCADA system upgrade, Baltimore shall continue to remotely monitor its Pumping Stations using its existing SCADA system.

vii.  Prior to the SCADA system upgrade, Baltimore shall archive alarm data from the existing SCADA system.

**D.  Pumping Station Equipment Inventory**:  Within thirty (30) days of completion of the Pumping Station projects required under Paragraph 11.A, Baltimore shall assign a unique identification number to each pump, motor, bar screen, and sensor at the respective Pumping Station and update the maintenance information management system ("MIMS") equipment inventory required under Paragraph 14 to include the upgraded equipment.  If physically practicable, Baltimore shall place an identification tag on each such piece of equipment.  For Pumping Stations not identified in Paragraph 11.A, Baltimore shall assign equipment identification numbers to each critical component by no later than ninety days (90) after the Date of Entry of the Consent Decree.

**E.  Pumping Station Preventative Maintenance**:  Baltimore shall implement a pumping

29

station preventative maintenance program to ensure the proper operation and maintenance of its pumping stations by implementing the following measures:

    i.      Within ninety (90) days of completion of each rehabilitation/repair project required under Paragraph 11.A, Baltimore shall update the preventative maintenance standard operating procedures and schedules stored in the MIMS system to reflect all new and/or rehabilitated equipment.

    ii.     Within ninety (90) days of the Date of Entry of the Consent Decree, Baltimore shall develop a procedure (or document existing procedures) for determining the cause of equipment and/or system failures and identifying preventive maintenance measures for minimizing future failures.

    iii.    Routinely track preventative maintenance of Pumping Stations (through MIMS or other maintenance tracking systems), including, but not be limited to, the following:

        a.     Appropriate, necessary and periodic service and calibration of all instrumentation, including flow meters, liquid level sensors, alarm systems, elapsed time meters, and remote monitoring equipment;

        b.     Appropriate, necessary and periodic inspection and service for each Pumping Station, including engines, motors, generators, pumps, wet wells, Pumping Station valves, and related equipment; and

        .     Appropriate, necessary and periodic inspection and testing and, if necessary, servicing of all pumps including impellers, seals and bearings, wear clearances, couplings, drives and motors.

    **F.** **Pumping Station Operation and Maintenance Manuals:** Within ninety (90) days of the Date of Entry of the Consent Decree, Baltimore shall update the existing operation and maintenance manuals. Each operation and maintenance manual shall reflect current station configuration, equipment, and characteristics. Each manual shall provide operating parameter value ranges representing recommended operating levels, and a summary of historical pump run

times. Baltimore shall update the operation and maintenance manual for each Pumping Station, no later than fifteen (15) months after the date for completion of that Pumping Station rehabilitation and repair program identified in Paragraph 11.A.

G. **Progress Reports**: Beginning thirty (30) days after the end of the first full calendar quarter following the Date of Entry of this Consent Decree, and thirty (30) days after the end of every calendar quarter thereafter, Baltimore shall certify and report to EPA and MDE the progress of Baltimore's Pumping Station inspection and repair program. The progress report shall:

i. List each Pumping Station;

ii. Identify the date of completion of the inspection of each Pumping Station;

iii. Identify the date of completion of the repair of each Pumping Station;

iv. Describe the repair or other improvement taken or to be taken with respect to each Pumping Station for which Baltimore has identified either an equipment malfunction or physical deficiencies that could lead to equipment malfunction; and

v. Identify whether a Pumping Station has caused or contributed to an overflow condition during the calendar quarter.

Beginning thirty (30) days after the end of the first full calendar quarter following the Date of Entry of this Consent Decree, and thirty (30) days after the end of each calendar quarter thereafter, Baltimore shall certify and report to EPA and MDE the progress Baltimore has made toward installation and operation of the new SCADA system. This Paragraph shall continue until such time as remote monitoring equipment for each Pumping Station in Appendix E is on-line and, in fact, operational for a period of at least ninety (90) days. Baltimore shall report on a quarterly basis the results of all the failure analyses performed using the procedure required under Paragraph 11.E.ii.

12. **Collection and Transmission System Model**

A. Baltimore shall design, purchase, or develop and install, implement, and maintain a current widely used and accepted (e.g., "XP-SWMM") computerized collection and transmission

system model or models (the "Model") for the Collection System to evaluate the impact of I/1 rehabilitation projects, proposed system modifications, upgrades, and expansions to the transmission capacity and performance of the Collection System. Baltimore shall develop a Model or Models meeting the requirements of this Paragraph for each sewershed and that includes the Model elements identified in Paragraph 12.B. The Model(s) and the data collection activities upon which they are based, shall be developed and implemented so as to ensure that the Model(s) are fully integrated for the Collection System. The integrated Model(s) shall allow Baltimore to assess the capacity of its Collection System, as provided herein, and to identify the measures necessary to address capacity limitations as required by Paragraph 9.F.

**B. Model Elements:**

i. The Model required by this Paragraph shall, at a minimum, be capable of, and be used for, predicting:

    a.    Volume of wastewater flow in the force mains and the Major Gravity Lines;

    b.    Hydraulic pressure (psig) or hydraulic grade line ("HGL") of wastewater at any point in force mains and the Major Gravity Lines;

    c.    Flow capacity of each of the Pumping Stations in the Collection System;

    d.    Flow capacity of each Pumping Station with its back-up pump out-of-service;

    e.    Peak flows for each Pumping Station during storm events of a magnitude of up to 20years; and

    f.    Likelihood and location of overflow(s) within a service area under high flow conditions, including Pumping Station service areas where the Pumping Station's back-up pump is out-of-service, and considering available wet well capacity, off-line storage capacity, and normal in-line storage capacity.

ii. The Model shall also be:

    a.    Configured based on representative, accurate and verified system attribute data (i.e., pipe sizes and invert elevations, manhole rim elevations, etc.);

32

b.    Calibrated using spatially and temporally representative rainfall data and flow data obtained under this Consent Decree pursuant to Paragraph 9.E.iii; and

c.    Verified using spatially and temporally representative rainfall data and flow data; that data shall be independent of the data used to calibrate the Model.

**C.  Model Project Approach Report:**

i.  Within one hundred and fifty (150) days from the Date of Entry of this Consent Decree, Baltimore shall submit to EPA and MDE for approval a report that sets forth a project approach and detailed schedule of development, installation and implementation of the Model for the Collection System (the "Project Approach Report"). The Project Approach Report shall include, at a minimum, the following information:

a.    Model's name and type;

b.    Model's specific attributes, characteristics and limitations;

c.    Base algorithms for each major computational function;

d.    Identification of all input parameters, constants, assumed values and expected outputs;

e.    Computer hardware required to run the Model;

f.    Computer hardware to be used; and

g.    A digital map that identifies and characterizes the portions of the Collection System that shall be included in the Model.

ii.  The Project Approach Report required by this Paragraph 12.C shall also identify how the Model will be adapted to predict wastewater flows through the Collection System, including:

a.    Identification of specific types of input data that are to be used and how attribute data accuracy and representativeness will be assured;

b.    Configuration of the Model;

c.    Procedures and protocols for performance of sensitivity analyses (i.e., how the Model responds to changes in input parameters and variables);

33

d.    Procedures for calibrating the Model to account for values representative of the Collection System using actual system data (e.g., precipitation and flow data), which include measures to assure that calibration variables such as pipe friction factors, are kept within generally-accepted realistic ranges;

e.    Procedures for verification of the Model's performance using actual system data (e.g., precipitation and flow data); and

f.    Procedures and methodologies for the generation of wet weather hydrographs for each sewershed flow monitoring basin.

D.  Within sixty (60) days of receipt of EPA's and MDE's final comments on the Model Project Approach Report required by Paragraph 12.C , Baltimore shall modify the report, consistent with EPA and MDE's final comments, and submit the Model Project Approach Report to EPA and MDE for final approval.  Baltimore shall immediately begin to implement the Project Approach Report upon receipt of EPA and MDE's final approval.  Upon final approval by EPA and MDE of the Project Approach Report shall be incorporated into, and become enforceable under this Consent Decree.

E.  **Model Certification:**  Baltimore shall complete implementation of the Model for each sewershed, on or before submission of the Sewershed Study and Plan required under Paragraph 9, and shall certify to EPA and MDE that:

i.    The Model includes the elements required by Paragraph 12.A and B to complete the work required by Paragraph 9.F; and

ii.    The Model has been calibrated (including the performance of sensitivity analyses) and verified in accordance with the Project Approach Report using actual system data (e.g., flow data) from permanent and temporary monitoring points in the Collection System.

Baltimore shall describe in a report to EPA and MDE, that shall be submitted together with the above-certification, the results of the Model calibration and verification.

34

**F. Progress Report:**   Beginning thirty (30) days after the end of the first full calendar quarter following receipt of EPA and MDE's final approval of the Model Project Approach Report and thirty (30) days after the end of each calendar quarter thereafter until EPA and MDE's acceptance of Baltimore's certification of the Model, Baltimore shall submit to EPA and MDE a report setting forth the progress made by Baltimore during the previous calendar quarter.

**13. Collection System Operation and Maintenance.**

A.  Baltimore shall implement a maintenance program for the Collection System, including its gravity sewer lines, force mains, Pumping Stations and other appurtenances (e.g., manholes, pressure sewers, inverted siphons, meter vaults), to provide for the proper operation and maintenance of equipment while minimizing failures, malfunctions, and line blockages due to the lack of adequate preventative care.  The program shall include:

i.      Re-inspection of the Collection System consistent with the requirements of Paragraph 9.D;

ii.     Routine preventative maintenance of Pumping Stations as described in Paragraph 11.E;

iii.    Sealing (where appropriate), and maintenance, of manholes;

iv.    Identification and remediation of poor construction;

v.     Procedures for ensuring that new sewers and connections are properly designed and constructed (including testing of new sewer installations) to prevent overflows and to ensure that new connections of inflow sources are prohibited;

vi.    Procedures for ensuring that rehabilitation projects are properly designed and constructed (including testing of rehabilitation installations) to prevent overflows;

vii.   A grease control program that, at a minimum, maps identified grease blockages, notifies pretreatment staff of recurring grease blockages, requires the installation of grease traps and/or the implementation of a trap cleaning and inspection program, and a proposal that includes scheduled inspection of known problem areas;

35

viii.    A root control program that addresses, at minimum, scheduling and performing corrective measures including both short-term mitigation of root intrusion (i.e., routine maintenance) and rehabilitation of the areas in which root intrusion has caused recurring blockages (i.e., sewer replacement or relining), and a proposal that includes scheduled inspection of known problem areas;

ix.    Procedures for identification of all known locations where Baltimore does not have ready physical and legal access to the Collection System, the causes for lack of access, and its strategy for obtaining and maintaining access to such location;

x.    Description of method for documenting complaints, work orders, updates to equipment inventory, and changes to Collection System components, as well as entry of such data into databases comprising the information management system required under Paragraph 14; and

xi.    Corrective maintenance response and reporting procedures.

B.   Within one hundred and twenty (120) days of the Date of Entry of this Consent Decree, Baltimore shall provide to EPA and MDE a report describing in detail the program required under Paragraph 13. Baltimore shall submit with the report copies of relevant forms, and product literature for all software, to be used as part of the maintenance program. Within thirty (30) days of receipt of EPA's and MDE's comments on the proposed operation and maintenance program, Baltimore shall modify the program accordingly, and submit the revised program to EPA and MDE for final approval. Upon receipt of EPA's and MDE's final approval of the operation and maintenance program, Baltimore shall implement the program, which shall be incorporated into, and become enforceable under this Consent Decree.

C.   Baltimore shall fully implement the maintenance program required under this Paragraph 13 no later than eighteen (18) months from the date of EPA's and MDE's approval of such program as provided in Paragraph 13.B.

D.   **Progress Reports**: After implementation of the maintenance program required under

36

Paragraph 13, Baltimore shall submit an annual report to EPA and MDE providing:

    i.    A list of complaints related to the Collection System;

    ii.    A list of completed work orders for the calendar year;

    iii.    A list of outstanding work orders;

    iv.    Current preventive maintenance schedules (task description, location, frequency), description of changes made to the schedules during the calendar year, and certification that the current schedules are being followed;

    v.    A list of tests performed of new sewer installations and rehabilitations (location, date, description of new installation and/or rehabilitation);

    vi.    An evaluation of the efficacy of the grease control program (summary of grease-related blockages identified, corrective action taken, preventive action taken, monthly rate of grease-related blockages and (if available) comparison of current and previous year performance, list of referrals to pretreatment staff, identification of remaining persistent and chronic blockage areas);

    vii.    An evaluation of the efficacy of the root control program (summary of root-related blockages identified, corrective action taken, preventive action taken, monthly rate of root-related blockages and (if available) comparison of current and previous year performance, identification of remaining persistent and chronic blockage areas); and

    viii.    An updated list of known locations where Baltimore does not have ready physical and/or legal access to the Collection System and the strategies Baltimore is employing to improve and secure such access to the Collection System.

**14.  Information Management System Program**

A.  Baltimore shall implement an information management system program to establish, update, and coordinate data systems used to collect information regarding the operation, maintenance and performance of the Collection System, including Collection System component inventory information, complaints, work orders, geographic data, and the status of work to be

implemented and completed under the Consent Decree. Baltimore shall design the information management system to assist Baltimore in analyzing data necessary to prepare the progress reports required under Paragraph 13.D and in mapping areas to be excepted from further inspections required by Paragraph 9.D.v.

**B. Geographic Information System.** As part of its information management system program Baltimore shall use a computerized geographic information system ("GIS") to map the Collection System. The GIS shall be able to:

    i.      Display all Collection System components;

    ii.     Use embedded objects (or other alternative, equivalent methods) to link to schematic diagrams and attribute data (including inventory information) for Collection System components;

    iii.    Display by color coding the portions of the Collection System that have been inspected and rehabilitated; and

    iv.    Display the location(s) at which samples from flow meters and rain gauges have been collected for development of the model required under Paragraph 12.

Baltimore shall install all hardware and software necessary for the GIS system and ensure that the system is fully operational by no later than two (2) years from the Date of Entry of the Consent Decree. At that time, Baltimore shall demonstrate to EPA and MDE that the GIS is fully functioning and capable of displaying the information described in Paragraph 14.B.i through iv, above. Baltimore shall complete the installation of the GIS System for a sewershed by no later than the date that the Sewershed Study and Plan for such sewershed is due under Paragraph 9.

**C. 500 Scale Maps.** Within ninety (90) days of the Date of Entry of this Consent Decree, Baltimore shall maintain at the Utilities Maintenance Division offices a complete set of 500 scale maps providing the location of sewers, manholes, meters, and other collection system appurtenances that include a means of cross referencing certain Collection System Components with component inventory data and component construction drawings.

38

**D.  Global Positioning System.**

i.  Within one hundred and twenty (120) days of the Date of Entry of this Consent Decree, Baltimore shall equip Utilities Maintenance Division crews with global positioning system (GPS) units enabling the crews to correct and/or update component information on the Collection System maps.

ii.  Baltimore shall use the GPS units or other equivalent, alternative means to record location of sewer maintenance work related to the removal of tree roots and/or grease, and to record the location of new private sewer connections.  Baltimore shall track and plot this information as part of its root and grease programs required by Paragraph 13.A, and its lateral rehabilitation programs required pursuant to Paragraph 10.

**E.  Inventory of Collection System Components**:  Within two (2) years of the Date of Entry of the Consent Decree, the inventory management system shall include an inventory of the Collection System components.  At that time, Baltimore shall demonstrate to EPA and MDE that the inventory management system is fully functioning and capable of displaying the information identified in this Paragraph 14.E for each component. The inventory database shall store, for each component, a unique identification number and a corresponding data file that stores the following information:

i.       Identification number;

ii.      Capacity (e.g., for pipes: diameter, for valves: flow rate);

iii.     Date of installation;

iv.      Location of installation (address and/or latitude and longitude);

v.       Useful life and scheduled date for replacement;

vi.      Repair history;

vii.     Make and model, if applicable;

viii.    Type (e.g., material of construction, configuration of valve, etc.); and

ix.      Service status (i.e., whether or not component is in service).

**F. Update Inventory of Collection System Components:** Within ninety (90) days of completion of the inspection of a Collection System component required pursuant to Paragraph 9.D. Baltimore shall update the Collection System component inventory such that the updated inventory includes, for the inspected component, the information described in Paragraphs 14.E.i., ii., iv., v., vii., viii., and ix. Within ninety (90) days of completion of the rehabilitation of a Collection System component required pursuant to the terms of the Consent Decree, Baltimore shall update the Collection System inventory such that the updated inventory includes, for the rehabilitated component, the information listed in Paragraph 14.E.

**G. Progess Reports:**

Baltimore shall submit quarterly reports providing:

i.      Percent of system inventoried; and

ii.     Progress towards GIS implementation.

**15. Valve Inspection and Repair Program**

A. No later than one year from the Date of Entry of the Consent Decree, Baltimore shall conduct inspections and exercise all valves identified in Appendix H in service in the Collection System.

B. Baltimore shall inspect, or use other means to determine, whether each valve contains cracks, faults, or is otherwise damaged to such an extent that its function could be impaired.

C. Baltimore shall exercise each valve by operating it in the closed and open position.

D. No later than one year from the Date of Entry of the Consent Decree, Baltimore shall complete the repair or removal of any valve that contains cracks, faults, or is damaged to such an extent that its function could be impaired.

**E. Progress Reports**: Beginning thirty (30) days after the end of the first full calendar quarter following the completion of the work described in Paragraphs 15.A through 15.D, and thirty (30) days after the end of every calendar quarter thereafter, Baltimore shall certify and report to EPA and MDE the progress of the valve inspection and repair program. The progress report

40

shall:

i.      List each valve;

ii.     Identify the date of completion of the inspection of each valve;

iii.    Identify whether the valve is in need of repair;

iv.     Identify the date of completion of the repair of each valve;

v.      Describe the repair or other improvement taken or to be taken with respect to each valve for which Baltimore has identified a crack, fault, or other damage that could impair its function; and

vi.     Identify whether a valve has caused or contributed to an overflow condition during the calendar quarter.

**16.  Emergency Response Plan - Unpermitted Discharges**

A.  Baltimore shall develop and implement an Emergency Response Plan to adequately protect the health and welfare of persons in the event of the unpermitted discharge of pollutants from the Collection System to surface waters (including its storm water system).

B.  Within thirty (30) days of the Date of Lodging of this Consent Decree, Baltimore shall provide to EPA and MDE for approval an Emergency Response Plan that addresses the actions to be taken by Baltimore in the event of the unpermitted discharge of pollutants from the wastewater treatment and collection system to surface waters.  The Emergency Response Plan shall include but not be limited to:

i.      A detailed description of the actions Baltimore will undertake to immediately provide notice to the public (through the local news media and other means) of the unpermitted discharge of pollutants from the wastewater treatment and Collection System to surface waters, including a plan for notifying the public that such discharge has caused an adverse impact on water quality measured by turbidity, dissolved oxygen, fecal coliform, total coliform, or other bacteriological standards required by State law related to the discharge of domestic wastewater.  For purposes

41

of Paragraphs 16 and 17, the phrase "adverse impact" shall mean any decrease in the levels of dissolved oxygen and any increase in the levels of the above-listed pollutants in the water body over background – i.e., the levels in the water body of such pollutants prior to, and immediately upstream of, the discharge.

ii.    A detailed description of the actions Baltimore will undertake to provide notice to EPA, the United States Coast Guard Service, MDE, local law enforcement authorities, state and local public health services, and other appropriate federal, state and local agencies;

iii.    A detailed plan (including the development of response standard operating procedures) to minimize the volume of untreated wastewater transmitted to the portion of the wastewater treatment and collection system impacted by the events precipitating the unpermitted discharge to surface waters and to minimize overflow volumes;

iv.    Identification of the personnel and resources who will be made available by Baltimore to correct or repair the condition causing or contributing to the unpermitted discharge to surface waters;

v.    A plan to ensure the preparedness, including responsiveness training of Baltimore employees, contractors, and personnel of other affected Baltimore agencies necessary for the effective implementation of the Emergency Response Plan in the event of an unpermitted discharge of wastewater to surface waters;

vi.    A detailed monitoring, sampling, analysis and reporting plan to determine if receiving water bodies have been adversely impacted by the discharge of wastewater associated with an overflow event and are meeting state and local water quality standards for, and are experiencing adverse impacts from, turbidity, dissolved oxygen, fecal coliform, total coliform, or other bacteriological standards required by State law related to the discharge of domestic wastewater.  The plan

shall include, at a minimum, a program for the collection of overflow wastewater samples (5-day biochemical oxygen demand, fecal coliform, total suspended solids, entericocci, E-coli, turbidity, and dissolved oxygen) and surface water samples (which shall specify the frequency and duration of samples to be taken, the parameters to be sampled, and the location of such sampling events), a plan to perform laboratory analysis consistent with 40 C.F.R. Part 136, quality assurance/quality control procedures and protocols, and a plan for the reporting of all such data and information to EPA, MDE, and other appropriate federal, state and local agencies. At a minimum, the sampling and analysis of ambient samples collected under this Paragraph shall continue to be collected until Baltimore is able to demonstrate that background levels of the pollutants identified in this Paragraph are achieved. In addition to the sampling that Baltimore shall specify should be undertaken in accordance with the sampling plan to be approved under this Paragraph, EPA or MDE may request, and Baltimore shall conduct, additional sampling and analysis as deemed necessary to evaluate the impact of a discharge event.

vii.  A plan for the implementation of institutional controls and actions to advise the public of, and limit access to and contact with, waterways, ground surfaces and resources affected by the discharge of pollutants from the Baltimore's Collection System (Public Notification Plan). The geographic extent and duration of public access limitations shall be determined in consultation with MDE and appropriate State and local health organizations; and

viii. Identification of overflow locations within the sewershed served by each Pumping Station and those locations at which a Sanitary Sewer Overflow is likely to occur first in the event of Pumping Station failure for each Pumping Station. The plan shall identify existing Pumping Station wet well capacity and any in-line storage

43

capacity. In addition, the annual updates to the plan shall reflect the findings of, and improvements made pursuant to the Sewershed Study and Plans required by Paragraph 9 of the Consent Decree. The Emergency Response plan shall include station-specific emergency procedures and bypass strategies and estimated storage capacity (i.e., maximum volume of sewage that can be stored in the event of a Pumping Station failure without causing a Sanitary Sewer Overflow and estimated time, at minimum, average, and maximum flow rates, during which sewage can be stored before a Sanitary Sewer Overflow will occur).

C. Within thirty (30) days of receipt of EPA and MDE's comments on the Emergency Response Plan for the unpermitted discharges, Baltimore shall modify the Emergency Response Plan accordingly and incorporate all such modifications into the Emergency Response Plan, and submit the Emergency Response Plan to EPA and MDE for final approval. Upon its approval by EPA and MDE, the Emergency Response Plan shall be incorporated into, and become enforceable under, this Consent Decree. Within thirty (30) days of EPA and MDE approval, Baltimore shall implement the plan. The Parties agree to meet and confer, as needed, to discuss the development and implementation of Baltimore's Emergency Response Plan.

D. Baltimore shall review the Emergency Response Plan on an annual basis and update such plan as necessary. Each annual update of the Emergency Response Plan shall be subject to EPA and MDE approval as specified in Paragraph B, above, and upon EPA and MDE approval shall be incorporated into, and become enforceable under, this Consent Decree. Baltimore shall maintain a copy of the Emergency Response Plan required by this Paragraph 16 at each of its Pumping Stations.

E. Any dispute with respect to any portion of the Emergency Response Plan required by this Paragraph shall not delay the development or implementation of the undisputed portions of the Emergency Response Plan.

17. **Reporting of Discharge Events and Recordkeeping**

A. Baltimore shall report to MDE by oral notification any unauthorized discharge of wastewater from the portions of the Collection System within the geographic boundaries of Baltimore to any waters of the United States and waters of the State of Maryland within twenty-four (24) hours of the time Baltimore first becomes aware of the unauthorized discharge. A written report shall also be provided to EPA and MDE within five (5) days of the time Baltimore first becomes aware of the unauthorized discharge. Any written report shall be made to Water Protection Division, United States Environmental Protection Agency, Region III and to the Compliance Program, Water Management Administration, MDE. The written report shall contain the following:

i. The cause of the discharge;

ii. Duration and volume (estimate if unknown);

iii. Description of the source (e.g., manhole cover, Pumping Station);

iv. Type of collection system that overflowed (i.e., combined or separate);

v. Location by street address, or any other appropriate method (i.e., by latitude and longitude);

vi. Date of event;

vii. The ultimate destination of the flow (e.g., surface waterbody, land use location), via municipal separate storm sewer system to a surface waterbody (show location on a map);

viii. Corrective actions or plans to eliminate future discharges; and

ix. Whether or not the overflow has caused, or contributed to, an adverse impact on water quality in the receiving water body.

B. Baltimore shall develop a detailed monitoring, sampling, analysis and reporting plan to determine if receiving water bodies are meeting state and local water quality standards for, and are experiencing adverse impacts from, turbidity, dissolved oxygen, fecal coliform, total coliform,

45

entericocci, E-coli, or other bacteriological standards required by State law related to the discharge of domestic wastewater.  Alternatively, Baltimore may demonstrate to EPA and MDE that existing data and information regarding ambient water quality for the above-referenced pollutants in surface water bodies that could be potentially impacted by discharges from the Collection System is adequate for determining if such water bodies have been adversely impacted by discharges from the Collection System.

C.  Baltimore shall maintain records until termination of the Consent Decree of the following information for each Sanitary Sewer Overflow from the Collection System:

    i.    The location of the overflow and receiving water, if any;

    ii.    An estimate of the volume of the overflow;

    iii.    A description of the sewer system component from which the overflow occurred (e.g., manhole, constructed overflow pipe, crack in pipe, etc.);

    iv.    The estimated date and time when the overflow began and when it stopped;

    v.    The cause or suspected cause of the overflow;

    vi.    Response actions taken;

    vii.    Steps that have been and will be taken to prevent the overflow from recurring and a schedule for those steps including:

        a.    work order records associated with investigation and repair of system problems related to sanitary sewer overflows; and

        b.    documentation of performance and implementation measures; and

    viii.    A list and description of complaints from customers or others regarding overflows.

D.  Baltimore shall maintain for five (5) years a copy of any written reports prepared pursuant to this Paragraph 17, above.

## VII.  REPORTING

18.  Beginning with the first full calendar quarter after the Date of Entry of the Consent Decree, Baltimore shall submit to EPA and MDE within thirty (30) days after the end of each calendar quarter until termination of this Consent Decree a Calendar Quarterly Progress Report ("Calendar Quarterly Report") covering the subject of this Consent Decree.  This Calendar Quarterly Report shall contain, the following:

      i.     Progress reports on the implementation of the requirements of Section VII (Remedial Measures) as described in Paragraphs 8 through 15;

      ii.    A description of any problems anticipated with respect to meeting the requirements of Section VII (Remedial Measures) of this Consent Decree; and

     iii.   A description of all environmentally beneficial projects and SEP implementation activity in accordance with Paragraph 29-33 of the Consent Decree; and

     iv.   Any such additional matters as Baltimore believes should be brought to the attention of EPA and MDE.

The Calendar Quarterly Report shall be certified, consistent with the requirements of 40 C.F.R. 122.22(a)(3), by the person responsible for compliance or by a person responsible for overseeing implementation of this Consent Decree, which shall state:

> I certify under penalty of law that this information was prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my directions and my inquiry of the person(s) who manage the system, or the person(s) directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.

## VIII.  CIVIL PENALTY

19.  Baltimore shall pay a civil penalty to the United States and the State of Maryland in the amount of six hundred thousand dollars ($600,000) for violations as alleged by the United States in the Complaint and the State of Maryland in the Complaint in Intervention, and covering capacity- related overflows occurring during wet weather from the outfalls identified in Appendix D through

the "Construction Completion" milestone date for the project(s) associated with the elimination of Overflows from such outfalls. Baltimore shall pay fifty percent (50%) of the civil penalty to the United States within thirty (30) days after the Date of Entry of this Consent Decree in accordance with Paragraph 21, below. Baltimore shall pay fifty percent (50%) of the civil penalty to the State of Maryland within thirty (30) days after the Date of Entry of the Consent Decree in accordance with Paragraph 21, below.

20. The United States and the State of Maryland shall be deemed judgment creditors for purposes of collection of this penalty.

21. Payment of the civil penalty shall be made by Electronic Funds Transfer ("EFT") to the U.S. Department of Justice ("DOJ") lockbox bank, referencing DOJ No. 90-5-1-1-4402/1. Payment shall be made in accordance with instructions provided by the United States to Baltimore following execution of this Consent Decree. Any EFT received at the DOJ lockbox bank after 11:00 A.M. Eastern Time will be credited on the next business day. Notice of the EFT shall simultaneously be mailed to the following:

> Docket Clerk (3RC00)
> U.S. EPA - Region III
> 1650 Arch Street
> Philadelphia, PA 19103-2029
>
> Joyce A. Howell (3EC00)
> U.S. EPA - Region III
> 1650 Arch Street
> Philadelphia, PA 19103-2029; and
>
> Chief, Environmental Enforcement Section
> Environment and Natural Resources Division
> U.S. Department of Justice
> P.O. Box 7611
> Washington, D.C. 20044-7611
> Reference DOJ Case No. 90-5-1-1-4402/1

The transmittal letter forwarding such notice shall include the caption, civil action number and judicial district of this action. Payments to the State of Maryland shall be made by tendering to the Maryland Department of the Environment, P.O. Box 2057, Baltimore, MD 21203-2057 checks

48

made payable to: "Maryland Clean Water Fund."

22.  If Baltimore fails to tender all or any portion of the civil penalty payment owed to the United States within thirty (30) days of the Date of Entry of this Consent Decree interest on the unpaid amount shall accrue in accordance with the provisions of 28 U.S.C. § 1961 and be paid from the date said payment is due until all amounts owed are paid.

## IX.  STIPULATED PENALTIES

23.  Baltimore shall pay stipulated penalties to the United States and the State of Maryland as specified in this Paragraph 23 for its failure to comply with the requirements of Paragraphs 8 through 17 of the Consent Decree.  Stipulated penalties due and owing under this Paragraph shall be paid in the manner specified in Paragraph 21 of the Consent Decree for the payment of the civil penalty and according to the percentage distribution specified in Paragraph 19.

### Compliance Measures

A.  Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to meet any of the milestone dates identified in Appendix D for the construction projects identified therein, as required by Paragraph 8.B.  The stipulated penalties collectively payable to the United States and the State of Maryland per day for each failure to meet each milestone date are as follows:

| Period of Noncompliance | Penalty per Milestone Date per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 2,500 |
| After 60 days | $ 6,000 |

B.  Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to meet the milestone dates identified in Paragraph 8.D for the elimination of Baltimore's Combined Sewer System and Combined Sewer Overflows.  The stipulated penalties collectively payable to the United States and the State of Maryland per day for each failure to meet each milestone date are as follows:

49

| Period of Noncompliance | Penalty per Milestone Date per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 2,500 |
| After 60 days | $ 6,000 |

C.  Baltimore will pay stipulated penalties to the United States and the State of Maryland for its failure to complete any of the elements of the sewershed evaluations described in Paragraph 9.D. ("Collection System Inspections"), 9.E. (Infiltration and Inflow ("I/I")), and 9.F. ("Long-Term Capacity/Peak Flow Management").  The stipulated penalties collectively payable to the United States and the State of Maryland per day for each failure to complete such an element are as follows:

| Period of Noncompliance | Penalty per Element per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

D.   Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to submit a complete Sewershed Study and Plan(s) as required by Paragraph 9.C by the milestone dates identified in Paragraph 9.B.  The stipulated penalties collectively payable to the United States and the State of Maryland per day for each failure to meet each milestone date are as follows:

| Period of Noncompliance | Penalty per Element per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

E.   Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to implement and complete any approved Sewershed Study and Plan(s) as described therein, or fails to implement the projects described in Paragraph 9.C.ii, vi., and vii

50

according to the schedules proposed and approved pursuant to those paragraphs. The stipulated penalties collectively payable to the United States and the State of Maryland per day for failing to implement and complete any element of an approved Sewershed Study and Plan or to implement any project in accordance with an approved schedule are as follows:

| Period of Noncompliance | Penalty per Element per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

F. Baltimore will pay stipulated penalties to the United States and the State of Maryland for its failure to implement the illegal connections program as specified in Paragraph 10.A and 10.F. The stipulated penalties collectively payable to the United States and the State of Maryland per day for its failure to implement the program are as follows:

| Period of Noncompliance | Penalty per Element per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

G. Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to meet any of the milestone dates identified in Paragraph 11.A for Pumping Station rehabilitation and repair projects. The stipulated penalties collectively payable to the United States and the State of Maryland per day for each failure to meet each milestone date are as follows:

| Period of Noncompliance | Penalty per Milestone Date per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 2,000 |
| After 60 days | $ 4,000 |

H. Baltimore will pay stipulated penalties to the United States and the State of Maryland

51

for its failure to implement and/or complete any of the elements of the Pumping Station program set forth in Paragraph 11.B (Pumping Station Inspection Procedures), 11.C (Pumping Station Remote Monitoring), 11.D (Pumping Station Equipment Inventory), 11.E (Pumping Station Preventative Maintenance), and 11.F (Pumping Station Operation and Maintenance Manuals).  The stipulated penalties collectively payable to the United States and the State of Maryland per day for its failure to implement and/or complete any of the elements identified in this paragraph are as follows:

| Period of Noncompliance | Penalty per Element per Day of Violation |
| --- | --- |
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

I.  Baltimore will pay stipulated penalties to the United States and the State of Maryland for its failure to implement and/or complete any of the elements of the Collection and Transmission System Model program set forth in Paragraph 12.A and provide the certification required by Paragraph 12.F. The stipulated penalties collectively payable to the United States and the State of Maryland per day for its failure to implement and/or complete any of the elements identified in this paragraph are as follows:

| Period of Noncompliance | Penalty per Element per Day of Violation |
| --- | --- |
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

J.  Baltimore will pay stipulated penalties to the United States and the State of Maryland for its failure to implement and/or complete any of the elements of the Operation and Maintenance Program set forth in Paragraphs 13.A and 13.B, the Information Management System Program set forth in Paragraphs 14.A through 14.I, and the Valve Inspection and Repair Program set forth in Paragraph 15. The stipulated penalties collectively payable to the United States and the State of

Maryland per day for its failure to implement and/or complete any of the elements identified in this paragraph are as follows:

| Period of Noncompliance | Penalty per Element per Day of Violation |
| --- | --- |
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

Reports

K.  Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to submit the reports identified in this Paragraph by the milestone dates in the Consent Decree for the submittal of such reports:  Baseline Information Report (8.C); Illegal Connection Reports (10.B and 10.C), Model Project Approach Report (12.B, 12.C, 12.D), Collection System Operation and Maintenance Report (13.B), and Progress Reports.

| Period of Noncompliance | Penalty per Day |
| --- | --- |
| 1st to 60th day | $750 |
| After 60 days | $2,000 |

L.  Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to submit an Emergency Response Plan report (16.B) and Discharge Event Reports (17.A) by the dates required  in the Consent Decree for the submittal of such reports.  The stipulated penalties collectively payable to the United States and the State of Maryland per day for its failure to submit the reports identified in this Paragraph are $3,000 per day.

M.  Overflows:  Baltimore will pay stipulated penalties to the United States and the State of Maryland for all Overflows in the amount set forth in this Paragraph, with the exception of capacity-related, wet weather Overflows from the constructed outfalls identified in Appendix D prior to the respective "Construction Completion" milestone date for the project(s) associated with the elimination of Overflows from such outfalls.  To demonstrate that a capacity-related Overflow was caused by a wet weather event, Baltimore shall demonstrate with flow monitoring records or

53

other engineering data that wet weather conditions caused the Overflow.  The stipulated penalties collectively payable to the United States and the State of Maryland per Overflow event are as follows:

| | |
|---|---|
| Less than 100 gallons | $100 |
| 100 to 2,499 gallons | $500 |
| 2,500 to 9,999 gallons | $1,000 |
| 10,000 to 99,999 gallons | $3,750 |
| 100,000 to 999,999 gallons | $10,000 |
| 1 million gallons or more | $15,000 |

N.  **Stipulated Penalty for the Supplemental Environmental Project:**

Baltimore will pay stipulated penalties to the United States and the State of Maryland for each day it fails to meet any of the design milestone dates identified in the Scope of Work set forth in Appendix I.  The stipulated penalties collectively payable to the United States and the State of Maryland per day for each failure to meet each design milestone date are as follows:

| Period of Noncompliance | Penalty per Milestone Date per Day of Violation |
|---|---|
| 1st to 30th day | $ 1,000 |
| 31st to 60th day | $ 1,500 |
| After 60 days | $ 2,250 |

O.  **Substantial Completion:** Baltimore may petition EPA and MDE to waive the assessment of stipulated penalties under Paragraphs 23.C, D, E, F, H, I, and J.  Baltimore shall submit such petition prior to the compliance deadline provided in the paragraph to which the waiver is related and shall in its submission:

54

    i.     notify EPA and MDE that all program elements or tasks required in that paragraph will not be completed before the deadline;

    ii.    demonstrate to EPA and MDE that it has completed at least 95% of the program elements or tasks required in that paragraph; and

    iii.   either propose an extended deadline for completion of the remaining program elements or tasks; or

    iv.   identify any deficiencies that cannot be cured because no future opportunity exists for doing so.

EPA and MDE shall not disapprove a petition that meets the foregoing criteria but may establish a different reasonable deadline. Baltimore shall pay stipulated penalties to EPA and MDE for failure to meet the extended deadline.

24. If a date by which Baltimore must meet any obligation of this Consent Decree falls on a holiday or week-end, the due date shall be the following business day, with the exception of the obligations set forth in Paragraph 17 of this Consent Decree. Stipulated civil penalties shall automatically begin to accrue on the first day Baltimore fails to satisfy any obligation or requirement of this Consent Decree and shall continue to accrue until the violation or deficiency is corrected. Stipulated penalties shall continue to accrue throughout any dispute resolution process, except that stipulated penalties shall not accrue beginning thirty (30) days after Baltimore seeks judicial review of a dispute pursuant to the Dispute Resolution provisions of this Decree.

25. Payment of stipulated civil penalties as set forth above shall be in addition to any other rights or remedies which may be available to the United States and the State of Maryland or their agencies by reason of Baltimore's failure to comply with the requirements of this Consent Decree and all applicable federal, state or local laws, regulations, wastewater discharge permit(s) and all other applicable permits.

26. Stipulated civil penalties shall be paid no later than thirty (30) days following the first day in which EPA and MDE send to Baltimore a demand for payment of the stipulated penalties

which have accrued to date together with an explanation for the basis(es) for the demand. Payment of stipulated civil penalties shall be paid as provided in Paragraphs 19-21.

27. In the event that a stipulated civil penalty is not paid when due, the stipulated civil penalty owed to the United States shall be payable with interest from the original due date to the date of payment at the statutory judgment rate set forth at 28 U.S.C. § 1961(a).

28. EPA and MDE may, in their sole and unreviewable discretion, waive any stipulated penalties that have accrued against Baltimore pursuant to this Consent Decree.

## X. SUPPLEMENTAL ENVIRONMENTAL PROJECT

29. Baltimore shall complete the following Supplemental Environmental Project ("SEP"), which the parties agree is intended to secure significant environmental protection and improvements which are not otherwise required by law.

30. Baltimore shall complete the SEP pursuant to the work plans and the time schedules described in the Scope of Work (herein after "Scope of Work"), attached hereto as Appendix 1 and incorporated herein by reference.

31. Baltimore shall expend at least $2.72 million for the SEP identified in Appendix 1 and complete the SEP in accordance with the schedule and specifications set forth in Appendix 1 and any scope of work. Baltimore shall include documentation of expenditures made in connection with the SEPs as part of the SEP Completion Report.

32. **Progress Reports**: Baltimore shall submit written quarterly reports to EPA and MDE according to the timetable set forth in Appendix 1, which at a minimum describe:
a) Actions which have been taken toward achieving compliance with this Section of the Consent Decree during the previous calendar quarter; b) Actions to be taken toward achieving compliance with this Section of the Consent Decree during the next calendar quarter; c) Problems encountered and actual delays in the work and any actions taken or to be taken to prevent future delays; and d) Itemized accounting of costs expended for each SEP during the quarter. The first progress report shall be due the first full calendar quarter following the date of project initiation as set forth in

Appendix I. All other quarterly reports shall be due as set forth in Appendix I.

33. Baltimore shall submit a SEP Completion Report to EPA and MDE upon completion of the SEP described in Appendix I. The Report shall contain the following information for the SEP: (a) a detailed description of the SEP implemented; (b) a description of any operating problems encountered and the solutions thereto; (c) itemized costs; (d) certification pursuant to Section VII (Reporting) that the SEP have been fully implemented pursuant to the terms of this Consent Decree; and (e) a description of the environmental and public health benefits which are anticipated to result from implementation of the SEP.

## XI.  EFFECT OF SETTLEMENT

34. Effective upon the Date of Entry of the Consent Decree, and in consideration of the civil penalty payments that will be made, and the injunctive relief and supplemental environmental projects that will be performed by Baltimore under the terms of this Consent Decree, except as expressly set forth in Paragraph 35 (Reservation of Rights), the United States covenants not to bring any administrative or civil judicial action for violations of Sections 301 and 402 of the Clean Water Act as alleged in the Complaint filed in this matter, and the State of Maryland covenants not to sue Baltimore for violations of Sections 301 and 402 of the Clean Water Act and Sections 9-322 and 9-323 of the Maryland Environment Article as alleged in the State of Maryland's complaint in intervention. Entry of the Consent Decree by the Court shall resolve the United States and the State of Maryland's civil claims, except as expressly set forth in Paragraph 35 (Reservation of Rights), for violations of the above-referenced statutory provisions as alleged in the Complaint and in the Complaint in Intervention up to and including the Date of Lodging of the Consent Decree.

35. **Reservations of Rights.**  Notwithstanding any other provision of this Consent Decree, the United States and the State of Maryland reserve, and this Consent Decree is without prejudice to, all rights against Baltimore with respect to all matters other than those expressly included in the Complaint including the following:

A.      Claims based on a failure by Baltimore to meet a requirement of this Consent

Decree;

B.    Claims for stipulated penalties, if any, under the terms of this Consent Decree;

C.    Any criminal liability; and

D.    Claims that a discharge or overflow from the Collection System may pose an imminent and substantial endangerment to health or the environment in accordance with Section 504 of the Clean Water Act, 33 U.S.C. § 504.

## XII.  FORCE MAJEURE

36.  "Force majeure" for the purposes of this Consent Decree is defined as an event arising from causes beyond the control of Baltimore or the control of any entity controlled by Baltimore, including its agents, consultants and contractors, which delays or prevents the performance of any obligation under this Consent Decree.  Unanticipated or increased costs or expenses associated with implementation of this Consent Decree and changed financial circumstances shall not, in any event, be considered force majeure events.  In addition, failure to apply for a required permit or approval or to provide in a timely manner all information required to obtain a permit or approval that is necessary to meet the requirements of this Consent Decree, or failure of Baltimore to approve contracts, shall not, in any event, be considered force majeure events.

37.  When Baltimore knows or if Baltimore should have known, by the exercise of due diligence, of an event that might delay completion of any requirement of this Consent Decree, whether or not the event is a force majeure event, Baltimore shall notify EPA and MDE, in writing, within thirty (30) days after Baltimore first knew, or in the exercise of reasonable diligence under the circumstances, should have known of such event.  The notice shall indicate whether Baltimore claims that the delay should be excused due to a force majeure event.  The notice shall describe in detail the basis for Baltimore's contention that it experienced a force majeure delay, the anticipated length of the delay, the precise cause or causes of the delay, the measures taken or to be taken to prevent or minimize the delay, and the timetable by which those measures will be implemented.  Baltimore shall adopt all reasonable measures to avoid or minimize such delay.  Failure to so

notify EPA and MDE shall render this Section void and of no effect as to the event in question, and shall be a waiver of Baltimore's right to obtain an extension of time for its obligations based on such event.

38.  If EPA and MDE find that a delay in performance is, or was, caused by a force majeure event, it shall extend the time for performance, in writing, for a period to compensate for the delay resulting from such event and stipulated penalties shall not be due for such period.  In proceedings on any dispute regarding a delay in performance, the dispute resolution provisions of Section XIV (Dispute Resolution) shall apply, and Baltimore shall have the burden of proving that the delay is, or was, caused by a force majeure event, and that the amount of additional time requested is necessary to compensate for that event.

39.  An extension of one compliance date based on a particular event shall not automatically extend any other compliance date.  Baltimore shall make an individual showing of proof regarding the cause of each delayed incremental step or other requirement for which an extension is sought.

## XIII.  RETENTION OF JURISDICTION

40.  This Court shall retain jurisdiction of this matter for the purposes of implementing and enforcing the terms and conditions of this Consent Decree and for the purpose of adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree, to the extent that this Consent Decree provides for resolution of disputes by the Court.

## XIV.  DISPUTE RESOLUTION

41.  Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.  However, the procedures set forth in this Section shall not apply to actions by the United States and the State of Maryland to enforce obligations of Baltimore that have not been disputed in accordance with this Section.

42.  Any dispute which arises under or with respect to this Consent Decree shall in the first

instance be the subject of informal negotiations between Baltimore, EPA and MDE. The period for informal negotiations shall not exceed twenty (20) days from the time the dispute arises, unless it is modified by written agreement of Baltimore, EPA and MDE. The dispute shall be considered to have arisen when one party sends the other Parties a written Notice of Dispute.

43. If either Baltimore on the one hand, or EPA or MDE on the other hand, believes it has a dispute with respect to this Consent Decree with the other party it shall, within fourteen (14) days of the circumstances giving rise to the dispute, serve upon the other party a notice, in writing, setting forth the matter(s) in dispute. The Parties shall then attempt to resolve such dispute through informal negotiations. If the dispute cannot be resolved by the Parties within twenty (20) days from receipt of such notice, Baltimore shall comply with the position of the EPA and MDE unless, within forty-five (45) days of receipt of such notice of dispute, Baltimore invokes the formal dispute resolution procedures of this Section by serving on EPA and MDE a written Statement of Position. Baltimore's Statement of Position shall set forth the nature of the dispute with a proposal for its resolution as well as any factual data, analysis or opinion supporting that position and any supporting documentation relied upon. EPA and MDE may, within thirty (30) days of receipt of this petition, serve upon Baltimore their Joint Statement of Position with an alternative proposal for resolution as well as any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA and MDE. In any such dispute invoked by Baltimore, Baltimore shall have the burden of proof. Within twenty (20) days after receipt of EPA's and MDE's Joint Statement of Position, Baltimore may serve a Reply upon EPA and MDE.

44. Following the EPA's and MDE's receipt of Baltimore's Statement of Position submitted pursuant to Paragraph 43, any Joint Statement of Position by EPA and MDE, and any Reply by Baltimore, EPA and MDE, will issue a Joint Final Decision resolving the dispute.
EPA and MDE will use reasonable efforts to issue a Joint Final Decision no later than sixty (60) days after receipt of Baltimore's Reply. Failure by EPA and MDE to issue a Joint Final Decision within the sixty (60) days specified above shall not be interpreted to mean that EPA and MDE have

60

adopted Baltimore's position in the subject of the dispute. EPA's and MDE's Joint Final Decision shall be binding on Baltimore unless, within twenty (20) days of receipt of the decision, Baltimore files with the Court and serves on EPA and MDE, a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the Parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the Consent Decree. The United States on behalf of EPA and MDE may file a response to Baltimore's motion.

45. All documents required by this Section to be served upon either party shall be served upon the addressees and in the manner identified in Paragraph 68 (Notice).

46. Submission of any matter to the Court for resolution shall not extend any of the deadlines set forth in this Consent Decree unless the Parties agree to such extension in writing or the Court grants an order extending such deadline. Stipulated penalties with respect to the disputed matter shall continue to accrue but payment shall be stayed pending resolution of the dispute as provided in Paragraph 44. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this Consent Decree. In the event that Baltimore does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section IX (Stipulated Penalties).

## XV.  **RIGHT OF ENTRY**

47. EPA and MDE, together with their authorized representatives and contractors shall each have authority at all times, upon the presentation of credentials, to enter the premises of Baltimore to:

A.    Monitor the progress of activities required by this Consent Decree;

B.    Verify any data or information submitted to the United States;

C.    Obtain samples, and, upon request, obtain splits of any samples collected by Baltimore or its consultants and contractors;

D.    Observe performance tests;

E.      Inspect and evaluate any portion of the Collection System; and

F.      Inspect and review any record required to be kept under the terms and conditions of this Consent Decree.

These inspection rights are in addition to, and in no way limit or otherwise affect, the EPA and MDE's statutory authorities to conduct inspections, to require monitoring and to obtain information from Baltimore as authorized by law.

## XVI.   NOT A PERMIT/COMPLIANCE WITH OTHER STATUTES/REGULATIONS

48.  This Consent Decree is not and shall not be construed as a permit issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, nor as a modification of any existing permit so issued, nor shall it in any way relieve Baltimore of its obligations to obtain a permit for its POTWs, the Collection System or any other part of its sewage treatment and collection system or facilities, and to comply with the requirements of any NPDES permit or with any other applicable federal or state law or regulation.  Baltimore must comply with any new permit, or modification of existing permits in accordance with applicable federal and state laws and regulations.

49.  Nothing herein shall be construed as relieving Baltimore of the duty to comply with the Clean Water Act, the Maryland water pollution control laws, the regulations promulgated under those acts, and all applicable permits issued under those acts and regulations.

## XVII. FAILURE OF COMPLIANCE

50.  The United States and State of Maryland, do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Baltimore's complete compliance with this Consent Decree will result in compliance with the provisions of the Clean Water Act, 33 U.S.C. §§ 1251 et seq. or with Baltimore's NPDES permits.   Notwithstanding EPA and MDE's review or approval of any plans, reports, policies, or procedures formulated pursuant to this Consent Decree, Baltimore shall remain solely responsible for any non-compliance with the terms of this Consent Decree, all applicable permits, the Clean Water Act and regulations promulgated under that Act.  The pendency or outcome of any proceeding concerning issuance, reissuance, or modification of

62

any permit shall neither affect nor postpone Baltimore's duties and obligations as set forth in this Consent Decree.

51.  Baltimore agrees that it may not assert as a defense to a claim that it is non-compliant with, or in violation of, the Consent Decree, that it has been unable to hire or retain qualified staff.

52.  The Parties agree that from time-to-time they shall consult and meet regarding progress made under the Consent Decree.  Nothing in this Consent Decree shall prevent Baltimore from seeking, or EPA and MDE from approving, interim recommendations made by the City that relate to approvals to be obtained under the Consent Decree.

53.  **Commercial Unavailability:**  Baltimore shall be solely responsible for compliance with any deadline or the performance of any work as described in Section VII (Remedial Measures) of this Consent Decree that requires the acquisition and installation of equipment or contracting with a vendor.  If it appears that the commercial unavailability of equipment or vendor may delay Baltimore's performance of  work according to an applicable implementation schedule, Baltimore shall notify EPA and MDE in accordance with the requirements of Section XIV (Dispute Resolution) of any such delays as soon as Baltimore reasonably concludes that the delay could affect its ability to comply with the implementation schedules set forth in this Consent Decree.  Baltimore shall propose a modification to the applicable schedule of implementation.  Prior to the notice required by this Paragraph 53, Baltimore must have undertaken reasonable efforts to obtain such a equipment and/or contacted a reasonable number of vendors and obtained a written representation that the equipment(s) and/or the vendor(s) are in fact commercially unavailable.  In the notice, Baltimore shall reference this Paragraph 53 of this Consent Decree, identify the milestone date(s) it contends it will not be able to meet, provide EPA and MDE with written correspondence to the vendor identifying efforts made to secure the equipment and/or services of the vendor, and describe the specific efforts Baltimore has taken and will continue to take to find such equipment or vendor.  Baltimore may propose a modified schedule or modification of other requirements of this Consent Decree to address such commercial

unavailability.   Section XIV (Dispute Resolution) shall govern the resolution of any claim of commercial unavailability.  EPA and MDE shall not unreasonably withhold its consent to requests for modifications of schedules of implementation if the requirements of this Paragraph are met. The failure by Baltimore to secure control equipment and vendor shall not constitute a force majeure event triggering the requirements of Section XIII (Force Majeure); this Paragraph shall apply.

## XVIII.  NON-WAIVER PROVISIONS

54.  This Consent Decree in no way affects or relieves Baltimore of any responsibility to comply with any  federal, state or local law or regulation.

55.  The Parties agree that Baltimore is responsible for achieving and maintaining complete compliance with all applicable federal and state laws, regulations, and permits, and that compliance with this Consent Decree shall be no defense to any actions commenced pursuant to said laws, regulations, or permits, except as otherwise expressly specified in the Consent Decree.

56.  The United States and MDE reserve any and all legal and equitable remedies available to enforce the provisions of this Consent Decree.

57.  This Consent Decree shall not limit any authority of EPA and MDE under the Clean Water Act or any applicable statute, including the authority to seek information from Baltimore or to seek access to the property of Baltimore.

58.  Performance of the terms of this Consent Decree by Baltimore is not conditioned on the receipt of any federal, state or local funds.  Application for construction grants, state revolving loan funds, or any other grants or loans, or delays caused by inadequate facility planning or plans and specifications on the part of Baltimore shall not be cause for extension of any required compliance date in this Consent Decree.

59.  It is the intent of the Parties hereto that the clauses hereof are severable, and should any clause(s) be declared by a court of competent jurisdiction to be invalid and unenforceable, the remaining clauses shall remain in full force and effect.

60.  The United States reserves all remedies available to it for violations of the Clean Water Act by Baltimore that are not alleged in the Complaint and for violations of the Clean Water Act by Baltimore that occur after the Date of Lodging of this Consent Decree.  The State of Maryland reserves all remedies available to it  for violations of the Clean Water Act and the State water pollution control laws by Baltimore that are not alleged in the Complaint in Intervention and for violations of the Clean Water Act and the State water pollution control laws by Baltimore that occur after the Date of Lodging of this Consent Decree.

61.  This Consent Decree does not resolve criminal liability, if any, that any person might have for violations of the Clean Water Act.

62.  The Complaint, the Complaint in Intervention, and this Consent Decree shall constitute and establish diligent prosecution by the United States and the State of Maryland, under Section 505(b)(1)(B) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B), and any other applicable federal or state law, of all matters alleged in the Complaint and in the Complaint in Intervention arising from the beginning of the applicable statutes of limitation through the Date of Lodging of the Consent Decree.

63.  Execution of this Consent Decree does not preclude Baltimore from asserting any legal or factual position in any action brought against Baltimore by any person or entity not a party to the Consent Decree.

64.  Nothing in this Consent Decree shall be construed to limit the authority of the United States or the State of Maryland to undertake any action against any person, including Baltimore, in response to conditions that may present an imminent and substantial endangerment to the environment or to the public health or welfare.

## XIX.  COSTS OF SUIT

65.  Each party shall bear its own costs and attorney's fees with respect to matters resolved by this Consent Decree.

## XX.  RECORD KEEPING

66. A.  Baltimore shall maintain copies of any reports, plans, permits and documents submitted to EPA and MDE pursuant to this Consent Decree, including any underlying research and data, for a period of five (5) years from date of submission.  Baltimore shall require any independent contractor operating any portion of the Collection System or implementing any portion of this Consent Decree to also retain such materials for a period of five (5) years from date of submission.

B.  In addition to the reports and documentation required to be provided by Baltimore under the terms of this Consent Decree, Baltimore shall also provide, upon demand, any analytical data or any other documents requested by the United States or State of Maryland to review work done, or to be done, by Baltimore or to determine Baltimore's compliance with the terms of this Consent Decree.

67.  Baltimore shall notify EPA and MDE thirty (30) days prior to the disposal or destruction of such records at the end of this five year period and shall, upon EPA and MDE's request, make such records available to EPA and MDE prior to such disposal or destruction.

## XXI. FORM OF NOTICE

68.  Unless otherwise specified, all reports, notices, or any other written communications required to be submitted under this Consent Decree shall be sent to the respective Parties at the following addresses:

**As to the United States:**
Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
1425 New York Avenue, N.W.
Washington, D.C.  20005

Reference DOJ Case No. 90-5-1-1-4402/1

**As to EPA**:
Joyce A. Howell (3RC20) (Cover letter only)
Senior Assistant Regional Counsel
United States Environmental Protection Agency
Region III
1650 Arch Street
Philadelphia, PA 19103

Angela McFadden (3WP31)
Water Protection Division
United States Environmental Protection Agency
Region III
1650 Arch Street
Philadelphia, PA 19103

**As to State of Maryland**:

Principal Counsel
Maryland Department of the Environment
Office of the Attorney General
2500 Broening Highway
Baltimore, MD 21224

Chief
Enforcement Division, Compliance Program
Water Management Administration
Maryland Department of Environment
2500 Broening Highway
Baltimore, MD 21224

**As to Baltimore**:

Director of Public Works
600 Abel Wolman Municipal Building
200 North Holliday Street
Baltimore, MD 21202

City Solicitor
City Hall
100 North Holliday Street
Baltimore, MD 21202

Notifications to or communications with EPA, MDE and the United States Department of Justice

("DOJ") shall be deemed submitted on the date they are posted.

## XXII.  MODIFICATION

69.  This Consent Decree contains the entire agreement of the Parties.  Prior drafts of the Consent Decree shall not be used in any action involving the interpretation or enforcement of the Consent Decree.  With the exception of modifications pertaining to scheduling and other matters deemed minor by written mutual agreement of EPA, MDE and Baltimore, any modification of this Consent Decree by the Parties shall be in writing and filed with the Court before it will be deemed effective.  Any unilateral attempt by a party to seek modification of the terms of the Consent Decree shall be subject to and consistent with the dispute resolution requirements in Section XIV (Dispute Resolution).  Nothing in this Consent Decree shall be interpreted as modifying the scope and standard of review that the Court will exercise in reviewing a petition for modification.

## XXIII. PUBLIC COMMENT AND ENTRY OF CONSENT DECREE

70.  The Parties agree and acknowledge that final approval by the United States and entry of this Consent Decree is subject to the requirements of 28 C.F.R. § 50.7, which provides for notice of the lodging of this Consent Decree in the Federal Register, an opportunity for public comment, and consideration by the United States of any comments.  This Paragraph does not create any rights exercisable by Baltimore.

## XXIV. TERMINATION

71.  The Consent Decree shall automatically terminate one year after Baltimore has certified to the United States, the State of Maryland and the Court that Baltimore has complied with all of its obligations under this Consent Decree.

72.  The Consent Decree shall not terminate if, following certification by Baltimore of compliance pursuant to Paragraph 71 above, the United States and State of Maryland assert in writing that full compliance has not been achieved.  If the United States and State of Maryland dispute Baltimore's full compliance, this Consent Decree shall remain in effect pending resolution of the dispute by the Parties or the Court in accordance with the Dispute Resolution provisions of this Decree.

## XXV.  <u>SIGNATORIES</u>

73.  The Assistant Attorney General on behalf of the United States and the undersigned representatives of the Mayor and City Council of Baltimore and the State of Maryland certify that they are fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally  bind such party to this document.

Dated and entered this _____ day of _____ 2002.

                            _____

                            United States District Judge

69

WE HEREBY CONSENT to the entry of the Consent Decree in the <u>United States v. Mayor and City Council of Baltimore</u>, Civil Action No.         , subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

FOR PLAINTIFF, THE UNITED STATES OF AMERICA:

DATE: 4.23.02

THOMAS L. SANSONETTI
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

DATE: 4-24-02

ADAM M. KUSHNER
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
1425 New York Avenue, N.W.
Washington, DC 20003
(202) 514-4046

United States Attorney
District of Maryland

DATE: 4-25-02

P. MICHAEL CUNNINGHAM
Assistant United States Attorney
District of Maryland
604 U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland 21201
(410) 209-4881

70

DATE: 4/24/02

_____
WILLIAM C. EARLY
Regional Counsel
U.S. Environmental Protection Agency, Region III

DATE: 4/24/02

_____
JOYCE A. HOWELL
Senior Assistant Regional Counsel
U.S. Environmental Protection Agency, Region III
1650 Arch Street
Philadelphia, PA 19103
(215) 814-2644

DATE:

_____
SYLVIA K. LOWRANCE
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
Washington, D.C. 20460

71

WE HEREBY CONSENT to the entry of the Consent Decree in the <u>United States v. Mayor and City Council of Baltimore</u>, Civil Action No.          , subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

DATE: _____     _____
                          DONALD S. WELSH
                          Regional Administrator
                          U.S. Environmental Protection Agency, Region III


DATE: _____     _____
                          JOYCE A. HOWELL
                          Senior Assistant Regional Counsel
                          U.S. Environmental Protection Agency, Region III
                          1650 Arch Street
                          Philadelphia, PA 19103
                          (215) 814-2644


DATE: 4/23/2002           _____
                          SYLVIA K. LOWRANCE
                          Principal Deputy Assistant Administrator
                          Office of Enforcement and Compliance Assurance
                          United States Environmental Protection Agency
                          Washington, D.C.  20460

71

WE HEREBY CONSENT to the entry of the Consent Decree in the <u>United States v. Mayor and City Council of Baltimore</u>, Civil Action No.          , subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

FOR PLAINTIFF, THE STATE OF MARYLAND:


DATE: 4/24/02        _____
                     JANE NISHIDA
                     Secretary
                     Maryland Department of the Environment


DATE: 4/24/02        _____
                     M. ROSEWIN SWEENEY
                     Principal Counsel
                     Maryland Department of the Environment


DATE: 4/24/02        _____
                     JENNIFER L. WAZENSKI
                     Assistant Attorney General
                     Maryland Department of the Environment
                     2500 Broening Highway
                     Baltimore, Maryland 21224
                     (410) 631-3058

72

WE HEREBY CONSENT to the entry of the Consent Decree in the <u>United States v. Mayor</u> <u>and City Council of Baltimore</u>, Civil Action No.            , subject to the public notice and comment requirements of 28 C.F.R. § 50.7.

FOR DEFENDANT, THE MAYOR AND CITY COUNCIL OF BALTIMORE:

DATE: _April 24, 202_                          _____
                                               MARTIN O'MALLEY
                                               Mayor, City of Baltimore

DATE: _April 24, 2002_                         _____
                                               THURMAN W. ZOLLICOFFER, JR.
                                               City Solicitor
                                               City of Baltimore

DATE: _April 24, 202_                          _____
                                               GEORGE L. WINFIELD
                                               Director of Public Works

DATE: _April 24, 2002_                         _____
                                               PETER KEITH, ESQ.
                                               Special Counsel to Mayor and City
                                               Council of Baltimore
                                               Gallagher, Evelius and Jones
                                               218 North Charles Street, #400
                                               Baltimore, MD 21201
                                               (410) 727-7702

APPROVED FOR FORM AND LEGAL SUFFICIENCY

DATE: _April 24, 2002_                         _____
                                               THURMAN W. ZOLLICOFFER, JR.
                                               City Solicitor

                                               APPROVED BY BOARD OF ESTIMATES

73                                             _____ APR 24 2002
                                               DEPUTY COMPTROLLER

## LIST OF APPENDICES

| | |
|---|---|
| Appendix A | Combined Sewer Overflow Structures |
| Appendix B | Map of Baltimore's Combined Sewer System |
| Appendix C | Sanitary Sewer Overflow Structures |
| Appendix D | Construction Projects for Jones Falls, Herring Run, and Gwynns Falls sewersheds, and the Gwynns Run portion of the High Level sewershed. |
| Appendix E | Pumping Station Rehabilitation and Repair Projects |
| Appendix F | Pumping Station Inspection Checklist |
| Appendix G | Pumping Station Repair Priority Ranking System |
| Appendix H | Wastewater Collection System Valves |
| Appendix I | Biological Nutrient Reduction Supplemental Environmental Project |

# APPENDIX A
## COMBINED SEWER OVERFLOW STRUCTURES

| Number | Manhole Location | Receiving Waters | City Grid Map | | | Type | Treatment Plant | Appendix D Project(s) to Eliminate |
|---|---|---|---|---|---|---|---|---|
| | | | Sheet | Plat | Number | | | |
| 10P | Front 4508 Wentworth Road | CSO Gwynns Falls | 6 | | 2WW | DWI | Patapsco | 22 |
| 11P | West of Hillsdale Road at California Boulevard | CSO Gwynns Falls | 6 | | 2WW | DWI | Patapsco | 22 |
| 13P | NE corner Purnell Drive and Forest Park Avenue | CSO Gwynns Falls | 6 | | 6QQ | DWI / CSO | Patapsco | 22 |
| 18P | Rear 4017 Liberty Heights Avenue | CSO Gwynns Falls | 6 | | 3YY | DWI | Patapsco | 22 |
| 19P | Granada Avenue Alley south of Main Avenue | CSO Gwynns Falls | 6 | | 3YY | DWI | Patapsco | 22 |
| 21P | North of Winterbourne Avenue, east of Chelsea Terrace | CSO Gwynns Falls | 6 | | 7II | DWI / CSO | Patapsco | 22 |
| 27P | Mohawk Path between Liberty and Kathland | CSO Gwynns Falls | 6 | | 1YY | DDSW | Patapsco | 21 |
| 31P | Rear 4310 Kathland Avenue | CSO Gwynns Falls | 6 | | 1YY | DWI | Patapsco | 22 |

Abbreviations:

CSO - Combined Sewer Overflow

DDSW - Direct Discharge to Stormwater

DWI - Dry Weather Interceptor

**APPENDIX B**
**MAP OF BALTIMORE'S COMBINED SEWER SYSTEM**



APPENDIX B
MAP OF BALTIMORE'S COMBINED SEWER SYSTEM



## APPENDIX B
## MAP OF BALTIMORE'S COMBINED SEWER SYSTEM



B-3

APPENDIX C
SANITARY SEWER OVERFLOW STRUCTURES

| Number | Manhole Location | Receiving Waters | City Grid Map Sheet | City Grid Map Plat Number | Type | Outfall Pipe (in) | Control Device | Treatment Plant | Appendix D Project(s) |
|---|---|---|---|---|---|---|---|---|---|
| 5 | Jones Falls Pumping Station, 3600 Ash Street | Jones Falls | 7 | 23YY | SSO | 36 | Weir | Back River | 3, 4, 5 |
| 20 | Front and side 3229 Sherburne Road | Western Run | 1 | 4B2 | SSO | 12 | Flap Gate | Back River | 6 |
| 21 | Cross Country Boulevard and Labyrinth Road | Western Run | 1 | 2KCC2 | SSO | 12 | Flap Gate | Back River | 1 |
| 22 | Cross Country Boulevard and Clarke Lane | Western Run | 1 | 2KCC2 | SSO | 15 | Flap Gate | Back River | 1 |
| 23 | Opposite 6769 Cross Country Boulevard | Western Run | 1 | 3AAA2 | SSO | 15 | Flap Gate | Back River | 1 |
| 24 | Opposite 5932 Cross Country Boulevard | Western Run | 1 | 5AA2 | SSO | 18 | Flap Gate | Back River | 1 |
| 29 | Opposite 2112 Western Run Drive | Western Run | 2 | 13DG2 | SSO | 15 | Flap Gate | Back River | 1 |
| 31 | N/W Corner Glen and Park Heights Avenues | Western Run | 1 | 1WW1 | SSO | 18 | Flap Gate | Back River | 6 |
| 32 | Rear 2900 Glen Avenue | Western Run | 1 | 1UU1 | SSO | 12 | Flap Gate | Back River | 6 |
| 33 | Opposite 5730 Cottonworth Avenue, front of Plaza Office | Jones Falls | 2 | 1REL2 | SSO | 15 | Flap Gate | Back River | 2 |
| 34 | 600 feet south of Plaz Office | Jones Falls | 2 | 1ROO2 | SSO | 15 | Flap Gate | Back River | 2 |
| 36 | Side of 5927 Falls Road | Jones Falls | 2 | 1HGG2 | SSO | 15 | Flap Gate | Back River | 6 |
| 55 | Front 3300 Woodland and Homer Avenues | Gwynns Run | 2 | 9XM1 | SSO | 15 | Flap Gate | Back River | 24 |
| 56 | S/W Corner Ridgewood and Umatilla Avenues | Gwynns Run | 2 | 11II1 | SSO | 18 | Flap Gate | Back River | 24 |
| 57 | Front of 4515 Umatilla Avenue, north of Ridgewood | Gwynns Run | 2 | 11II1 | SSO | 18 | Flap Gate | Back River | 24 |
| 60 | NE corner Liberty Heights and Edgewood Road | Gwynns Run | 7 | 9WW | SSO | 15 | Flap Gate | Back River | 24 |
| 63 | NW corner Liberty Heights and Wabash Avenue | Gwynns Run | 7 | 13UU | SSO | 15 | Flap Gate | Back River | 24 |
| 67 | Approximately 200 feet south of Falls Road | Jones Falls | 8 | 37WW | SSO | 18 | Flap Gate | Back River | 7 |
| 68 | 50 feet south of North Avenue Bridge, 33 feet west of RR tracks | Jones Falls | 8 | 37KK | Siphon Blowoff | 15 | Gate Valve | Back River | 11 |
| 69 | N/W corner Maryland Avenue and Oliver Street | Jones Falls | 8 | 33GG | SSO | 24 | Flap Gate | Back River | 9 |
| 72 | Rear 428 E. Preston St. in RR yard | Jones Falls | 8 | 37GG | SSO | 24 | Flap Gate | Back River | 8, 10 |
| 81 | East of Dukeland Street, south of Wilkens Avenue | Gwynns Falls | 12 | 15S | Siphon Blowoff | 8 | Flap Gate | Back River | 25 |
| 81 | East of Dukeland Street, south of Wilkens Avenue | Gwynns Falls | 12 | 15S | Siphon Blowoff | 8 | Flap Gate | Back River | 25 |
| 84 | Annapolis Road and Clare Street | Gwynns Falls | 13 | 27Y | Siphon Blowoff | 15 | Plug Valve | Back River | 20 |
| 88 | 9600 Govane Avenue, south of Benninghaus Road | Herring Run | 3 | 37 YY1 | SSO | 10 | Flap Gate | Back River | 15 |
| 92 | Bay View Yard south of Penn Central R/R Tracks, west of North Point Road | Herring Run | 15 | 8SA | SSO | 12 | Gate Valve | Back River | 16 |
| 93 | 5400 Trant Avenue at Siewers Avenue | Moores Run | 10 | 67YY | SSO | 8 | Flap Gate | Back River | 13 |
| 94 | Bowleys Lane and Moravia Road | Moores Run | 10 | 63OO | Siphon Blowoff | 15 | Flap Gate | Back River | 16 |
| 103 | Dorchester and Cedardale Avenues | Gwynns Run | 7 | 9YY | SSO | 12 | Flap Gate | Back River | 24 |

C-1

APPENDIX D
CONSTRUCTION PROJECTS FOR ELIMINATION OF SSO AND CSO STRUCTURES

| PROJECT ID NO. | PROJECT | DESCRIPTION AND REMARKS | DATE CONSTRUCTION CONTRACT ADVERTISED | DATE OF PRACTICAL COMPLETION | DATE SSO STRUCTURES ELIMINATED | SSO/CSO STRUCTURES ELIMINATED |
|---|---|---|---|---|---|---|
| | | **UPPER JONES FALLS SEWERSHED** | | | | |
| 1 | Western Run Interceptor (UR Branch) Sanitary Contract No. 760 | 1. Install approximately 880 linear feet of 30-inch parallel relief sewer from UR80 to UR10 along UR80A (ROA). 2. Install approximately 4,100 linear feet of 21- to 24-inch parallel relief sewer from UR20 to UR65. 3. Rehabilitate approximately 5,300 linear feet of existing 18-inch sewer from UR10 to UR20. | June 30, 2002 | June 30, 2004 | June 30, 2005 | Eliminates SSO nos. 21, 22, 23, 24, and 29 |
| 2 | Upper Jones Falls Interceptor (North & South of Hook's Cove Plant) Sanitary Contract 772 | 1. Rehabilitation of approximately 15,500 linear feet of existing 12- to 48-inch sewer located between Mt. Washington flume (UR21) and Jones Falls Pumping Station (JFPS). Approximately 5,500 linear feet of 42-inch sewer and approximately 5,100 linear feet of 48-inch sewer. 2. Lining does not include two sections: JFFR to JFFA, due to inaccessibility, and JFFA to JFFG, relatively new 68-inch sewer with adequate capacity. 3. Manhole and stream bank restoration. | June 30, 2004 | June 30, 2006 | June 30, 2007 | Eliminates SSO nos. 33 and 34 |
| 3 | New Jones Falls Force Main/Pressure Sewer - Lower Section | 1. Replacement of approximately 7,600 linear feet of force main/pressure sewer in Broadway from Cowan to East Clay Street connecting to high-level sewer. 2. Improvements to gate valves and air release valves for existing force main/pressure sewer. | December 30, 2002 | June 30, 2004 | June 30, 2005 | Contributes to elimination of SSO No. 5 |
| 4 | Jones Falls Pumping Station Force Main Pressure Sewer | Upgrade existing force main/pressure sewer to transfer increased flows from rehabilitated/upgraded Jones Falls Pumping Station as well as additional flows from pressure future pumping stations in Stony Run and along the JCA branch. | June 30, 2005 | June 30, 2007 | June 30, 2008 | Contributes to elimination of SSO No. 5 |
| 5 | Jones Falls Pumping Station | Upgrade existing pumping station to handle at least 50 mgd | December 30, 2005 | June 30, 2007 | June 30, 2008 | Eliminates SSO No. 5 |
| 6 | Elimination of Collection System Overflows in Upper Jones Falls Sewershed | Assess hydraulics and design improvements to annex adjacent to overflows | Existing on call contract | June 30, 2003 | June 30, 2004 | Eliminates SSO Nos. 20, 31, 32 and 36 |
| | | **LOWER JONES FALLS SEWERSHED** | | | | |
| 7 | Lower Jones Falls Interceptor (Upper Portion of Gwynns Marsha) Sanitary Contract No. 773 | 1. Install approximately 7,900 linear feet of 18 to 24-inch parallel relief sewer from JGN60 (near Jones Falls Pumping Station) to JGN20 at the connection of the JGE branch). 2. Rehabilitation of approximately 15,900 linear feet of existing sewer ranging from 12- to 60-inch. 3. Inverted siphon rehabilitation at Falls Road chamber (JG50). 4. Stream bank restoration along Union Avenue near Meadow Mills at Woodberry. | July 31, 2003 | June 30, 2005 | June 30, 2007 | Eliminates SSO No. 32 (imode) does not show overflow activity during a 2-year storm, but a 10-year storm has been active) |
| 8 | Stony Run Interceptor and Pumping Station (JGR Branch) | 1. Construct a 20-mgd capacity pumping station near manhole JGF67 in Wyman Park. 2. Install approximately 2,100 linear feet of 24-inch force main from new pumping station to JFPS pressure sewer (length approximately same as location of pumping station). 3. Parallel approximately 4,600 linear feet of existing sewer from south of Coldspring Lane (JGF48) to the new pumping station with 12- to 18-inch sewer. | December 30, 2005 | June 30, 2007 | June 30, 2008 | Contributes to elimination of SSO No. 32; eliminates SSO No. 129 |
| 9 | Maryland Avenue Interceptor (JGR Branch) | 1. Replace (upsize) approximately 4,600 linear feet of existing 12- to 24-inch sewer with new 21- to 36-inch sewer (upsize branch location will be proposed 90-1-A manhole) 2. Improvements to siphon (SSO No. 129 under 1-83 (JGB19). 3. Sewer replacement may require crossing the CLRL. | December 30, 2005 | June 30, 2005 | June 30, 2006 | Eliminates SSO Nos. 69 & 126 |
| 10 | Greenmount Avenue Interceptor and Pumping Station (JGA Branch) | 1. Construct a 15-mgd pumping station near Greenmount Avenue (JGA21) 2. Install approximately 2,600 linear feet of 21-inch force main from new pumping station to JFPS pressure sewer (length depends on location of pumping station). 3. Line approximately 8,000 linear feet of 15- to 33-inch existing sewer from JGA16 to new pumping station. | December 30, 2005 | June 30, 2007 | June 30, 2008 | Contributes to elimination of SSO No. 72 |
| 11 | Elimination of Sigman Blowoff (South of North Avenue Bridge, west of RR tracks) | 1. Cleaning and inspection of siphon with repairs as necessary. 2. Elimination of blow off | On call contract | June 30, 2004 | June 30, 2005 | Eliminates SSO No. 84 |

D-1

APPENDIX D
CONSTRUCTION PROJECTS FOR ELIMINATION OF SSO AND CSO STRUCTURES

| PROJECT ID NO. | PROJECT | DESCRIPTION AND REMARKS | DATE CONSTRUCTION CONTRACT ADVERTISED | DATE OF PRACTICAL COMPLETION | DATE SSO STRUCTURES ELIMINATED | SSO/CSO STRUCTURES ELIMINATED |
|---|---|---|---|---|---|---|
| | **HERRING RUN SEWERSHED** | | | | | |
| 12 | Moores Run Interceptor - Middle Section Storm Drain #27 | Construction of approximately 4850 linear feet of 18-inch, approximately 900 linear feet 24-inch, approximately 1900 linear feet of 27-inch and approximately 100 linear feet of 30-inch sewer to replace existing interceptor | June 30, 2003 | June 30, 2005 | June 30, 2006 | Contributes to elimination of SSO Nos. 114 and 119 |
| 13 | Moores Run Interceptor - Lower Section | Construction of approximately 6900 linear feet of 42-inch, approximately 2700 linear feet of 36-inch siphon, and approximately 3700 linear feet of 54-inch sewer to replace the existing interceptor | June 30, 2005 | June 30, 2007 | June 30, 2008 | Eliminates SSO No. 93 |
| 14 | Moores Run Interceptor - Upper Section | Construction of approximately 1700 linear feet of 18-inch and approximately 2200 linear feet of 27-inch sewer to replace the existing interceptor | June 30, 2005 | June 30, 2006 | June 30, 2008 | Contributes to elimination of SSO Nos. 114 and 119 |
| 15 | Elimination of Combined System Overflows in Herring Run Sewershed | Assess hydraulics and design improvements to areas adjacent to overflows | Existing on-call contract | June 30, 2003 | June 30, 2004 | Eliminates SSO Nos. 84 and 109 |
| 16 | Elimination of Siphon Blowoffs (Bay View Tract south of RR tracks - Boarkely Lane/Moravia Road) | 1. Cleaning and inspection of siphons with repairs as necessary 2. Elimination of blow-offs | On-call contract | June 30, 2004 | June 30, 2005 | Eliminates SSO Nos. 92 and 94 |
| | **GWYNNS FALLS SEWERSHED** | | | | | |
| 17 | Powder Mill System improvements including UIR Branch in Gwynns Falls Sewershed | Rehabilitation of approximately 12,000 linear feet of 12- to 24-inch conveyance piping and approximately 33,000 linear feet of 9- to 10-inch collection piping | June 30, 2003 | June 30, 2006 | June 30, 2007 | Eliminates SSO Nos. 289*, 299*, 309* and 339* |
| 18 | Dead Run System Improvements | Clean, inspect and rehabilitate of approximately 29,000 linear feet of 12- to 24-inch conveyance piping and approximately 11,000 linear feet of 8- to 10-inch collection piping | June 30, 2003 | June 30, 2006 | June 30, 2007 | Eliminates SSO Nos. 184* and 174* |
| 19 | Maidens Choice Interceptor | Clean, inspect and rehabilitate 12,400 linear feet of 12- to 24-inch conveyance piping | June 30, 2004 | June 30, 2007 | June 30, 2008 | Eliminates SSO Nos. 239 and 249* |
| 20 | Elimination of Siphon Blowoffs (Annapolis Road and Clare Street, Chesholm Rd. west of Frankintown Rd.) | 1. Cleaning and inspection of siphons with repairs as necessary 2. Elimination of blow-offs | On-call contract | June 30, 2004 | June 30, 2005 | Eliminates SSO Nos. 84 and 22* |
| | **COMBINED SEWER AREAS** | | | | | |
| 21 | Westbrook | Implementation of Long Term Control Plan and combined sewer separation design in Westbrook area | June 30, 2003 | June 30, 2002 | June 30, 2003 | Eliminates CSO No. 21* |
| 22 | Forest Park | Implementation of Long Term Control Plan and combined sewer separation design in Forest Park area | December 30, 2004 | June 30, 2005 | June 30, 2006 | Eliminates CSO Nos. 10*, 11*, 12*, 13*, 18*, 19*, 20*, 25*, 26*, 27*, 129 and 131 and 31* |
| | **HIGH LEVEL SEWERSHED** | | | | | |
| 23 | Gwynns Run Interceptor | Improvements to the Gwynns Run Interceptor | December 30, 2004 | June 30, 2006 | June 30, 2007 | Eliminates SSO Nos. 106, 107 and 120 |
| 24 | Gwynns Run Improvements | Assess hydraulics and design improvements to areas adjacent to overflows | June 30, 2013 | June 30, 2016 | June 30, 2017 | Eliminates SSO Nos. 55, 59, 57, 60, 67, 103, 126, 127, 129 and 131 |
| 25 | Elimination of Siphon Blowoffs (east of Loudoun Street, south of Wilkens Avenue) | 1. Cleaning and inspection of siphons with repairs as necessary 2. Elimination of blow-offs | On-call contract | June 30, 2004 | June 30, 2005 | Eliminates SSO Nos. 79 and 81* |
| | **LOW LEVEL SEWERSHED** | | | | | |
| 26 | Elimination of Siphon Blowoff (east of 850 Uretica Avenue) | 1. Cleaning and inspection of siphon with repairs as necessary 2. Elimination of blow-off | On-call contract | June 30, 2004 | June 30, 2005 | Eliminates SSO No. 32* |

**APPENDIX E**
**PUMPING STATION REHABILITATION AND REPAIR PROJECTS**

**Sanitary Contract 9539 – Brooklyn Pumping Station**

- Replace the existing pump controls with variable frequency drives.
- Replace the bar screen.
- Replace the existing two (2) sluice gates and associated operators.
- Replace the existing three (3) valve actuators with electric actuators.
- Install new instrumentation and control systems.
- Upgrade the lighting and ventilation systems.
- Construction to divide the single chamber wet well.

**Sanitary Contract 8338 – Dundalk Pumping Station**

- Replace the existing four (4) pumps with new pumps and variable frequency drives and controls.
- Upgrading the electrical service to provide 480-volt, 3-phase power.
- Replace the existing two (2) screens and conveyor belt.
- Replace the existing three (3) generators with a new 1,000 kW generator.
- Upgrade the lighting and ventilation systems.
- Replacement of existing valve actuators with new electrical valve actuators.
- Replacement of existing aluminum slide gates with new stainless steel gates with electric motor operators.
- Installation of a new instrumentation and control system.

**Sanitary Contract 7508 – Jones Falls Pumping Station**

- Replace the existing vertical pumps with horizontal units.

E-1

APPENDIX E
PUMPING STATION REHABILITATION AND REPAIR PROJECTS

- Replace the existing flowmatcher pump controls with variable frequency drives.
- Dividing the wet well into three (3) sections.
- Upgrade the primary and secondary power systems.
- Flood proofing of the station to elevation 144.0'.
- Provide a mezzanine level for electrical equipment.
- Replace the bridge crane.
- Installation of two (2) stainless steel bar screens.
- Replace the sluice gates and operators with new gates with motorized operators.
- Upgrade the lighting and ventilation systems.
- Construction of two (2) new screen effluent channels.
- Replacement of existing valve actuators with new electrical valve actuators.
- Installation of new sump pumps and piping.
- Installation of new instrumentation and control system
- Installation of new flood doors and sluice gates and closure of existing wall openings and louvers.
- Installation of a fence grounding system.

Rehabilitation of the Locust Point Pumping Station

- Replace the existing two (2) pumps with new pumps and controls
- Rehabilitate the existing emergency generator.
- Replace the hydraulic valve actuator and stem seal on cone valve A.
- Reconfigure the pump piping arrangement.
- Construct a split wet well.
- Upgrade the lighting and ventilation systems.
- Repair or repair the instrumentation system.

E-2

**APPENDIX E**
**PUMPING STATION REHABILITATION AND REPAIR PROJECTS**

**Sanitary Contract 9505 – Quad Avenue Pumping Station**

- Replace the three (3) existing pumps with new dry pit submersible pumps with variable frequency drives and new pump controls.
- Replace existing bar screen with new stainless steel bar screens.
- Replace existing eight (8) sluice gates and operators with new stainless sluice gates and frames with motorized gate operators.
- Replace the dry well and wet well ventilation and air analyzer systems.
- Replace existing three (3) plug valves and three (3) cone valves.
- Replace the existing valve actuators with electric actuators.
- Replace a magnetic flow meter.
- Replace the existing generator with a new 500 kW unit.
- Upgrade the lighting systems and installation of a grounding grid.
- Replace the driveway and roofing system.
- Replacement of the drywell sump suction valve on pump #1.
- Upgrade of the 480 volt 3-phase power system.
- Installation of a new instrumentation and control system.
- Replacement of grating and modification of the screen room at the operational level.

**Renovation of the Westport Pumping Station**

- Replace the existing bar screen with a climber type screen.

**Wastewater Pumping Stations**
**Equipment Checklist**

Station: _____    Date: _____    Time: _____

| Area | ✓ | Task | Equipment Operable? | Job Request Needed? | Remarks |
|------|---|------|---------------------|---------------------|---------|
| Entry | ☐ | Check incoming power source | YES   NO | YES   NO | _____ |
| Controls | ☐ | Check alarm lights | YES   NO | YES   NO | _____ |
| Control Room | ☐ | Record pumping times | | | _____ |
| Control Room | ☐ | Check/replace recording charts | YES   NO | YES   NO | _____ |
| Control Room | ☐ | Check pump control configuration | YES   NO | YES   NO | _____ |
| Control Room | ☐ | Switch pump leads sequence | | | _____ |
| Control Room | ☐ | Check wet well operating level | | | _____ |
| Dry Well | ☐ | Drain Process Air Line Condensation | | | _____ |
| Dry Well | ☐ | Check Air Compressor Operating Pressure | | | _____ |
| Dry Well | ☐ | Check Air Compressor Oil Level | | | _____ |
| Dry Well | ☐ | Check Hydropneumatic System Reservoir Level | | | _____ |
| Dry Well | ☐ | Check Hydropneumatic Sysem Air Pressure | | | _____ |
| Exit | ☐ | Make sure equipment is back on normal operation | | | _____ |
| Exit | ☐ | Secure building | | | _____ |
| | | Verify operation of the following equipment: | | | |
| Dry Well | ☐ | No. 1 Main Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 2 Main Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 3 Main Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 4 Main Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 5 Main Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 6 Main Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 1 Waterseal Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 2 Waterseal Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 3 Waterseal Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 1 Vacuum Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 2 Vacuum Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 3 Vacuum Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 4 Vacuum Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 5 Vacuum Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 6 Vacuum Pump | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 1 Air Compressor | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 2 Air Compressor | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 3 Air Compressor | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 1 Bar Screen | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 2 Bar Screen | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | Hydropneumatic System | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | Wet Well Exhaust Fans | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | Dry Well Exhaust Fans | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 1 Main Pump Cone Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 2 Main Pump Cone Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 3 Main Pump Cone Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 4 Main Pump Cone Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 5 Main Pump Cone Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 1 Main Pump Plug Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 2 Main Pump Plug Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 3 Main Pump Plug Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | No. 4 Main Pump Plug Valve | YES   NO | YES   NO | _____ |
| Dry Well | ☐ | Dry Well Sump Pump | YES   NO | YES   NO | _____ |
| Wet Well | ☐ | Bubbler System | YES   NO | YES   NO | _____ |
| Barscreen | ☐ | Barscreen area fans | YES   NO | YES   NO | _____ |
| Barscreen | ☐ | Barscreen rakes | YES   NO | YES   NO | _____ |
| Backup Power | ☐ | Emergency Generator | | YES   NO | _____ |

Supervisor I: _____    Date: _____
Supervisor II: _____    Date: _____
Operations Supervisor: _____    Date: _____

F-1

**WASTE WATER PUMPING STATIONS**
# STANDARD OPERATING PROCEDURE

| TO: ALL EMPLOYEES | | FROM: B.G. IVINS |
|---|---|---|
| ATTN: SUPERVISORS | SUBJECT: TRUCK CREW STATION INSPECTION | |

All Stations shall be inspected twice each day and a checklist will be completed for each inspection.

ALL PERSONNEL ARE TO PERFORM A GENERAL INSPECTION WHEN ENTERING A STATION:

| | Purpose |
|---|---|
| 1. LISTEN FOR ANY AUDIBLE ALARMS BEFORE ENTERING STATION. ALSO CHECK ALARM PANEL INDICATOR LIGHTS FOR ALARMS AFTER ENTERING. NOTE ANY PROBLEMS IN STATION LOGBOOK. | Verfiy equipment failures, create historical record for trouble shooting and facility management. |
| 2. CHECK INCOMING POWER TO VERIFY PRIMARY POWER SOURCE. | Verify primary power source. |
| 3. RECORD DATE AND TIME OF VISIT. | Maintain authorized entry record. |
| 4. CHECK OR CHANGE RECORDING CHARTS. (MARK DATE & TIME). | Ensure recording of operation data. |
| 5. CHECK ALL ALARM LIGHTS AND TEST LAMPS. | Verify that alarms are working. |
| 6. NOTE PUMPING TIME FOR EACH PUMP UNIT. | Verify proper pump operation. |
| 7. CHECK CONFIGURATION OF PUMP CONTROLS. | Alternating sequence management. |
| 8. SWITCH PUMP LEAD SEQUENCE. | Maintain equal pump wear. |
| 9. CHECK WETWELL OPERATING LEVEL. | |
| 10. CHECK OPERATION OF PUMPS AND CHECK VALVES. | |
| 11. DRAIN PROCESS AIR CONDENSATION. | Prevent moisture from entering process equipment. |
| 12. CHECK DRYWELL SUMP PUMP. | Prevent dry well flooding. |
| 13. CHECK AIR COMPRESSOR PRESSURE. | Ensure sufficient air pressure to actuate equipment. |
| 14. CHECK AIR COMPRESSOR OIL LEVEL. | Ensure proper amount of oil in compressor to prevent seizing. |
| 15. CHECK HYDROPNEUMATIC SYSTEM RESERVOIR LEVEL. | Ensure sufficient water level to actuate equipment. |
| 16. VERIFY HYDROPNEUMATIC SYSTEM AIR PRESSURE. | Ensure normal operating pressure. |
| 17. VERIFY OPERATION OF WET WELL, DRY WELL, AND BAR SCREEN EXHAUST FANS. | Prevent low oxygen levels and/or accumulation of gases in area. |
| 18. VERIFY OPERATION OF BARSCREEN RAKES | Prevent accumulation of solids on screens. |
| 19. BEFORE LEAVING THE FACILITY MAKE SURE THAT ALL EQUIPMENT IS RETURNED BACK TO NORMAL OPERATION AND THE BUILDING AND GROUNDS ARE PROPERLY SECURED. | |

The Supervisor I on the truck crew or the designated lead operator shall be responsible for completing the checklist during each station visit. A signature is required on each sheet.

| SIGNATURE: | TITLE: MANAGER | DATE: |
|---|---|---|
| CODE: PS.- | SUPERSEDES: NA | REMOVAL DATE: |

## APPENDIX G
## PUMPING STATION REPAIR PRIORITY RANKING SYSTEM

MAINTENANCE PRIORITY CODES                 Reissue 3/1/00

Job priority codes are used by maintenance to schedule work orders in order of their importance to operations.  Operations will specify a priority for each work request based upon the following guidelines:

| Priority | Class | Description |
|---|---|---|
| 1 | Emergency | Immediate corrective maintenance is required to avoid imminent danger to life or essential facilities or major violations of the City's discharge permits. Takes preference over all other maintenance work (including jobs in progress) and must be worked around the clock until condition is stabilized. |
| 2 | Urgent | Jobs that must be accomplished as soon possible. Generally applied to repair of key process units which lack suitable back up or when call-ins off shift are required. |
| 3 | Special | Jobs that normally are considered routine, but because of special circumstances, such as dependence upon scheduled area shutdowns or precedence to other jobs requests in system should be considered a higher priority than routine.  Most due-dated (promised) work will fall into this category. |
| 4 | Routine | Jobs that must be completed as soon as practical. Majority of work will be in this category including most preventive maintenance, overhauls, and repairs to back-up process units. |
| 5 | Convenient | Jobs that are desirable but may be completed when normal work is slack.  Normally consists of backlog of work, which can be used to smooth out peaks and valleys in manpower loads. |

Within any non-emergency priority, work orders will be generally assigned on the basis of the following:

> .Due dates (if specified); otherwise
> .First-in, First-out;
> .Common location to minimize travel; and
> .Common equipment system to minimize down time.

Priorities of work orders in backlog will be reviewed with Operations at regular coordination meetings and revised as appropriate.

APPENDIX H
WASTEWATER COLLECTION SYSTEM VALVES

| Name of Facility | Type of Valve | Valve Size | Location | Sanitary Contract No. | Comments |
|---|---|---|---|---|---|
| Brooklyn Pump Station | Gate Valve | 20" | Valve vault - Hanover Street | 9539 | Pump Station Isolation Valve |
| Dundalk Pump Station | Plug Valve | 30" | Concrete vault - Parking Lot outside the pump station | 8338 | Pump Station Isolation Valve |
| Eastern Avenue Pump Station | Gate Valve | 42" | Outside valve vault #1 | 594 | |
| | Gate Valve | 42" | Outside valve vault "A" | 594 | |
| | Gate Valve | 42" | Outside valve vault "B" | 594 | |
| | Gate Valve | 42" | Outside valve vault #4 | 594 | |
| | Gate Valve | 42" | Outside valve vault #3 | 594 | |
| | Gate Valve | 24" | Outside valve vault #6 | 594 | Valve is not in use |
| | Gate Valve | 42" | Outside valve vault #5 | 594 | |
| | Gate Valve | 42" | Outside valve vault "C" | 594 | |
| | Gate Valve | 42" | Outside valve vault "C" | 594 | |
| | Gate Valve | 60" | Outside valve vault "C" | 594 | |
| Jones Falls Force Main | Gate Valve | 30" | Valve vault - Chestnut Street | 530 | |
| | Gate Valve | 30" | Valve vault - 33nd Street west of Chestnut Street | 530 | |
| Southwest Diversion Structure | Sluice Gate | 6'6' x72" | Baltimore Street | 628 | Flow diversion to Patapsco WWTP |
| | Sluice Gate | 36" x72" | Baltimore Street | 628 | Flow diversion to Back River WWTP |
| Western Run Diversion Structure | Sluice Gate | 24" x24" | Western Run Drive - MH-32 & 33 | 692 | |

Appendix I

City of Baltimore
Department of Public Works
Bureau of Water and Wastewater
Patapsco Wastewater Treatment Plant
Biological Nutrient Removal Design Project

## SUPPLEMENTAL ENVIRONMENTAL PROJECT

The City of Baltimore, in support of the Chesapeake Bay Agreement, will design biological nutrient removal ("BNR") improvements to the Patapsco Wastewater Treatment Plant ("WWTP") with the objective of reducing nutrient (i.e., nitrogen and phosphorus) discharge to the Patapsco River and subsequently the Chesapeake Bay to achieve the future total maximum daily loads ("TMDLs") for the Patapsco River and to ultimately comply with future permit limitations for nitrogen and phosphorus.

The Patapsco WWTP BNR Project work shall include the evaluation of historical wastewater characteristics data; the evaluation of prior BNR studies; and the performance of pilot BNR testing of the Patapsco effluent and bench-scale testing of portions of the Patapsco effluent to screen treatment alternatives and to maximize nitrogen removal capabilities of selected treatment processes. In addition, the BNR work will include the development of conceptual designs of selected alternatives to identify the most cost-effective means to remove nitrogen from the Patapsco WWTP flow prior to discharge.

The Patapsco BNR Project design will be developed to the 30% completion stage, including the collection of the geotechnical data and site condition information. A value engineering review will be performed at the 30% completion stage. The Patapsco BNR design project will be further developed through the 60%, 90%, 100%, and bid-ready document stages, and will include the preparation of the civil, structural, hydraulic, process, mechanical, electrical, HVAC, instrumentation/control designs and preparation of the construction plans, specifications, and cost estimates.

The preliminary cost opinion for all design work to bid-ready completion is at least approximately $13,600,000 with the City's share estimated as at least $2.72 million. To construct the Patapsco WWTP BNR facilities with minimal impact on its capability to maintain treatment, the design process will stage the BNR facilities improvements into at least three (3) major construction contracts. The design and associated stages of construction contracts will be scheduled to ensure maintenance of the Patapsco WWTP's wastewater treatment capabilities during construction and to minimize the site congestion resulting from multiple construction

contracts. Conceptually, the Patapsco BNR project design (and consequently construction) sequence will start with BNR treatment of the Low Level portion of the Patapsco wastewater flow followed by the design and construction of the new BNR facilities and concluding with the design and construction of the existing facilities BNR modifications. While portions of the design and construction phases could be overlapped, the sequence of construction schedule may reflect the completion and operation start-up of one contract prior to removing the treatment facilities of the next construction contract from service.

The design portion of the Patapsco WWTP BNR Project will be completed by Baltimore by the project design milestone dates set forth below:

### Milestone Dates for Study/Design of Patapsco WWTP BNR Project

| Activity | Notice to Proceed | Completion |
|---|---|---|
| Study/30% Design | March 2002 | August 2004 |
| Low Level BNR Design | November 2003 | May 2005 |
| New BNR Facilities Design | March 2004 | March 2006 |
| BNR Modifications Design | June 2007 | June 2009 |

Baltimore shall submit to EPA and MDE the design memorandum for the Study/30% Design phase of the Patapsco WWTP BNR Project no later thirty (30) days after the August 2004 Study/30% Design completion milestone date. Baltimore shall submit to EPA and MDE a detailed process flow diagram (specifying volumetric flow rates and nutrient concentration for influent, effluent, and internal process streams (i.e., for flow between treatment elements and other pieces of critical equipment)), treatment elements, and critical pieces of equipment.

The final BNR design shall incorporate the most effective technology transferable to the BNR treatment works site and available to Baltimore as of March 2002. Baltimore shall design the BNR process to remove the amount of nutrients achievable within the limits of this technology, and estimates that currently available technology can achieve effluent concentrations as low as 5 mg/l to 3 mg/l.

Baltimore may apply to EPA and MDE to extend the milestone dates set forth above for the Low Level Design, New BNR Facilities Design, and the BNR Modifications Design phases

I-2

of the Pataspco WWTP BNR Project. Such application for extension shall be based upon the conclusions reached by Baltimore as result of the work performed in connection with the "Study/30% design phase" of the Pataspco WWTP BNR Project. Consistent with the Chesapeake Bay Agreement, under no circumstances shall the dates for the Low Level Design, New BNR Facilities Design, and the BNR Modifications Design phases of the Pataspco WWTP BNR Project be extended to cause completion of the construction of the BNR project to extend beyond December 31, 2010.

It is expressly understood that this SEP is for completion of design phases only, and does not include any phase of actual construction.

1-3

E-FILED; Baltimore City Circuit Court
Docket: 10/30/2024 6:35 PM; Submission: 10/30/2024 6:35 PM
Envelope: 18628434

# EXHIBIT 2

**CITY OF BALTIMORE**
**DEPARTMENT OF PUBLIC WORKS**
**BUREAU OF WATER AND WASTEWATER**
**WATER AND WASTEWATER ENGINEERING DIVISION**
**AGREEMENT FOR PROJECT NO. 1001**

THIS AGREEMENT entered into this _____ day of _____, 2006, by and between the Mayor and City Council of Baltimore, a municipal corporation of the State of Maryland, (hereinafter referred to as the "CITY"), and Black & Veatch Corporation with its principal office located at 18310 Montgomery Village Avenue, Suite 500, Gaithersburg, Maryland 21217, (hereinafter referred to as "CONSULTANT").

WHEREAS, the CITY and the CONSULTANT wish to enter into an Agreement for Project No. 1001, Herring Run Collection System Evaluation and Sewershed Plan, whereby the CONSULTANT will provide engineering services.

NOW, THEREFORE, THIS AGREEMENT WITNESSETH; that in consideration of the promises contained herein and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## A.    PROJECT SCOPE

The project involves completion of a comprehensive evaluation of the Herring Run sewage collection system and development of a sewershed plan to comply with Paragraph 9 of the Consent Decree (CD) issued by the United States Environmental Protection Agency (EPA) and the State of Maryland Department of the Environment (MDE) to the Mayor and City Council of Baltimore, Maryland.

Paragraph 9 of the CD requires the City to:

- Inspect its collection system in accordance with sub-paragraph 9.D.

- Evaluate infiltration and inflow (I/I) using appropriate rainfall and flow monitoring data as specified in sub-paragraph 9.E.

- Evaluate the collection system's capacity to collect and convey peak flows experienced by and predicted for the collection system as specified in sub-paragraph 9.F.

- Present a plan that includes the elements identified in sub-paragraph 9.C.

- Submit a plan that presents the results of the collection system inspections, the I/I evaluation, and long-term capacity/peak flow management evaluations.

- Present specific rehabilitation projects and/or other corrective actions to address deficiencies identified during the evaluation of the collection system.

1

- Present a schedule for completion of any proposed rehabilitation project and/or other corrective action.

The detailed Scope of Services is included as Attachment A to this Agreement.

**B.     TIME FOR COMPLETION**

This Agreement will commence upon approval by the Baltimore City Board of Estimates, and remain in effect for a period of 42 months or until the upset limit is reached, whichever occurs first.

**C.     SERVICES TO BE PROVIDED BY CONSULTANT – GENERAL**

1.    CONSULTANT shall review historical data, including but not limited to soil data filed among the records of the Department of Public Works prior to and as an integral part of the design process.

2.    CONSULTANT shall take reasonable care to review plans, drawings, specifications, plats, design and documents prior to finalization and submission of the final Design Documents to the CITY to provide that the said drawings, specifications, design and documents are consistent.

3.    To the extent that "as-built" conditions can be visually observed, CONSULTANT shall research and verify the accuracy of CITY records and "as-builts" prior to incorporating information gleaned from these records and "as-builts" into the design of the project.

4.    CONSULTANT shall submit invoices and progress reports every month.  The progress report should describe progress by task, including any decision made by the CONSULTANT and CITY that may effect completion of the project, design cost and/or estimated construction cost.

**D.     CONSULTANT'S PROFESSIONAL RESPONSIBILITY AND STANDARD OF CARE**

1.    By execution of this Agreement, the CONSULTANT agrees to the following:

a.    The CONSULTANT is an experienced architectural and/or engineering firm having the skill and the legal and professional ability necessary to perform all the Services required of it under this Agreement in connection with the design and/or engineering of a project having the scope and complexity of the project(s) and/or tasks contemplated herein.

b.    The CONSULTANT has the capabilities and resources necessary to perform its obligations hereunder.

c.    The CONSULTANT is familiar with all current and applicable laws, rules and regulations that are applicable to the design and construction of the project(s) and/or tasks, and that all drawings, specifications and other

2

documents prepared by the CONSULTANT shall be prepared in accordance with and shall accurately reflect and incorporate all such laws, rules and regulations.

2.   The CONSULTANT hereby represents and agrees that the drawings, specifications and other documents prepared by it pursuant to this Agreement shall be sufficiently detailed and functional for the purposes intended.   The Project(s) and/or tasks, if constructed in accordance with the intent established by such drawings, specifications and other documents shall be structurally sound and sufficiently detailed for a properly functioning facility suitable for the purposes for which it is intended.

3.   The CONSULTANT shall be responsible for any negligent error, inconsistencies or omissions in the drawings, specifications, and other documents.  It shall be the responsibility of the CONSULTANT throughout the period of performance under the Agreement to use due care with professional competence.   The CONSULTANT will immediately correct at no additional cost to the CITY any and all errors and omissions in the drawings, specifications and other documents prepared by the CONSULTANT.  The CONSULTANT further agrees, at no additional cost to render assistance to the CITY in resolving problems relating to the design or specified material.

4.   It is the responsibility of the CONSULTANT to make certain that all drawings, specifications and other documents are in accordance with applicable laws, statutes, building codes and regulations and that appropriate approvals are obtained from federal, state and local governments, as necessary.  The design shall conform to the Uniform Federal Accessibility Standards, and/or the Americans with Disabilities Act, if applicable.

5.   The Consultant shall be responsible for the technical accuracy of its services and documents resulting there from, and the City shall not be responsible for discovering deficiencies therein.  The Consultant shall correct such deficiencies without additional compensation, except to the extent such action is directly attributable to deficiencies in City furnished information.

## E.   OBLIGATIONS OF CITY

1.   The CITY will, promptly after approval of this Agreement by the Board of Estimates, designate a Project Engineer having general authority and responsibility to act with respect to this Agreement.

2.   The CITY will provide access to all appropriate information in its possession concerning the assigned tasks, including design and construction documents.

3

CONSULTANT shall not assign this Agreement, nor shall any part of the work be done, nor material furnished under such Agreement without prior written consent of CITY, nor any right to any monies to be paid hereunder without the prior written notification of the CITY.

6. In the performance of the work covered by this Agreement, CONSULTANT shall not discriminate against any worker because or race, creed, age, color, sex, political affiliation, national origin, sexual orientation or qualified handicap.

7. CONSULTANT warrants that he has not employed or retained any company or persons, other than a bona fide employee working solely for the CONSULTANT, to solicit or secure this Agreement and that he has not paid or agreed to pay any company or person, other than a bona fide employee working solely for the CONSULTANT, any fee, commission, percentage, brokerage fee, gift or any other consideration, contingent upon or resulting from the award or making of this Agreement. For breach or violation of this warranty, CITY will have the right to annul this Agreement without liability, or, in its discretion, to deduct from the Agreement price or consideration or otherwise recover the full amount of such fee, commission, percentage, brokerage fee, gift or contingent fee.

8. All project specific sketches, drawings, record drawings, and other materials prepared by CONSULTANT in connection with the proposed work shall become the sole and absolute property of CITY when CONSULTANT has been compensated for services rendered. All such documents prepared by CONSULTANT pursuant to this Agreement are instruments of service in respect to the project. They are not intended or represented to be suitable for reuse by CITY or others on extensions of the project or on any other project. Any reuse without prior written verification or adaptation by CONSULTANT for the specific purpose intended will be at CITY's sole risk and without liability or legal exposure to CONSULTANT.

9. CONSULTANT agrees to maintain a working office within the CITY, or convenient thereto, where CITY representatives may review or discuss proposed features as the work progresses.

10. The CONSULTANT shall follow all applicable Federal and State grant and technical requirements, Baltimore City Codes, and the Maryland Occupational Safety and Health Act (MOSHA) as they may apply to the services to be performed, and all other Federal and State laws and regulations. Notwithstanding the above, if a change in any law or regulation increases the cost of CONSULTANT'S work or services, then CONSULTANT will be entitled to an equitable adjustment to its schedule and compensation.

11. CONSULTANT shall indemnify, save and hold harmless the CITY, its officers, agents and employees from any and all liability, claims, suits, demands, actions, damages and expenses (including reasonable attorney fees) of whatsoever kind

and by whomsoever brought against the CITY, it officers, agents and employees, arising from or in connection with any willful or negligent act, error or omission of CONSULTANT, its employees or agents in the performance of this Agreement. This requirement shall be included in all subconsultant agreements.

12.     CONSULTANT shall not engage, on a full or part-time basis, during the period of the Agreement, any professional or technical personnel who are or who have been at any time during the period of the Agreement in the employ of the Public Works organization of CITY; the Public Works organizations of any of the Maryland Counties; the State MDE or the Federal Environmental Protection Agency, except regularly retired employees, without consent of the Head, Bureau of Water and Wastewater.

13.     CONSULTANT shall submit a progress chart accompanied by a monthly narrative progress report setting forth the status of the services to be performed, delays resulting from lack of sufficient data, or by lack of decisions, and other pertinent factors salient to the prosecution of work.

14.     CONSULTANT shall furnish a list of employees and their current hourly pay rate for all personnel to be performing services. CONSULTANT shall furnish a five (5) year history of salary escalation and projection of future increases for personnel to be providing the services to be performed, and the specific job classification for each. Projections are required to allow payment for wage increases during the duration of the Agreement. CONSULTANT will advise CITY'S Project Manager in writing of revisions to the personnel roster.

15.     CONSULTANT agrees to prosecute the work continuously and diligently and that compensation or extension of time resulting from delays, not the fault of CONSULTANT shall be settled by agreement with the Head, Bureau of Water and Wastewater. The parties understand that CONSULTANT shall not be in default under this Agreement for delays in performance caused by circumstances beyond its reasonable control. Should such circumstances occur, CONSULTANT shall, within a reasonable time of being prevented from performing, give written notice to CITY and shall be entitled to an equitable adjustment in schedule and compensation.

a)      Subject to the power and authority of the Director of Public Works as provided by Law, the Head, Bureau of Water and Wastewater shall in all cases, determine the amount or quantity, quality and acceptability of the work and materials which are to be paid for under this Agreement, shall decide all questions in relation to said work and the performance thereof, and shall, in all cases, decide questions which may arise relative to the fulfillment of this Agreement or to the obligations of the CONSULTANT thereunder.

b)      To prevent disputes and litigation where the CONSULTANT is not satisfied with the decision of the Head, Bureau of Water and Wastewater,

6

the CONSULTANT shall submit the claim to the Director of Public Works, or his designee, who will decide any dispute between the CONSULTANT and the CITY, and his determination, decision and/or estimate shall be a condition precedent to the right of the CONSULTANT to receive any monies under this Agreement, and is subject to review on the record by a court of competent jurisdiction.

16.    The CONSULTANT shall maintain records of all actions, and accurate books of account for all funds received and disbursed, with full documentation to substantiate the transactions. Records shall be retained for a period of at least three (3) years, and at least five (5) years for USEPA Consent Decree required projects after receipt of the final payment under this Agreement. The CONSULTANT shall notify the CITY of the destruction of any of these records ninety (90) days prior to said destruction. If CONSULTANT and its parent organization should cease to exist, custody of the records for the Agreement will be immediately transferred to the CITY.

17.    At such times and in such forms as the CITY may require, there shall be made available to the CITY such statements, records, reports, data and information as the CITY may request pertaining to matters covered by this Agreement. The CITY reserves the right to publish and/or make public any and all such statements, records, reports, data and information resulting from the services provided hereunder. But, the CONSULTANT must obtain the prior written consent of the CITY to publish and/or make public any statement, record, report, data or information resulting from the services provided hereunder. Notwithstanding anything to the contrary herein, CONSULTANT shall not be restricted in any way from releasing information in response to a subpoena, court order, or legal process, but shall notify CITY of the demand for information before CONSULTANT responds to such demand.

18.    During the period required in Paragraph 16 of this Agreement and at any time during normal business hours and as often as the CITY/or its representatives may deem necessary, there shall be made available to the CITY or its representative for examination, all of the CONSULTANT'S records with respect to all matters covered by the Agreement, and CONSULTANT will permit the CITY or its representative to audit, examine and make excerpts of transcripts from such records, and to make audits of all contract invoices, materials, payrolls, and other data relating to all matters covered by this Agreement.

19.    The completed Architect-Engineer Questionnaire fled by the CONSULTANT with the City of Baltimore Office of Boards and Commissions and heretofore accepted by the CITY for this project is incorporated herein by reference and made a part of this Agreement, and its existence is considered a condition precedent to the engagement of the CONSULTANT. Dependence has been placed thereon by the CITY in determining the CONSULTANT'S fitness to satisfactorily execute the scope of work covered by this Agreement and any

material adverse misstatement therein bearing upon CONSULTANT'S ability shall render this Agreement voidable at the option of the CITY without liability on its part for payment of compensation to the CONSULTANT as herein provided. CONSULTANT is responsible to advise the CITY on a continuing basis at any time and from time to time of any changes in the identity of principals or officers of the CONSULTANT'S firm who are identified in the Questionnaire and are intended by CITY to be actively engaged in the services to be performed.

20.    If CONSULTANT files for bankruptcy, is forced into bankruptcy by creditors, or is otherwise declared bankrupt under any Chapter of the Bankruptcy Code, it shall be considered an immediate event of default of this Agreement, and the CITY may instantly terminate this Agreement, at its sole discretion. In the event of termination all funds held by the City that are due to the CONSULTANT for completed work will be paid to the Trustee in Bankruptcy appointed by the Court.

21.    This Agreement may be executed in multiple copies, and each such copy shall be deemed an original.

22.    No failure by the CITY to exercise and no delay in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

23.    By executing this Agreement, CONSULTANT asserts that it has not engaged in any practice or entered into any past or ongoing agreement that would be considered a conflict of interest with the instant agreement. CONSULTANT agrees to refrain from entering into all such practices or agreements during the term of the instant agreement (and any extensions thereto), including any agreements and/or practices that could give rise to even the appearance of a conflict of interest.

       Furthermore, CONSULTANT asserts that it has fully disclosed to the CITY any and all practices and/or agreements of whatever nature or duration that could give rise to even the appearance of a conflict of interest with the parties or subject matter of the instant agreement and will continue to do so during the term of this Agreement and any extensions thereto.

24.    This writing contains the complete and integrated Agreement between the parties. Other than writings or documents which are specifically incorporated by reference, no oral or written representations are a part of the Agreement. The Agreement may be amended only in writing, and only by signature of authorized representatives.

25.    The Consultant shall procure and maintain during the life of this agreement, the following required insurance coverage;

      i.    Worker's Compensation coverage as required by the State of Maryland, as well as any similar coverage required for this work by applicable Federal or "other States" State Law.

      ii.    Professional Liability, Errors, and Omissions Insurance at a limit of not less than One Million Dollars ($1,000,000) in the event that services delivered pursuant to this Agreement, either directly or indirectly, involves or requires professional services, Professional Liability, Errors, and Omissions coverage shall be provided. "Professional Services" for the purpose of this Agreement shall mean any services provided by a licensed consultant professional.

      iii.    The City, its elected/ appointed officials, employees, and agents shall be covered, by endorsement, when applicable, as additional insureds under CONSULTANT'S general liability and automobile liability policies as respects to; liability arising out of activities performed by or on behalf of the CONSULTANT in connection with this Agreement.

      iv.    To the extent of the CONSULTANT'S negligence, the CONSULTANT'S insurance coverage shall be primary insurance as respects the City, its elected/appointed employees and agents. Any insurance and/or self insurance maintained by the City, its elected appointed officials, employees and agents, shall not contribute with CONSULTANT'S insurance or benefit the CONSULTANT in any way.

      v.    Coverage shall not be suspended, voided, cancelled, reduced in coverage, or in limits, except by the reduction of applicable aggregate limit by claims paid, until after forty-five (45) days prior written notice has been given to the City. There will be an exception for non-payment of premium, which is ten (10) days notice of cancellation.

      vi.    Insurance is to be placed with insurers with a Best's rating of no less than A:VII, or, if not rated with Best's with minimum surpluses the equivalent of Best's surplus size VII and must be licensed/approved to do business in the State of Maryland.

      vii.    The CONSULTANT shall furnish the City a "Certificate of Insurance" with a copy of the additional insured endorsement, when applicable, as verification that the coverage is in force.

24.    Pursuant to the City of Baltimore Guidelines for the Performance Evaluation of Design Consultants and Construction Contractors, Consultants will be given a performance evaluation rating for each project they design.

**F.    GENERAL CONDITIONS**

1.  CONSULTANT shall identify and notify CITY of any subcontractor or subconsultant retained by the CONSULTANT. No such subcontractors or subconsultants shall be retained without the prior written consent of the CITY, nor shall the CONSULTANT assign any part of this Agreement without the prior written consent of the CITY, or any monies owing to the CONSULTANT without the prior written notification of the CITY. CONSULTANT shall be responsible for the work and conduct and coordination of any subcontractors or subconsultants, at all times.

2.  Failure of CONSULTANT to make satisfactory progress pursuant to the terms herein shall give CITY the right to rescind the Agreement; and shall give CITY the right to deduct from any payments that may be due or may become due to CONSULTANT all costs and charges incurred by CITY by reason of such delay. In the event that this Agreement is rescinded by reason of such delay, all drawings, plans, sketches, estimates, and data pertaining to the subject or prepared by CONSULTANT hereunder and any unused material supplied by CITY shall be delivered to CITY upon demand.

3.  CITY, at its discretion, will have the right, at any point prior to completion, to order CONSULTANT in writing to terminate, alter, or modify the services to be performed in whole or in part, even though such termination, alteration, or modification will result in an increase or decrease in the service of CONSULTANT. If CITY terminates services in full, CONSULTANT, upon payments of amounts actually due, shall deliver to CITY all drawings, estimates, computations, etc. either completed or partially completed, together with unused materials supplied by CITY, all of which shall become the property of CITY. If alteration, or modification of the services to be performed results in an increase or decrease in the services of CONSULTANT, appropriate adjustments in payment to CONSULTANT will be made in accordance with the provisions of Section G. If CONSULTANT is terminated for the CITY'S convenience, then CONSULTANT shall be compensated for all services performed plus any reasonable termination expenses incurred by CONSULTANT (including but not limited to cancellation or demobilization costs or fees).

4.  Each party hereto is to make available to the other party, without cost, all existing technical data for the services to be performed which is in their respective offices, including but not limited to, geographical information system (GIS) data, utility maps, "as-built" record information, relevant reports, hydraulic modeling results, inspection data and maintenance records, if any exist.

5.  The benefits and obligations hereunder shall inure and be binding upon the parties hereto and their respective successors and assigns, provided the personnel of the organization that is the successor to CONSULTANT, whether such successor be an individual, a partnership or a corporation, is acceptable to CITY.

## G.    ENGINEERING FEES

1. Basis of Payment

CITY will pay and CONSULTANT shall accept as final compensation for services in connection with the Project a sum not to exceed $13,499,549. This sum is based on a cost ceiling of $13,265,074 plus a fixed fee of $234,475 for profit. Payment beyond the cost ceiling will not be made without formally amending this Agreement, and the fixed fee for profit will not be increased except in the case of an amendment increasing the scope of work. The basis of payment for professional services shall be established in the following manner:

a. For Black & Veatch Corporation employees actively engaged on the project, the rate of 2.585 times actual payroll expended, the said multiplier derived as actual payroll plus payroll burden and an allowable overhead cost of 135 percent plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit.

b. For URS Corporation employees actively engaged on the project, the rate of 2.48 times actual payroll expended, the said multiplier derived as actual payroll plus payroll burden and an allowable overhead cost of 125.06 percent plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit.

c. For George, Miles & Buhr, LLP employees actively engaged on the project, the rate of 2.585 times actual payroll expended, the said multiplier derived as actual payroll plus payroll burden and an allowable overhead cost of 135 percent plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit.

d. For EA Engineering, Science and Technology employees actively engaged on the project, the rate of 2.585 times actual payroll expended, the said multiplier derived as actual payroll plus payroll burden and an allowable overhead cost of 135 percent plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit.

e. For Phoenix Engineering, Inc, employees actively engaged on the project, the rate of 2.585 times actual payroll expended, the said multiplier derived as actual payroll plus payroll burden and an allowable overhead cost of 135 percent plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit.

f. For Twenty-First Century Group employees actively engaged on the project, the rate of 2.20 times actual payroll expended, the said multiplier derived as actual payroll plus payroll burden and an allowable overhead cost of 100.00 percent plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit.

    g.  Plus Principals' time at $85.00 per hour, without benefit of overhead allowance or fee markup.

    h.  Plus direct reimbursable costs. This includes direct out-of-pocket expenses, parking, travel costs, printing and reproduction costs, subcontracts for field services and CCTV inspections, and other miscellaneous expenses directly related to the Project. Field services and CCTV inspections will be provided by: URS Corporation; EA Engineering, Science and Technology; Severn Trent Environmental Services, Inc.; EBA Engineering, Inc.; Savin Engineers, P.C.; Transviron Inc.; and A. Morton Thomas, Inc. Costs for field services and CCTV inspections shall be reimbursed on a unit cost basis. Mileage shall be billed at a maximum rate of $0.445 per mile.

1. CITY reserves the right to audit any and all of the CONSULTANT'S records, including payroll burden and overhead costs. Rates are to be established in accordance with the Title 48, Chapter 1 (Federal Acquisition Regulation), Subchapter E, Part 31, Subpart 31-1 and 31-2 of the Code of Federal Regulations.

2. The percentage of Direct Labor Cost which represents the Payroll Overhead and Burden as enumerated in attachments shall not be adjusted.

3. Derivation of technical payroll and/or unit costs for both the CONSULTANT and all of the Subconsultants are summarized on the CONSULTANT'S Cost Summary Form 5700-41 dated June 5, 2006 along with the Cost Summary Forms 5700-41 for the Subconsultants.

4. Services not covered by Basic Fee Payment section of extra or additional work authorized by CITY shall be negotiated on the same basis as described above at such time as such extra work is determined to be necessary.

5. Method of Payment

The above fee shall be paid monthly, following approval of the work by the CITY, on the basis of invoices supported by certified payrolls and other documented records. The CITY, at its discretion will have the right at any time prior to completion of the work to withhold payment to the CONSULTANT for performed services if the percent of payment requested is, in the opinion of the CITY, substantially in excess of the CITY'S evaluation of the completion of the work. The payment shall be withheld until such time as the percentage of completion is consistent with the percentage of payment requested.

## H.    GOVERNING LAW

This Agreement shall be construed and enforced in accordance with, and governed by, the laws of the State of Maryland. CONSULTANT hereby agrees to submit to the jurisdiction of Baltimore City courts with respect to the enforcement of this Agreement.

IN WITNESS WHEREOF, the parties hereto to have executed this Agreement, intending that it should be under seal the day and year first above written.

WITNESS

_____
Title: PROJECT MANAGER

FIRM: Black & Veatch Corporation

_____
BRENT REUSS, VICE PRESIDENT

ATTEST:

_____
CUSTODIAN OF THE CITY SEAL

MAYOR AND CITY COUNCIL OF BALTIMORE

_____
MARTIN O'MALLEY, MAYOR

APPROVED:

_____
DIRECTOR OF PUBLIC WORKS

APPROVED AS TO FORM AND LEGAL SUFFICIENCY:

_____
CHIEF SOLICITOR

_____
HEAD, BUREAU OF WATER AND WASTEWATER

APPROVED BY THE BOARD OF ESTIMATES

_____
CHIEF, WATER AND WASTEWATER ENGINEERING DIVISION

_____
CLERK                    DATE

E-FILED; Baltimore City Circuit Court
Docket: 10/30/2024 6:35 PM; Submission: 10/30/2024 6:35 PM
Envelope: 18628434

# EXHIBIT 3

CITY OF BALTIMORE
DEPARTMENT OF PUBLIC WORKS
BUREAU OF WATER AND WASTEWATER
WATER AND WASTEWATER ENGINEERING DIVISION
AGREEMENT FOR PROJECT 1124U – WASTEWATER ENGINEERING SERVICES FOR THE
IMPROVEMENTS OF THE HERRING RUN SEWERSHED COLLECTION SYSTEM

JAN 2 6 2011

THIS AGREEMENT entered into this _____ day of _____, 20___, by and between the Mayor and City Council of Baltimore, a municipal corporation of the State of Maryland, (hereinafter referred to as the "CITY"), and URS Corporation, a Nevada Corporation, with its principal offices located at 1800 Washington Blvd., Suite 410, Baltimore, Maryland, 21230, (hereinafter referred to as "CONSULTANT").

WHEREAS, the CITY and the CONSULTANT wish to enter into an Agreement for Project No. 1124U, Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System whereby the CONSULTANT will provide engineering services.

NOW, THEREFORE, THIS AGREEMENT WITNESSETH; that in consideration of the promises contained herein and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

A.    PROJECT SCOPE

URS Corporation ("CONSULTANT") will provide engineering services necessary to further evaluate, prepare a Design Memorandum, develop contract documents, and provide post-award services for the rehabilitation of the collection system in project area outlined in the attached map. The project area boundaries are approximately delineated by York Road, Argonne Drive, Perring Parkway and Walker Avenue. These improvements were identified in the Herring Run Collection System Evaluation and Sewershed Plan – Project #1001, dated June of 2009 (The Report) developed by Black & Veatch and provided by the CITY to the CONSULTANT.

The improvements identified in The Report are intended to eliminate Sanitary Sewer Overflows (SSOs) by providing additional hydraulic capacity and reducing Infiltration and Inflow (I&I). These improvements are designed to allow the system to convey Year 2025, 2-year-storm flows without SSO occurrences. The collection system defects and deficiencies identified in the report will be reviewed and confirmed during this project. The recommended improvements include approximately 27,546 feet of CIPP Lining, 523 feet of CIPP Lining and point repairs, 201 point repairs, 800 LF of pipe replacement, rehabilitating 153 manholes, reinspections of 323,559 lf of sewers and 1482 manholes; and bringing to grade 129 Can Not Locate (CNL) and Can Not Open (CNO) manholes. It is estimated that 2 construction contracts will be advertised. A more detailed scope of services is included as an attachment to this agreement.

B.    TIME FOR COMPLETION

This Agreement will commence upon approval by the Baltimore City Board of Estimates, and remain in effect for a period of five (5) years, or until the upset limit is reached, whichever occurs first.

C.    SERVICES TO BE PROVIDED BY CONSULTANT – GENERAL

1. CONSULTANT shall review historical data, including but not limited to soil data filed among the records of the Department of Public Works prior to and as an integral part of the design process.

2. CONSULTANT shall take reasonable care to review plans, drawings, specifications, plats, design and documents prior to finalization and submission of the final Design Documents to the CITY to provide that the said drawings, specifications, plats, design and documents are consistent.

3. CONSULTANT shall verify the accuracy of CITY records and "as-builts" prior to incorporating information gleaned from these records and "as-builts" into the design of the project.

4. Consultant agrees that they will not remove any designated Project Manager or team member without prior written permission from the City's Project Manager, unless the Consultant's Project Manager or team member is no longer employed by the Consultant. Failure to comply with this term shall be considered an event of default under this agreement.

5. The CONSULTANT shall deliver all construction specifications and addenda electronically to the CITY's representative, in a minimum number of files. Addenda must be received no later than 10 business days prior to the existing bid due date, unless a bid due date extension is incorporated into the addendum. Addenda files must be in Microsoft Word or Adobe Acrobat format. Each page must reflect the Addendum number, the individual page number, and total number of pages, including drawings.

6. CONSULTANT shall provide a schedule of deliverables utilizing the Primavera Project Life Cycle template as provided by the Project Engineer. This schedule will reflect the anticipated time frames, in work days, for the activities listed. (The Project Manager or the CONSULTANT may add additional activities to the Project Life Cycle).

7. The CONSULTANT will check for and report to the Project Manager in writing, the presence of asbestos, lead coatings, and/or any other hazardous materials at the proposed construction site under design in this agreement. It is not the intent of this Agreement that CONSULTANT shall be required to provide services related to handling or existence of hazardous materials including asbestos.

8. The CONSULTANT will identify and advise the Project Manager of any Right of Way concerns. The CONSULTANT will initiate preliminary contact/discussion with the affected property owner, and will acquire, research, complete, and submit any related documents necessary to achieve Right of Way clearances.

D.    OBLIGATIONS OF CITY

1. The CITY will, promptly after approval of this Agreement by the Board of Estimates, designate a Project Manager having general authority and responsibility to act with respect to this Agreement.

2. The CITY will provide all appropriate information in its possession concerning the assigned tasks, including design and construction documents.

E.    CONSULTANT'S PROFESSIONAL RESPONSIBILITY AND STANDARD OF CARE

1. By execution of this Agreement, the CONSULTANT agrees to the following:

   a.  The CONSULTANT is an experienced architectural and/or engineering firm having the skill and the legal and professional ability necessary to perform all the Services required of it under this Agreement in connection with the design and/or engineering of a project having the scope and complexity of the project(s) and/or tasks contemplated herein.

   b.  The CONSULTANT has the capabilities and resources necessary to perform its obligations hereunder.

   c.  The CONSULTANT is familiar with current and applicable laws, rules and regulations that are applicable to the design and construction of the project(s) and/or tasks, and that drawings, specifications and other documents prepared by the CONSULTANT shall be prepared in accordance with and shall accurately reflect and incorporate all such laws, rules and regulations.

2. The CONSULTANT hereby represents and agrees that the drawings, specifications and other documents prepared by it pursuant to this Agreement shall be sufficiently detailed and functional for the purposes intended.  The Project(s) and/or tasks, if constructed in accordance with the intent established by such drawings, specifications and other documents shall be structurally sound and sufficiently detailed for a properly functioning facility suitable for the purposes for which it is intended.

3. The CONSULTANT shall be responsible for any negligent error, inconsistencies or omissions in the drawings, specifications, and other documents. It shall be the responsibility of the CONSULTANT throughout the period of performance under the Agreement to use due care with professional competence. The CONSULTANT will immediately correct at no additional cost to the CITY any and all negligent errors and omissions in the drawings, specifications and other documents prepared by the CONSULTANT. The CONSULTANT further agrees, at no additional cost to render assistance to the CITY in resolving problems relating to the negligent design or specified material.

4. It is the responsibility of the CONSULTANT to make certain that all drawings, specifications and other documents are in accordance with applicable laws, statutes, building codes and regulations. The CONSULTANT shall assist the CITY in obtaining appropriate federal, state and local government approvals.  The design shall conform to the Uniform Federal Accessibility Standards, and/or the Americans with Disabilities Act, if applicable.

5. The CONSULTANT shall be responsible for the technical accuracy of its services and documents resulting there from, and the CITY shall not be responsible for discovering deficiencies therein. The CONSULTANT shall correct such deficiencies without additional compensation, except to the extent such action is directly attributable to deficiencies in CITY furnished information.

F.    GENERAL CONDITIONS

1. CONSULTANT shall identify and notify CITY of any subcontractor or subconsultant retained by the CONSULTANT.  No such subcontractors or subconsultants shall be retained without the prior written

consent of the CITY, nor shall the CONSULTANT assign any part of this Agreement without the prior written consent of the CITY, or any monies owing to the CONSULTANT without the prior written notification of the CITY. CONSULTANT shall be responsible for the work and conduct and coordination of any subcontractors or subconsultants, at all times.

2. Failure of CONSULTANT to make satisfactory progress pursuant to the terms herein shall give CITY the right to rescind the Agreement; and shall give CITY the right to deduct from any payments that may be due or may become due to CONSULTANT all costs and charges incurred by CITY by reason of such delay. In the event that this Agreement is rescinded by reason of such delay, all drawings, plans, sketches, estimates, and data pertaining to the subject or prepared by CONSULTANT hereunder and any unused material supplied by CITY shall be delivered to CITY upon demand.

3. CITY, at its discretion, will have the right, at any point prior to completion, to order CONSULTANT in writing to terminate, alter, or modify the services to be performed in whole or in part, even though such termination, alteration, or modification will result in an increase or decrease in the service of CONSULTANT. If CITY terminates services in full, CONSULTANT, upon payments of amounts actually due, shall deliver to CITY all drawings, estimates, computations, etc. either completed or partially completed, together with unused materials supplied by CITY, all of which shall become the property of CITY. If alteration, or modification of the services to be performed results in an increase or decrease in the services of CONSULTANT, appropriate adjustments in payment to CONSULTANT will be made in accordance with the provisions of Section F.

4. Each party hereto is to make available to the other party, without cost, all technical data for the services to be performed which is in their respective offices.

5. The benefits and obligations hereunder shall inure and be binding upon the parties hereto and their respective successors and assigns, provided the personnel of the organization that is the successor to CONSULTANT, whether such successor be an individual, a partnership or a corporation, is acceptable to CITY. CONSULTANT shall not assign this Agreement, nor shall any part of the work be done, nor material furnished under such Agreement without prior written consent of CITY, nor any right to any monies to be paid hereunder without the prior written notification of the CITY.

6. In the performance of the work covered by this Agreement, CONSULTANT shall not discriminate against any worker because or race, creed, age, color, sex, political affiliation, national origin, sexual orientation or qualified handicap.

7. CONSULTANT warrants that he has not employed or retained any company or persons, other than a bona fide employee working solely for the CONSULTANT, to solicit or secure this Agreement and that he has not paid or agreed to pay any company or person, other than a bona fide employee working solely for the CONSULTANT, any fee, commission, percentage, brokerage fee, gift or any other consideration, contingent upon or resulting from the award or making of this Agreement. For breach or violation of this warranty, CITY will have the right to annul this Agreement without liability, or, in its discretion, to deduct from the Agreement price or consideration or otherwise recover the full amount of such fee, commission, percentage, brokerage fee, gift or contingent fee.

8. All sketches, drawings, record drawings, and other materials prepared by CONSULTANT in connection with the proposed work shall be the sole and absolute property of CITY.

9. CONSULTANT agrees to maintain a working office within the CITY, or convenient thereto, where CITY representatives may review or discuss proposed features as the work progresses.

10. The CONSULTANT shall follow all applicable Federal and State grant and technical requirements, Baltimore City Codes, and the Maryland Occupational Safety and Health Act (MOSHA) as they may apply to the services to be performed, and all other Federal and State laws and regulations.

11. CONSULTANT shall indemnify, save and hold harmless the CITY, its officers, agents and employees from any and all liability, claims, suits, demands, actions, damages and expenses (including reasonable attorney fees) of whatsoever kind and by whomsoever brought against the CITY, it officers, agents and employees, to the extent arising from or in connection with any willful or negligent act, error or omission of CONSULTANT, its employees or agents in the performance of this Agreement. This requirement shall be included in all subconsultant agreements.

Notwithstanding any other provisions of this Agreement, the CITY reserves the right to seek recovery from the CONSULTANT for any claims, suits, actions, damages, and/or cost resulting from damages to life and property of any kind to the extent arising out of or resulting from services negligently rendered by the CONSULTANT under this Agreement.

12. CONSULTANT shall not engage, on a full or part-time basis, during the period of the Agreement, any professional or technical personnel who are or who have been at any time during the period of the Agreement in the employ of the Public Works organization of CITY; the Public Works organizations of any of the Maryland Counties; the State MDE or the Federal Environmental Protection Agency, except regularly retired employees, without consent of the Head, Bureau of Water and Wastewater.

13. CONSULTANT shall submit a progress chart accompanied by a monthly narrative progress report setting forth the status of the services to be performed, delays resulting from lack of sufficient data, or by lack of decisions, and other pertinent factors salient to the prosecution of work.

14. Under separate cover and submitted with the Agreements, the CONSULTANT shall furnish a list of employees and their current hourly pay rate for all personnel to be performing services. CONSULTANT shall furnish a five (5) year history of salary escalation, and the specific job classification for each. CONSULTANT will advise the CITY's Project Manager in writing of revisions to the personnel roster.

15. CONSULTANT agrees to prosecute the work continuously and diligently and that compensation or extension of time resulting from delays, not the fault of CONSULTANT shall be settled by agreement with the Head, Bureau of Water and Wastewater.

a) Subject to the power and authority of the Director of Public Works as provided by Law, the Head, Bureau of Water and Wastewater shall in all cases, determine the amount or quantity, quality and acceptability of the work and materials which are to be paid for under this Agreement, shall decide all questions in relation to said work and the performance thereof, and shall, in all cases, decide questions which may arise relative to the fulfillment of this Agreement or to the obligations of the CONSULTANT thereunder.

b)  To prevent disputes and litigation where the CONSULTANT is not satisfied with the decision of the Head, Bureau of Water and Wastewater, the CONSULTANT shall submit the claim to the Director of Public Works, or his designee, who will decide any dispute between the CONSULTANT and the CITY, and his determination, decision and/or estimate shall be a condition precedent to the right of the CONSULTANT to receive any monies under this Agreement, and is subject to review on the record by a court of competent jurisdiction.

16. The CONSULTANT shall maintain records of all actions, and accurate books of account for all funds received and disbursed, with full documentation to substantiate the transactions. Records shall be retained for a period of at least three (3) years, and at   least five (5) years for USEPA  Consent Decree required projects, after receipt of the final payment under this Agreement.  If CONSULTANT and its parent organization should cease to exist, custody of the records for the Agreement will be immediately transferred to the CITY.

17. At such times and in such forms as the CITY may require, there shall be made available to the CITY such statements, records, reports, data and information as the CITY may request pertaining to matters covered by this Agreement. The CITY reserves the right to publish and/or make public any and all such statements, records, reports, data and information resulting from the services provided hereunder. But, the CONSULTANT must obtain the prior written consent of the CITY to publish and/or make public any statement, record, report, data or information resulting from the services provided hereunder.

18. At any time during normal business hours and as often as the CITY/or its representatives may deem necessary, there shall be made available to the CITY or its representative for examination, all of the CONSULTANT'S records with respect to all matters covered by the Agreement, and CONSULTANT will permit the CITY or its representative to audit, examine and make excerpts of transcripts from such records, and to make audits of all contract invoices, materials, payrolls, and other data relating to all matters covered by this Agreement.

19. The completed Architect-Engineer Questionnaire filed by the CONSULTANT with the CITY of Baltimore Office of Boards and Commissions and heretofore accepted by the CITY for this project is incorporated herein by reference and made a part of this Agreement, and it's existence is considered a condition precedent to the engagement of the CONSULTANT. Dependence has been placed thereon by the CITY in determining the CONSULTANT's fitness to satisfactorily execute the scope of work covered by this Agreement and any material adverse misstatement therein bearing upon CONSULTANT's ability shall render this Agreement voidable at the option of the CITY without liability on its part for payment of compensation to the CONSULTANT as herein provided. CONSULTANT is responsible to advise the CITY on a continuing basis at any time and from time to time of any changes in the identity of principals or officers of the CONSULTANT's firm who are identified in the Questionnaire and are intended by CITY to be actively engaged in the services to be performed.

20. If CONSULTANT files for bankruptcy, is forced into bankruptcy by creditors, or is otherwise declared bankrupt under any Chapter of the Bankruptcy Code, it shall be considered an immediate event of default of this Agreement, and the CITY may instantly terminate this Agreement, at its sole discretion. In the event of termination all funds held by the CITY that are due to the CONSULTANT for completed work will be paid to the Trustee in Bankruptcy appointed by the Court.

21. This Agreement may be executed in multiple copies, and each such copy shall be deemed an original.

22. No failure by the CITY to exercise and no delay in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

23. By executing this Agreement, CONSULTANT asserts that it has not engaged in any practice or entered into any past or ongoing agreement that would be considered a conflict of interest with the instant agreement. CONSULTANT agrees to refrain from entering into all such practices or agreements during the term of the instant agreement (and any extensions thereto), including any agreements and/or practices that could give rise to even the appearance of a conflict of interest.

Furthermore, CONSULTANT asserts that it has fully disclosed to the CITY any and all practices and/or agreements of whatever nature or duration that could give rise to even the appearance of a conflict of interest with the parties or subject matter of the instant agreement and will continue to do so during the term of this Agreement and any extensions thereto.

24. This writing contains the complete and integrated Agreement between the parties. Other than writings or documents which are specifically incorporated by reference, no oral or written representations are a part of the Agreement. The Agreement may be amended only in writing, and only by signature of authorized representatives.

25. The CONSULTANT shall procure and maintain during the life of this agreement, the following required insurance coverage;

    i.   Worker's Compensation coverage as required by the State of Maryland, as well as any similar coverage required for this work by applicable Federal or "other States" State Law.

    ii.  Professional Liability, Errors, and Omissions Insurance at a limit of not less than One Million Dollars ($1,000,000) in the event that services delivered pursuant to this Agreement, either directly or indirectly, involves or requires professional services, Professional Liability, Errors, and Omissions coverage shall be provided. "Professional Services" for the purpose of this Agreement shall mean any services provided by a licensed CONSULTANT professional.

    iii. The CITY, its elected/ appointed officials, employees, and agents shall be covered, by endorsement, when applicable, as additional insureds as respects to; liability arising out of activities performed by or on behalf of the CONSULTANT in connection with this Agreement.

    iv.  To the extent of the CONSULTANT's negligence, the CONSULTANT's insurance coverage shall be primary insurance as respects the CITY, its elected/appointed employees and agents. Any insurance and/or self insurance maintained by the CITY, its elected appointed officials, employees and agents, shall not contribute with CONSULTANT's insurance or benefit the CONSULTANT in any way.

    v.   Coverage shall not be suspended, voided, cancelled, reduced in coverage, or in limits, except by the reduction of applicable aggregate limit by claims paid, until after forty-five (45) days prior

written notice has been given to the CITY. There will be an exception for non-payment of premium, which is ten (10) days notice of cancellation.

vi.  Insurance is to be placed with insurers with a Best's rating of no less than A:VII, or, if not rated with Best's with minimum surpluses the equivalent of Best's surplus size VII and must be licensed/approved to do business in the State of Maryland.

vii. The CONSULTANT shall furnish the CITY a "Certificate of Insurance" with a copy of the additional insured endorsement, when applicable, as verification that the coverage is in force. The CITY reserves the right to require complete copies of insurance policies at any time.

26. Pursuant to the CITY of Baltimore Guidelines for the Performance Evaluation of Design Consultants and Construction Contractors, Consultants will be given a performance evaluation rating for each project they design

F.    ENGINEERING FEES

1.    Basis of Payment

1,497,040.39

The CITY will pay and the CONSULTANT will accept as final compensation for services in connection with the Project a sum not to exceed $1,497,353.69. This sum is based on a cost of $1,412,568.74 plus fixed fee of $84,784.95 for profit. Payment beyond the cost ceiling will not be made without formally amending this AGREEMENT, and the fixed fee for profit will not be increased except in the case of an amendment increasing the scope of work. The basis of payment shall be established in the following manner.

a.  For **URS Corporation** employees actively engaged on the project, the rate of **2.33** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **112.03** % plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$865,149.50** plus a fixed fee of **$84,784.95**.

b.  For **EBA Engineering, Inc.** employees actively engaged on the project, the rate of **2.49** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **125.95** % plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$155,856.88** plus a fixed fee of **$9,958.99**.

c.  For **Carroll Engineering, Inc.** employees actively engaged on the project, the rate of **2.54** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **130.64** % plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$53,280.38** plus a fixed fee of **$5,201.22**.

d.  For **J.A. Rice, Inc.** employees actively engaged on the project, the rate of **2.32** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **111.32**% plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$41,944.44** plus a fixed fee of **$2,444.44**.

e.  For **RJM Engineering, Inc.** employees actively engaged on the project, the rate of **2.45** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **122.62%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$103,444.47** plus a fixed fee of **$10,267.95**.

f.  For **Savin Engineers, P.C.,** employees actively engaged on the project, the rate of **2.59** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **135.00%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$93,929.42** plus a fixed fee of **$2,494.27**.

g.  For **Phoenix Engineering, Inc.** employees actively engaged on the project, the rate of **2.24** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **103.35%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$30,554.51** plus a fixed fee of **$2,970.45**

h.  For **Bay City Construction Company.** employees actively engaged on the project, the rate of **2.20** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **100.00%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$33,100.00** plus a fixed fee of **$1,972.00**.

i.  Principals time at $ 85.00 per hour, without benefit of overhead allowance or fee markup.

j.  Plus directly reimbursable costs. This includes costs for travel expenses, printing and reproduction costs, subcontracts, technical computer usage, and other miscellaneous expenses directly related to the project. Mileage shall be billed at the prevailing rate as promulgated by the IRS, currently set at $ 0.50 per mile.

2.  The CITY reserves the right to audit the CONSULTANT'S payroll burden and overhead costs. Rates are to be established in accordance with Title 48, Subchapter E, Part 31, Subpart 31.2 of the Code of Federal Regulations.

3.  Derivation of technical payroll for both CONSULTANT and Subconsultants are summarized on the attached CONSULTANT'S EPA 5700-41, along with other attachments. The wage rates reported in the Attachments will be in effect for the duration of this agreement.

4.  Services not covered by Basic Fee – Payment of extra or additional work authorized by CITY shall be negotiated on the same basis as described above at such time as such extra work is determined necessary.

5.  Method of Payment – The above fee shall be paid monthly, following approval of the work by the CITY, on the basis of invoices supported by certified payrolls and other documented records. The CITY, at its discretion, will have the right at any time prior to completion of the work to withhold payment to the CONSULTANT for performed services if the percent of payment requested is, in the opinion of the CITY, substantially in excess of the CITY's evaluation of the completion of the work.

IN WITNESS WHEREOF, the parties hereby evidence their agreement to the above terms and conditions by having caused this Agreement to be executed, sealed and delivered the day and year first written.

WITNESS

_____
Title: Contracts Administrator

ATTEST:

_____
CUSTODIAN OF THE CITY SEAL

APPROVED:

_____
DIRECTOR OF PUBLIC WORKS

_____
ACTING HEAD, BUREAU OF WATER AND WASTEWATER

For G.S. Yasser Abouaish
_____
CHIEF, WATER AND WASTEWATER
ENGINEERING DIVISION

URS Corporation

_____
Title: Vice President

MAYOR AND CITY COUNCIL OF BALTIMORE

_____
STEPHANIE RAWLINGS-BLAKE, MAYOR

APPROVED AS TO FORM AND LEGAL
SUFFICIENCY:

_____
CHIEF SOLICITOR

APPROVED BY THE BOARD OF ESTIMATES

_____        JAN 2 6 2011
CLERK                                          DATE

Page 11

# SUMMARY OF ATTACHMENTS

| | |
|---|---|
| **ATTACHMENT A** | **SCOPE OF SERVICES** |
| **ATTACHMENT B** | **URS SUPPORTING DOCUMENTS** |
| **ATTACHMENT C** | **EBA SUPPORTING DOCUMENTS** |
| **ATTACHMENT D** | **CARROLL SUPPORTING DOCUMENTS** |
| **ATTACHMENT E** | **JA RICE SUPPORTING DOCUMENTS** |
| **ATTACHMENT F** | **RJM SUPPORTING DOCUMENTS** |
| **ATTACHMENT G** | **SAVIN SUPPORTING DOCUMENTS** |
| **ATTACHMENT H** | **PHOENIX SUPPORTING DOCUMENTS** |
| **ATTACHMENT I** | **BAY CITY SUPPORTING DOCUMENTS** |
| **ATTACHMENT J** | **MBE/WBE DOCUMENTS** |

# ATTACHMENT A

# SCOPE OF SERVICES

**Attachment A**
**SCOPE OF SERVICES**
**Wastewater Engineering Services for the Improvements of**
**Herring Run Sewershed Collection System**
**Project No. 1124U**

## DESCRIPTION

URS Corporation ("CONSULTANT") will provide engineering services necessary to further evaluate, prepare a Design Memorandum, develop contract documents, and provide post-award services for the rehabilitation of the collection system in project area outlined in the attached map. The project area boundaries are approximately delineated by York Road, Argonne Drive, Perring Parkway and Walker Avenue. These improvements were identified in the Herring Run Collection System Evaluation and Sewershed Plan – Project #1001, dated June of 2009 (The Report) developed by Black & Veatch and provided by the CITY to the CONSULTANT.

The improvements identified in The Report are intended to eliminate Sanitary Sewer Overflows (SSOs) by providing additional hydraulic capacity and reducing Infiltration and Inflow (I&I). These improvements are designed to allow the system to convey Year 2025, 2-year-storm flows without SSO occurrences. The collection system defects and deficiencies identified in the report will be reviewed and confirmed during this project. The recommended improvements include approximately 27,546 feet of CIPP Lining, 523 feet of CIPP Lining and point repairs, 201 point repairs, 800 LF of pipe replacement, rehabilitating 153 manholes, reinspections of 323,559 lf of sewers and 1482 manholes; and bringing to grade 129 Can Not Locate (CNL) and Can Not Open (CNO) manholes. It is estimated that 2 construction contracts will be advertised.

The Report recommendations were based on flow metering, CCTV (Closed-Circuit Television) inspection, hydraulic modeling, and field inspections. This information, along with other data developed during this investigation, will be utilized to develop a Design Memorandum for the recommended improvements. Once the Design Memorandum is approved by the CITY, the CONSULTANT will prepare contract documents for construction of the recommended improvements.

This Scope of Services shall provide the necessary engineering design services to implement the findings and recommendations presented in The Report and determined during the investigative phase of this assignment.

The following scope of work is divided into five (5) tasks as follows:

1. Project Management
2. Document Review and Design Memorandum
3. Field Investigations
4. Design Services
5. Post Award Services

## TASK 1 - PROJECT MANAGEMENT

### Subtask 1.0 - Project Management

The CONSULTANT shall provide overall project management and coordination of the Project, including the activities of its sub-consultants and subcontractors. A qualified Project Manager shall be assigned by the CONSULTANT having the responsibility and authority to make day-to-day decisions relative to the Project. A Principal-in-Charge shall also be designated by the CONSULTANT to provide executive oversight and quality control, and who shall have the final authority to act on behalf of the CONSULTANT.

### Subtask 1.1 - Project Initiation Meeting

The CONSULTANT shall schedule and arrange for one (1) Project Initiation Meeting to be held in the CITY's offices. A Notice of Meeting shall be prepared and distributed to a list of invitees to be furnished by the CITY. The CONSULTANT shall introduce the project, the proposed project schedule, and identify any issues that require input or resolution by the CITY. This meeting will be utilized to clarify recommendations presented in The Report, and to address any changes or additional recommendations proposed by the CONSULTANT. Following the Project Initiation Meeting, the CONSULTANT shall prepare and distribute Meeting Minutes to all invitees. The project schedule will be revised based on the issued discussion, and then issued with these minutes. The meeting minutes will be submitted to the CITY, for their review and comments, no later than 10 days following the Project Initiation Meeting. A final copy of the meeting minutes will be submitted to the CITY no later than five (5) days following receipt by the CONSULTANT of the CITY's review and approval of the meeting minutes.

### Subtask 1.2 - Progress Meetings

During the course of the Project the CONSULTANT shall schedule and arrange for monthly Progress Meetings (assume 36 meetings), to be held at the CITY's offices. Progress meetings will be held with members of the consultant team, the City, and other agencies as needed. These meetings will be a forum for discussion of progress to date and to resolve project issues. A Notice of Meeting and an Agenda shall be prepared and distributed in advance of each Progress Meeting as directed by the CITY.

The CONSULTANT shall review the progress of the project, identify any issues requiring action or resolution by the CITY, review the schedule, and identify activities for the coming month. The CONSULTANT shall maintain an up-to-date Project Schedule, using Microsoft Project Schedule® or equivalent project management software, and provide copies of the schedule and review the updated Project Schedule at the progress meeting. Following each Progress Meeting, the CONSULTANT shall prepare and distribute Meeting Minutes to all invitees. These minutes shall be distributed no later than 5 (five) days following the meeting.

### Subtask 1.3 - Contract Administration

The CONSULTANT shall prepare and submit monthly invoices in accordance with the CITY's policies and procedures. Each invoice shall include a Progress Report in accordance with CITY's standard format describing the activities occurring during the period of the invoice, and any problems or outstanding issues requiring resolution. The monthly invoices shall include all supporting documentation for labor and direct expenses, for the CONSULTANT and its sub-consultants or sub-contractors, in the format required by the CITY.

### Subtask 1.4 - Community Meetings

The CONSULTANT shall, at the CITY's request, attend community meetings to provide technical assistance including preparing presentation and handout materials, as required. The CITY shall coordinate the location and times of these meetings, and notify all attendees. The meeting shall take place at facilities provided by the CITY. For budgetary purposes, a total of three (3) meetings have been assumed. The CONSULTANT shall inform the CITY in writing of any public or private entities requesting information relating to the CITY's environmental programs. The CITY shall approve any information released by the CONSULTANT, to any outside agencies, in writing.

## TASK 2 - DOCUMENT REVIEW AND DESIGN MEMORANDUM

This phase of the Project involves reviewing available information generated by Project #1001 for the project area, and preparing a Design Memorandum for the recommended improvements. The following presents the anticipated tasks to perform this work. It is anticipated that no more than 2 construction contracts will be generated under this scope of work.

### Subtask 2.0 – Document Review

The CITY will provide the CONSULTANT with all available CCTV and manhole inspection records for their review. After completing its review, the CONSULTANT shall confirm the recommendations and formulate the necessary rehabilitation work. Based on this review, the CONSULTANT shall select the rehabilitation techniques that are considered appropriate for the repairs.

It is assumed that, when possible, all records to be provided by the CITY will be in electronic format, contained in an easily searchable database.

The CITY will also provide electronic copies of the Report containing the recommendations to the selected project area.

### Subtask 2.1 - Hydraulic Modeling

The CONSULTANT will coordinate with the CITY and the Program Manager any hydraulic simulations necessary during the design of the recommended hydraulic improvements.

### Subtask 2.2 – Design Memorandum (35% Design)

Based on the findings from the Document Review and Hydraulic Modeling Subtasks, a Design Memorandum will be prepared which details the extent, methods and limits of the rehabilitation work and hydraulic improvements. This effort will consist of investigating various methods of rehabilitation to include CIPP; slip-lining; and point repair to select a repair method which is suitable for the actual pipe and site conditions. A review of inflow sources in the private portion of the collection system will be performed to assess their impact on the system and determine the feasibility of addressing them. The recommended hydraulic improvements will also be investigated to determine a feasible implementation method.

The Design Memorandum will consist of the preparation of 35% design-level guidelines. The 35% submittal will include preliminary plans, which delineate the limits and location of the work. The base mapping for this work will consist of the CITY's GIS Sewer layers, and it will be based on City of Baltimore/ Maryland State Plane Coordinates system and NAD 83/91.

All preliminary design work will be prepared in accordance with the City of Baltimore Manual of Design Procedure and Criteria and Standard Specifications for Material, Highway, Bridges, Utilities and Incidental Structures and subsequent addenda thereto. The contract plans will be prepared at a scale of 1"= 40 feet with a vertical scale of 1" = 10 feet on profile drawings. Preliminary technical specifications will be prepared which identify the recommended rehabilitation methods that are not part of the CITY standard specifications.

Any permits anticipated for the proposed work will be identified, including but not limited to, Maryland Department of the Environment (MDE), Maryland Department of Natural Resources (DNR), U.S. Corps of Engineers, CITY Soil Conservation District, Maryland State Highway Administration, applicable Baltimore County agencies, and preliminarily identified regulatory and permitting agencies. Due to the non-continuous nature of the project area to be rehabilitated, it is expected that permitting agencies will require individual permits for individual sections of the project area. It is estimated that approximately twelve (12) permit applications will be required to be completed.

Anticipated Right-of-Entry agreements and temporary access requirements will be preliminarily identified during this subtask.

The CONSULTANT will complete and submit to the CITY, for review and approval, an Engineer's estimated Construction Cost (35% level), preliminary contract drawings and specifications, and a completed City of Baltimore Design Project Submittal Checklist.

A field walk will be scheduled with the CITY, and other pertinent agencies, to review the 35% submittal in the field. The CONSULTANT will schedule and attend a review meeting with the appropriate CITY personnel to discuss the submittal and address any comments made during the field walk.

### Subtask 2.3 - Right-of-way Documents

The CONSULTANT shall gather all right-of-way (ROW) information to confirm the project is entirely within CITY ROW, easements, or property. The CONSULTANT shall conduct necessary research at the CITY Records Office, and other offices as necessary, to obtain required information. The Consultant will prepare and submit to the CITY preliminary Right-of-Entry documents and ROW easements plats.

### TASK 3 – FIELD INVESTIGATIONS

The CONSULTANT shall provide the necessary resources and services to perform the field survey and environmental assessment necessary for designing the recommended improvements.  The CITY shall coordinate and facilitate access to public facilities as needed. The CITY shall assist the CONSULTANT with public notices as needed.

### Subtask 3.0 - Field Survey/Investigations

The CONSULTANT shall provide the topographic surveys necessary to design the replacement, pipeline rehabilitation, manhole rehabilitation, access roads, and permitting needs of the portion of the sanitary sewer system to be improved. Survey controls will be set within the limits of the project and traverse will be run along the length of the proposed alignment. Traverse points and benchmarks shall be referenced along the site and outside of the construction area. All survey work will be performed on CITY of Baltimore/ Maryland State Plane Coordinates system and based on horizontal and vertical datum NAD 83/91 and NGVD1988, respectively. All fielding surveying, computations and Field surveys will be performed with EDM's and data collectors. An electronic field book will be provided to the CITY for all fieldwork.

All fieldwork will be downloaded to a CADD station and survey worksheets will be prepared. This information will be used to confirm manhole locations provided on the CITY's GIS Sewer Layer coverage. All manholes located during the survey will be clearly identified. An electronic file of the worksheets will be provided to the CITY. All fielding surveying, computations and worksheets will be performed in accordance with the CITY of Baltimore Manual of Design Procedure and Criteria.

If the CONSULTANT finds previously uninspected sewers or manholes that are deemed necessary for completion of the design work, they may perform the inspections as part of this

task. Inspection work may include CCTV inspections, manhole inspections, manhole locating and exposing, dye testing and smoke testing.

### Subtask 3.1 - Environmental Assessment

The CONSULTANT will conduct an environmental assessment in order to identify environmental constraints located along the alignment of the Project that may result in impacts to wetlands or waters of the United States. The CONSULTANT will prepare and submit a letter format Environmental Assessment Report that includes a description of ecological features, including photographs of environmental conditions, along the proposed alignment.

The CONSULTANT will identify environmental permits that may be required if disturbance is proposed to waters of the United States, non-tidal wetlands, forests or sensitive habitat (i.e., rare, threatened and endangered species (RTE)). The CONSULTANT will prepare and submit RTE information requests to the Maryland Department of Natural Resources and the U.S. Fish and Wildlife Service. The information requests will include a vicinity map and USGS map. It is estimated that two (2) Environmental Assessment Reports will be required under this project.

### Subtask 3.2 – Geotechnical Investigation

The Consultant will determine the locations to perform geotechnical investigations, and will collect soil borings along proposed pipe replacement projects. It is estimated that no more than 300 vertical linear feet of borings will be required under this project. The collected samples will be analyzed to determine suitability of soils for construction, needs for dewatering, and geotechnical requirements for design and construction methods. The analyses will include screening for petroleum and common hazardous waste parameters, if determined to be necessary. The CONSULTANT shall not be required to handle hazardous materials, or prepare a Hazardous Materials Abetment plan under this contract. The Consultant will prepare and submit a Geotechnical Investigation Report detailing the geotechnical work performed and the results of the investigation.

## TASK 4 – DESIGN SERVICES

This task covers the professional engineering services to prepare contract documents sufficient for a contractor to perform this rehabilitation project. All documents will be prepared in accordance with the CITY of Baltimore Manual of Design Procedure and Criteria and Standard Specifications for Material, Highway, Bridges, Utilities and Incidental Structures and subsequent addenda thereto. The following presents the anticipated tasks to perform this work.

***Subtask 4.0 – 70% Design Documents***

The CONSULTANT shall incorporate the CITY's and other reviewing agency comments received on the Design Memorandum submittal, and proceed to bring the design to a 70% completion. The design will incorporate survey data. If differences between the GIS and the survey data are noticed, the CONSULTANT shall submit to the CITY, within 60 days, the necessary information to update the CITY's GIS in accordance with the requirements of the BaSES Manual, Chapter 5.

The contract drawings will include design of replacement sewer lines (pipeline and manholes), rehabilitation of sewers and manholes (CIP lining, point repairs and other commonly utilized rehabilitation technologies), structural modifications to any connecting structure, connection details, special structures, and notation necessary for construction of this project. The design will incorporate improvement considerations to attempt to mitigate wet-weather flows from private sources, namely the sewer house connections. The 40 Scale CITY GIS Sewer layer will be finalized to present the limits of the work.

In the case of sewer replacements, existing and proposed sewer lines will be shown on plan and profile based on the survey under subtask 3.2. The contract drawings will be prepared in AutoCAD format. As-built drawings will be provided by the CITY from the CITY's electronic archive files and incorporated into the contract documents.

The contract specifications will provide means and methods for the selected rehabilitation types for both the pipeline and manholes. All materials of construction will be specified. The specifications will contain bid items and fixed price contingency items necessary to execute this renovation and improvement project. The documents will be prepared to encourage competitive bids.

A Traffic Control Plan will be prepared in order to safely conduct all construction activities, while attempting to minimize disruption to the local communities, schools and commercial businesses. The Traffic Control Plan will be prepared in accordance with CITY of Baltimore, Department of Transportation specifications and guidelines. Additionally, traffic control along Maryland State Roads must conform to MD SHA guidelines and follow all SHA permitting processes and requirements. It is anticipated that each construction contract will require a Traffic Control Plan.

Erosion & Sediment Control (E&S) plans will be completed in accordance with the rehabilitation/replacement work. All control measures and details will be prepared in accordance to CITY's Erosion & Sediment Control Guidelines and Details. A sequence of construction will be prepared to promote adherence to the intent of this plan. The CONSULTANT will submit E&S plans to the appropriate agencies for review and approvals. It is anticipated that each construction contract will require an E&S plan.

The CONSULTANT will complete and submit to the CITY for approval an Engineer's estimate of most probable Construction Cost (70% level), Contract Drawings and Specifications, and a

completed City of Baltimore Design Project Submittal Checklist. Up to thirty (30) sets of Documents will be submitted per contract to be advertised.

### Subtask 4.1 – 100% Design Documents

This task will involve incorporating CITY, and other agencies, review comments received on the 70% Design submittal and will proceed with bringing the design to 100 % completion. All required permits will be identified for the proposed improvements. A revised Engineer's Estimate of Probable Construction Cost will be prepared for the 100% design. Up to thirty (30) sets of the 100% contract plans, specifications, Design Project Checklist, and cost estimate will be submitted to the CITY for review for each contract to be advertised. Upon receipt of CITY comments on this 100% submission, a final review meeting will be scheduled with the CITY to discuss their comments and any other outstanding issues.

The CONSULTANT will complete and submit to the CITY, for review and approval, an Engineer's estimate of probable Construction Cost (100% level), Contract Drawings and Specifications, and a completed City of Baltimore Design Project Submittal Checklist.

### Subtask 4.2 – Permit Applications

Along with the 100% documents, the CONSULTANT will prepare the necessary permit applications and submit them to the CITY for approval and signatures. The completed permits will be delivered to the appropriate agencies for final approval. All fees associated with the submission, review and issuance of all required permits will be paid for by the CITY.

### Subtask 4.3 – Bid-Ready Documents

The CONSULTANT shall incorporate all remaining comments and amendments as recommended by the CITY and other agencies at the 100% submittal. The consultant shall prepare forty (40) sets of Bid Ready Documents per contract, along with the final Engineer's Estimate of Probable Construction Cost.

### Subtask 4.4 – Assistance during Bidding and Award

The CONSULTANT shall attend the pre-bid conference for the project and prepare the conference minutes. Where appropriate, the CONSULTANT shall answer questions raised by prospective bidders at the pre-bid conference.

The CONSULTANT shall prepare all necessary addenda answering questions raised during the bidding phase and at the pre-bid conference, including necessary corrections or modifications to the Contract Documents prior to the receipt of bids. It is estimated that 3 addenda will be issued per contract during its bidding phase.

The CONSULTANT shall review and analyze the bids submitted; when required, provide justification for award of those bids 10% over or under the Engineer's Estimate. The CONSULTANT will prepare a written recommendation concerning the award of the contract.

**TASK 5 - POST AWARD SERVICES**

The CONSULTANT will assist the CITY during construction to oversee that the work performed by the contractor is completed in accordance with the design and as specified in the contract documents.

***Subtask 5.0 - Submittals***

The CONSULTANT shall review all Post Award submittals required of the contractors as per the bidding documents.    The CONSULTANT will prepare a written recommendation concerning the issue of Notice-to-Proceed with work to the contractor based on the review of their post award submittals.

The CONSULTANT shall review and endorse shop drawings, samples, materials specifications, equipment data, operation and maintenance manuals and other data which the Contractor is required to submit, but only for conformance with the design concept of the project and compliance with the information given in the Contract Documents. Such reviews and approvals or other action shall not extend to means, methods, techniques, sequences, procedures of construction, or to safety precautions and programs incidental thereto. Review re-submittals, if necessary. The CONSULTANT shall maintain a shop drawing log and submit to the CITY on a monthly basis or as required.

The CONSULTANT shall evaluate and determine the acceptability of substitute materials and equipment requested by the Contractor. The CONSULTANT shall make a recommendation and advise the CITY accordingly. It is estimated that no more than 10 submittals will be received per contract.

***Subtask 5.1 - Technical Consultations, RFIs, and Change Orders***

The CONSULTANT shall provide personnel for onsite observations and consultations with the CITY staff at the request of the CITY, with minimal notice, to resolve problems as they occur during construction. Based on an estimated 12-months construction period, the CONSULTANT anticipates on-site observations to consist of approximately 8 days per contract awarded for construction.

When requested by the CITY, the CONSULTANT will respond to Requests for Information (RFI) originating from the Contractor to answer questions or resolve issues relating to design and construction. Documentation, including reports, supplemental specifications and sketches will be prepared as required to provide supplementary instructions and details to assist in resolving conflicts arising from interpretations of the Drawings and Specifications. Responses and recommendations will be submitted in writing to the CITY in a timely manner. The CONSULTANT will maintain an accurate log of RFI's received and their disposition, and report on their status periodically to CITY.  It is estimated that 15 RFIs will be received per contract awarded for construction.

The CONSULTANT shall, prior to the end of the maintenance period, schedule and perform one final inspection of the entire work to determine the status of all equipment, structures and systems with the requirements of the Contract Documents provisions. The CONSULTANT shall prepare a list of all deficiencies and other requirements of the Contractor and submit to the CITY for review. The CITY will issue all deficiency lists.

### Subtask 5.5 - Record Drawings and GIS Update

The CONSULTANT shall assist the CITY in maintaining marked-up Drawings and Specifications. The CONSULTANT shall monitor the documents on a monthly basis during construction by reviewing the "red-line" marked-up set of Contract Drawings maintained by the Contractor and the CITY's Resident Project Representative and advise the CITY of differences in notations observed. At the completion of construction, the CONSULTANT shall collect the two sets of record drawing marked-up prints from the CITY's Resident Project Representative, and transfer all records of modifications during construction to the original Mylar drawings. The CONSULTANT shall furnish CITY with original Mylar record drawings and fifteen (15) sets of reduced (11"x17") record drawings within ninety (90) days of receipt of all documents from the CITY.

The CONSULTANT shall meet with City staff to determine protocols for performing updates to the wastewater enterprise GIS, which shall include the development of a data management plan as well as a Quality Assurance/Quality Control plan to manage the GIS work performed by CONSULTANT. Within 60 days from conditional acceptance of the Mylar record drawings, the CONSULTANT shall submit to the City updates to the City's GIS in accordance with the requirements of Chapter 5 of the BaSES Manual. Updates will be based solely upon the Mylar source documents and are anticipated to be in the format of a versioned geodatabase.

### Subtask 5.6 - Re-Inspection Of Collection System Sewers

The CONSULTANT will assist the CITY in re-inspecting the non-improved sewers within the project area.

#### Assist City in Creating RFP

The CONSULTANT will identify the sewers that qualify for re-inspection per the Baltimore City Consent Decree.  The City GIS will be utilized to estimated quantities of pipelines to be re-inspected.  The CONSULTANT will assist the City in generating a Request for Proposal (RFP) to have these sewers inspected.

#### Work Order Generation and Tracking

The CONSULTANT will work with the CITY and their selected CCTV Contractor to perform the re-inspection work associated with the project area.  The CONSULTANTS role shall be to create and track work orders and allow the CITY to view the status of all sewer segments within the project area.

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

(See accompanying instructions before completing this form)

### PART I - GENERAL

| | |
|---|---|
| 1. RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO.<br>Herring Run Engineering Services Proj. 1124U |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>URS Corporation | 4. DATE OF PROPOSAL<br>July 15, 2010 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code):<br>1800 Washington Blvd, Suite 410<br>Baltimore, MD 21230 | 6. TYPE OF SERVICES TO BE FURNISHED<br>Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Project Manager | 3094 | $ 54.29 | $ 167,958.90 | |
| Senior Engineer | 3010 | $ 38.38 | $ 115,521.02 | |
| Engineer | 2740 | $ 28.95 | $ 79,332.57 | |
| CADD/Tech II | 1528 | $ 23.69 | $ 36,197.48 | |
| CADD/Tech I | 40 | $ 21.37 | $ 854.91 | |
| **DIRECT LABOR TOTAL:** | | | | $399,864.88 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.12034 | $ 399,864.88 | $ 447,984.62 | |
| **INDIRECT COSTS TOTAL:** | | | | $447,984.62 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 500 miles @ $0.50/mi | 500 | $ 0.50 | $ 250.00 | |
| (3) PARKING: 50 days @ $8.00/day | 50 | $ 8.00 | $ 400.00 | |
| TRAVEL SUBTOTAL: | | | $ 650.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| EQUIPMENT | | | $ - | |
| | | | $ - | |
| MATERIALS/SUPPLIES | | | | |
| Plan Sheet Reproduction | 2000 | $ 1.00 | $ 2,000.00 | |
| 8.5x11 BW Copies | 5000 | $ 0.05 | $ 250.00 | |
| | | | $ - | |
| EQUIPMENT SUBTOTAL | | | $ 2,250.00 | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| EBA Engineering, Inc. | 1 | $ 165,815.87 | $ 165,815.87 | |
| Carroll Engineering, Inc. | 1 | $ 58,481.42 | $ 58,481.42 | |
| J. A. Rice, Inc. | 1 | $ 44,388.88 | $ 44,388.88 | |
| RJM Engineering, Inc. | 1 | $ 113,712.42 | $ 113,712.42 | |
| Savin Engineers, P.C. | 1 | $ 96,423.69 | $ 96,423.69 | |
| Phoenix Engineering, Inc. | 1 | $ -33,524.96 | $ 33,524.96 | *33,211.66* |
| Bay City Construction Company, Inc. | 1 | $ 35,072.00 | $ 35,072.00 | |
| SUBCONSULTANT(S) SUBTOTAL: | | | $ -547,419.24 | *547,105.94* |
| d. OTHER (Specify categories) | QTY | COST | ESTIMATED COST | |
| Principal | 30 | $ 85.00 | $ 2,550.00 | |
| Manhole Inspections (each) | 50 | $ 185.00 | $ 9,250.00 | |
| Smoke Testing (per LF) | 4000 | $ 0.65 | $ 2,600.00 | |
| | | | | |
| | | | | |
| OTHER SUBTOTAL: | | | $ 14,400.00 | |
| e. OTHER DIRECT COSTS TOTAL: (Combine Sum of Items a, b, c, and d) | | | *564,605.94* | $564,719.24 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | *1,412,455.44* | $1,412,568.74 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $84,784.95 |
| 12. TOTAL PRICE | | | | $1,497,353.69 |

EPA FORM 5700-41 (3-04)

*1,497,640.39*

**Project 1124U**
**Wastewater Engineering Services for the Improvements to the Herring Run Sewershed**
Min-Hour Estimate

| Task | URS Corporation | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| | Principal | Project Manager | Senior Engineer | Engineer | CADD/Tech II | CADD/Tech I | |
| **Project Management** | | | | | | | |
| 1.0 Project Management | 30 | 1560 | | | | | 1590 |
| 1.1 Project Initiation Meeting | | 6 | 6 | | | | 12 |
| 1.2 Progress Meetings | | 144 | 0 | | | | 144 |
| 1.3 Contract Administration | | 576 | 0 | | | | 576 |
| 1.4 Community Meetings | | 48 | 0 | | | | 48 |
| **Document Review and Design Memorandum** | | | | | | | |
| 2.0 Document Review | | 20 | 160 | 300 | 300 | | 780 |
| 2.1 Hydraulic Modeling | | 20 | 40 | | | | 60 |
| 2.2 Design Memorandum | | 40 | 80 | | | | 120 |
| 2.3 Rght-of-Way Documents | | 40 | 80 | 80 | 80 | 40 | 320 |
| **Field Investigations** | | | | | | | |
| 3.0 Field Survey | | 8 | 80 | 80 | | | 168 |
| 3.1 Environmental Assessment | | 8 | 160 | 240 | 300 | | 708 |
| 3.2 Geotechnical Investigation | | 8 | 40 | 40 | | | 88 |
| **Design Services** | | | | | | | |
| 4.0 70% Design Documents | | 40 | 360 | 360 | 80 | | 840 |
| 4.1 100% Design Documents | | 40 | 360 | 360 | 80 | | 840 |
| 4.2 Permit Applications | | 8 | 300 | 300 | | | 608 |
| 4.3 Bid Ready Documents | | 24 | 80 | 80 | | | 184 |
| 4.4 Assistance During Bid Award | | 24 | 80 | 40 | | | 144 |
| **Post Award Services** | | | | | | | |
| 5.0 Submittals | | 40 | 160 | 160 | | | 360 |
| 5.1 Technical Consultations, RFIs and Change Orders | | 80 | 320 | | | | 400 |
| 5.2 Progress Meetings/Conferences | | 144 | 144 | | | | 288 |
| 5.3 CCTV Inspections | | 40 | 40 | | 192 | | 272 |
| 5.4 Conditional and Final Acceptance Inspection | | 40 | 160 | 160 | | | 360 |
| 5.5 Record Drawings and GIS Update | | 80 | 120 | 120 | 280 | | 600 |
| 5.6 Re-Inspection of Collection System Sewers | | 56 | 240 | 420 | 216 | | 932 |
| TOTAL | 30 | 3094 | 3010 | 2740 | 1528 | 40 | 8852 |

# ATTACHMENT C

# EBA ENGINEERING

# (SUPPORTING DOCUMENTS)

**COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE**

(See accompanying instructions before completing this form)

**PART I - GENERAL**

| 1.  RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO.<br>Herring Run Engineering Services Proj. 1124U |
|---|---|
| 3.  NAME OF CONTRACTOR OR SUBCONTRACTOR<br>EBA Engineering, Inc | 4.  DATE OF PROPOSAL<br>July 15, 2010 |
| 5.  ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (*Include ZIP Code*)<br>SETON BUSINESS PARK, 4813 SETON DRIVE<br>BALTIMORE, MD 21215 | 6.  TYPE OF SERVICES TO BE FURNISHED<br>Wastewater Engineering Services for the Improvements<br>of the Herring Run Sewershed Collection System |

**PART II - COST SUMMARY**

| 7.   DIRECT LABOR (*Specify labor categories*) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| SR. PROJECT MANAGER | 16 | $ 53.98 | $ 863.68 | |
| PROJECT MANAGER | 160 | $ 47.18 | $ 7,548.80 | |
| PROJECT ENGINEER | 361 | $ 38.19 | $ 13,786.59 | |
| ENGINEER | 320 | $ 30.60 | $ 9,792.00 | |
| Engineering Technician | 220 | $ 27.07 | $ 5,955.40 | |
| Materials Technician I | 0 | $ 15.26 | $ - | |
| Materials Technician II | 0 | $ 23.59 | $ - | |
| Technician | 0 | $ 18.41 | $ - | |
| CADD Operator | 240 | $ 25.54 | $ 6,129.60 | |
| Inspector | 0 | $ 28.72 | $ - | |
| Survey Crew Chief | 0 | $ 23.99 | $ - | |
| Survey Technician | 0 | $ 17.09 | $ - | |
| DIRECT LABOR TOTAL: | | $ 17.09 | | $ 44,076.07 |

| 8.   INDIRECT COSTS (*Specify indirect cost pools*) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.2595 | $ 44,076.07 | $ 55,513.81 | |
| INDIRECT COSTS TOTAL: | | | | $ 55,513.81 |

| 9.   OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a.   TRAVEL | | | ESTIMATED COST | |
| (1)  MILEAGE: 1000 miles @ $0.50/mi | 1,000 | $ 0.50 | $ 500.00 | |
| (2)  PARKING: 20 trips @ $8/trip | 20 | $ 8.00 | $ 160.00 | |
| TRAVEL SUBTOTAL: | | | $ 660.00 | |
| b.  EQUIPMENT, MATERIALS, SUPPLIES (*Specify*) | QTY | COST | ESTIMATED COST | |
| Plan Sheet Reproduction | 500 | $ 1.00 | $ 500.00 | |
| B&W Photocopies (8.5x11) - EA | 2,280 | $ 0.05 | $ 114.00 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| EQUIPMENT SUBTOTAL: | | | $ 614.00 | |
| c.  SUBCONSULTANT(S) | | | ESTIMATED COST | |
| | | | | |
| SUBCONSULTANT(S) SUBTOTAL: | | | $ - | |
| d.  OTHER (*Specify categories*) | | | ESTIMATED COST | |
| Principal | 10 | $ 85.00 | $ 850.00 | |
| Geotechnical Investigations (see attached) | 1 | $ 54,143.00 | $ 54,143.00 | |
| | | | $ - | |
| | | | $ - | |
| | | | $ - | |
| OTHER SUBTOTAL: | | | $ 54,993.00 | |
| e.  OTHER DIRECT COSTS TOTAL:  (Combine Sum of Items a, b, c, and d) | | | | $ 56,267.00 |
| 10.  TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $ 155,856.88 |
| 11.  PROFIT (10 percent of direct labor and indirect costs) | | | | $ 9,958.99 |
| 12.  TOTAL PRICE | | | | $ 165,815.87 |

EPA FORM 5700-41 (3-04)

PROJECT NO. 1124U – WASTEWATER ENGINEERING SERVICES FOR IMPROVEMENTS
TO HERRING RUN SEWERSHED
GEOTECHNICAL DRILLING AND LABORATORY TESTING PRICES
EBA ENGINEERING, INC.

DRILLING PRICES

| Item | Qty | | | Unit Price | Unit | | | Total |
|---|---|---|---|---|---|---|---|---|
| Utility Clearance | 2 | @ | $ | $575.00 | /LS | = | $ | 1,150.00 |
| Traffic Control - Signs and Cones only | 5 | @ | $ | $675.00 | /day | = | $ | 3,375.00 |
| Traffic Control - Signs, Cones and Arrow board | 2 | @ | $ | $1,000.00 | /day | = | $ | 2,000.00 |
| Traffic Control - Signs, Cones and Flaggers | 2 | @ | $ | $1,300.00 | /day | = | $ | 2,600.00 |
| Mob/Demob - Pavement Coring Equipment | 2 | @ | $ | $900.00 | /LS | = | $ | 1,800.00 |
| Mob/Demob - Truck-Mounted Drill Rig | 2 | @ | $ | $1,150.00 | /LS | = | $ | 2,300.00 |
| Mob/Demob - ATV-Mounted Drill Rig | 2 | @ | $ | $1,800.00 | /LS | = | $ | 3,600.00 |
| Mob/Demob - Tripod Drill Rig | 2 | @ | $ | $900.00 | /LS | = | $ | 1,800.00 |
| Bull Dozer and Operator | 2 | @ | $ | $1,500.00 | /day | = | $ | 3,000.00 |
| Drilling Crew Clearing, Standby and Moving Time | 2 | @ | $ | $195.00 | /hour | = | $ | 390.00 |
| Soil Drilling with SPT @ 5' intervals – Truck-Mounted Drill Rig (12@15') | 200 | @ | $ | $18.50 | /ft | = | $ | 3,700.00 |
| Soil Drilling with SPT @ 5' intervals – ATV-Mounted Drill Rig (1@10') | 100 | @ | $ | $20.50 | /ft | = | $ | 2,050.00 |
| Tripod Drill Rig Set-Up | 5 | @ | $ | $630.00 | /ea | = | $ | 3,150.00 |
| Soil Drilling with SPT @ 5' intervals – Tripod Drill Rig (1@10') | 50 | @ | $ | $48.00 | /ft | = | $ | 2,400.00 |
| Additional SPT and Split Spoon Samples | 10 | @ | $ | $32.00 | /ea | = | $ | 320.00 |
| Extra Jar Samples for Corrosion Evaluation | 10 | @ | $ | $32.00 | /ea | = | $ | 320.00 |
| Shelby Tube Samples | 10 | @ | $ | $160.00 | /ea | = | $ | 1,600.00 |
| Bulk Samples | 10 | @ | $ | $32.00 | /ea | = | $ | 320.00 |
| Rock Coring Set-Up | 5 | @ | $ | $210.00 | /ea | = | $ | 1,050.00 |
| Rock Coring (1@5') | 20 | @ | $ | $85.00 | /ft | = | $ | 1,700.00 |
| Pavement Cut/Patch and Cleanup | 20 | @ | $ | $160.00 | /ea | = | $ | 3,200.00 |
| Grout Backfill | 300 | @ | $ | $10.50 | /ft | = | $ | 3,150.00 |
| Pavement Core and Patch | 10 | @ | $ | $265.00 | /ea | = | $ | 2,650.00 |
| Observation Well Permits | 1 | @ | $ | $165.00 | /ea | = | $ | 165.00 |
| Installation of 2" Observation Well in Soil Boring | 1 | @ | $ | $38.00 | /ft | = | $ | 38.00 |
| Observation Well Covers | 1 | @ | $ | $290.00 | /ea | = | $ | 290.00 |
| | | | | Subtotal | | = | $ | 48,118.00 |

LABORATORY TESTING PRICES

| Item | Qty | | | Unit Price | Unit | | | Total |
|---|---|---|---|---|---|---|---|---|
| Moisture Content | 10 | @ | $ | $12.50 | /ea | = | $ | 125.00 |
| Sieve Analysis | 10 | @ | $ | $80.00 | /ea | = | $ | 800.00 |
| Liquid and Plastic Limits of Soils | 10 | @ | $ | $80.00 | /ea | = | $ | 800.00 |
| Particle Size Analysis (with Hydrometer Test) | 10 | @ | $ | $135.00 | /ea | = | $ | 1,350.00 |
| Moisture-Density Relationship (Proctor) | 10 | @ | $ | $155.00 | /ea | = | $ | 1,550.00 |
| Extrusion and Density of Tube Sample | 10 | @ | $ | $45.00 | /ea | = | $ | 450.00 |
| Unconfined Compressive Strength of Soil | 10 | @ | $ | $95.00 | /ea | = | $ | 950.00 |
| | | | | Subtotal | | = | $ | 6,025.00 |
| | | | | Grand total | | = | $ | 54,143.00 |

# Wastewater Engineering Services for the Improvements to the Herring Run Sewershed
## Project 11240
### Manhour Estimate

| Task | EA Engineering | | | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Principal | SR. PROJECT MANAGER | PROJECT MANAGER | PROJECT ENGINEER | ENGINEER | Engineering Technician | Materials Technician I | Materials Technician II | Technician | CADD Operator | Inspector | Survey Crew Chief | Survey Technician | |
| **Project Management** | | | | | | | | | | | | | | 0 |
| 1.1 Project Management | | | | | | | | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | | | | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | | | | | | | | | 0 |
| 1.3 Contract Administration | | | | | | | | | | | | | | 0 |
| 1.4 Community Meetings | | | | | | | | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | | | | | | | | 0 |
| 2.0 Document Review | | | | | | | | | | | | | | 0 |
| 2.1 Hydraulic Modeling | | | | | | | | | | | | | | 0 |
| 2.2 Design Memorandum | | | | | | | | | | | | | | 0 |
| 2.3 Right-of-Way Documents | | | | | | | | | | | | | | 0 |
| **Field Investigations** | | | | | | | | | | | | | | 0 |
| 3.0 Field Survey | | | | | | | | | | | | | | 0 |
| 3.1 Environmental Assessment | | | | | | | | | | | | | | 0 |
| 3.2 Geotechnical Investigation | | | | | | | | | | | | | | 0 |
| **Design Services** | | | | | | | | | | | | | | 0 |
| 4.0 70% Design Documents | 5 | 8 | 80 | 200 | 180 | 140 | | | | 160 | | | | 773 |
| 4.1 100% Design Documents | 5 | 8 | 80 | 161 | 140 | 80 | | | | 80 | | | | 554 |
| 4.2 Permit Applications | | | | | | | | | | | | | | 0 |
| 4.3 Bid Ready Documents | | | | | | | | | | | | | | 0 |
| 4.4 Assistance During Bid Award | | | | | | | | | | | | | | 0 |
| **Post Award Services** | | | | | | | | | | | | | | 0 |
| 5.0 Submittals | | | | | | | | | | | | | | 0 |
| 5.1 Technical Consultation, RFIs and Change Orders | | | | | | | | | | | | | | 0 |
| 5.2 Progress Meetings/Conferences | | | | | | | | | | | | | | 0 |
| 5.3 CCTV Inspections | | | | | | | | | | | | | | 0 |
| 5.4 Operational and Final Acceptance Inspection | | | | | | | | | | | | | | 0 |
| 5.5 Record Drawings and GIS Update | | | | | | | | | | | | | | 0 |
| 5.6 Re-inspection of Collection System Sewers | | | | | | | | | | | | | | 0 |
| **TOTAL** | 10 | 16 | 160 | 361 | 320 | 220 | 0 | 0 | 0 | 240 | 0 | 0 | 0 | 1327 |

# ATTACHMENT D

# CARROLL ENGINEERING

# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE
(See accompanying instructions before completing this form)

### PART I - GENERAL

| | |
|---|---|
| 1. RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO.<br>Herring Run Engineering Services Proj. 1124U |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>Carroll Engineering, Inc. | 4. DATE OF PROPOSAL<br>July 15, 2010 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code)<br>11350 McCormick Road<br>Hunt Valley, MD 21031-1002 | 6. TYPE OF SERVICES TO BE FURNISHED<br>Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Project Engineer | 80 | $ 54.25 | $ 4,340.00 | |
| Civil Engineer | 160 | $ 43.30 | $ 6,928.00 | |
| Landscape Architect | 2 | $ 43.83 | $ 87.66 | |
| Structural Engineer | 2 | $ 33.52 | $ 67.04 | |
| CADD/Drafter | 390 | $ 28.47 | $ 11,103.30 | |
| Technician | 2 | $ 12.23 | $ 24.46 | |
| DIRECT LABOR TOTAL: | | $ 17.09 | | $ 22,550.46 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.3064 | $ 22,550.46 | $ 29,459.92 | |
| INDIRECT COSTS TOTAL: | | | | $ 29,459.92 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 500 miles @ $0.50/mi | 500 | $ 0.50 | $ 250.00 | |
| (2) PARKING: 20 trips @ $8/trip | 20 | $ 8.00 | $ 160.00 | |
| TRAVEL SUBTOTAL: | | | $ 410.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| Plan Sheet Reproduction | 300 | $ 1.00 | $ 300.00 | |
| B&W Photocopies (8.5x11) - EA | 1,000 | $ 0.05 | $ 50.00 | |
| EQUIPMENT SUBTOTAL: | | | $ 350.00 | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| SUBCONSULTANT(S) SUBTOTAL: | | | $ . | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| Principal | 6 | $ 85.00 | $ 510.00 | |
| OTHER SUBTOTAL: | | | $ 510.00 | |
| e. OTHER DIRECT COSTS TOTAL: (Combine Sum of Items a, b, c, and d) | | | | $ 1,270.00 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $ 53,280.38 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $ 5,201.04 |
| 12. TOTAL PRICE | | | | $ 58,481.42 |

EPA FORM 5700-41 (3-04)

**Project 1124U**

**Wastewater Engineering Services for the Improvements to the Herring Run Sewershed**

**Man-Hour Estimate**

| Task | Carroll Engineering | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | Principal | Project Engineer | Civil Engineer | Landscape Architect | Structural Engineer | CADD/Drafter | Technician | |
| **Project Management** | | | | | | | | |
| 1.0 Project Management | | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | | | 0 |
| 1.3 Contract Administration | | | | | | | | 0 |
| 1.4 Community Meetings | | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | | |
| 2.0 Document Review | | | | | | | | 0 |
| 2.1 Hydraulic Modeling | | | | | | | | 0 |
| 2.2 Design Memorandum | | | | | | | | 0 |
| 2.3 Right-of-Way Documents | 2 | 20 | 80 | 1 | 1 | 80 | 1 | 185 |
| **Field Investigations** | | | | | | | | |
| 3.0 Field Survey | | | | | | | | 0 |
| 3.1 Environmental Assessment | | | | | | | | 0 |
| 3.2 Geotechnical Investigation | | | | | | | | 0 |
| **Design Services** | | | | | | | | |
| 4.0 70% Design Documents | 2 | 20 | 80 | 1 | 1 | 80 | 1 | 185 |
| 4.1 100% Design Documents | | | | | | | | 0 |
| 4.2 Permit Applications | | | | | | | | 0 |
| 4.3 Bid Ready Documents | | | | | | | | 0 |
| 4.4 Assistance During Bid Award | | | | | | | | 0 |
| **Post Award Services** | | | | | | | | |
| 5.0 Submittals | | | | | | | | 0 |
| 5.1 Technical Consultations, RFIs and Change Orders | | | | | | | | 0 |
| 5.2 Progress Meetings/Conferences | | | | | | | | 0 |
| 5.3 CCTV Inspections | | | | | | | | 0 |
| 5.4 Conditional and Final Acceptance Inspection | | | | | | | | 0 |
| 5.5 Record Drawings and GIS Update | 2 | 40 | | | | 230 | | 272 |
| 5.6 Re-Inspection of Collection System Sewers | | | | | | | | 0 |
| **TOTAL** | 6 | 80 | 160 | 2 | 2 | 390 | 2 | 642 |

# ATTACHMENT E

# JA RICE

# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

(See accompanying instructions before completing this form)

### PART I - GENERAL

| | |
|---|---|
| 1. RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO.<br>Herring Run Engineering Services Proj. 1124U |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>J. A. Rice, Inc. | 4. DATE OF PROPOSAL<br>July 15, 2010 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code).<br>P.O. Box 1288<br>Millersville, MD 21108 | 6. TYPE OF SERVICES TO BE FURNISHED<br>Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Licensed Surveyor | 42 | $46.73 | $    1,962.66 | |
| Party Chief | 158 | $27.30 | $    4,313.40 | |
| Instrument Man | 140 | $17.53 | $    2,454.20 | |
| Rodman | 28 | $13.13 | $      367.64 | |
| CADD Technician | 70 | $35.28 | $    2,469.60 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **DIRECT LABOR TOTAL:** | | | | $    11,567.50 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.1132 | $   11,567.50 | $   12,876.94 | |
| **INDIRECT COSTS TOTAL:** | | | | $    12,876.94 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 2000 miles @ $0.50/mi | 2,000 | $0.50 | $    1,000.00 | |
| | | | $        - | |
| **TRAVEL SUBTOTAL:** | | | $    1,000.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| | | | $        - | |
| | | | $        - | |
| **EQUIPMENT SUBTOTAL:** | | | $        - | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| **SUBCONSULTANT(S) SUBTOTAL:** | | | $        - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| Traffic Control (per day) | 15 | $   1,100.00 | $   16,500.00 | |
| | | | $        - | |
| | | | $        - | |
| | | | $        - | |
| | | | $        - | |
| | | | $        - | |
| **OTHER SUBTOTAL:** | | | $   16,500.00 | |
| e. OTHER DIRECT COSTS TOTAL. (Combine Sum of Items a, b, c, and d) | | | | $    17,500.00 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $    41,944.44 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $    2,444.44 |
| 12. TOTAL PRICE | | | | $    44,388.88 |

EPA FORM 5700-41 (3-04)

**Project 1124U**

**Wastewater Engineering Services for the Improvements to the Herring Run Sewershed**

**Man-Hour Estimate**

| Task | Licensed Surveyor | Party Chief | Instrument Man | J.A. Rice Rodman | CADD Technician | TOTAL |
|---|---|---|---|---|---|---|
| **Project Management** | | | | | | |
| 1.0 Project Management | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | 0 |
| 1.3 Contract Administration | | | | | | 0 |
| 1.4 Community Meetings | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | |
| 2.0 Document Review | | | | | | 0 |
| 2.1 Hydraulic Modeling | | | | | | 0 |
| 2.2 Design Memorandum | | | | | | 0 |
| 2.3 Right-of-Way Documents | | | | | | 0 |
| **Field Investigations** | | | | | | |
| 3.0 Field Survey | 42 | 158 | 140 | 28 | 70 | 438 |
| 3.1 Environmental Assessment | | | | | | 0 |
| 3.2 Geotechnical Investigation | | | | | | 0 |
| **Design Services** | | | | | | |
| 4.0 70% Design Documents | | | | | | 0 |
| 4.1 100% Design Documents | | | | | | 0 |
| 4.2 Permit Applications | | | | | | 0 |
| 4.3 Bid Ready Documents | | | | | | 0 |
| 4.4 Assistance During Bid Award | | | | | | 0 |
| **Post Award Services** | | | | | | |
| 5.0 Submittals | | | | | | 0 |
| 5.1 Technical Consultations, RFIs and Change Orders | | | | | | 0 |
| 5.2 Progress Meetings/Conferences | | | | | | 0 |
| 5.3 CCTV Inspections | | | | | | 0 |
| 5.4 Conditional and Final Acceptance Inspection | | | | | | 0 |
| 5.5 Record Drawings and GIS Update | | | | | | 0 |
| 5.6 Re-Inspection of Collection System Sewers | | | | | | 0 |
| **TOTAL** | 42 | 158 | 140 | 28 | 70 | 438 |

# ATTACHMENT F

# RJM ENGINEERING

# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

(See accompanying instructions before completing this form)

### PART I - GENERAL

| | |
|---|---|
| 1   RECIPIENT | ASSISTANCE IDENTIFICATION NO |
| City of Baltimore, Department of Public Works | Herring Run Engineering Services Proj. 1124U |
| 3   NAME OF CONTRACTOR OR SUBCONTRACTOR | 4.   DATE OF PROPOSAL |
| RJM Engineering, Inc. | July 15, 2010 |
| 5   ADDRESS OF CONTRACTOR OR SUBCONTRACTOR *(include ZIP Code)* | 6   TYPE OF SERVICES TO BE FURNISHED |
| 6021 University Boulevard, Suite 530 | Wastewater Engineering Services for the Improvements |
| Ellicott City  MD 21043 | of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7.   DIRECT LABOR *(Specify labor categories)* | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Project Manager | 120 | $52.64 | $         6,316.80 | |
| Project Engineer | 480 | $49.88 | $       23,942.40 | |
| Design Engineer | 240 | $45.06 | $       10,814.40 | |
| CADD Technician | 180 | $31.55 | $         6,049.50 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **DIRECT LABOR TOTAL:** | | | | $       46,123.20 |

| 8.   INDIRECT COSTS *(Specify indirect cost pools)* | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.2262 | $     46,123.20 | $       56,558.27 | |
| **INDIRECT COSTS TOTAL:** | | | | 56,558.27 |

| 9   OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a.   TRAVEL | | | ESTIMATED COST | |
| (1)   MILEAGE: 0 miles @ $0.50/mi | - | $0.50 | $                 - | |
| (2)   PARKING:  0trips @ $8/trip | - | $8.00 | $                 - | |
| **TRAVEL SUBTOTAL:** | | | $                 - | |
| b.   EQUIPMENT, MATERIALS, SUPPLIES *(Specify)* | QTY | COST | ESTIMATED COST | |
| Plan Sheet Reproduction | | $            1.00 | $                 - | |
| B&W Photocopies (8.5x11) - EA | | $            0.05 | $                 - | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **EQUIPMENT SUBTOTAL:** | | | $                 - | |
| c.   SUBCONSULTANT(S) | | | ESTIMATED COST | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **SUBCONSULTANT(S) SUBTOTAL:** | | | $                 - | |
| d.   OTHER *(Specify categories)* | | | ESTIMATED COST | |
| Principal | 9 | $        85.00 | $            765.00 | |
| **OTHER SUBTOTAL:** | | | $            765.00 | |

| e.   OTHER DIRECT COSTS TOTAL.  (Combine Sum of Items a, b, c, and d) | $            765.00 |
|---|---|
| 10.   TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | $       103,444.47 |
| 11.   PROFIT (10 percent of direct labor and indirect costs) | $       10,267.95 |
| 12   TOTAL PRICE | $       113,712.42 |

EPA FORM 5700-41 (3-04)

## Project 1124U
## Wastewater Engineering Services for the Improvements to the Herring Run Sewershed
### Man-Hour Estimate

| Task | RJM Engineering | | | | | TOTAL |
|---|---|---|---|---|---|---|
| | Principal | Project Manager | Project Engineer | Design Engineer | CADD Technician | |
| **Project Management** | | | | | | |
| 1.0 Project Management | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | 0 |
| 1.3 Contract Administration | | | | | | 0 |
| 1.4 Community Meetings | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | |
| 2.0 Document Review | | | | | | 0 |
| 2.1 Hydraulic Modeling | | | | | | 0 |
| 2.2 Design Memorandum | | | | | | 0 |
| 2.3 Right-of-Way Documents | | | | | | 0 |
| **Field Investigations** | | | | | | |
| 3.0 Field Survey | | | | | | 0 |
| 3.1 Environmental Assessment | | | | | | 0 |
| 3.2 Geotechnical Investigation | | | | | | 0 |
| **Design Services** | | | | | | |
| 4.0 70% Design Documents | 3 | 40 | 160 | 80 | 80 | 363 |
| 4.1 100% Design Documents | 3 | 40 | 160 | 80 | 80 | 363 |
| 4.2 Permit Applications | | | | | | 0 |
| 4.3 Bid Ready Documents | | | | | | 0 |
| 4.4 Assistance During Bid Award | | | | | | 0 |
| **Post Award Services** | | | | | | |
| 5.0 Submittals | | | | | | 0 |
| 5.1 Technical Consultations, RFIs and Change Orders | 3 | 40 | 160 | 80 | | 283 |
| 5.2 Progress Meetings/Conferences | | | | | | 0 |
| 5.3 CCTV Inspections | | | | | | 0 |
| 5.4 Conditional and Final Acceptance Inspection | | | | | | 0 |
| 5.5 Record Drawings and GIS Update | | | | | | 0 |
| 5.6 Re-Inspection of Collection System Sewers | | | | | | 0 |
| **TOTAL** | 9 | 120 | 480 | 240 | 160 | 1009 |

# ATTACHMENT G

# SAVIN ENGINEERING

# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE
(See accompanying instructions before completing this form)

### PART I - GENERAL

| | |
|---|---|
| 1. RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO<br>Herring Run Engineering Services Proj. 1124U |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>Savin Engineers, P.C. | 4. DATE OF PROPOSAL<br>July 15, 2010 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code):<br>3700 Koppers Street, Suite 119<br>Baltimore, MD 21227 | 6. TYPE OF SERVICES TO BE FURNISHED<br>Wastewater Engineering Services for the Improvements<br>of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Sr. Engineer | 30 | $44.01 | $  1,320.30 | |
| Project Engineer | 80 | $32.14 | $  2,571.20 | |
| Engineer | 240 | $28.01 | $  6,722.40 | |
| Sr. Construction Inspector | 0 | $43.46 | $      - | |
| CAD Technician | 0 | $39.10 | $      - | |
| Technician | 0 | $23.68 | $      - | |
| | | | | |
| | | | | |
| **DIRECT LABOR TOTAL:** | | | | $  10,613.90 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.3500 | $  10,613.90 | $  14,328.77 | |
| **INDIRECT COSTS TOTAL:** | | | | $  14,328.77 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 1,000 miles @ $0.50/mi | 1,000 | $0.50 | $    500.00 | |
| (2) PARKING: 10 trips @ $8/trip | 10 | $8.00 | $     80.00 | |
| **TRAVEL SUBTOTAL:** | | | $    580.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| Plan Sheet Reproduction | 10 | $  1.00 | $     10.00 | |
| B&W Photocopies (8.5x11) - EA | 1,000 | $  0.05 | $     50.00 | |
| | | | | |
| **EQUIPMENT SUBTOTAL:** | | | $     60.00 | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| | | | | |
| **SUBCONSULTANT(S) SUBTOTAL:** | | | $      - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| Principal | 10 | $  85.00 | $    850.00 | |
| Field Investigations (see attached breakdown) | 1 | $  67,496.75 | $  67,496.75 | |
| | | | $      - | |
| | | | $      - | |
| | | | $      - | |
| | | | $      - | |
| **OTHER SUBTOTAL:** | | | $  68,346.75 | |
| e. OTHER DIRECT COSTS TOTAL: (Combine Sum of Items a, b, c, and d) | | | | $  68,986.75 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $  93,929.42 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $  2,494.27 |
| 12. TOTAL PRICE | | | | $  96,423.69 |

EPA FORM 5700-41 (3-04)

URS CORP.
CITY OF BALTIMORE DPW
HERRING RUN SEWERSHED REHABILITATION

**SUMMARY OF UNIT PRICES FOR FIELD SERVICES**

Savin Engineers, P.C.
May 19, 2010

| Item 1 | Light Cleaning & CCTV Inspection | Size | Quantity (lf) | Unit Cost ($/lf) | | Cost |
|---|---|---|---|---|---|---|
| | 1-3 passes for all pipe sizes | 8 - 12" | 6,000 | $2.65 | $ | 15,900.00 |
| | | 14 - 18" | 4,000 | $3.00 | $ | 12,000.00 |
| | | 20 - 33" | 2,000 | $3.50 | $ | 7,000.00 |
| | | 36 - 56" | 1 | $6.50 | $ | 6.50 |
| | | 60 - 75" | 1 | $10.50 | $ | 10.50 |
| Item 2 | Heavy Sewer Cleaning (Contingent) | Size | Quantity (lf) | Unit Cost ($/lf) | | Cost |
| | Up to 10 passes for all pipe sizes | 8 - 12" | 600 | $2.50 | $ | 1,500.00 |
| | | 14 - 18" | 400 | $4.50 | $ | 1,800.00 |
| | | 20 - 33" | 200 | $5.50 | $ | 1,100.00 |
| | | 36 - 56" | 1 | $8.00 | $ | 8.00 |
| | | 60 - 66" | 1 | $13.00 | $ | 13.00 |
| Item 3 | CCTV Inspection (Contingent) | Size | Quantity (lf) | Unit Cost ($/lf) | | Cost |
| | | 8 - 12" | 1,000 | $1.50 | $ | 1,500.00 |
| | | 14 - 18" | 1,000 | $1.75 | $ | 1,750.00 |
| | | 20 - 24" | 1,000 | $2.00 | $ | 2,000.00 |
| | | 36 - 56" | 1 | $2.50 | $ | 2.50 |
| | | 60 - 66" | 1 | $3.25 | $ | 3.25 |
| Item 4 | Deep ROW CCTV Inspection (Contingent) | Size | Quantity (lf) | Unit Cost ($/lf) | | Cost |
| | | 8 - 12" | 300 | $3.00 | $ | 900.00 |
| | | 14 - 18" | 300 | $3.50 | $ | 1,050.00 |
| | | 20 - 33" | 300 | $4.00 | $ | 1,200.00 |
| | | 36 - 56" | 1 | $5.00 | $ | 5.00 |
| | | 60 - 75" | 1 | $7.00 | $ | 7.00 |
| Item 5 | Temporary Control of Flows (> 1 mgd) (Contingent) | Capacity | Quantity (days) | Unit Cost ($/day) | | Cost |
| | | 1 1 - 2 mgd | 2 | $1,900.00 | $ | 3,800.00 |
| | | 2 1 - 5 mgd | 2 | $2,500.00 | $ | 5,000.00 |
| Item 6 | Smoke Testing (Contingent) | Size | Quantity (lf) | Unit Cost ($/lf) | | Cost |
| | | 4 - 24" | 1,000 | $0.65 | $ | 650.00 |
| | | 27 - 36" | 100 | $0.80 | $ | 80.00 |
| Item 7 | Dyed Water Testing (Contingent) | Size | Quantity (each) | Unit Cost ($/each) | | Cost |
| | <15 gal | Small | 8 | $119.00 | $ | 952.00 |
| | >15 gal | Large | 8 | $157.00 | $ | 1,256.00 |
| | | Dye Flood | 8 | $621.00 | $ | 4,968.00 |
| Item 8 | Manhole Inspection w/Camera | | Quantity (each) | Unit Cost ($/each) | | Cost |
| | | | 1 | $125.00 | $ | 125.00 |
| Item 6 | Other Direct Costs | | Quantity | Unit Cost | | Cost |
| | Van Rental (per day) | | 2 | $175.00 | | 350.00 |
| | Flusher Rental (per day) | | 2 | $250.00 | | 500.00 |
| | Vac Rental (per day) | | 2 | $300.00 | | 600.00 |
| | TV Truck Rental (per day) | | 2 | $350.00 | | 700.00 |
| | Inspection Vehicle Mileage (each) | | 200 | $3.00 | | 600.00 |
| | Personnel Per Diem (per day) | | 4 | $40.00 | | 160.00 |

| | TOTAL | $ | 67,496.75 |
|---|---|---|---|

**Wastewater Engineering Services for the Improvements to the Herring Run Sewershed**

**Project #1240**

**Man-Hour Estimate**

| Task | Savin Engineering | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | Principal | Sr. Engineer | Project Engineer | Engineer | Sr. Construction | CAD Technician | Technician | |
| **Project Management** | | | | | | | | 0 |
| 1.0 Project Management | | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | | | 0 |
| 1.3 Contract Administration | | | | | | | | 0 |
| 1.4 Community Meetings | | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | | 360 |
| 2.0 Document Review | 10 | 30 | 80 | 240 | | | | 360 |
| 2.1 Hydraulic Modeling | | | | | | | | 0 |
| 2.2 Design Memorandum | | | | | | | | 0 |
| 2.3 Right-of-Way Documents | | | | | | | | 0 |
| **Field Investigations** | | | | | | | | 0 |
| 3.0 Field Survey | | | | | | | | 0 |
| 3.1 Environmental Assessment | | | | | | | | 0 |
| 3.2 Geotechnical Investigation | | | | | | | | 0 |
| **Design Services** | | | | | | | | 0 |
| 4.0 70% Design Documents | | | | | | | | 0 |
| 4.1 100% Design Documents | | | | | | | | 0 |
| 4.2 Permit Applications | | | | | | | | 0 |
| 4.3 Bid Ready Documents | | | | | | | | 0 |
| 4.4 Assistance During Bid Award | | | | | | | | 0 |
| **Post Award Services** | | | | | | | | 0 |
| 5.0 Submittals | | | | | | | | 0 |
| 5.1 Technical Consultations, RFIs and Change Orders | | | | | | | | 0 |
| 5.2 Progress Meetings/Conferences | | | | | | | | 0 |
| 5.3 CCTV Inspections | | | | | | | | 0 |
| 5.4 Conditional and Final Acceptance Inspection | | | | | | | | 0 |
| 5.5 Record Drawings and GIS Update | | | | | | | | 0 |
| 5.6 Re-Inspection of Collection System Sewers | | | | | | | | 0 |
| **TOTAL** | 10 | 30 | 80 | 240 | 0 | 0 | 0 | 360 |

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

(See accompanying instructions before completing this form)

### PART I - GENERAL

| 1  RECIPIENT | ASSISTANCE IDENTIFICATION NO. |
|---|---|
| City of Baltimore, Department of Public Works | Herring Run Engineering Services Proj. 1124 |
| 3  NAME OF CONTRACTOR OR SUBCONTRACTOR | 4  DATE OF PROPOSAL |
| Phoenix Engineering, Inc. | July 15, 2010 |
| 5  ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code) | 6  TYPE OF SERVICES TO BE FURNISHED |
| 1420-A Joh Avenue | Wastewater Engineering Services for the |
| Baltimore, MD 21227 | Improvements of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7  DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Senior Electrical Estimator | 0 | $53.28 | $  - | |
| Senior Mechanical Estimator | 0 | $49.45 | $  - | |
| Construction Manager | 140 | $42.84 | $  5,997.60 | |
| Project Manager | 80 | $42.07 | $  3,365.60 | |
| Senior A/S/C Estimator | 2 | $40.37 | $  80.74 | |
| Project Engineer | 140 | $36.25 | $  5,075.00 | |
| Technician | 2 | $22.59 | $  45.18 | |
| CADD Technician | 2 | $21.73 | $  43.46 | |
| | | | | $  14,607.58 |

| 8  INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.0335 *$  14,607.58 | $  15,096.93 | | 14,812.09 $ |
| | 1.0148 | | | |
| INDIRECT COSTS TOTAL: | | | | $  15,096.93 |

| 9  OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE  0 miles @  .50/mi | | $0.50 | $  - | |
| TRAVEL SUBTOTAL: | | | $  - | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| EQUIPMENT | | | | |
| MATERIALS/SUPPLIES | | | | |
| Printing | | $  1.00 | $  - | |
| Mailings | | $  12.50 | $  - | |
| Black & White (8.5x11) Copies | | $  0.05 | $  - | |
| EQUIPMENT SUBTOTAL | | | $  - | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| SUBCONSULTANT(S) SUBTOTAL: | | | $  - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| Principal | 10 | $  85.00 | $  850.00 | |
| OTHER SUBTOTAL | | | $  850.00 | |
| e. OTHER DIRECT COSTS TOTAL. (Combine Sum of Items a, b, c, and d) | | | | $  850.00 |
| 10.  TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $  30,554.51 |
| 11.  PROFIT (10 percent of direct labor and indirect costs) | | | | $  2,970.45 |
| 12.  TOTAL PRICE | | | | $  33,524.95 |

EPA FORM 5700-41 (3-04)

Handwritten margin notes: 30,269.67, 1,441.99, 33,711.69

**Wastewater Engineering Services for the Improvements to the Herring Run Sewershed**
**Project 1124U**
**Man-Hour Estimate**

| Task | Phoenix Engineering | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | Principal | Senior Electrical | Senior Mechanical | Construction Manager | Project Manager | Senior AS/QC Estimator | Project Engineer | Technician | CADD Technician | |
| **Project Management** | | | | | | | | | | |
| 1.0 Project Management | | | | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | | | | | 0 |
| 1.3 Contract Administration | | | | | | | | | | 0 |
| 1.4 Community Meetings | | | | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | | | | |
| 2.0 Document Review | | | | | | | | | | 0 |
| 2.1 Hydraulic Modeling | | | | | | | | | | 0 |
| 2.2 Design Memorandum | | | | | | | | | | 0 |
| 2.3 Right-of-Way Documents | | | | | | | | | | 0 |
| **Field Investigations** | | | | | | | | | | |
| 3.0 Field Survey | | | | | | | | | | 0 |
| 3.1 Environmental Assessment | | | | | | | | | | 0 |
| 3.2 Geotechnical Investigation | | | | | | | | | | 0 |
| **Design Services** | | | | | | | | | | |
| 4.0 70% Design Documents | | | | | | | | | | 0 |
| 4.1 100% Design Documents | | | | | | | | | | 0 |
| 4.2 Permit Applications | | | | | | | | | | 0 |
| 4.3 Bid Ready Documents | | | | | | | | | | 0 |
| 4.4 Assistance During Bid Award | | | | | | | | | | 0 |
| **Post Award Services** | | | | | | | | | | |
| 5.0 Submittals | | | | | | | | | | 0 |
| 5.1 Technical Consultations, RFIs and Change Orders | 10 | | | 140 | 80 | 2 | 140 | 2 | 2 | 376 |
| 5.2 Progress Meetings/Conferences | | | | | | | | | | 0 |
| 5.3 CCTV Inspections | | | | | | | | | | 0 |
| 5.4 Conditional and Final Acceptance Inspection | | | | | | | | | | 0 |
| 5.5 Record Drawings and GIS Update | | | | | | | | | | 0 |
| 5.6 Re-Inspection of Collection System Sewers | | | | | | | | | | 0 |
| TOTAL | 10 | 0 | 0 | 140 | 80 | 2 | 140 | 2 | 2 | 376 |

# ATTACHMENT I

# BAY CITY CONSTRUCTION

# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE
(See accompanying instructions before completing this form)

### PART I - GENERAL

| 1. RECIPIENT | ASSISTANCE IDENTIFICATION NO. |
|---|---|
| City of Baltimore, Department of Public Works | Herring Run Engineering Services Proj. 1124U |

| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR | 4. DATE OF PROPOSAL |
|---|---|
| Bay City Construction Company, Inc | July 15, 2010 |

| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code) | 6. TYPE OF SERVICES TO BE FURNISHED |
|---|---|
| 12206 CLeghorn Road<br>Cockeysville, Md 21030 | Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Project Manager | 8 | $55.00 | $ 440.00 | |
| Project Administrator | 16 | $35.00 | $ 560.00 | |
| Foreman | 40 | $55.00 | $ 2,200.00 | |
| Operator | 40 | $42.50 | $ 1,700.00 | |
| Dump Truck Driver | 15 | $26.00 | $ 390.00 | |
| Parts Truck Driver | 10 | $25.00 | $ 250.00 | |
| Laborers | 120 | $21.60 | $ 2,592.00 | |
| Flagmen | 80 | $21.60 | $ 1,728.00 | |
| **DIRECT LABOR TOTAL:** | | | | $ 9,860.00 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.0000 | $ 9,860.00 | $ 9,860.00 | |
| **INDIRECT COSTS TOTAL:** | | | | $ 9,860.00 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| | | | $ - | |
| **TRAVEL SUBTOTAL:** | | | $ - | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| B&W Photocopies (8.5x11) - EA | 287 | $ 0.05 | $ 14.35 | |
| **EQUIPMENT SUBTOTAL** | | | $ 14.35 | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| **SUBCONSULTANT(S) SUBTOTAL:** | | | $ - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| Manhole Access (see attached breakdown) | 1 | $13,365.65 | $ 13,365.65 | |
| | | | | |
| **OTHER SUBTOTAL** | | | $ 13,385.65 | |
| e. OTHER DIRECT COSTS TOTAL (Combine Sum of Items a, b, c, and d) | | | | $ 13,380.00 |

| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | $ 33,100.00 |
|---|---|
| 11. PROFIT (10 percent of direct labor and indirect costs) | $ 1,972.00 |
| 12. TOTAL PRICE | $ 35,072.00 |

EPA FORM 5700-41 (3-04)

URS CORP.
CITY OF BALTIMORE DPW
HERRING RUN SEWERSHED REHABILITATION

**SUMMARY OF UNIT PRICES FOR MANHOLE ACCESS SERVICES**

Bay City Construction, Inc.
September 7, 2010

| Item | Quantity | Cost/Unit | Cost |
|---|---|---|---|
| John Deere 310 Backhoe (/hr) | 40 | $32.45 | $1,298.00 |
| Tool Truck (/hr) | 10 | $12.20 | $122.00 |
| Dump Truck (/hr) | 15 | $70.10 | $1,051.50 |
| Parts Truck (/hr) | 10 | $26.50 | $265.00 |
| Non-Tilt Deck Utility Trailor (/hr) | 40 | $6.20 | $248.00 |
| Air Compressor/Hose/Jack Hammer (/hr) | 40 | $16.40 | $656.00 |
| Sawcutting (lf) | 100 | $3.20 | $320.00 |
| Concrete Sidewalk (sf) | 80 | $10.00 | $800.00 |
| Concrete Curb & Gutter (lf) | 10 | $31.25 | $312.50 |
| Amerimix Morter (bag) | 50 | $7.95 | $397.50 |
| Sanitary MH Frame & Cover (each) | 7 | $500.35 | $3,502.45 |
| SHA Mix #3 (CY) | 5 | $131.30 | $656.50 |
| Hot Mix 9.5mm PG 64-22 Lvl2-070 (ton) | 5 | $59.00 | $295.00 |
| Concrete Stone Sand (ton) | 5 | $19.50 | $97.50 |
| #7 Rebar (16' section) (each) | 20 | $39.00 | $780.00 |
| MH Risers (vlf) | 7 | $79.10 | $553.70 |
| Original Markings (each) | 20 | $35.00 | $700.00 |
| Remarks (each) | 4 | $15.00 | $60.00 |
| Traffic Control (day) | 5 | $250.00 | $1,250.00 |
| | | TOTAL | $13,365.65 |

**Project 11240**
**Wastewater Engineering Services for the Improvements to the Herring Run Sewershed**
Man-Hour Estimate

| Task | Project Manager | Project Administrato | Foreman | Operator | Bay City Construction | | Laborers | Flagmen | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Dump Truck Driver | Parts Truck Driver | | | |
| **Project Management** | | | | | | | | | |
| 1.0 Project Management | | | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | | | | 0 |
| 1.3 Contract Administration | | | | | | | | | 0 |
| 1.4 Community Meetings | | | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | | | |
| 2.0 Document Review | | | | | | | | | 0 |
| 2.1 Hydraulic Modeling | | | | | | | | | 0 |
| 2.2 Design Memorandum | | | | | | | | | 0 |
| 2.3 Right-of-Way Documents | | | | | | | | | 0 |
| **Field Investigations** | | | | | | | | | |
| 3.0 Field Survey | 8 | 16 | 40 | 40 | 15 | 10 | 120 | 80 | 329 |
| 3.1 Environmental Assessment | | | | | | | | | 0 |
| 3.2 Geotechnical Investigation | | | | | | | | | 0 |
| **Design Services** | | | | | | | | | |
| 4.0 70% Design Documents | | | | | | | | | 0 |
| 4.1 100% Design Documents | | | | | | | | | 0 |
| 4.2 Permit Applications | | | | | | | | | 0 |
| 4.3 Bid Ready Documents | | | | | | | | | 0 |
| 4.4 Assistance During Bid Award | | | | | | | | | 0 |
| **Post Award Services** | | | | | | | | | |
| 5.0 Submittals | | | | | | | | | 0 |
| 5.1 Technical Consultations, RFIs and Change Orders | | | | | | | | | 0 |
| 5.2 Progress Meetings/Conferences | | | | | | | | | 0 |
| 5.3 CCTV Inspections | | | | | | | | | 0 |
| 5.4 Conditional and Final Acceptance Inspection | | | | | | | | | 0 |
| 5.5 Record Drawings and GIS Update | | | | | | | | | 0 |
| 5.6 Re-Inspection of Collector System Sewers | | | | | | | | | 0 |
| **TOTAL** | 8 | 16 | 40 | 40 | 15 | 10 | 120 | 80 | 329 |

**MINORITY AND WOMEN'S BUSINESS OPPORTUNITY OFFICE**
**MBE AND WBE PARTICIPATION COMPLIANCE REVIEW**

To (Agency):  Department of Public Works

Contract Number:    Project 1124 U - Wastewater Engineering Services for Improvements of
Herring Run Sewershed Collection System

MBE Goal:  27 %

WBE Goal:  9 %

Contractor:  URS Corporation

Total Contract Amount:    $ 1,497,353.69    040.39

| MBE/WBE Firms | Dollar Amount | Percentage |
|---|---|---|
| MBE: EBA Engineering, Inc. | $ 165,815.87 | 11.07 % |
| RJM Engineering, Inc. | 113,712.42 | 7.59 % |
| Savin Engineers, P.C. | 96,423.69 | 6.45 % |
| Bay City Construction Co., Inc. | 35,072.00 | 2.34 % |
| Total MBE: | $ 411,023.98 | 27.45 % |
| | | |
| WBE: Carroll Engineering, Inc. | $ 58,481.42 | 3.91 % |
| J.A. Rice, Inc. | 44,388.88 | 2.96 % |
| Phoenix Engineering, Inc. | $ 33,244.66  33,524.96 | 2.24 %  2.22% |
| Total WBE: | $ 136,395.26  021.968 | 9.11 %  9.09% |

__x__  Compliant                              ___  Non-Compliant

Comments:

_Stephanie Pringle_  11/16/10
Analyst                    Date

_Shirley A. Williams_  11/16/10
Chief, MWBOO                    Date
NOV 17 AM 11:31

**Mayor and City Council of Baltimore**
**Minority and Women's Business Program**
**Baltimore City Code, Article 5, Subtitle 28**

## BIDDER INFORMATION AND FORMS

CONTRACTING AGENCY: **DPW – BUREAU OF WATER WASTEWATER**

CONTRACT NUMBER: **PROJECT NO. 1124U**

CONTRACT TITLE: **WASTEWATER ENGINEERING SERVICES FOR THE**
**IMPROVEMENTS OF THE HERRING RUN SEWERSHED**
**COLLECTION SYSTEM**

Pursuant to Article 5, Subtitle 28 of the Baltimore City Code (2007 Edition) – Minority and Women's Business Program, Minority Business Enterprise (MBE) and Women's Business Enterprise (WBE) participation goals apply to this contract.

**The Overall MBE goal is ........ 27.45 %**        **The WBE goal is .......... 9.11%**

MBE Sub-goals are:

African American ....... N/A %

Asian American .......... N/A %

Hispanic American ..... N/A %

Native American ......... N/A %

**Bid Requirements**

Bid must include a commitment to utilize MBEs and WBEs at a percentage that equals or exceeds the contract goals stated above. Bidder must submit the following completed documents WITH THE BID:

(1) MBE and WBE Participation Disclosure Forms
(2) Statement of Intent Form(s) signed by both Bidder and MBE or WBE
(3) MBE/WBE Participation Affidavit

Any bid that does not include the MBE/WBE Participation Disclosure Form, signed Statement of Intent Form(s) and MBE and WBE Participation Affidavit is non-responsive and will be rejected.

Bidder must keep a record of bidder's efforts to obtain MBE and WBE participation.

**Verifying Certification**

Each bidder is responsible for verifying that all MBEs and WBEs to be used on a contract are certified by the Minority and Women's Business Opportunity Office (MWBOO) at bid opening. The MBEs and WBEs named must be certified to provide the services for which they are listed to perform on this contract. A directory of certified MBEs and WBEs is available from MWBOO. Since changes to the Directory occur daily, the bidder should call MWBOO at 410-396-4355 to verify certification, expiration dates, and services that the MBE or WBE is certified to provide.

B-1

**Contract Requirements**

During the term of the contract, any unjustified failure to comply with the MBE and WBE participation requirements is a material breach of contract.

Before final payment may be made under the contract, the contractor must submit the Subcontractor Utilization Form with its final payment request. The Subcontractor Utilization Form will include a list of the names of all subcontractors utilized on the contract, both MBE/WBE and non-MBE/WBE, the total amount paid to each subcontractor, and the owner's race/ethnicity and sex.

**Substitution of MBE or WBE**

*The Minority and Women's Business Opportunity Office must approve substitution of an MBE or WBE specified at bid opening. Any unjustified failure to comply with this requirement is a material breach of contract.*

**Waiver Requests**

If a bidder is unable to comply with a contract goal, the bidder may submit a waiver request with the bid. The waiver request must be made on the MBE/WBE Participation Waiver Request Form. No waiver will be granted unless the waiver request includes documentation that demonstrates a good faith effort to comply with the goals.

**MBE and WBE Participation Standards**

Participation of M/WBEs

A business enterprise that is certified as both an MBE and WBE (M/WBE) may not be counted toward both MBE and WBE goals for the same project. The bidder must select the goal for which the business enterprise is to be counted toward. (Art.5, §28-35)

Non-affiliation

A bidder may not use an MBE or WBE to meet a contract goal if:
1. the bidder has a financial interest in the MBE or WBE
2. the bidder has an interest in the ownership or control of the MBE or WBE
3. the bidder is significantly involved in the operation of the MBE or WBE

(Art. 5, §28-41)

A bidder that is an MBE or WBE may NOT use itself to meet a contract goal.

Commercially Useful Function

The bidder may count toward the contract goals only expenditures to MBEs and WBEs that perform a commercially useful function in the execution of the contract. Commercially useful function means the performance of real and distinct work for which the business enterprise has the skill, expertise, and actual responsibility to perform, manage and supervise. (Art.5, §28-32).

B-2

Subcontracting by MBE or WBE

A bidder may not count toward its contract goal any agreement with a certified MBE or WBE subcontractor who intends to subcontract more than 10% of the dollar amount of the services to be performed under its agreement with the bidder. This restriction does not apply to an MBE's or WBE's contracts for the purchase of materials, equipment, or supplies as an incident to the performance of services under its agreement with the bidder. (Art. 5, §28-34)

Manufacturers

A bidder may count toward the contract goal its entire expenditure to a certified MBE or WBE manufacturer. (Art. 5, §28-36)

Suppliers

Manufacturers - A bidder may count toward the contract goal 100% of its expenditure to a certified MBE or WBE supplier who manufactures the goods supplied.

Non-Manufacturers - A bidder may count 100% of its expenditure to a certified MBE or WBE supplier who is a wholesaler warehousing the goods supplied; or who is a manufacturer's representative. However, only 25% of each contract goal may be attained by expenditures to MBEs or WBEs that are non-manufacturing suppliers. (Art. 5, §28-37)

Joint Ventures

A bidder may count toward the contract goal the portion of its expenditure to a joint venture that is equal to the percentage of the MBE or WBE participation in the joint venture. The MBE or WBE member of the joint venture must have an interest in the control, management, and operation of the joint venture commensurate with the member's percentage of ownership. The MBE or WBE that is a member of the joint venture must be responsible for a clearly defined portion of the work to be performed, equal to its share in the ownership, control, and management of the joint venture. (Art. 5, §28-33)

Insurance companies and travel agents

A bidder may count toward the contract goals only 15% of its expenditure to a MBE or WBE insurance company or travel agent. (Art. 5, §28)

Financial institutions

A bidder may count toward the contract goals only the fees charged and earned by an MBE or WBE financial institution. (Art. 5, §28-39)

If you would like to receive a copy of Article 5, Subtitle 28 of the Baltimore City Code (2007 Edition) please call MWBOO at 410-396-4355 or consult the MWBOO website at www.Baltimorecity.gov/government/law/MWBOO.

A copy is also available on the MWBOO website at http://cityservices.baltimorecity.gov/law/mwboo

**MAYOR AND CITY COUNCIL OF BALTIMORE**
MINORITY AND WOMEN'S BUSINESS OPPORTUNITY OFFICE

---

**MBE AND WBE PARTICIPATION
REQUIRED FORMS**

---

Name of Bidder (Proposer):  URS Corporation

Address:  1800 Washington Blvd., Baltimore, MD, 21230

Contracting Agency: DPW – Bureau of Water and Wastewater

Contract (Project) Title: Wastewater Engineering Services For The Improvements Of The Herring
Run Sewershed Collection System

---

Contract Number: Project No. 1124U

Bid Due Date:  N/A

**The Overall MBE goal is ........ 27.45 %**       **The WBE goal is .......... 9.11 %**  *9.09%*

  MBE Sub-goals are:

      African American ....... N/A %

      Asian American ......... N/A %

      Hispanic American ..... N/A %

      Native American ........ N/A %

**THIS PACKAGE OF MBE AND WBE PARTICIPATION FORMS IS DUE WITH
THE BID.**

FOR MORE INFORMATION OR ASSISTANCE WITH THESE FORMS, CONTACT:

Minority and Women's Business Opportunity Office (MWBOO)
Baltimore City Department of Law
Room 101 City Hall
100 N. Holliday Street
Baltimore, Maryland 21202
410-396-4355

B-4

---

### PART A: INSTRUCTIONS

---

The requirements of the Article 5, Subtitle 28 of the Baltimore City Code (2007 Edition), are a part of this contract and are incorporated by reference. FAILURE OF ANY BIDDER, CONTRACTOR OR SUBCONTRACTOR TO COMPLY WITH ARTICLE 5, SUBTITLE 28 SHALL BE A MATERIAL BREACH OF CONTRACT.

The following are included:

Part A: Instructions
Part B: MBE and WBE Participation Disclosure Form
Part C: Statement of Intent Form – A Statement of Intent Form shall be completely executed for each and every MBE and WBE named in Part B.
Part D: MBE/WBE Participation Affidavit – to be completed by Bidder.
Part E: MBE/WBE Participation Waiver Request Form. If you are unable to meet the MBE and WBE participation goals for this contract, the law requires you to submit a waiver request with the bid.
Part F: Subcontractor Utilization Form

**ALL FORMS ARE DUE WITH BID.**

For any Contract not competitively bid and awarded by the Board of Estimates, this form is due before the Board of Estimates approves the Contract or Agreement.

---

**PART B: <u>WBE</u> PARTICIPATION DISCLOSURE FORM**

---

**Use this form to list WOMEN'S Business Enterprises that you will use to meet the WBE Participation Goal. Please be reminded that:**

- The same subcontractor may not be used to meet both the MBE and WBE goals.
- If Bidder is an MBE or WBE, Bidder may not use itself to meet either of the contract goals.
- Only 25% of **each** contract goal may be attained by expenditures to MBEs or WBEs that are non-manufacturing suppliers (i.e., if bid amount is $100,000 and WBE goal is 6% or $6,000; then participation limit for WBE suppliers that are non-manufacturers is $1,500 or 25% of the 6% WBE goal).

Prime Contractor's Name:  URS Corporation _____

Prime Contractor's Address:  1800 Washington Blvd., Baltimore, MD, 21230 _____

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System

**WBE SUBCONTRACTORS**

| Name | Certification Number | Expiration Date | $ Amount of Subcontract | % of Total Contract |
|------|---------------------|-----------------|------------------------|---------------------|
| Carroll Engineering, Inc. | 90-001614 | 6/22/2011 | $58,481.42 | 3.91% |
| J.A. Rice, Inc. | 91-001783 | 1/29/2012 | $44,388.88 | 2.96% |
| Phoenix Engineering, Inc. | 02-004191 | 7/16/2011 | $33,524.96 *211.698* | 2.24% *2.221.8* |

TOTAL DOLLAR AMOUNT OF CONTRACT...................$1,497,353.69

TOTAL DOLLAR AMOUNT OF WBE SUBCONTRACTS...$136,395.26 *081.968*

TOTAL WBE PERCENTAGE OF ENTIRE CONTRACT ...................9.11% *09 8*

Form Prepared by:

| Nathan Atkinson, Branch Manager | 410-468-0875 | 7/21/10 |
|--------------------------------|--------------|---------|
| Name and Title | Phone # | Date |

*(If necessary, make additional copies of this page. Each additional page must be signed and dated.)*

B-7

## PART C: MBE/WBE AND PRIME CONTRACTOR'S
## STATEMENT OF INTENT

### COMPLETE A SEPARATE FORM FOR EACH AND EVERY MBE AND WBE NAMED IN PART B OR BID WILL BE CONSIDERED NON-RESPONSIVE.
(Make additional copies of this form as needed.)

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services For The Improvements Of The Herring Run Sewershed Collection System

Name of Prime Contractor: URS Corporation
Name of MBE or WBE: EBA Engineering, Inc.
MBE or WBE Certification Number: 95-00083

Work/Service to be performed by MBE or WBE:

Civil, Geotechnical, Environmental, Water and Wastewater, And Transportation Engineering; Inspection And Construction Management; Planning; Surveying And Mapping; Research; Materials Testing Laboratory

Materials/Supplies to be furnished by MBE or WBE:

Shall include, but not be limited to, all equipment, materials, employees, certifications, licenses, insurance, etc... needed to complete the work services to be performed.

**Subcontract Amount: $165,815.87**   (If this is a requirements contract, the subcontract amount may be omitted; however, the subcontract percentage must be included.)
**Subcontract percentage of total contract: 11.07%**

### (If MBE sub-goals apply, please indicate the sub-goal covered by this Statement of Intent..)

African American......._____ %    Asian American ..._____ %

Hispanic American....._____ %    Native American.._____ %

The undersigned Prime Contractor and subcontractor agree to enter into a contract for the work/service indicated above for the dollar amount or percentage indicated to meet the MBE/WBE participation goals, subject to the prime contractor's execution of a contract with the City of Baltimore for the above referenced contract number. The undersigned subcontractor is currently certified as an MBE or WBE with the City of Baltimore Minority and Women's Business Opportunity Office.

_____    11/04/10
Signature of Prime Contractor (REQUIRED)    Date

_____    11/03/10
Signature of MBE or WBE (REQUIRED)    Date

B-8

---
### PART C: MBE/WBE AND PRIME CONTRACTOR'S
### STATEMENT OF INTENT
---

COMPLETE A SEPARATE FORM FOR EACH AND EVERY MBE AND WBE NAMED IN
PART B OR BID WILL BE CONSIDERED NON-RESPONSIVE.
(Make additional copies of this form as needed.)

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services For The
Improvements Of The Herring Run Sewershed Collection System

Name of Prime Contractor: URS Corporation
Name of MBE or WBE: RJM Engineering, Inc.
MBE or WBE Certification Number: 97-003264

Work/Service to be performed by MBE or WBE:

**Civil, Structural and Geotechnical Engineering; Utility and Traffic Engineering;
Construction Management**

Materials/Supplies to be furnished by MBE or WBE:

**Shall include, but not be limited to, all equipment, materials, employees, certifications,
licenses, insurance, etc... needed to complete the work services to be performed.**

**Subcontract Amount: $113,712.42**  (If this is a requirements contract, the subcontract amount
may be omitted; however, the subcontract percentage must be included.)
**Subcontract percentage of total contract: 7.59%**

**(If MBE sub-goals apply, please indicate the sub-goal covered by this
Statement of Intent.)**

African American......._____ %    Asian American ..._____ %

Hispanic American....._____ %    Native American .._____ %

    The undersigned Prime Contractor and subcontractor agree to enter into a contract for the
work/service indicated above for the dollar amount or percentage indicated to meet the
MBE/WBE participation goals, subject to the prime contractor's execution of a contract with the
City of Baltimore for the above referenced contract number. The undersigned subcontractor is
currently certified as an MBE or WBE with the City of Baltimore Minority and Women's
Business Opportunity Office.

Signature of Prime Contractor (REQUIRED)         Date

Signature of MBE or WBE (REQUIRED)         November 3, 2010
                                     Date

B-9

---

**PART C: MBE/WBE AND PRIME CONTRACTOR'S
STATEMENT OF INTENT**

---

COMPLETE A SEPARATE FORM FOR EACH AND EVERY MBE AND WBE NAMED IN
PART B OR BID WILL BE CONSIDERED NON-RESPONSIVE.
(Make additional copies of this form as needed.)

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services For The
Improvements Of The Herring Run Sewershed Collection System

Name of Prime Contractor: URS Corporation
Name of MBE or WBE: Savin Engineers, P.C.
MBE or WBE Certification Number: 04-004533

Work/Service To Be Performed By MBE Or WBE:

**Engineering, Construction Management, Sewer and Pipeline Inspection**

Materials/Supplies to be furnished by MBE or WBE:

**Shall include, but not be limited to, all equipment, materials, employees, certifications,
licenses, insurance, etc... needed to complete the work services to be performed.**

**Subcontract Amount: $96,423.69** (If this is a requirements contract, the subcontract amount
may be omitted; however, the subcontract percentage must be included.)
**Subcontract percentage of total contract: 6.44%**

**(If MBE sub-goals apply, please indicate the sub-goal covered by <u>this</u>
Statement of Intent.)**

African American......._____ %     Asian American..._____ %

Hispanic American....._____ %     Native American..._____ %

    The undersigned Prime Contractor and subcontractor agree to enter into a contract for the
work/service indicated above for the dollar amount or percentage indicated to meet the
MBE/WBE participation goals, subject to the prime contractor's execution of a contract with the
City of Baltimore for the above referenced contract number. The undersigned subcontractor is
currently certified as an MBE or WBE with the City of Baltimore Minority and Women's
Business Opportunity Office.

_____        11/4/10
Signature of Prime Contractor **(REQUIRED)**    Date

_____        11/3/10
Signature of MBE or WBE **(REQUIRED)**    Date

B-10

---

**PART C: MBE/WBE AND PRIME CONTRACTOR'S
STATEMENT OF INTENT**

COMPLETE A SEPARATE FORM FOR EACH AND EVERY MBE AND WBE NAMED IN
PART B OR BID WILL BE CONSIDERED NON-RESPONSIVE.
(Make additional copies of this form as needed.)

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services For The
           Improvements Of The Herring Run Sewershed Collection System

Name of Prime Contractor: URS Corporation
Name of MBE or WBE: Bay City Construction Co., Inc.
MBE or WBE Certification Number: 89-000355

Work/Service to be performed by MBE or WBE:

**Paving (Bituminous And Portland Cement Concrete); Curbs, Gutters And Sidewalks;
Excavation; Sitework; Drainage Structures (Manholes, Inlets, Etc.); Duct Line
Construction; Erosion Control; Hauling; Sewer Construction; Water Mains**

Materials/Supplies to be furnished by MBE or WBE:

**Shall include, but not be limited to, all equipment, materials, employees, certifications,
licenses, insurance, etc... needed to complete the work services to be performed.**

**Subcontract Amount: $35,072.00** (If this is a requirements contract, the subcontract amount
may be omitted; however, the subcontract percentage must be included.)
**Subcontract percentage of total contract: 2.34%**

**(If MBE sub-goals apply, please indicate the sub-goal covered by this
Statement of Intent.)**

African American......._____ %   Asian American ..._____ %

Hispanic American....._____ %   Native American .._____ %

    The undersigned Prime Contractor and subcontractor agree to enter into a contract for the
work/service indicated above for the dollar amount or percentage indicated to meet the
MBE/WBE participation goals, subject to the prime contractor's execution of a contract with the
City of Baltimore for the above referenced contract number. The undersigned subcontractor is
currently certified as an MBE or WBE with the City of Baltimore Minority and Women's
Business Opportunity Office.

| | |
|---|---|
| Signature of Prime Contractor (REQUIRED) | 11/4/10<br>Date |
| Signature of MBE or WBE (REQUIRED)<br>Bay City Construction Inc.<br>Rolando B. de la Cruz, Sr.<br>President | 11/03/2010<br>Date |

B-11

<div style="border:1px solid black; text-align:center; font-weight:bold">

PART C: MBE/WBE AND PRIME CONTRACTOR'S
STATEMENT OF INTENT

</div>

COMPLETE A SEPARATE FORM FOR EACH AND EVERY MBE AND WBE NAMED IN
PART B OR BID WILL BE CONSIDERED NON-RESPONSIVE.
(Make additional copies of this form as needed.)

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services For The
Improvements Of The Herring Run Sewershed Collection System

Name of Prime Contractor: URS Corporation
Name of MBE or WBE: Carroll Engineering, Inc.
MBE or WBE Certification Number: 90-001614

Work/Service to be performed by MBE or WBE:

**Civil and Structural Engineering; Landscape Architecture**

Materials/Supplies to be furnished by MBE or WBE:

**Shall include, but not be limited to, all equipment, materials, employees, certifications,
licenses, insurance, etc... needed to complete the work services to be performed.**

**Subcontract Amount: $58,481.42** (If this is a requirements contract, the subcontract amount
may be omitted; however, the subcontract percentage must be included.)
**Subcontract percentage of total contract: 3.91%**

**(If MBE sub-goals apply, please indicate the sub-goal covered by this
Statement of Intent.)**

African American......._____ %     Asian American ..._____ %

Hispanic American....._____ %     Native American.._____ %

    The undersigned Prime Contractor and subcontractor agree to enter into a contract for the
work/service indicated above for the dollar amount or percentage indicated to meet the
MBE/WBE participation goals, subject to the prime contractor's execution of a contract with the
City of Baltimore for the above referenced contract number. The undersigned subcontractor is
currently certified as an MBE or WBE with the City of Baltimore Minority and Women's
Business Opportunity Office.

_____     _11/4/10_
Signature of Prime Contractor **(REQUIRED)**          Date

_____     _11-3-10_
Signature of MBE or WBE **(REQUIRED)**          Date

<div style="text-align:center">B-12</div>

| PART C: MBE/WBE AND PRIME CONTRACTOR'S STATEMENT OF INTENT |
| --- |

COMPLETE A SEPARATE FORM FOR EACH AND EVERY MBE AND WBE NAMED IN
PART B OR BID WILL BE CONSIDERED NON-RESPONSIVE.
(Make additional copies of this form as needed.)

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services For The
Improvements Of The Herring Run Sewershed Collection System

Name of Prime Contractor: URS Corporation
Name of MBE or WBE: J.A. Rice, Inc.
MBE or WBE Certification Number: 91-001783

Work/Service to be performed by MBE or WBE:

**Land Surveying, Construction Stake Out**

Materials/Supplies to be furnished by MBE or WBE:

**Shall include, but not be limited to, all equipment, materials, employees, certifications, licenses, insurance, etc... needed to complete the work services to be performed.**

**Subcontract Amount: $44,388.88** (If this is a requirements contract, the subcontract amount may be omitted; however, the subcontract percentage must be included.)
**Subcontract percentage of total contract: 2.96%**

**(If MBE sub-goals apply, please indicate the sub-goal covered by this Statement of Intent.)**

African American....... _____ %    Asian American ... _____ %

Hispanic American..... _____ %    Native American .. _____ %

The undersigned Prime Contractor and subcontractor agree to enter into a contract for the work/service indicated above for the dollar amount or percentage indicated to meet the MBE/WBE participation goals, subject to the prime contractor's execution of a contract with the City of Baltimore for the above referenced contract number. The undersigned subcontractor is currently certified as an MBE or WBE with the City of Baltimore Minority and Women's Business Opportunity Office.

Signature of Prime Contractor (**REQUIRED**)          Date 11/4/10

Signature of MBE or WBE (**REQUIRED**)          Date 11/3/10

B-13

---

**PART C: MBE/WBE AND PRIME CONTRACTOR'S STATEMENT OF INTENT**

COMPLETE A SEPARATE FORM FOR EACH AND EVERY MBE AND WBE NAMED IN
PART B OR BID WILL BE CONSIDERED NON-RESPONSIVE.
(Make additional copies of this form as needed.)

Contract Number and Title: Project No. 1124U, Wastewater Engineering Services For The
Improvements Of The Herring Run Sewershed Collection System

Name of Prime Contractor: URS Corporation
Name of MBE or WBE: Phoenix Engineering, Inc.
MBE or WBE Certification Number: 02-004191

Work/Service to be performed by MBE or WBE:

**Consulting Civil Engineering, Cost Estimating, Claims Analysis**

Materials/Supplies to be furnished by MBE or WBE:

**Shall include, but not be limited to, all equipment, materials, employees, certifications,
licenses, insurance, etc... needed to complete the work services to be performed.**

Subcontract Amount: $33,524.96 (If this is a requirements contract, the subcontract amount
may be omitted; however, the subcontract percentage must be included.)
Subcontract percentage of total contract: 3.24% 2.22 %

**(If MBE sub-goals apply, please indicate the sub-goal covered by this
Statement of Intent.)**

African American......._____ %    Asian American ..._____ %

Hispanic American....._____ %    Native American .._____ %

     The undersigned Prime Contractor and subcontractor agree to enter into a contract for the
work/service indicated above for the dollar amount or percentage indicated to meet the
MBE/WBE participation goals, subject to the prime contractor's execution of a contract with the
City of Baltimore for the above referenced contract number. The undersigned subcontractor is
currently certified as an MBE or WBE with the City of Baltimore Minority and Women's
Business Opportunity Office.

_____          11/4/10
Signature of Prime Contractor **(REQUIRED)**          Date

_____          11/3/10
Signature of MBE or WBE **(REQUIRED)**          Date

B-14

---

## PART D: MBE/WBE PARTICIPATION AFFIDAVIT

The Undersigned authorized representative of Contractor does hereby make the following Affidavit:

Contractor acknowledges the MBE goal of ~~27%~~ *27.45% ₩* and the WBE goal of ~~9%~~ *9.01% ₩* for the contract shown at the top of this page.

My firm will make good faith efforts to achieve the MBE and WBE participation goals for this contract. I understand that, if awarded the contract, my firm must submit to the Minority and Women's Business Opportunity Office (MWBOO) copies of all executed agreements with the MBE and WBE firms being utilized to achieve the participation goals and other requirements of Article 5, Subtitle 28 of the Baltimore City Code (2007 Edition). I understand that these documents must be submitted prior to the issuance of a notice to proceed.

I understand that, if awarded the contract, my firm must submit to the MWBOO canceled checks and any other documentation and reports required by MWBOO on a quarterly basis, verifying payments to the MBE and WBE firms utilized on the contract.

I understand that, if I am awarded this contract and I find that I am unable to utilize the MBEs or WBEs identified in my Statements of Intent, I must substitute other certified MBE and WBE firms to meet the participation goals. I understand that I may not make a substitution until I have obtained the written approval of MWBOO.

I understand that, if awarded this contract, authorized representatives of the City of Baltimore may examine, from time to time, the books, records and files of my firm to the extent that such material is relevant to a determination of whether my firm is complying with the MBE and WBE participation requirements of this contract.

I do solemnly declare and affirm under the penalty of perjury that the contents of the foregoing Affidavit are true and correct to the best of my knowledge, information and belief.

URS Corporation
Contractor Company Name

Signature

1800 Washington Blvd., Baltimore, MD, 21230
Address

Nathan Atkinson, Branch Manager
Print Name and Title

Sworn and subscribed before me this  27  day of  October , in the year  2010 .

Notary Public

My Commission Expires 8/2/12

[Notary seal: TARA L. HATCHER, NOTARY PUBLIC, BALTIMORE CO., MD]

B-15

## PART E: MBE/WBE PARTICIPATION WAIVER REQUEST FORM

Name of Bidder (Proposer)  URS Corporation
Address  1800 Washington Blvd., Baltimore, MD, 21230

Contracting Agency: DPW – Bureau of Water and Wastewater
Contract (Project) Number and Title: Project No.1124U, Wastewater Engineering Services For
   The Improvements Of The Herring Run Sewershed Collection System
Bid Due Date:  NA

Goals on this contract:  ..................... MBE: ~~27%~~  27.45% ...and...    WBE: ~~9 %~~  9.09%
African American ......N/A %          Asian American   ....... N/A %
Hispanic American ....N/A %          Native American   ....... N/A %

I have achieved: ................................................ MBE: 27.47%   ...and...   WBE: 9.10 %
African American ......  ___ %          Asian American ..... _____%
Hispanic American ....  ___ %          Native American .... _____%

I am requesting a waiver of: ............................... MBE: ___ %    ...and...   WBE: ___ %
African American ......  ___ %          Asian American .... _____%
Hispanic American ....  ___ %          Native American .... _____%

I have contacted MWBOO for assistance.  ___ Yes  ___ No   (Check One)

Number of MBE firms contacted: 4 (Attach a list of names.)

Number of WBE firms contacted: 3 (Attach a list of names.)

Explain why waiver is being requested:

   Attach documentation of your good faith efforts to secure, contact and negotiate with MBEs
   and WBEs, including:

   (1) the reasons your company is unable to secure sufficient MBE/WBE participation to meet
       the stated goals.
   (2) The efforts made by your company to select portions of the contract to be performed by
       MBEs and WBEs
   (3) For each MBE or WBE that placed a bid that you consider to be unacceptable, a
       statement that explains the basis for that conclusion.

_____                    10/27/10
Signature of Authorized Company Representative        Date

B 16

| PART F: SUBCONTRACTOR UTILIZATION FORM |
|---|

**THIS FORM MUST BE INCLUDED WITH REQUEST FOR FINAL PAYMENT.**

Prime Contractor's Name:  URS Corporation _____

Contract Number and Title: Project No.1124U, Wastewater Engineering Services for The Improvements Of The Herring Run Sewershed Collection System

Total Contract Dollar Amount: 1,497,353.69 _____

**Provide the following information for EACH and EVERY subcontractor, both MBE/WBE and NON-MBE/WBE used on this contract.  (Duplicate form if necessary.)**

| Name of Subcontractor | Goods or services provided on subcontract |
|---|---|
| EBA Engineering, Inc. | Civil, Geotechnical, Environmental, Water and Wastewater, And Transportation Engineering; Inspection And Construction Management; Planning; Surveying And Mapping; Research, Materials Testing Laboratory |
| Race/ethnicity AND sex of subcontractor's owner | Dollar amount of subcontract |
| Asian-American Male | $165,815.87 |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |
|  |  |

| Name of Subcontractor | Goods or services provided on subcontract |
|---|---|
| RJM Engineering, Inc. | Civil, Structural and Geotechnical Engineering; Utility and Traffic Engineering; Construction Management |
| Race/ethnicity AND sex of subcontractor's owner | Dollar amount of subcontract |
| Asian-American Male | $113,712.42 |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |
|  |  |

| Name of Subcontractor | Goods or services provided on subcontract |
|---|---|
| Savin Engineers, P.C. | Engineering, Construction Management, Sewer and Pipeline Inspection |
| Race/ethnicity AND sex of subcontractor's owner | Dollar amount of subcontract |
| Asian-American Male | $96,423.69 |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |
|  |  |

Prime Contractor's signature _____    Date _____

B-17

## PART F: SUBCONTRACTOR UTILIZATION FORM

**THIS FORM MUST BE INCLUDED WITH REQUEST FOR FINAL PAYMENT.**

Prime Contractor's Name: URS Corporation _____

Contract Number and Title: Project No.1124U, Wastewater Engineering Services For The Improvements Of The Herring Run Sewershed Collection System

Total Contract Dollar Amount: 1,497,353.69 _____

**Provide the following information for EACH and EVERY subcontractor, both MBE/WBE and NON-MBE/WBE used on this contract. (Duplicate form if necessary.)**

| Name of Subcontractor<br><br>**Bay City Construction Co., Inc.** | Goods or services provided on subcontract<br>Concrete, Grading, Paving, Drainage Structures, Brick Pavers, Trucking, Manufacturer of Ready Mix Concrete and Recycled Concrete Aggregates |
|---|---|
| Race/ethnicity AND sex of subcontractor's owner<br><br>Asian-American Male | Dollar amount of subcontract<br><br>$35,072.00 |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |

| Name of Subcontractor<br><br>Carroll Engineering, Inc. | Goods or services provided on subcontract<br>Civil and Structural Engineering; Landscape Architecture |
|---|---|
| Race/ethnicity AND sex of subcontractor's owner<br><br>White Female | Dollar amount of subcontract<br><br>$58,481.42 |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |

| Name of Subcontractor<br><br>J.A. Rice, Inc. | Goods or services provided on subcontract<br><br>Land Surveying, Construction Stake Out |
|---|---|
| Race/ethnicity AND sex of subcontractor's owner<br><br>White Female | Dollar amount of subcontract<br><br>$44,388.88 |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |

Prime Contractor's signature _____    Date  10/27/10

B-18

## PART F: SUBCONTRACTOR UTILIZATION FORM

**THIS FORM MUST BE INCLUDED WITH REQUEST FOR FINAL PAYMENT.**

Prime Contractor's Name: URS Corporation _____

Contract Number and Title: Project No.1124U, Wastewater Engineering Services For The Improvements Of The Herring Run Sewershed Collection System

Total Contract Dollar Amount: 1,497,353.69

**Provide the following information for EACH and EVERY subcontractor, both MBE/WBE and NON-MBE/WBE used on this contract. (Duplicate form if necessary.)**

| Name of Subcontractor<br><br>Phoenix Engineering, Inc. | Goods or services provided on subcontract<br><br>Consulting Civil Engineering, Cost Estimating, Claims Analysis |
|---|---|
| Race/ethnicity AND sex of subcontractor's owner<br><br>Asian-American Female | Dollar amount of subcontract<br>2-1-66<br>$33,524.96 |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |

| Name of Subcontractor<br><br> | Goods or services provided on subcontract<br><br> |
|---|---|
| Race/ethnicity AND sex of subcontractor's owner<br><br> | Dollar amount of subcontract<br><br> |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |

| Name of Subcontractor<br><br> | Goods or services provided on subcontract<br><br> |
|---|---|
| Race/ethnicity AND sex of subcontractor's owner<br><br> | Dollar amount of subcontract<br><br> |
| Dollar amount paid to date | If amount paid to date is less than subcontract dollar amount, explain why. |

_____          10/27/10
Prime Contractor's signature                         Date

B-19

E-FILED; Baltimore City Circuit Court
Docket: 10/30/2024 6:35 PM; Submission: 10/30/2024 6:35 PM
Envelope: 18628434

# EXHIBIT 4

CITY OF BALTIMORE
DEPARTMENT OF PUBLIC WORKS
OFFICE OF ENGINEERING AND CONSTRUCTION
AMENDMENT No. 1 TO AGREEMENT FOR PROJECT 1124U – WASTEWATER ENGINEERING
SERVICES FOR THE IMPROVEMENTS OF THE HERRING RUN SEWERSHED COLLECTION
SYSTEM

MAR 2 5 2015

THIS AMENDMENT entered into this _____ day of _____, 20___, by and between the
Mayor and City Council of Baltimore, a municipal corporation of the State of Maryland, (hereinafter
referred to as the "CITY"), and URS Corporation, a Nevada Corporation, with its principal offices located
at 1800 Washington Blvd., Suite 410, Baltimore, Maryland, 21230, (hereinafter referred to as
"CONSULTANT").

WHEREAS, the CITY and the CONSULTANT entered into an Agreement (hereinafter referred to
as "Original Agreement") on January 26, 2011 for Project No. 1124U, Wastewater Engineering Services
for the Improvements of the Herring Run Sewershed Collection System whereby the CONSULTANT will
provide engineering services.

WHEREAS, the City and the CONSULTANT both wish to amend the Original Agreement.

NOW, THEREFORE, THIS AMENDMENT WITNESSETH; that in consideration of the
promises contained herein and other good and valuable considerations, the receipt and sufficiency of
which is hereby acknowledged, the parties hereto agree as follows:

I.    The Original Agreement shall be amended and supplemented as follows:

A. To Section A - PROJECT SCOPE add:

The attached Scope of Services, Attachment "A" – Task 6, is added to the original project scope
which modifies and/or supplements the scope of services in the original Agreement to provide
Water Resources Engineering Services for the Stabilization of Chinquapin Run to its confluence
with Herring Run.

B. TIME FOR COMPLETION

Delete in its entirety and replace with:

25 *ag/t*

The Original Agreement commenced on January 26, 2011 and remains in effect until January 26, 3-19-15
2018, or until the upset limit is reached, whichever comes first.

C. SERVICES TO BE PROVIDED BY CONSULTANT – GENERAL

Supplement with the following:

9. At the option of the CITY, and for fees to be negotiated, the CONSULTANT may provide Construction Phase Services under an Amendment to the Contract. Design Services during construction include review of construction submittals including shop drawings, review/response to RFIs and PCOs, resolution of field problems, periodic or on-call construction observations and preparation of Record drawings.

10. At the option of the CITY, and fees to be negotiated, the CONSULTANT may provide additional design services. Additional design services include modifications to the contract drawings and documents due to delay of construction from the time of bid-ready submission.

F. GENERAL CONDITIONS

Replace sections 12 and 15 as follows:

12. CONSULTANT shall not engage, on a full or part-time basis, during the period of the Agreement, any professional or technical personnel who are or who have been at any time during the period of the Agreement in the employ of the Public Works organization of CITY; the Public Works organizations of any of the Maryland Counties; the State MDE or the Federal Environmental Protection Agency, except regularly retired employees, without consent of the Director of Public Works

15. CONSULTANT agrees to prosecute the work continuously and diligently and that compensation or extension of time resulting from delays, not the fault of CONSULTANT shall be settled by agreement with the Head, Bureau of Water and Wastewater (or the Director's designee)

a) Subject to the power and authority of the Director of Public Works as provided by Law, the Head, Bureau of Water and Wastewater (or the Director's designee) shall in all cases, determine the amount or quantity, quality and acceptability of the work and materials which are to be paid for under this Agreement, shall decide all questions in relation to said work and the performance thereof, and shall, in all cases, decide questions which may arise relative to the fulfillment of this Agreement or to the obligations of the CONSULTANT thereunder.

b) To prevent disputes and litigation where the CONSULTANT is not satisfied with the decision of the Head, Bureau of Water and Wastewater (or the Director's designee), the CONSULTANT shall submit the claim to the Director of Public Works, or his designee, who will decide any dispute between the CONSULTANT and the CITY, and his determination, decision and/or estimate shall be a condition precedent to the right of the CONSULTANT to receive any monies under this Agreement, and is subject to review on the record by a court of competent jurisdiction.

F. ENGINEERING FEES

Delete this section in its entirety and replace with the following:

G. ENGINEERING FEES

1.    Basis of Payment

The CITY will pay and the CONSULTANT will accept as final compensation for services in connection with the Project a sum not to exceed **$1,997,024.77**. This sum is based on a cost of **$1,885,308.72** plus fixed fee of **$111,716.05** for profit. Payment beyond the cost ceiling will not be made without formally amending this AMENDMENT, and the fixed fee for profit will not be increased except in the case of an amendment increasing the scope of work. The basis of payment shall be established in the following manner.

a.    For **URS Corporation** employees actively engaged on the project, the rate of **2.33** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **112.03** % plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$1,140,147.14** plus a fixed fee of **$111,716.05**.

b.    For **EBA Engineering, Inc.** employees actively engaged on the project, the rate of **2.49** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **125.95** % plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$181,874.63** plus a fixed fee of **$12,458.77**.

c.    For **Carroll Engineering, Inc.** employees actively engaged on the project, the rate of **2.54** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **130.64** % plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$53,280.38** plus a fixed fee of **$5,201.04**.

d.    For **J.A. Rice, Inc.** employees actively engaged on the project, the rate of **2.32** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **111.32%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$96,899.79** plus a fixed fee of **$7,788.78**.

e.    For **RJM Engineering, Inc.** employees actively engaged on the project, the rate of **2.45** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **122.62%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$103,444.47** plus a fixed fee of **$10,267.95**.

f.    For **Savin Engineers, P.C.** employees actively engaged on the project, the rate of **2.59** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **135.00%** plus ten (10) percent of the aggregate

of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$93,929.42** plus a fixed fee of **$2,494.27**.

g.  For **Phoenix Engineering, Inc.** employees actively engaged on the project, the rate of **2.2** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **101.4%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$30,269.67** plus a fixed fee of **$2,941.99**.

h.  For **Bay City Construction Company.** employees actively engaged on the project, the rate of **2.20** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **100.00%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$33,100.00** plus a fixed fee of **$1,972.00**.

i.  For **NMP Engineering Consultants, Inc.** employees actively engaged on the project, the rate of **2.54%** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **130.66%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$60,715.08** plus a fixed fee of **$5,958.90**.

j.  For **E2CR, Inc.** employees actively engaged on the project, the rate of **2.585%** times actual payroll expended, the said multiplier derived as payroll plus payroll burden and allowable overhead cost of **135.00%** plus ten (10) percent of the aggregate of payroll, payroll burden, and overhead to represent anticipated profit. Amounting to a cost ceiling of **$41,421.40** plus a fixed fee of **$1,143.04**.

k.  Principals time at $85.00 per hour, without benefit of overhead allowance or fee markup.

l.  Plus directly reimbursable costs. This includes costs for travel expenses, printing and reproduction costs, subcontracts, technical computer usage, and other miscellaneous expenses directly related to the project. Mileage shall be billed at the prevailing rate as promulgated by the IRS, currently set at $ 0.56 per mile

2.  The CITY reserves the right to audit the CONSULTANT'S payroll burden and overhead costs. Rates are to be established in accordance with Title 48, Subchapter E, Part 31, Subpart 31.2 of the Code of Federal Regulations.

3.  Derivation of technical payroll for both CONSULTANT and Subconsultants are summarized on the attached CONSULTANT'S EPA 5700-41, along with other attachments. The wage rates reported in the Attachments will be in effect for the duration of this agreement.

4.  Services not covered by Basic Fee – Payment of extra or additional work authorized by CITY shall be negotiated on the same basis as described above at such time as such extra work is determined necessary.

5. Method of Payment – The above fee shall be paid monthly, following approval of the work by the CITY, on the basis of invoices supported by certified payrolls and other documented records. The CITY, at its discretion, will have the right at any time prior to completion of the work to withhold payment to the CONSULTANT for performed services if the percent of payment requested is, in the opinion of the CITY, substantially in excess of the CITY's evaluation of the completion of the work. The payment shall be withheld until such time as the percentage of completion is consistent with the percentage of payment requested.

ADD THE FOLLOWING SECTIONS:

H.  <u>LOCAL HIRING ORDINANCE</u>

Article 5, Subtitle 27 of the Baltimore City Code, as amended (the "Local Hiring Law") and its rules and regulations apply to contracts and agreements executed by the City on or after the Local Hiring Law's effective date of December 23, 2013 which is applicable to all vendors. The Local Hiring Law applies to every contract for more than $300,000 made by the City, or on its behalf, with any person. It also applies to every agreement authorizing assistance valued at more than $5,000,000 to a City-subsidized project. Please visit www.oedworks.com for detailed on the requirements of the law.

I.  <u>PAYMENT TO SUBCONTRACTORS</u>

Article 5, Subtitle 28-55 applies to all contract that have been executed by the City. CONSULTANT must pay its subconsultants in a timely fashion for satisfactory work. A payment is timely if it is mailed, delivered or transferred to a sub-consultant no later than 7 calendar days after the CONSULTANT received payment from the CITY. Beginning with the second pay request from the CONSULTANT to the CITY, the CONSULTANT must provide the CITY with evidence that all subcontractors have been paid out of the proceeds of the prior payment, unless a bona fide dispute, documented in writing, exists between the CONSULTANT and the unpaid subcontractor.

J.  <u>TERMINATION FOR CONVENIENCE</u>

City may terminate this Agreement at any time upon thirty (30) days' prior written notice to the Consultant.  If the Agreement is so terminated and the Consultant shall not have been in default, the Consultant will be compensated for all work accomplished, but not yet paid for, in accordance with the provisions of this Agreement.  Consultant will not receive any further payments under this Agreement.

II. Unless otherwise changed in writing, the remaining terms and conditions of the Original Agreement, shall remain unchanged and in full force and effect.

-------------------------------------------------End of Contract-------------------------------------------------

IN WITNESS WHEREOF, the parties hereby evidence their agreement to the above terms and conditions by having caused this AMENDMENT No. 1 to be executed, sealed and delivered the day and year first above written.

WITNESS                                    URS Corporation

Title: Office Manager                      Title: Vice President          SEAL

ATTEST:                                    MAYOR AND CITY COUNCIL OF BALTIMORE

CUSTODIAN OF THE CITY SEAL                 STEPHANIE RAWLINGS-BLAKE, MAYOR
APPROVED:                                  APPROVED AS TO FORM AND LEGAL
                                           SUFFICIENCY:

DIRECTOR, DEPARTMENT OF                    CHIEF SOLICITOR
PUBLIC WORKS

CHIEF, OFFICE OF ENGINEERING AND
CONSTRUCTION                               APPROVED BY THE BOARD OF ESTIMATES

                                           CLERK                 DATE MAR 2 5 2015

June 2014                      Page 6                      1124U (SC910)

# TASK 6
# ATTACHMENT A
# SCOPE OF SERVICES

**Attachment A**
**SCOPE OF SERVICES**
**Water Resources Engineering Services for the Stabilization of**
**Chinquapin Run**
**TASK 6**
**November 17, 2014**
**Project No. 1124U**

## DESCRIPTION

URS Corporation ("CONSULTANT") will provide environmental, surveying and engineering services necessary to further evaluate, prepare a Design Memorandum, and develop contract documents for the stabilization of Chinquapin Run from Walker Avenue at the Baltimore City/County line to its confluence with Herring Run, a distance of about 11,600 linear feet as outlined on the map to the right.



The Chinquapin Run Stream Assessment dated March 2012 prepared by RK&K for the Baltimore City Department of Public Works – Surface Water Management Division provided a stream assessment of Chinquapin Run from Walker Drive to the bridge crossing at Belvedere Avenue, and a proposed conceptual stream stabilization design between Northern Parkway and Belvedere Avenue. The conceptual design noted by RK&K focused on stabilizing the stream to reduce shear stresses, thereby reducing bank erosion. Additionally, the concept proposed to reconnect the channel to the floodplain to the extent practical in order to provide improved habitat and diversity throughout the study reach.

This Scope of Services shall provide the necessary investigative and engineering design services to perform the following:

- Provide a **seamless design approach** between the sanitary sewer upgrades and the stream stability/outfall improvements as outlined in detail below,

- Review and update the **Chinquapin Run Stream Assessment** prepared by RK&K that addresses Chinquapin Run between Walker Avenue and Belvedere Avenue and address its compatibility with the United States Fish and Wildlife Service (USFWS) guidelines (Harman and Starr, 2011) and required activities for stream stability,

- Perform a new **Stream Assessment** for Chinquapin Run between Belvedere Avenue and its confluence with Herring Run, and address its compatibility with the USFWS guidelines and required activities,

- Develop a **conceptual stream stabilization design** (35%) along Chinquapin Run between Walker Avenue and Northern Parkway , and appropriate segments between The Alameda its confluence with Herring Run with up to two alternatives, a distance of 6,000 to 7,000 linear feet total,

- Perform a **BMP site search** in the area of the stream restoration reach for up to 10 locations and the top ranked site will be documented with computations, drainage area, area of pavement treated, type of BMP and a design sketch.

- Document the findings of the updated and new stream assessment, conceptual (35%) designs for the stream stabilization, storm drain system outfalls, and watershed BMP's into a **Design Memorandum** with 35% complete plans and details,

- Prepare **final stream stabilization** designs and construction documents (70%, 100%, Bid Documents) based on the selected alternative for appropriate segments of Chinquapin Run between Walker Avenue and its confluence with Herring Run,

- Prepare the project for **permit reviews and approvals** through the City, State and Federal Agencies,

- Provide **peer reviews** of all milestone submittals to assure that the submittals and designs are completed, quality control checked, and constructible.

The following scope of work is divided into four (4) Sections as follows:

1. Project Management
2. Document Review and Design Memorandum
3. Design Services
4. Additional Services

## SECTION 1 - PROJECT MANAGEMENT

### Subsection 1.0 - Project Management

The CONSULTANT shall provide overall project management and coordination of the Project, including the activities of its sub-consultants and subcontractors. A qualified Project Manager shall be assigned by the CONSULTANT having the responsibility and authority to make day-to-day decisions relative to the Project. A Principal-in-Charge shall also be designated by the

CONSULTANT to provide executive oversight and quality control, and who shall have the final authority to act on behalf of the CONSULTANT.

### Subsection 1.1 - Project Initiation Meeting

The CONSULTANT shall schedule and arrange for one (1) Project Initiation Meeting to be held in the CITY's offices. A Notice of Meeting shall be prepared and distributed to a list of invitees to be furnished by the CITY. The CONSULTANT shall introduce the project, the proposed project schedule, and identify any issues that require input or resolution by the CITY. This meeting will be utilized to clarify recommendations and assumptions presented in the scope of work, and to address any changes or additional recommendations proposed by the CONSULTANT. Following the Project Initiation Meeting, the CONSULTANT shall prepare and distribute Meeting Minutes to all invitees. The project schedule will be revised based on the issued discussion, and then issued with these minutes. The meeting minutes will be submitted to the CITY, for their review and comments, no later than 10 days following the Project Initiation Meeting.  A final copy of the meeting minutes will be submitted to the CITY no later than five (5) days following receipt by the CONSULTANT of the CITY's review and approval of the meeting minutes.

### Subsection 1.2 - Progress Meetings

During the course of the Project, the CONSULTANT shall schedule and arrange for monthly Progress Meetings (assume 18 meetings), to be held at the CITY's offices. Progress meetings will be held with members of the CONSULTANT team, the City, and other agencies as needed. These meetings will be a forum for discussion of progress to date and to resolve project issues. A Notice of Meeting and an Agenda shall be prepared and distributed in advance of each Progress Meeting as directed by the CITY.

The CONSULTANT shall review the progress of the project, identify any issues requiring action or resolution by the CITY, review the schedule, and identify activities for the coming month. The CONSULTANT shall maintain an up-to-date Project Schedule, using Microsoft Project Schedule® or equivalent project management software, and provide copies of the schedule and review the updated Project Schedule at the progress meeting. Following each Progress Meeting, the CONSULTANT shall prepare and distribute Meeting Minutes to all invitees.  These minutes shall be distributed no later than 5 (five) days following the meeting.

### Subsection 1.3 - Community Meetings

The CONSULTANT shall, at the CITY's request, attend a community meeting to provide technical assistance including preparing presentation and handout materials, as required.  The CITY shall coordinate the location and time of the meeting, and notify all attendees.  The meeting shall take place at facilities provided by the CITY. For budgetary purposes, a single community meeting has been assumed. The CONSULTANT shall inform the CITY in writing of any public or private entities requesting information relating to the CITY's environmental

programs. The CITY shall approve any information released by the CONSULTANT, to any outside agencies, in writing.

## SECTION 2 - DOCUMENT REVIEW, PRELIMINARY DESIGN AND DESIGN MEMORANDUM

This phase of the Project involves reviewing and documenting available information needed to implement the scope of services identified above, and preparing a Design Memorandum for the services to be performed. The following presents the anticipated tasks to perform this work. It is anticipated that one construction contract will be generated under this scope of work.

### Subsection 2.0 – Document Review

The CITY will provide the CONSULTANT with all available watershed assessments and studies, available GIS information, utility drawings that have not been previously provided, after completing its review, the CONSULTANT shall confirm the recommendations and formulate the necessary rehabilitation work. Based on this review, the CONSULTANT shall select the rehabilitation techniques that are considered appropriate for the repairs.

It is assumed that, when possible, all records to be provided by the CITY will be in electronic format, contained in an easily searchable database.

The CITY will also provide electronic copies of the Report containing the recommendations to the selected project area.

### Subsection 2.1 – Topographic and Property Surveys

The CONSULTANT shall provide the topographic surveys necessary to design the stream stabilization coupled with the sewer replacement, pipeline rehabilitation, manhole rehabilitation, access roads, and permitting needs for Chinquapin Run. Survey controls will be set within the limits of the project and traverse will be run along the length of the project. Traverse points and benchmarks shall be referenced along the site and outside of the construction area.

URS Hunt Valley will establish horizontal and vertical control by either GPS and/or conventional surveying methods. The horizontal control will be based on Maryland Coordinate System NAD83/91 and BCMD. The vertical datum will be based on North American Vertical Datum (NAVD) 88 and BCMD. All fielding surveying, computations and Field surveys will be performed with EDM's and data collectors. An electronic field book will be provided to the CITY for all fieldwork.

All fieldwork will be downloaded to a CADD station and survey worksheets will be prepared. An electronic file of the worksheets will be provided to the CITY. All fielding surveying,

computations and worksheets will be performed in accordance with the CITY of Baltimore Manual of Design Procedure and Criteria.

It is anticipated that the survey will include forest stands (including individual trees greater than or equal to 8" DBH) and environmental features (wetlands and waters of the U.S.). The survey will be merged with prior topographic surveys and coupled with GIS topography as appropriate. Included within the survey limits provided, URS Hunt Valley will survey the following applicable topographic and planimetric features to be determined:

   a. Spot elevations throughout the entire site including areas of relative low and high spots
   b. Stream topography
   c. Top and bottom of any walls
   d. Fence line (including height and type of material)
   e. Delineation of both impervious and pervious surfaces with designations regarding type of surface. This may include concrete, asphalt, grass, etc…
   f. Horizontal location of tree lines located at the drip line.
   g. Location of the exterior perimeter of the building(s) footprint, if applicable.
   h. All observed evidence of utility structures within the site to be surveyed. This will include, but not limited to: storm drainage, sanitary sewer, water, communication, electric, etc… We will measure the invert elevations of observed evidence of storm drainage, sanitary sewer, electric, etc… that have access for a measurement to be taken. Should the structures be unable to be opened, we will notify you to see about obtaining assistance from the client. Note: locations of buried structures and pipelines are not included within this scope. If a utility designation is performed prior to our field survey, we will locate any observed evidence of underground utilities as marked.

2. Included within the survey limits provided, URS Hunt Valley will provide the following services:
   a. Prepare a property mosaic drawing for the limits of the Chinquapin Run survey. We will research and gather right-of-way and easement information to confirm the project is within existing City easements, rights-of-way, and/or property.

3. The final deliverable will consist of the following:
   a. Prepare a property mosaic summarizing research efforts of existing easements, rights-of-way, and property along the limits of Chinquapin Run.


Services not included within this scope:

1. Field-run boundary survey along the limits of Chinquapin Run project.

2. Land acquisition documents. All work is anticipated within public right-of-way or easements.
3. Environmental features. All environmental features will be located by the URS environmental team and not by the survey crews. This includes all trees, wetlands, and waters of the U.S. The information gathered by our environmental team will be collected using GPS and merged into the survey file.

Assumptions:

1. Baltimore City will provide survey control in the BCMD datum for our use.
2. Baltimore City will make available right-of-way, easement and property information to assist in research for the property mosaic.
3. Access to subject and adjoining property will be permitted. Baltimore City will provide and mail letters to adjoining property owners notifying them of surveying activities in the area.
4. The survey will be based on NAD83/91 horizontally and NAVD88 vertically. Additional data will be collected so that the project may also be translated to the BCMD if need be.
5. The length of the on-site survey is approximately 11,600 feet.

URS will be sharing this effort with our subconsultant J.A. Rice. URS will also assist with the merging of the surveys and verification of J.A. Rice's portion of the survey.

### Subsection 2.2 - Environmental Assessment

The CONSULTANT will conduct an environmental assessment in order to identify environmental constraints located along the alignment of the Project that may result in impacts to wetlands, waters of the United States, forested areas, and floodplains. The CONSULTANT will prepare and submit a letter format Environmental Assessment Report that includes a description of ecological features, including photographs of environmental conditions, along the proposed alignment.

The CONSULTANT will identify environmental permits that may be required if disturbance is proposed to waters of the United States, non-tidal wetlands, forests or sensitive habitat (i.e., rare, threatened and endangered species (RTE). The CONSULTANT will utilize the approved Natural Resource Inventory/Forest Stand Delineation prepared for the portion of the project area from East Lake Avenue south to East Belvedere Avenue under the previous study by RK&K. The CONSULTANT will use the existing environmental inventory prepared for Project 11240. The CONSULTANT will prepare and submit RTE information requests to the Maryland Department of Natural Resources and the U.S. Fish and Wildlife Service. The information requests will include a vicinity map and USGS map. It is estimated that two (2) Environmental Assessment Reports will be required under this project.

Assumptions:

1. Coordination with the Maryland Historic Trust is not anticipated.

2. Archaeological/Architectural Resource Investigations/Studies are not anticipated.
3. Section 106 NHPA Consultation with the Maryland Historic Trust is not anticipated.
4. Hazardous Materials Investigations/Phase 1 ESA's are not anticipated.
5. Compensatory Wetland Mitigation Planning, Designs and Approvals are not anticipated.
6. Off-site forest conservation mitigation site searches and plan development is not anticipated.
7. Trees 8" DBH or greater within 50' of the proposed limit of disturbance will be located with GPS per Baltimore City's Parks Direction for the Forest Stand Delineation.
8. A single pre-application meeting with MDE/USACE is anticipated.
9. The City will prepare long-term protection agreements required for any proposed forest conservation areas.
10. Up to 20 Sample Plots and corresponding data sheets will be prepared.
11. A field confirmation of jurisdictional boundaries with MDE/USACE is excluded.

### Subsection 2.3 – Geomorphic Assessment

The CONSULTANT will perform Rosgen Level III stream classifications and assessments for the reach of Chinquapin Run from The Alameda to the confluence with Herring Run, a distance of about 7,000 linear feet, to complete the entire study and design area.

### Subsection 2.4 – Hydrologic/Hydraulic Modeling

The CONSULTANT will develop the existing and proposed condition hydrologic modeling using GISHydro as developed by the RK&K stream assessment.  The CONSULTANT will prepare the hydraulic modeling using HEC-RAS to support the stream stabilization design and geomorphic assessments.  The models will utilize field run topography and supplemented with GIS level topography available from the CITY.  The H/H data identified in the RK&K report will be utilized and supplemented as required.

### Subsection 2.5 – Design Memorandum (35% Design)

Based on the findings from the Document Review, Surveys, Environmental Assessments, H&H Modeling Subtasks, a Design Memorandum will be prepared which details the extent, methods and limits of the stream stabilization.  Conceptual level plans prepared by R.K. &K. for the stream segment from Northern Parkway to Belvedere will be made available and used to the extent possible. The design (CADD) files will be made available for use by URS.

The Design Memorandum will consist of the preparation of 35% design-level plans, cross sections, details, and cost estimates. The base mapping for this work will consist of field run topography coupled with the CITY's GIS topographic layers, and it will be based on City of Baltimore/ Maryland State Plane Coordinates system and NAD 83/91.

NMP will initiate a BMP site search in the area of the stream restoration reach and within the survey limits as depicted on the map on the following page. The graphic shows potential BMP locations as presented in a Technical Memorandum prepared by the Center for Watershed Protection dated September 15, 2008 within Chinquapin Run Park. The designations on the graphic match those in the Technical Memorandum for reference. Additional BMP locations outside of the park area but within the Chinquapin Run watershed will not be considered as part of this scope of work. Storm flow from impervious areas will be searched in the office and visually field verified. At least 5 BMP locations will be attempted but not guaranteed. The maximum number of locations will not exceed 10. Drainage areas will be determined with ranking determined by the maximum impervious area draining to



the BMP feature. The highest ranked BMP location will then be sized for the maximum volume up to the first 1 inch of runoff. All results will be provided in a technical memorandum providing description of the located and top ranked BMP, impervious area anticipated to be treated, type of BMP, mapping of the documented drainage area and concept sketch and an estimated construction cost. The final design (70% and beyond) for the selected BMP or subsequent BMPs will be performed as additional services under a separate task order or change order under this agreement.

All preliminary design work will be prepared in accordance with the City of Baltimore Manual of Design Procedure and Criteria and Standard Specifications for Material, Highway, and Bridges, Utilities and Incidental Structures and subsequent addenda thereto. The contract plans will be prepared at a scale of 1"= 20 feet with a vertical scale of 1" = 10 feet on profile drawings. Preliminary technical specifications will be prepared which identify the

recommended stream stabilization methods that are not part of the CITY standard specifications.

Any permits anticipated for the proposed work will be identified, including but not limited to, Maryland Department of the Environment (MDE), Maryland Department of Natural Resources (DNR), U.S. Corps of Engineers, CITY Soil Conservation District, Maryland State Highway Administration, applicable Baltimore County agencies, and other preliminarily identified regulatory and permitting agencies. Due to the non-continuous nature of the project area proposed to be stabilized, it is expected that permitting agencies will require specific permits for individual sections of the project area. It is estimated that approximately twelve (12) permit applications (Federal/State/Local) will be required to be completed.

Anticipated Right-of-Entry agreements and temporary access requirements will be preliminarily identified during this subtask.

The CONSULTANT will complete and submit to the CITY, for review and approval, an Engineer's estimated Construction Cost (35% level), preliminary contract drawings, and a completed City of Baltimore Design Project Submittal Checklist.

A field walk will be scheduled with the CITY, and other pertinent agencies, to review the 35% submittal in the field. The CONSULTANT will schedule and attend a review meeting with the appropriate CITY personnel to discuss the submittal and address any comments made during the field walk.

### Subsection 2.6 – Geotechnical Investigation

The Consultant will determine the locations to perform geotechnical investigations, and will collect soil borings along proposed pipe replacement projects. The collected samples will be analyzed to determine suitability of soils for construction, needs for dewatering, and geotechnical requirements for design and construction methods. The analyses will include screening for petroleum and common hazardous waste parameters, if determined to be necessary. The CONSULTANT shall not be required to handle hazardous materials, or prepare a Hazardous Materials Abetment plan under this contract. The Consultant will prepare and submit a Geotechnical Investigation Report detailing the geotechnical work performed and the results of the investigation.

URS will be utilizing EBA for the geotechnical exploration, drilling and reporting of the findings.

### SECTION 3 – DESIGN SERVICES

This task covers the professional engineering services to prepare contract documents sufficient for a contractor to perform this stream assessment and stabilization project. All documents will be prepared in accordance with the CITY of Baltimore Manual of Design Procedure and Criteria and Standard Specifications for Material, Highway, and Bridges, Utilities and Incidental Structures and subsequent addenda thereto. The following presents the anticipated tasks to perform this work.

*Subsection 3.0 – 70% Design Documents*

The CONSULTANT shall incorporate the CITY's and other reviewing agency comments received on the Design Memorandum submittal, and proceed to bring the design to a 70% completion. The design will incorporate follow-up survey data. If differences between the GIS and the survey data are noticed, the CONSULTANT shall submit to the CITY, within 60 days, the necessary information to update the CITY's GIS in accordance with the requirements of the BaSES Manual, Chapter 5.

The contract drawings will include the following drawings: Title Sheet; Geometric Layout; Existing Conditions/Demolition Plans; Proposed Conditions Plans; Proposed Condition Profiles; Stream Sections/Cross Sections; Stream Stabilization Details; Landscape Plans; Forest Stand Delineation; Forest Conservation Plans; Erosion and Sediment Control Plans, Notes, Details; Detailed Phasing and Sequence of Construction; and notation necessary for construction of this project. It is noted that the list of drawings are tentative and subject to revision as the design progresses from 35% to Bid Documents.

The contract drawings will be prepared in AutoCAD format. As-built drawings will be provided by the CITY from the CITY's electronic archive files and incorporated into the contract documents.

The contract specifications will provide means and methods for the selected stream stabilization including a means for construction access. All materials of construction will be specified or referenced to allow for alternatives. The specifications will contain bid items and fixed price contingency items necessary to execute this project. The documents will be prepared to encourage competitive bids.

A Traffic Control Plan will be prepared in order to safely conduct all construction activities, while attempting to minimize disruption to the local communities, schools and commercial businesses. The Traffic Control Plan will be prepared in accordance with CITY of Baltimore, Department of Transportation specifications and guidelines. Additionally, traffic control along Maryland State Roads must conform to MD SHA guidelines and follow all SHA permitting processes and requirements. It is anticipated that each construction contract will require a Traffic Control Plan.

Erosion & Sediment Control (E&S) plans will be completed in accordance with the stream stabilization/BMP work. All control measures and details will be prepared in accordance to CITY's Erosion & Sediment Control Guidelines and Details. A sequence of construction will be prepared to promote adherence to the intent of this plan. The CONSULTANT will submit E&S plans to the appropriate agencies for review and approvals. It is anticipated that each construction contract will require an E&S plan.

The CONSULTANT will complete and submit to the CITY for approval an Engineer's estimate of most probable Construction Cost (70% level), Contract Drawings and Specifications, and a

completed City of Baltimore Design Project Submittal Checklist. Up to thirty (30) sets of Documents will be submitted per contract to be advertised.

## Subsection 3.1 – 100% Design Documents

This task will involve incorporating CITY, and other agencies, review comments received on the 70% Design submittal and will proceed with bringing the design to 100 % completion. All required permits will be identified for the proposed improvements. A revised Engineer's Estimate of Probable Construction Cost will be prepared for the 100% design. Up to thirty (30) sets of the 100% contract plans, specifications, Design Project Checklist, and cost estimate will be submitted to the CITY for review for each contract to be advertised. Upon receipt of CITY comments on this 100% submission, a final review meeting will be scheduled with the CITY to discuss their comments and any other outstanding issues.

The CONSULTANT will complete and submit to the CITY, for review and approval, an Engineer's estimate of probable Construction Cost (100% level); Contract Drawings and Specifications, and a completed City of Baltimore Design Project Submittal Checklist.

## Subsection 3.2 – Permit Applications

Along with the 100% documents, the CONSULTANT will prepare the necessary permit applications and submit them to the CITY for approval and signatures. The completed permits will be delivered to the appropriate agencies for final approval.  All fees associated with the submission, review and issuance of all required permits will be paid for by the CITY.

## Subsection 3.3 – Bid-Ready Documents

The CONSULTANT shall incorporate all remaining comments and amendments as recommended by the CITY and other agencies at the 100% submittal. The consultant shall prepare forty (40) sets of Bid Ready Documents per contract, along with the final Engineer's Estimate of Probable Construction Cost.

## Subsection 3.4 – Peer Reviews

The CONSULTANT shall utilize the services of NMP Engineering as part of our team that is not involved with the day to day development of the design to perform a peer review of all milestone deliverables. The peer review will address design intent, constructability, and quality assurance/control. The peer reviews will be scheduled and performed prior to the submittal of plans to the CITY.  Peer review comments will be discussed, documented and appropriately incorporated into the plans.

## SECTION 4 - ADDITIONAL SERVICES

At the option of the CITY and a fee to be negotiated, the CONSULTANT may provide Post-Award Services.

# TASK 6
# ATTACHMENT B
# URS CORPORATION
# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

(See accompanying instructions before completing this form)

### PART I - GENERAL

| | |
|---|---|
| 1. RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO.<br>Herring Run Engineering Services Proj. 1124U |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>URS Corporation | 4. DATE OF PROPOSAL<br>November 17, 2014 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code):<br>3600 O'Donnell Street, Suite 300<br>Baltimore, MD 21224 | 6. TYPE OF SERVICES TO BE FURNISHED<br>Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Project Manager* | 248 | $ 54.43 | $ 13,499.58 | |
| Senior Engineer** | 1129 | $ 38.38 | $ 43,329.98 | |
| Engineer*** | 1425 | $ 28.95 | $ 41,258.73 | |
| CADD/Tech II | 1221 | $ 23.69 | $ 28,924.82 | |
| CADD/Tech I**** | 0 | $ 21.37 | $ - | |
| DIRECT LABOR TOTAL: | | | | $127,013.11 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.12034 | $ 127,013.11 | $ 142,297.87 | |
| INDIRECT COSTS TOTAL: | | | | $142,297.87 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 2211 miles @ $0.56/mi | 2211 | $ 0.56 | $ 1,238.16 | |
| (3) PARKING. @ $8.00/day | 75 | $ 8.00 | $ 600.00 | |
| TRAVEL SUBTOTAL: | | | $ 1,838.16 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| EQUIPMENT | | | $ - | |
| | | | $ - | |
| MATERIALS/SUPPLIES | | | | |
| Plan Sheet Reproduction | 3440 | $ 1.00 | $ 3,440.00 | |
| 8.5x11 BW Copies | 4130 | $ 0.05 | $ 206.50 | |
| Mylar | 10 | $ 11.70 | $ 117.00 | |
| EQUIPMENT SUBTOTAL | | | $ 3,763.50 | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| EBA Engineering, Inc. | 1 | $ 28,517.53 | $ 28,517.53 | |
| J. A. Rice, Inc. | 1 | $ 60,299.69 | $ 60,299.69 | |
| NMP Engineering Consultants, Inc. | 1 | $ 66,673.98 | $ 66,673.98 | |
| E2CR, Inc. | 1 | $ 42,564.44 | $ 42,564.44 | |
| SUBCONSULTANT(S) SUBTOTAL: | | | $ 198,055.64 | |
| d. OTHER (Specify categories) | QTY | COST | ESTIMATED COST | |
| Principal | 1 | $ 85.00 | $ 85.00 | |
| | | | $ - | |
| | | | $ - | |
| | | | | |
| | | | | |
| OTHER SUBTOTAL: | | | $ 85.00 | |
| e. OTHER DIRECT COSTS TOTAL: (Combine Sum of Items a, b, c, and d) | | | | $203,742.30 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $473,053.28 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $26,931.10 |
| 12. TOTAL PRICE | | | | $499,984.38 |

EPA FORM 5700-41 (3-04)

Project 11201?

Wastewater Engineering Services for the Improvements to the Herring Run Sewershed
TASK 6 - Combination Run Stream Restoration and Bahn Implementation(?)

| Task | Principal | Project Manager | Senior Engineer** | Engineer*** | URS Corporation CADD/Tech II | CADD/Tech I**** | TOTAL |
|---|---|---|---|---|---|---|---|
| **Project Management** | | | | | | | |
| 1.0 Project Management | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | 4 | | | | 4 |
| 1.2 Progress Meetings | | | 24 | | | | 24 |
| 1.3 Community Meetings (2) | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | |
| 2.0 Document Review | | 1 | 12 | 16 | | | 29 |
| 2.1 Topographic and Property Surveys | | 64 | 46 | 121 | 121 | | 352 |
| 2.2 Environmental Assessment | | 60 | 180 | 220 | 160 | | 620 |
| 2.3 Geomorphic Assessment | | 40 | 105 | | | | 145 |
| 2.4 Hydrologic/Hydraulic Modeling | | 16 | 40 | 60 | 24 | | 140 |
| 2.5 Design Memorandum (35% Design) | | 19 | 112 | 104 | 104 | | 339 |
| 2.6 Geotechnical Investigation | | 4 | 32 | 8 | | | 44 |
| **Design Services** | | | | | | | |
| 3.0 70% Design Documents | | 19 | 272 | 418 | 366 | | 1095 |
| 3.1 100% Design Documents | | 16 | 218 | 370 | 330 | | 934 |
| 3.2 Permit Applications | | 4 | 36 | 56 | 40 | | 136 |
| 3.3 Bid Ready Documents | | 4 | 40 | 52 | 56 | | 152 |
| 3.4 Peer Reviews (Coordination with NMP) | | 1 | 8 | 8 | | | 6 |
| **TOTAL** | 0 | 248 | 1129 | 1425 | 1221 | 0 | 4025 |

* Also a Project Surveyor
** Also a survey Technician A
*** Also a Part Chief
**** Also an Instrument Operator

Project 1124U
Westheimer Engineered Services for the Improvements to the Hunting Hill Stream[illegible]
TASK 2.1 Construction Plan Stream Restoration and SWP [illegible]
[illegible] Corporation

| Task | Principal | Project Manager* | Senior Engineer* | Engineer* | CADD/Tech II | CADD/Tech II** | TOTAL |
|---|---|---|---|---|---|---|---|
| **2.5 Design Memorandum (35% Design)** | | | | | | | |
| Plans | | | | | | | |
| Title Sheet | | 1 | 4 | 4 | 4 | | 13 |
| Plan Sheets (12@ at 1" = 20') | | 6 | 40 | 40 | 40 | | 126 |
| Stream Profile (12 @ 1" = 20' Hor., 1" = 10' Vert.) | | 4 | 32 | 32 | 32 | | 100 |
| Restoration / Stabilization Details (4) | | 2 | 8 | 12 | 12 | | 34 |
| Construction Cost Estimate | | 0 | 4 | | | | 4 |
| Memorandum | | 6 | 24 | 16 | 16 | | 62 |
| Subtotal | | 19 | 112 | 104 | 104 | 0 | 339 |
| **Design Services** | | | | | | | |
| **3.0 70% Design Documents** | | | | | | | |
| Plans | | | | | | | |
| Title Sheet | | 1 | 2 | 2 | 2 | | 7 |
| Geometric Layout (2) | | 2 | 4 | 12 | 16 | | 34 |
| Plan Sheets (12@ at 1" = 20') | | 2 | 50 | 100 | 100 | | 252 |
| Stream Profile (12 @ 1" = 20' Hor., 1" = 10' Vert.) | | 2 | 32 | 32 | 32 | | 98 |
| Restoration / Stabilization Details (4) | | 2 | 16 | 24 | 24 | | 66 |
| Erosion and Sediment Control Plan (12 @ 1"=20') | | 1 | 24 | 80 | 80 | | 185 |
| Erosion and Sediment Control Notes/Details(4') | | 2 | 24 | 24 | 24 | | 74 |
| Landscaping Plans (12 @ 1"=20') | | 1 | 24 | 40 | 36 | | 101 |
| Landscape Details (2) | | 1 | 16 | 24 | 24 | | 65 |
| Forest Stand Delineation Plan (4) | | 1 | 24 | 32 | 24 | | 81 |
| Forest Conservation Plan (4) | | 1 | 24 | 32 | 24 | | 81 |
| Construction Cost Estimate | | 1 | 16 | 16 | | | 34 |
| Specifications | | 1 | 16 | | | | 17 |
| Subtotal | | 19 | 272 | 418 | 386 | | 1095 |
| **3.1 100% Design Documents** | | | | | | | |
| Plans | | | | | | | |
| Title Sheet | | 1 | 2 | 2 | 2 | | 7 |
| Geometric Layout (2) | | 1 | 4 | 12 | 12 | | 29 |
| Plan Sheets (12@ at 1" = 20') | | 2 | 40 | 100 | 100 | | 242 |
| Stream Profile (12 @ 1" = 20' Hor., 1" = 10' Vert.) | | 1 | 24 | 32 | 32 | | 89 |
| Restoration / Stabilization Details (4) | | 1 | 12 | 24 | 24 | | 61 |
| Erosion and Sediment Control Plan (12 @ 1"=20') | | 1 | 16 | 40 | 40 | | 97 |
| Erosion and Sediment Control Notes/Details(4') | | 1 | 16 | 24 | 24 | | 65 |
| Landscaping Plans (12 @ 1"=20') | | 1 | 16 | 40 | 24 | | 81 |
| Landscape Details (2) | | 1 | 16 | 24 | 24 | | 65 |
| Forest Stand Delineation Plan (4) | | 1 | 16 | 32 | 24 | | 73 |
| Forest Conservation Plan (4) | | 1 | 24 | 24 | 24 | | 73 |
| Construction Cost Estimate | | 2 | 16 | 16 | | | 34 |
| Specifications | | 2 | 16 | | | | 18 |
| Subtotal | | 16 | 218 | 370 | 330 | | 934 |
| **3.2 Permit Applications** | | | | | | | |
| Erosion and Sediment Control | | 1 | 12 | 24 | 12 | | 49 |
| JPA/Exhibits/Follow-up Coordination | | 2 | 16 | 16 | 24 | | 58 |
| NOI | | 1 | 8 | 16 | 4 | | 29 |
| Subtotal | | 4 | 36 | 56 | 40 | | 136 |
| **3.3 Bid Ready Documents** | | | | | | | |
| Address Final Comments | | 1 | 16 | 24 | 24 | | 65 |
| Prepare Plans for Signature | | 1 | 4 | 4 | 32 | | 41 |
| Finalize Construction Cost Estimate | | 1 | 8 | 16 | | | 25 |
| Finalize Specifications | | 1 | 12 | 8 | | | 21 |
| Subtotal | | 4 | 40 | 52 | 56 | | 152 |

# TASK 6
# ATTACHMENT C
# EBA ENGINEERING
# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

(See accompanying instructions before completing this form)

### PART I - GENERAL

| 1. RECIPIENT | ASSISTANCE IDENTIFICATION NO. |
|---|---|
| City of Baltimore, Department of Public Works | Herring Run Engineering Services Proj. 1124U |

| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR | 4. DATE OF PROPOSAL |
|---|---|
| EBA Engineering, Inc. | November 17, 2014 |

| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code): | 6. TYPE OF SERVICES TO BE FURNISHED |
|---|---|
| SETON BUSINESS PARK, 4813 SETON DRIVE<br>BALTIMORE, MD 21215 | Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| SR. PROJECT MANAGER | 18 | $ 53.98 | $ 971.64 | |
| PROJECT MANAGER | 0 | $ 47.18 | $ - | |
| PROJECT ENGINEER | 120 | $ 38.19 | $ 4,582.80 | |
| ENGINEER | 160 | $ 30.60 | $ 4,896.00 | |
| Engineering Technician | 0 | $ 27.07 | $ - | |
| Materials Technician I | 0 | $ 15.26 | $ - | |
| Materials Technician II | 0 | $ 23.59 | $ - | |
| Technician | 0 | $ 18.41 | $ - | |
| CADD Operator | 24 | $ 25.54 | $ 612.96 | |
| Inspector | 0 | $ 28.72 | $ - | |
| Survey Crew Chief | 0 | $ 23.99 | $ - | |
| Survey Technician | 0 | $ 17.09 | $ - | |
| DIRECT LABOR TOTAL: | | $ 17.09 | | $ 11,063.40 |
| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
| OVERHEAD AND PAYROLL BURDEN | 1.2595 | $ 11,063.40 | $ 13,934.35 | |
| INDIRECT COSTS TOTAL: | | | | $ 13,934.35 |
| 9. OTHER DIRECT COSTS | | | | |
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 1200 miles @ $0.56/mi | 1,200 | $ 0.56 | $ 672.00 | |
| (2) PARKING: 1 trips @ $8/trip | 1 | $ 8.00 | $ 8.00 | |
| TRAVEL SUBTOTAL: | | | $ 680.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| | | | $ - | |
| | | | $ - | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| EQUIPMENT SUBTOTAL | | | $ - | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| | | | | |
| | | | | |
| SUBCONSULTANT(S) SUBTOTAL: | | | $ - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| Principal | 4 | $ 85.00 | $ 340.00 | |
| | | | $ - | |
| | | | $ - | |
| | | | $ - | |
| OTHER SUBTOTAL: | | | $ 340.00 | |
| e. OTHER DIRECT COSTS TOTAL: (Combine Sum of Items a, b, c, and d) | | | | $ 1,020.00 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $ 26,017.75 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $ 2,499.78 |
| 12. TOTAL PRICE | | | | $ 28,517.53 |

Wastewater Engineering Services for ... Improvements and Several Watersheds ...
TASK X: Chincoteague Bay Stream Restoration and BMP Implementation
Resource Estimate

| Task | Principal | Sr. PROJECT MANAGER | PROJECT MANAGER | PROJECT ENGINEER | ENGINEER | Engineering Technician | CADD Operator | Inspector | Survey Crew (3-up) | Survey Technician | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Project Management** | | | | | | | | | | | |
| 1.0 Project Management | | | | | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | | | | | | 0 |
| 1.3 Contract Administration | | | | | | | | | | | 0 |
| 1.4 Community Meetings | | | | | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | | | | | |
| 2.0 Document Review | | | | | | | | | | | 0 |
| 2.1 Topographic and Property Surveys | | | | | | | | | | | |
| 2.2 Right-of-Way Assessment | | | | | | | | | | | |
| 2.3 Environmental Assessment | | | | | | | | | | | |
| 2.4 Geomorphic Assessment | | | | | | | | | | | |
| 2.5 Hydrologic/Hydraulic Modeling | | | | | | | | | | | |
| 2.6 Storm Drain Assessment and Outfall Assessments | | | | | | | | | | | |
| 2.7 BMP Assessment | | | | | | | | | | | 0 |
| 2.8 Design Memorandum (35% Design) | 4 | 18 | | 120 | 160 | | | | | | 326 |
| 2.9 Geotechnical Investigation | | | | | | | 24 | | | | |
| **Design Services** | | | | | | | | | | | |
| 3.0 70% Design Documents | | | | | | | | | | | 0 |
| 3.1 100% Design Documents | | | | | | | | | | | 0 |
| 3.2 Permit Applications | | | | | | | | | | | 0 |
| 3.3 Bid Ready Documents | | | | | | | | | | | 0 |
| 3.4 Peer Reviews | | | | | | | | | | | 0 |
| 3.5 Assistance During Bidding and Award | | | | | | | | | | | 0 |
| **TOTAL** | 4 | 18 | 0 | 120 | 160 | 0 | 24 | 0 | 0 | 0 | 326 |

# TASK 6
# ATTACHMENT D
# JA RICE
# (SUPPORTING DOCUMENTS)

**COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE**

(See accompanying instructions before completing this form)

**PART I - GENERAL**

| | |
|---|---|
| 1. RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO.<br>Herring Run Engineering Services Proj. 1124U |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>J. A. Rice, Inc. | 4. DATE OF PROPOSAL<br>November 17, 2014 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code):<br>P.O. Box 1288<br>Millersville, MD 21108 | 6. TYPE OF SERVICES TO BE FURNISHED<br><br>Wastewater Engineering Services for the Improvements of the Herring Run Sewershed Collection System |

**PART II - COST SUMMARY**

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Licensed Surveyor | 40 | $48.50 | $        1,940.00 | |
| Party Chief | 405 | $27.25 | $      11,036.25 | |
| Instrument Man | 360 | $15.50 | $        5,580.00 | |
| Rodman | 0 | $13.50 | $                 - | |
| CADD Technician | 120 | $34.88 | $        4,185.60 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **DIRECT LABOR TOTAL:** | | | | $      22,741.85 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.3500 | $  22,741.85 | $      30,701.50 | |
| **INDIRECT COSTS TOTAL:** | | | | $      30,701.50 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 2700 miles @ $0.56/mi | 2,700 | $0.56 | $        1,512.00 | |
| | | | $                 - | |
| **TRAVEL SUBTOTAL:** | | | $        1,512.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| | | | $                 - | |
| | | | $                 - | |
| | | | | |
| **EQUIPMENT SUBTOTAL:** | | | $                 - | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| **SUBCONSULTANT(S) SUBTOTAL:** | | | $                 - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| | | | $                 - | |
| | | | $                 - | |
| | | | $                 - | |
| | | | $                 - | |
| | | | $                 - | |
| | | | $                 - | |
| **OTHER SUBTOTAL:** | | | $                 - | |
| e. OTHER DIRECT COSTS TOTAL: (Combine Sum of Items a, b, c, and d) | | | | $        1,512.00 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $      54,955.35 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $        5,344.34 |
| 12. TOTAL PRICE | | | | $      60,299.69 |

EPA FORM 5700-41 (3-04)

Project 1124U
Wastewater Engineering Services for the improvements to the Herring Run Sewershed
TASK 6 - Comprehensive Raw Sewage Investigation and BMP Implementation
Manhour Estimate

| Task | J.A. Rice | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Licensed Surveyor | Party Chief | Instrument Man | Rodman | CADD Technician | TOTAL |
| **Project Management** | | | | | | |
| 1.0 Project Management | | | | | | 0 |
| 1.1 Project Initiation Meeting | | | | | | 0 |
| 1.2 Progress Meetings | | | | | | 0 |
| 1.3 Contract Administration | | | | | | 0 |
| 1.4 Community Meetings | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | 0 |
| 2.0 Document Review | | | | | | 0 |
| 2.1 Topographic and Property Surveys | 40 | 405 | 360 | 0 | 120 | 925 |
| 2.2 Right-of-Way Assessment | | | | | | 0 |
| 2.3 Environmental Assessment | | | | | | 0 |
| 2.4 Geomorphic Assessment | | | | | | 0 |
| 2.5 Hydrologic/Hydraulic Modeling | | | | | | 0 |
| 2.6 Storm Drain Assessment and Outfall Assessments | | | | | | 0 |
| 2.7 BMP Assessment | | | | | | 0 |
| 2.8 Design Memorandum (35% Design) | | | | | | 0 |
| 2.9 Geotechnical Investigation | | | | | | 0 |
| **Design Services** | | | | | | 0 |
| 3.0 70% Design Documents | | | | | | 0 |
| 3.1 100% Design Documents | | | | | | 0 |
| 3.2 Permit Applications | | | | | | 0 |
| 3.3 Bid Ready Documents | | | | | | 0 |
| 3.4 Peer Reviews | | | | | | 0 |
| 3.5 Assistance During Bidding and Award | | | | | | 0 |
| TOTAL | 40 | 405 | 360 | 0 | 120 | 925 |

# TASK 6
# ATTACHMENT E
# NMP ENGINEERING
# (SUPPORTING DOCUMENTS)

## COST OR PRICE SUMMARY FOR SUBAGREEMENTS UNDER U.S. EPA ASSISTANCE

(See accompanying instructions before completing this form)

### PART I - GENERAL

| | |
|---|---|
| 1. RECIPIENT<br>City of Baltimore, Department of Public Works | ASSISTANCE IDENTIFICATION NO.<br>Herring Run Engineering Services Proj. 1124U |
| 3. NAME OF CONTRACTOR OR SUBCONTRACTOR<br>NMP Engineering Consultants, Inc. | 4. DATE OF PROPOSAL<br>November 17, 2014 |
| 5. ADDRESS OF CONTRACTOR OR SUBCONTRACTOR (Include ZIP Code):<br>Executive Plaza III, Suite 300<br>11350 McCormick Road, Hunt Valley, MD 21030 | 6. TYPE OF SERVICES TO BE FURNISHED<br>Wastewater Engineering Services for the Improvements<br>of the Herring Run Sewershed Collection System |

### PART II - COST SUMMARY

| 7. DIRECT LABOR (Specify labor categories) | HOURS | HOURLY RATE | ESTIMATED COST | TOTALS |
|---|---|---|---|---|
| Project Manager | 168 | $50.50 | $ 8,484.00 | |
| Project Engineer | 285 | $39.50 | $ 11,257.50 | |
| Civil Engineer | 154 | $32.16 | $ 4,952.64 | |
| Inspector | 0 | $30.50 | $ - | |
| Landscape Architect | 24 | $47.50 | $ 1,140.00 | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| DIRECT LABOR TOTAL: | | | | $ 25,834.14 |

| 8. INDIRECT COSTS (Specify indirect cost pools) | RATE | X DIRECT LABOR TOTAL | ESTIMATED COST | |
|---|---|---|---|---|
| OVERHEAD AND PAYROLL BURDEN | 1.3066 | $ 25,834.14 | $ 33,754.89 | |
| INDIRECT COSTS TOTAL: | | | | $ 33,754.89 |

| 9. OTHER DIRECT COSTS | | | | |
|---|---|---|---|---|
| a. TRAVEL | | | ESTIMATED COST | |
| (1) MILEAGE: 400 miles @ $0.56/mi | 400 | $0.56 | $ 224.00 | |
| (2) PARKING: 8 trips @ $8/trip | 8 | $8.00 | $ 64.00 | |
| TRAVEL SUBTOTAL: | | | $ 288.00 | |
| b. EQUIPMENT, MATERIALS, SUPPLIES (Specify) | QTY | COST | ESTIMATED COST | |
| Plan Sheet Reproduction | | $ 1.00 | $ - | |
| B&W Photocopies (8.5x11) - EA | 1,161 | $ 0.05 | $ 58.05 | |
| Color Photocopies (8.5x11) - EA | 500 | $ 0.20 | $ 100.00 | |
| | | | | |
| | | | | |
| | | | | |
| EQUIPMENT SUBTOTAL | | | $ 158.05 | |
| c. SUBCONSULTANT(S) | | | ESTIMATED COST | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| SUBCONSULTANT(S) SUBTOTAL: | | | $ - | |
| d. OTHER (Specify categories) | | | ESTIMATED COST | |
| Principal | 6 | $ 85.00 | $ 680.00 | |
| OTHER SUBTOTAL: | | | $ 680.00 | |
| e. OTHER DIRECT COSTS TOTAL: (Combine Sum of Items a, b, c, and d) | | | | $ 1,126.05 |
| 10. TOTAL ESTIMATED COST (sum of direct labor, indirect costs and other direct costs) | | | | $ 60,715.08 |
| 11. PROFIT (10 percent of direct labor and indirect costs) | | | | $ 5,958.90 |
| 12. TOTAL PRICE | | | | $ 66,673.98 |

EPA FORM 5700-41 (3-04)

**Project 1124U**
**Wastewater Engineering Services for the Improvements to the Jennings Run Watershed**
**TASK 6 - Chinquapin Run Stream Restoration and SWP Implementation**
**Man-hour Estimate**

| Task | NMP Engineering | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| | Principal | Project Manager | Project Engineer | Civil Engineer | Inspector | Landscape Architect | |
| **Project Management** | | | | | | | |
| 1.0 Project Management | | | | | | | 0 |
| 1.1 Project Initiation Meeting | | 4 | 4 | | | | 8 |
| 1.2 Progress Meetings | | 16 | 16 | | | | 32 |
| 1.3 Contract Administration | | | | | | | 0 |
| 1.4 Community Meetings | | | | | | | 0 |
| **Document Review and Design Memorandum** | | | | | | | |
| 2.0 Document Review | | | | | | | 0 |
| 2.1 Topographic and Property Surveys | | | | | | | 0 |
| 2.2 Right-of-Way Assessment | | | | | | | 0 |
| 2.3 Environmental Assessment | | | | | | | 0 |
| 2.4 Geomorphic Assessment | | 24 | 94 | 40 | | | 158 |
| 2.5 Hydrologic/Hydraulic Modeling | | | | | | | 0 |
| 2.6 Storm Drain Assessment and Outfall Assessments | | | | | | | 0 |
| 2.7 BMP Assessment | | 16 | 83 | 60 | | | 159 |
| 2.8 Design Memorandum (35% Design) | | 36 | 30 | 10 | | 4 | 80 |
| 2.9 Geotechnical Investigation | | | | | | | 0 |
| **Design Services** | | | | | | | |
| 3.0 70% Design Documents | | 36 | 26 | 16 | | 8 | 86 |
| 3.1 100% Design Documents | | 26 | 18 | 16 | | 6 | 66 |
| 3.2 Permit Applications | | | | | | | 0 |
| 3.3 Bid Ready Documents | | 10 | 14 | 12 | | 6 | 42 |
| 3.4 Peer Reviews | | | | | | | 0 |
| 3.5 Assistance During Bidding and Award | | | | | | | 0 |
| **TOTAL** | 0 | 168 | 285 | 154 | | 24 | 631 |